# EXHIBIT A

<u>**Making Order Out of Chaos: A Proposal To Improve Organization and Coordination in Multi-Jurisdictional Merger-Related Litigation**</u>

By: Mark Lebovitch, Jerry Silk and Jeremy Friedman[1]

In the past two years, the court system has seen a sharp increase in the volume of merger-related class action lawsuits, particularly (but by no means exclusively) in the Delaware Court of Chancery.[2] The increased case volume has led to unusual behavior (by shareholders' and defense counsel alike), particularly in connection with the organization of parallel actions in different jurisdictions and the appointment of lead class counsel. This article explores the issues raised by competing multi-jurisdictional deal-related litigation and by the difficulty of organizing leadership of deal cases filed in the Court of Chancery. We then propose, at least to start a discussion, a new approach through which the Court of Chancery may be able to mitigate or cure these issues, while further solidifying its preeminent role in the evolution of corporate law.

<u>**The Multi-Jurisdictional Litigation Problem**</u>

An all-too-familiar pattern emerges following the announcement of the acquisition of a Delaware corporation. Some of the plaintiffs' bar will race to file a class action lawsuit in the Delaware Court of Chancery. Other plaintiffs' lawyers will race to a courthouse in the state of the target's headquarters.[3] A third set of firms will file "tag-along" actions in federal court asserting the same state law claims as the other plaintiffs, but incorporating a proxy claim under Section 14A of the Securities Exchange Act as a basis for the federal court's jurisdiction.[4] The result is parallel litigation that wastes judicial resources, unduly burdens defendants, and, most importantly, threatens shareholders.

---

[1] Messrs. Lebovitch and Silk are partners and Mr. Friedman an associate of Bernstein Litowitz Berger & Grossmann LLP ("BLBG").

[2] The number of M&A-related lawsuits filed nationwide increased dramatically from 159 in 2008 to 398 in 2010. *See Securities Suits Abound in a Harsh 2009 – An Advisen Quarterly Report – 2009 Review* at 9-10; *2010 a Record Year for Securities Litigation, An Advisen Quarterly Report – 2010 Review* at 3-4.

[3] Certain plaintiffs' lawyers avoid filing deal-related litigation in the Delaware Court of Chancery because of the perception that Delaware is less shareholder-friendly and reluctant to award reasonable attorneys' fees.

[4] These federal "tag-along" actions may be procedurally flawed. Plaintiffs filing these suits typically do not issue the public notice required by the Private Securities Litigation Reform Act ("PSLRA"). Also, the only basis to avoid the stay of discovery pending decision on a motion to dismiss rests on the pendent breach of fiduciary duty claim, which could have been and often has been asserted in a state forum.

Defending duplicative litigation presents a burden for defendants focused on closing the M&A transaction (which may or may not serve shareholder interests). In each forum, defense counsel may have to appear in-person at various court hearings, respond to duplicative discovery requests and brief substantially similar issues. These duplicate costs generally continue until defendants agree to a litigation schedule with plaintiffs in one forum and the judge in the alternate forum orders a stay. Sometimes, however, judges in the competing jurisdictions will refuse to stand down. For example, when Topps Company, Inc. went private, neither Vice Chancellor Strine[5] nor New York State Justice Cahn[6] would agree to stay his action in favor of the alternate forum. This subjected defendants to litigating in two jurisdictions, risking different interpretations and rulings about their behavior.

Litigating in multiple fora can also create privilege issues for defendants. Even if the case is only set for hearings in one jurisdiction, defendants may be compelled to provide discovery to plaintiffs in each forum. Competing jurisdictions may have different rules regarding assertions of privilege or the application of other shields against discovery.[7] Defendants incur additional and unnecessary expenses if required to simultaneously comply with different privilege rules in different fora, including distinct or complicated reviews of the document production to ensure compliance with conflicting procedural rules. This not only burdens defendants, but can make it more difficult to meet the tight deadlines common in expedited deal litigation (which hurts the shareholders' lawyers as well).

Shareholders also face harm from multi-jurisdictional deal litigation. First, forum shopping is hardly a vice of plaintiffs' lawyers alone. If defendants learn that one judge is skeptical of the transaction's process or other aspects of defendants' conduct, their counsel may well seek to further the litigation in the other jurisdiction, hoping to find a judge less inclined to protect shareholders. Also, repeat player defense counsel are acutely aware which plaintiffs' counsel are "pilgrims" (*i.e.*, early and easy settlers). Defendants may seek to advance the procedural status of the litigation pursued by counsel less likely to litigate and thereby avoid more aggressive members of the shareholders' bar. This may include stipulating to certification of a class, agreeing to an expedited schedule, and providing preferential access to documents.

Shareholders are also hurt when a plaintiffs' firm in one of the competing jurisdictions seeks to accelerate the procedural posture of its case by pursuing a temporary restraining order or some other form of extra-expedited relief that is not really appropriate for the facts of the case. Shareholders' counsel seeking to prosecute the action for the sole benefit of their clients (who may well pursue the action more aggressively but will not employ procedural gimmicks) are stuck on the outside looking in.

---

[5] *See In re Topps Co. S'holders Litig.*, 924 A.2d 951 (Del. Ch. 2007).

[6] *See In the Matter of The Topps Co., Inc. S'holders Litig.*, 2007 N.Y. Misc. LEXIS 8973 (Sup. Ct. NY County 2007).

[7] For example, Delaware recognizes a business strategy immunity that defendants may use to shield from discovery what could be the most compelling evidence in the case, while other jurisdictions will not recognize the doctrine or apply it with less deference.

As the litigation evolves, defendants continue to pit shareholders' counsel in the competing forums against one another in ways that minimize shareholder recovery. Defendants may initiate a reverse auction, approaching the weakest link among plaintiffs' counsel and offer "low hanging fruit" like a disclosure-only settlement. Fearing that defendants will settle the case with the weakest link, a shareholder advocate who might otherwise lobby aggressively for a more substantial settlement faces pressure to lower its own demands.

Even when one jurisdiction is stayed, if the case proceeded in Delaware, the shareholders' counsel who pursued the action in Delaware may face a potential conflict when the parties near a settlement. Suppose that the Delaware plaintiffs are close to reaching a settlement that counsel views as highly favorable to shareholders. Defendants condition their agreement to this shareholder-favorable settlement on the Delaware plaintiffs' counsel getting all plaintiffs in other jurisdictions on board with the settlement (including those who simply filed an action and then stipulated to a stay of their case). Sensing leverage, plaintiffs in the alternate and stayed forum refuse to join the settlement unless they are paid a significant "tax," disproportionate to any efforts or actual contributions toward the outcome of the case. The Delaware plaintiffs' lawyers are forced to pay out to third parties dollars from a fee they were not yet allowed to negotiate from defendants. As a result, Delaware shareholders' counsel may have to litigate a contested fee application in which a major beneficiary is the counsel from the other jurisdiction. Whether the end result is a negotiated fee or a contested fee application, Delaware shareholders' counsel must request a larger fee to pay the necessary "taxes" to plaintiffs in the alternate forum. Thus, defendants often end up paying higher attorneys' fees than if the case was litigated in a single forum.

The judiciary is becoming more sensitive to some of these issues. In *Scully v. Nighthawk*, Vice Chancellor Laster criticized the parties for engaging in certain of the unsavory practices described in this section.[8] At a hearing on plaintiff's motion to expedite, Vice Chancellor Laster found that there were meaningful, litigable process claims relating to the transaction, while noting that plaintiff's disclosure claims were not colorable.[9] After Vice Chancellor Laster stressed that the case "really had legs," defendants allegedly engaged in forum-shopping.[10] Defendants purportedly approached plaintiffs' counsel who filed a duplicate action in Arizona and offered the Arizona plaintiffs a disclosure-only settlement.[11] Defendants and Arizona plaintiffs supposedly convinced the Delaware plaintiffs to join the disclosure-settlement, which the parties submitted to the Arizona courts for approval.[12] After learning of the parties' actions, Vice Chancellor Laster ordered the parties to prepare submissions detailing the negotiation of the

---

[8]  Transcript of Courtroom Status Conference (December 17, 2010), C.A. No. 5890-VCL.

[9]  *Id*. at 3.

[10]  *Id*. at 17.

[11] *Id*. at 24-25.

[12] *Id*.

settlement,[13] appointed a special counsel,[14] and questioned whether disciplinary proceedings might be warranted.[15]

In short, the current system is prone to manipulation and gamesmanship. The best way to eliminate, or at least mitigate, these problems is to adopt a system that centralizes deal-related litigation into a single forum.

## The Evolving Process for Appointing Class Counsel in Delaware Deal Litigation

The increased volume of deal-related lawsuits has not only led to parallel cases in multiple jurisdictions, but has also tested, and arguably broken, the existing system for appointing lead counsel in the Delaware actions. Delays and dysfunction in selecting lead counsel in the Delaware action increase the likelihood that the parallel action will proceed and the concerns identified above will manifest themselves.

In a world where only one or two complaints challenge a deal, the lawyers will organize themselves. When seven or eight complaints challenge the same deal, chaos ensues. While every lawyer filing a complaint would like to control the prosecution of the case, there can only be so many cooks in the kitchen. If the rules by which the court will select counsel are clear, the interested parties will reach agreement. If the rules of decision are unclear or unenforced, however, consensual organization becomes more difficult, and the least cooperative firm has the ability to extract disproportionate "rents."

Despite what we believe is a close link between the identity of lead counsel and the quality of case outcome for shareholders, many jurisdictions still determine lead plaintiff and lead counsel through a rule of absolute priority (*i.e.*, the first plaintiff to file a complaint is appointed lead). While a hard and fast "first-filer" rule reduces leadership fights, it harms shareholders because counsel are incentivized to hastily file "bare-bones" complaints that do little more than copy the deal's press release and recite a handful of analyst quotes. Instead of taking the time to fully investigate a transaction and craft pleadings with particularized factual allegations, plaintiffs race to the courthouse. In these jurisdictions, prosecution of the case is controlled by the lawyer who was retained by a client first and submits a pleading, no matter how deficient the pleading and/or the lawyer.

The Delaware Court of Chancery has clearly rejected the first-filed approach to leadership disputes. As Chancellor Chandler noted in *TCW Technologies Limited Partnership v. Intermedia Communications, Inc.* ("TCW"), "[a]lthough it might be thought, based on myth, fables, or mere urban legends, that the first to file a lawsuit in this Court wins some advantage in the race to represent the shareholder class, that assumption, … has neither empirical nor logical

---

[13] *Id*. at 26-27.

[14] *Id*. at 28.

[15] *Id*.

support."[16]  The Court of Chancery's clear rejection of a rule of priority was an important step in what we see as a decades-long evolution.  But rejecting the race to the courthouse is just one step towards achieving the best result for all parties.

During the 1980s and much of the 1990s, the selection of lead counsel for class action merger-related cases was simple.  Nearly every out-of-town lawyer in the "traditional" plaintiffs' bar challenging a transaction filed with the same Delaware local counsel.  The out-of-town lawyers would be ranked in the local counsel's "black book" based on how quickly they contacted local counsel with both a client and a complaint.  The first lawyer listed in the book would control the case, while the second and third lawyers might be granted roles on the plaintiff's executive committee.  The other lawyers interested in pursuing the action were shut out of the process entirely.  This system was efficient, empowered the local counsel, and truly created a "race to the book."

By the late 1990's, new Delaware counsel emerged who sidestepped the "book system" by filing cases on behalf of institutional investor clients and litigating cases more aggressively than was typical of the traditional plaintiffs' bar.  Leadership fights ensued, though accommodations remained common.  One creative effort by first movers was the tendency of the first two filers to stipulate that they should be appointed lead counsel for the class.  If they could get the court to approve their self-elevation before other shareholders (particularly institutions who have a formal and often time-consuming board approval process for initiating new litigation) filed suit, the leadership "fight" could be resolved before it even started.

In October 2000, the Court was forced to intervene in a leadership dispute.  In *TCW*, notwithstanding Chancellor Chandler's request, counsel for the shareholder plaintiffs were unable to agree upon a consolidation order.[17]  In a landmark decision, the Chancellor articulated a multi-factor test, stating that lead plaintiff and lead counsel should be determined based upon (i) the quality of the pleading, (ii) the vigor and skill with which the various contestants have prosecuted the lawsuit; (iii) plaintiff's economic stake in the outcome of the lawsuit; and (iv) the competence of counsel and their access to the resources necessary to prosecute the claims at issue.[18]

While Chancellor Chandler provided greater clarity for resolving leadership fights, the Court of Chancery maintained its strong preference for plaintiffs to reach a consensual leadership structure.  This is understandable, as one can perceive these motions as a food fight among lawyers.  However, there is another side to these motions that is more important to Delaware's stature as the country's leading forum for corporate governance litigation.  A non-effective or dysfunctional process for selecting lead counsel in class actions leads to suboptimal results for shareholders, waste for defendants, and an inability for the court to move the case along, even as other jurisdictions move ahead.

---

[16] 2000 Del. Ch. LEXIS 147 *8-9 (Del. Ch. Oct. 17, 2000).

[17] *TCW* at *6.

[18] *Id.* at *10-11.

Over the last few years, members of the Court have made clear their distaste for leadership fights, at times refusing to consider substantive motions until leadership was "worked out." Fear that presenting a leadership dispute may upset the judge handling the case has created a perverse incentive, as law firms not likely to be asked to serve as a lead counsel refuse to come under the logical leadership "tent," instead holding out in an attempt to garner a lead counsel title. These holdouts harm shareholders' interests by forcing counsel to wage a multi-week battle with other plaintiffs' lawyers instead of focusing their undivided attention on prosecuting their collective claims against defendants.

To solve the holdout problem, plaintiffs' counsel sometimes agree to leadership structures in which four co-lead counsel are appointed to guide the case. This "four-headed hydra" is typically a disservice to shareholders in deal litigation, where the proceedings are often expedited and lead counsel must make one split-second decision after another. The need to constantly reach a consensus among numerous co-lead counsel can be paralyzing. Plaintiffs are up against the best litigators in the country. Beating the best may require a wise and benevolent dictatorship, not representative democracy.

The problem of the "four-headed hydra" will likely only increase if the leadership issues detailed here are not remedied. The high-profile successes achieved by certain members of the plaintiffs' bar have triggered a wave of new entrants in the field. Also, the dramatic decrease in securities class actions and the lower expected costs of litigating deal cases has further increased the number of filers. As more law firms enter this already crowded field and the number of lawsuits stemming from each deal continues to increase, there is pressure to organize cases with seven or eight co-lead counsel, creating a truly unworkable structure.

In addition to inviting hold-outs, the lack of a fixed leadership process increases the burden on defendants and the Court. Before a leadership structure has been established, potential movants file for bizarre and unnecessary types of interim relief to show that they are vigorously litigating their case. Similarly, within days of filing their initial complaint, each plaintiff will serve their own discovery requests, forcing defendants to respond to these duplicative demands.

During December 2010, the Court of Chancery addressed the growing problem of leadership disputes. In *In Re Del Monte Foods Company Shareholders Litigation*, Vice Chancellor Laster required each movant to submit both a leadership brief and a confidential case management plan for *in camera* review. The contents of the confidential plan included (i) a listing of the names, hourly rates, and qualifications of the attorneys and other professionals who will staff the matter, (ii) a work plan estimating the tasks required for each phase of the case and the hours that each professional will devote to those tasks, together with an estimate of expenses to be incurred, (iii) a description of the movant's goals for the litigation, strategies for achieving those goals, and the range of likely outcomes, and (v) the fee expectations of counsel under each likely outcome.[19]

---

[19] 2010 Del. Ch. LEXIS 255 *10-11 (Del. Ch. Dec. 31, 2010).

Vice Chancellor Laster made a similar request in *In Re Compellent Technologies, Inc. Shareholder Litigation*.[20] The *Compellent* order notably requested identification of "[t]he occasions on which the proposed lead counsel firms have obtained a monetary recovery or other economic relief for a class of stockholders that was solely the result of representative litigation and not the result of a bidder increasing its bid, a negotiation involving a special committee, or other shared-credit scenario, together with documentary support for each occasion on which such relief was obtained."[21]

In *Compellent*, the leadership fight dissipated after Vice Chancellor Laster issued his order. In *Del Monte*, Vice Chancellor Laster issued a decision appointing lead plaintiffs and lead counsel by applying the *TCW* factors in a manner that placed extra emphasis on counsel's track record and their ability to effectively represent the class.[22] The *Del Monte* decision and the *Compellent* order suggest that Vice Chancellor Laster is looking for plaintiffs' counsel to evaluate their case thoughtfully and meaningfully, and that he will take that assessment and counsel's track record into account. Colloquy during the hearing in the *Del Monte* case suggests that the Court's request for a litigation plan and budget was geared primarily towards this goal, although also towards placing an upfront check on exaggerated claims of hours worked that sometimes accompany fee requests, an issue on which the Court has commented. Vice Chancellor Laster recognized the uncertainty that inherently surrounds expedited merger-related litigation – and litigation in general – and thus the impossibility of forecasting precisely how litigation would unfold.

Whether other members of the Court will adopt a similar approach to leadership disputes remains to be seen. We are not aware of other judges expressly embracing Vice Chancellor Laster's approach, although Vice Chancellor Noble recently appointed lead counsel in *In re Novell, Inc. Shareholder Litigation* based on his determination of which firms he trusted to be most likely to provide shareholders with the best opportunity for a favorable outcome.[23]

## Our Proposal to Improve the Leadership Appointment Process and Mitigate Multi-Jurisdictional Litigation Problems

Building on the recent developments in Delaware, we recommend that the most effective way to settle organizational issues in merger-related class actions is through the adoption of an efficient, predictable and transparent rules-based system for appointing lead plaintiffs and lead counsel. We propose a framework that may help eliminate many of the problems detailed herein. This is intended to start a conversation among interested parties, and we acknowledge further detail for implementation is needed.

---

[20] *See* Order of Consolidation, C.A. No. 6084-VCL.

[21] *Id*. at 6.

[22] See *Del Monte* at *27-34.

[23] Transcript of Oral Argument on Plaintiffs' Motions to Consolidate and to Appoint Lead Plaintiff and Co-Lead Counsel (December 17, 2010), C.A. No. 6032-VCN.

Our proposal picks what we believe to be the most effective features of existing Delaware law, the PSLRA, and Federal Rule of Civil Procedure 23(g)(3). In particular, we do not believe the PSLRA model used for securities class actions (which places the greatest weight on moving plaintiff's economic stake) is the best framework to look to for guidance. Rather, we think of merger-related litigation as more analogous to antitrust and consumer class actions, where interim class counsel are appointed based on their ability to achieve the best results.

Under our proposed framework, the first plaintiff to file a complaint in the Delaware Court of Chancery challenging a merger would be required to publish nationwide notice of its action. Publication would trigger a ten-day period during which any other shareholder interested in challenging the transaction would have the opportunity to submit a leadership motion detailing its theory of the case and providing a case management plan.[24] To protect movants' confidential information and case strategy, these submissions would be reviewed by the court *in camera*. Perhaps plaintiffs can also be encouraged to submit joint case management plans in which multiple plaintiffs and counsel agree in advance to litigate the case collaboratively.

Providing a fixed time period would have two salutary benefits. First, firms receiving the notice could investigate potential claims in a more thoughtful way, which should improve the quality of subsequent proceedings. Second, many sophisticated investors, including prominent pension funds that are unable to participate in merger litigation because their internal board approval process takes too much time, would be able to enter the field. Studies indicate that results for all shareholders improve when pension funds are involved.[25]

The ten-day period balances the need for sufficient time to investigate the transaction with the need to expedite the majority of merger-related proceedings. As soon as reasonably practicable after the conclusion of the ten-day period, if the competing firms had not agreed on a leadership structure, the Court of Chancery would resolve the dispute. We recommend that the Court adopt a presumption that leadership structures should not include more than three co-class counsel and that fewer than three lead counsel could be in the best interest of the class. Lead counsel then has discretion to bring in other firms if necessary to work the case effectively and to set compensation for participating firms based on their efforts, without facing a hold-out problem.

In selecting the appropriate lead plaintiff and lead counsel, the Court of Chancery would continue to apply the *TCW* factors. As suggested by *Del Monte*, particular emphasis should be placed on counsel's track record and ability to effectively represent the class, taking into account the nature of the action, the novelty of the issues raised, and the movant's case management plan.

---

[24] For cases where expedition is sought, ten calendar days may work best. For cases where time permits, ten business days may be more appropriate.

[25] *See* James D. Cox et al., *There Are Plaintiffs and … There Are Plaintiffs: An Empirical Analysis of Securities Class Action Settlements*, 61 Vand. L. Rev. 355, 368-75 (2008) (finding that public pension funds obtain superior results relative to other plaintiffs).

Under this system, some members of the plaintiffs' bar (including the authors' own firm) may be denied leadership in particular cases. However, there is no need to fear that a handful of firms will obtain a monopoly over deal litigation. Under the proposed system, the fast and frequent filers (*i.e.*, firms who file complaints challenging almost every M&A transaction) will be guaranteed the opportunity to direct cases in which more selective firms (or those with more selective clients) choose not to participate.

Under this proposed system, there would no longer be any uncertainty as to when, or if, the Court of Chancery would make a determination as to leadership in contested situations. Within two weeks of the first-filed complaint, a clear and efficient leadership structure would be established to govern prosecution of the case. Plaintiffs would no longer have an incentive to resort to tactics like unnecessary motions and duplicative discovery requests whose sole purpose is to aid in a leadership fight. Additionally, plaintiffs would be stripped of their leverage to holdout in an attempt to extract a co-leadership role because the determination would rest in the hands of the Court of Chancery, not co-counsel. The "four-headed hydra" would also be slayed because the Court of Chancery would adopt a presumption in favor of fewer lead firms. Perhaps most importantly, defendants could no longer play plaintiffs against one another to the detriment of the class.

This transparent, efficient and predictable framework, which could be enacted by either the Delaware state legislature, by court rules promulgated by the Court of Chancery, or as a matter of practice, would remedy many of the multi-jurisdictional and Delaware-specific problems described above. The multi-jurisdictional problems would be mitigated, though not solved, by virtue of increased transparency and the perception of fairness to all shareholders in Delaware. Leadership typically would be settled by the Court of Chancery, but the case might not ultimately proceed in Delaware. While unusual, we could envision a movant arguing credibly that the case would be more appropriately litigated in a different forum. Under the right circumstances, the Court of Chancery might agree and stay the Delaware proceeding. The resulting flexibility, respect for the internal affairs doctrine, and overarching goal of providing shareholders with their best opportunity to obtain a favorable outcome on an expedited basis would hopefully encourage judges in competing jurisdictions to respect the Court of Chancery's process and leadership determinations.

The proposed system would not solve all multi-jurisdictional issues. Initially, plaintiffs' lawyers who perceive themselves as unlikely to garner court appointment in a Delaware leadership fight may continue to file actions in alternate forums. The judge in the alternate forum, however, would be less likely to entertain the suit because such plaintiff had the ability to participate in Delaware's open and transparent leadership process, but declined the invitation. Some judges in alternate forums might not yield, fearing that Delaware unduly favors corporate defendants. Importantly, by adopting our proposed framework, the Court of Chancery would send a signal to judges around the country that it has heightened interest in protecting shareholders.

Stockholders will benefit from having all litigation relating to a single deal in a single forum because the defendants' costs in fighting merger-related litigation would significantly decrease. Moreover, defendants would no longer be able to look for the weakest link among the

plaintiffs' lawyers and steer the litigation and settlement towards that firm. Defendants would be forced to litigate against the firm with the best track record and ability to effectively represent the class. Without the pressures that currently drive down settlements, the net recovery for shareholders in meritorious cases should increase. If a more efficient leadership appointment system leads to better results for shareholders, fee awards should also rise, tempering the incentive to file elsewhere in pursuit of personal profit.

It is in everyone's interest to address the growing problem of multi-jurisdictional litigation challenging virtually every deal. When the volume of securities litigation reached similar levels, Congress adopted the PSLRA. When securities litigation shifted to state courts and continued to increase in volume, Congress adopted the Securities Litigation Uniform Standards Act. No one can predict what Congress would do with deal litigation. Rather than waiting for Congress, which surely does not appreciate the on-the-ground realities of M&A litigation, we believe the optimal solution can come from the judiciary and the deal litigation bar.