1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4

   IN RE GOOGLE INC. COOKIE      :   CIVIL ACTION
5  PLACEMENT CONSUMER PRIVACY    :
   LITIGATION                    :
6  --------------------------    :   NO. 12-MD-2358 (SLR)

7

8                          - - -

9                          Wilmington, Delaware
                           Wednesday, October 24, 2012
10                         9:30 o'clock, a.m.

11                         - - -

12  BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

13                         - - -

14  APPEARANCES:

15

           KEEFE BARTELS
16         BY:  STEPHEN G. GRYGIEL, ESQ.
               (Red Bank, New Jersey)

17

18                -and-

19

20         STRANGE & CARPENTER
           BY:  BRIAN RUSSELL STRANGE, ESQ.
21             (Los Angeles, California)

22

                  -and-
23

24
                           Valerie J. Gunning
25                         Official Court Reporter

```
 1    APPEARANCES (Continued):

 2
               BARTIMUS, FRICKLETON, ROBERTSON & GORNY, P.C.
 3             BY:  JAMES P. FRICKLETON, ESQ.
                    (Leawood, Kansas)
 4

 5
                    Counsel for Ana Yngelmo and Plaintiffs
 6

 7
               BARNOW AND ASSOCIATES, P.C.
 8             BY:  BEN BARNOW, ESQ.
                    (Chicago, Illinois)
 9

10                     -and-

11
               HARKEY CLASBY & BUSHMAN LLP
12             BY:  LANCE A. HARKE, ESQ.
                    (Miami, Florida)
13

14                  Kreisman Plaintiffs'
                    Proposed Interim Co-Lead Counsel
15

16
               BERMANIS LAW FIRM, LLC
17             By:  ANDREW LYSKOWSKI, ESQ.

18
                    Counsel for Plaintiff
19                  Brian Martorana (MO)

20

21             STEWARTS LAW US LLP
               BY:  DAVID A. STRAITE, ESQ. and
22                  MICHELE CARINO, ESQ.

23
                    Counsel for Plaintiff
24                  Matthew Soble

25
```

1    APPEARANCES (Continued):

2

3              TYCKO & ZAVAREII LLP
               BY:  HASSAN ZAVAREII, ESQ.
4                  (Washington, D.C.)

5

               Counsel for Plaintiffs
6              M. Musgrove and Kevin Jacobsen

7

8              EICHEN CRUTCHLOW ZASLOW & McELROY, LLP
               BY:  BARRY R. EICHEN, ESQ.
9                  (Edison, New Jersey)

10

               Counsel for Plaintiff
11             Ana Yngelmo

12

13             MILBERG, LLP
               BY:  PETER SEIDMAN, ESQ.
14

15             Counsel for State Court Plaintiff
               Mark Caranalong
16

17

               MURPHY FALCON & MURPHY
18             BY:  WILLIAM MURPHY, JR., ESQ.

19

               Counsel for Plaintiff
20             Glaser

21

22

               STEWARD LAW FIRM LLC
23             BY:  JOHN STEWARD, ESQ.

24

               Counsel for Plaintiff
25             John Treis

```
 1    APPEARANCES (Continued):

 2

 3               MORGAN & MORGAN
               BY:  RACHEL SOFFIN, ESQ.
 4

 5                    Counsel for Plaintiff
                    L. Haretick
 6

 7

               BRYANT LAW CENTER
 8             BY:  MARK BRYANT, ESQ. and
                    EMILY ROARK, ESQ.
 9

10                    Counsel for Plaintiff
                    Bill Gorley
11

12
               CHAMP CROCKER, ESQ.
13

14                    Counsel for Plaintiffs

15

16
               RICHARD KAUFMAN, ESQ.
17             (Beaumont, Texas)

18                    Counsel for Plaintiffs
19

20

21               FISH & RICHARDSON, P.C.
               BY:  SUSAN MORRISON COLETTI, ESQ.
22

23                        -and-

24

25
```

```
 1    APPEARANCES (Continued):

 2

 3              SIDLEY & AUSTIN LLP
              BY:  EDWARD R. McNICHOLAS, ESQ.
 4                  (Washington, D.C.)

 5

              Counsel for Defendant
 6            PointRoll Inc.

 7

 8              WILSON SONSINI GOODRICH & ROSATI
              BY:  MICHAEL H. RUBIN, ESQ. and
 9                  ANTHONY J. WEIBELL, ESQ.
                  (Palo Alto, California)
10

11              Counsel for Defendant
              Google
12

13

14                       - - -

15

16

17

18

19

20

21

22

23

24

25
```

1                        P R O C E E D I N G S

2

3                  (Proceedings commenced in the courtroom,

4    beginning at 9:32 a.m.)

5

6                  THE COURT:  Good morning, counsel.

7                  (Counsel respond, "Good morning, your Honor.")

8                  THE COURT:  Let's take some time to make

9    some introductions and then we'll proceed.  I'm not sure

10   what you have in mind for me, but I certainly have some

11   thoughts to share with you.  So let's start with plaintiffs'

12   counsel.

13                 MR. GRYGIEL:  Good morning, your Honor.  Steve

14   Grygiel from Keefe Bartels for the plaintiffs.

15                 MR. STRANGE:  Good morning, your Honor.  Brian

16   Strange from Strange & Carpenter for the plaintiffs.

17                 MR. FRICKLETON:  James Frickleton of Bartimu,

18   Frickleton, Robertson & Gorney for the plaintiffs.

19                 THE COURT:  All right.

20                 MR. STRAITE:  Good morning, your Honor.  David

21   Straite, Stewart Law U.S., Wilmington, Delaware, for the

22   plaintiffs.

23                 MR. MURPHY:  Good morning, your Honor.  William

24   H. Murphy, Jr., Baltimore, Maryland, for the plaintiffs.

25                 THE COURT:  All right.

1          MR. EICHEN:  Good morning, your Honor.  Barry

2    Eichen, Eichen Crutchlow Zaslow, for the plaintiffs.

3          THE COURT:  All right.  Thank you.

4          MR. RYAN:  Good morning, your Honor.  My name is

5    Mark Bryant.  I'm from Kentucky, for the plaintiffs.

6          MS. ROARK:  Good morning, your Honor.  Emily

7    Roark, Kentucky, for the plaintiffs.

8          MR. BARNOW:  Good morning, your Honor.  Ben

9    Barnow for plaintiffs.

10          MR. HARKE:  Good morning, your Honor.  Lance

11    Harke from Miami, Florida, also on behalf of the

12    plaintiffs.

13          MR. STEWARD:  Good morning, your Honor.

14    John Steward from St. Louis, Missouri, on behalf of

15    plaintiffs.

16          MR. ZAVAREEI:  Good morning, your Honor.  Hassan

17    Zavareii from Washington, D.C. for plaintiffs.

18          MR. LYSKOWSKI:  Good morning, your Honor.

19    Andrew Lyskowski from Missouri for plaintiffs.

20          MR. CROCKER:  Good morning, your Honor.  Champ

21    Crocker from Alabama for the plaintiffs.

22          MR. KAUFMAN:  Good morning, your Honor.  Richard

23    Kaufman, Beaumont, Texas, for the plaintiffs.

24          MR. RUBIN:  Good morning, your Honor.  Michael

25    Rubin of Wilson Sonsini for defendant Google.

1          MR. WEIBELL:  Good morning, your Honor.  Tony

2     Weibell, for defendant Google.

3          MS. COLETTI:  Good morning, your Honor.  Susan

4     Coletti from Fish & Richardson for defendant PointRoll.

5     This is my co-counsel, Edward McNicholas, of Sidley &

6     Austin, also for PointRoll.

7          MR. McNICHOLAS:  Good morning, your Honor.

8          THE COURT:  Good morning.

9          All right.  I guess I'd like to share some

10    thoughts with you and then have you react to them, and

11    certainly if you are prepared to make some presentations, we

12    can see whether they're in order.

13         I certainly agree that it is premature to put

14    much of a scheduling order in place, but I do want to start

15    out with some observations and to see if we can't start out

16    on the same page.

17         Number one, I would propose the following in

18    terms of a preliminary schedule.

19         Number one, I will endeavor to get the lead

20    counsel issue resolved within the next 30 days, which is on

21    or about November 21st.  It's not really 30 days.  It's four

22    weeks.

23         I would propose that we put in an order that

24    four weeks after that, the plaintiffs would have to file

25    their consolidated Amended Complaint, and that's on or about

1    December 19th, 2012.  That the defendants would then respond

2    with an answer or other motion practice on or before

3    January 22nd, 2014 -- 2013, and that we hold a status

4    conference on January 30th, 2013, at 4:30.

5            Now, I understand by reading the joint case

6    scheduling order that you all submitted, that the defendants

7    believe that a motion practice is likely because of the

8    standing issue.  I only grabbed one complaint, class action

9    complaint that was filed among the many that were filed, and

10   unlike the Third Circuit case that the defendants cited

11   where the claims asserted were negligence and breach of

12   contract, the plaintiff, at least in this case, asserted

13   statutory violations, which do not require injury.  In fact,

14   they just require violation to lead to the imposition of

15   sanctions.

16           So I obviously have -- no one has seen the final

17   version, but so long as my understanding is correct, that

18   with statutory violations you don't need injury in fact, and

19   as long as there's at least one of those asserted, I'm not

20   confident that defendants' position is well-taken, that

21   everything stands still until their motion practice is

22   resolved.

23           Now, if they've got some kind of motion about

24   the statutory violations that does not involve a factual

25   investigation, then certainly we'll talk about that on

1  January 30th.  But I just wanted to give you that for what

2  it's worth.

3          So that at least moves us forward, gives me

4  homework, gives you all homework.  And we'll meet together

5  with perhaps a better idea of how to move the case forward

6  after that.

7          With respect to some of the positions that

8  you all have taken in the proposal, just some observations.

9          Number one, I am amazed that there are pages and

10  pages of discovery that plaintiffs believe -- they believe

11  discovery is appropriate, and certainly it may well be, but

12  we also need to put some judicious restraint on how far

13  reaching discovery is, because we're all aware of the costs

14  associated and burdens associated with it.

15          On the other hand, defendant uses the word

16  "entitled" an awful lot.  You have to understand that in my

17  courtroom, that is not a word that I embrace with much

18  enthusiasm; that there are very few things to which we

19  are entitled.  You're entitled to a fair process and I am

20  bound to give it to you.  But just be aware that that

21  raises the hackles on the back of my neck when I see the

22  word.  I would appreciate it if you didn't use it on a

23  regular basis.

24          So with respect to the other limits that you

25  have talked about, the requests for admission,

1    interrogatories, everything else, I think that can wait

2    until January, when we have a better idea.  I've looked at

3    some, and it strikes me that the defendants are being a

4    little stingy on what all these plaintiffs can have versus

5    what they can have, since there are only two defendants and

6    there are multiple plaintiffs.  But that's something we can

7    talk about with a little more information and come to better

8    decisions.

9            So those were my preliminary thoughts.  And I am

10   happy -- I apologize on the one hand for having everyone

11   here when we couldn't put together a full scale scheduling

12   order, but, on the other hand, I think it's helpful for you

13   to understand who I am and how I approach case management.

14   And it certainly is helpful for me to kind of see the

15   graphics of what this case might turn out to be.

16           So you've got my first thoughts on this case,

17   and certainly if the parties have presentations to make, I

18   don't want to deprive you of making those presentations if

19   you think it is helpful and will move the case forward and

20   will help educate me, to some extent.

21           So from plaintiffs' perspective?

22           MR. GRYGIEL:  Good morning, your Honor.  Steve

23   Grygiel.

24           With that from the Court, that you're asking if

25   there's something that we might want to present, I'd like to

1    ask the Judge, is there something you would find, your

2    Honor, particularly helpful for coming to a decision here on

3    the 23(g) issue, which we think is of crucial importance,

4    because there's an awful lot I think I've got ready to say,

5    but I don't want to say anything if your Honor is not

6    interested in hearing it.

7              THE COURT:  Well, I am not sure.  I mean,

8    I have not necessarily been faced with exactly this sort of

9    case.  If you would like to give me the best of your

10   presentation and just let me hear at least some of it, to

11   see how much --

12             MR. GRYGIEL:  Sure thing, your Honor.

13             Our group has been called the Grygiel Group,

14   which would, of course, make my mother and father proud --

15   I'm not sure I really deserve that nomenclature -- as

16   representing 16 out of the 24 cases.  And that took some

17   work, your Honor.

18             As your Honor said in Outten, a consensual

19   private ordering is something that the courts like to see.

20   It's also important because it represents the ability of the

21   lawyers who are doing that private ordering to reach

22   consensus out of mayhem, to get agreement out of discord,

23   and we did that.

24             Unlike the other group in this case, upon whom I

25   cast no aspersions, our group did not start out as a

1    monolith.  We started out as separate groups.  Through the

2    course of working after the JPML, we were able to bring

3    California people into the fold.  We were able to bring

4    people from Illinois into the fold.  That's Mr. Kristoff.

5    We were able to bring people from Florida, that's

6    Mr. Yantunis, into the fold, Mr. Shubb from New York.  We

7    were able to bring together a very large number of people

8    that essentially recognized that the leadership structure

9    that we were talking about, three people on the executive

10   committee, Mr. Frickleton, Mr. Strange and I, and a six-

11   member plaintiff steering committee would be appropriately

12   sized and appropriately nimble and sufficiently effective,

13   more than sufficiently well versed in the areas that count

14   in this case properly to represent the class.

15            And as your Honor knows from the Outten case, it

16   makes sense from a juris prudential standpoint, to be able

17   to look at one group and say that group has not just the

18   experience, but the most important criterion, the

19   substantive knowledge of the area of law that is at

20   issue.

21            Here, your Honor, that is three things.

22            Not only have we forged consensus and shown our

23   ability a to lead a large group in an otherwise unwieldy and

24   somewhat amorphous mass, we've done more than that.  We

25   understand this area of law very well.  Why?  From very

1    recent experience.

2              Bragging just a little bit, on page 43 of the

3    transcript issued by Judge Davila in a recent motion to

4    dismiss that Mr. Straite and I argued, he commended our

5    pleadings in a case very similar to this one.  It's the case

6    against Facebook.  Judge Davila called our pleadings,

7    meaning our motions to dismiss as well as our complaint,

8    very good, fantastic, very helpful to the Court.  He said it

9    was a great help to the Court to have pleadings of that

10   caliber.

11             Now, he was complimenting, your Honor, both the

12   defendant and the plaintiff, but the point is, there we have

13   a case involving the same kind of claims we're going to have

14   here, the general rubric being privacy.  Specifically, the

15   computer fraud and abuse act, the stored communications act

16   and the wiretap act, as well as California state and common

17   law causes of action.  That's important because, of course,

18   the terms of service that Google had incorporate California

19   law.  Mr. Strange is very well versed in California law, and

20   I can assure the Court that after arguing the motion to

21   dismiss, I, too, I think, am now quite adroit in the nuances

22   of California privacy law.

23             We bring this experience that's not just

24   experience in large cases, which everyone in this room has,

25   but specific experience, as Judge Davila recognized, on

1    exactly the kinds of issues that are going to confront this

2    course.  It's recent and it's not just Facebook.

3                Mr. Strange, for example, is involved in the

4    Hulu case, Hulu KISSmetrics, and the Path case are privacy

5    rights cases.  Mr. Frickleton is involved in the Facebook

6    case.  I'm in the Facebook case.  Mr. Straite is.

7    Mr. Eichen is.  Mr. Murphy is.  And Mr. Murphy is also an

8    MIT graduate, so he brings a certain technological expertise

9    to our lawyers side of the table that is usually found

10   wanting.

11               There are 33 areas of law that are really going

12   to count.  In the first, and I bore my colleagues with this

13   a lot, is the pleadings standards.  Everyone says, well,

14   Judge, we get it.  It's all Twombly and it's all Iqbal.  We

15   get it.  Specificity.

16               Well, no.  Not so fast, for a couple of reasons.

17   And if I appear like a wretched penitent here, your Honor, I

18   don't mean to.

19               THE COURT:  And before you go on, was everyone

20   ready to have this sort of discussion today, because I am

21   not sure I -- I'm not sure.

22               MR. BARNOW:  If I might, your Honor, just to

23   fast-forward, we are prepared, but I heard the Court, and I

24   will probably get up after my colleague's presentation to

25   say we rely on our papers because it's pretty much in there.

1    But we stand at the pleasure of the Court.  But that's what

2    I'm planning on saying at this point.

3                THE COURT:  Okay.  Well, I just want to make

4    sure that you have a full and fair opportunity to respond

5    here and that you were prepared to do so.  So I appreciate

6    that.

7                MR. BARNOW:  Thank you.

8                THE COURT:  I appreciate that.  All right.

9                MR. GRYGIEL:  I don't need to was on and bore

10   your Honor, but I think the most important thing, your

11   Honor, here on 23(g) is not just saying I've done a lot of

12   the things in the past and I'm a good lawyer and other

13   judges have said it.  I think it is very important to show a

14   Court that you know what you're talking about.  Twombly and

15   Iqbal, crucial.

16               The defendants are going to say no matter what

17   we write in our pleadings, that you have not satisfied the

18   standard of specificity set in those cases.  I will simply

19   make a couple of broad brush points.  Twombly and Iqbal are

20   very different cases.  In fact, they set different tests

21   which the Third Circuit has recognized and endorsed in

22   Phillips versus County of Allegheny.

23               Very briefly, what does Twombly say?  The

24   pleadings need to be sufficiently specific to raise a

25   reasonable expectation that discovery will produce evidence

1    of the required elements of the claim.

2              What does Iqbal say?  The pleadings have

3    to be sufficiently factually specific to raise the

4    inference that the defendant is liable for the misconduct

5    charged.

6              I think it's clear from that statement, which I

7    submit is very accurate in distinguishing those two cases

8    and the tests they impose, that the Twombly test is more

9    lenient.  That's very important.  And it's not just

10   important because Twombly and Iqbal are different.  It's

11   important because the Third Circuit in Phillips versus

12   County of Allegheny has followed the Twombly test.

13             Your Honor yourself has actually followed the

14   Twombly test in the recent Meres case, and your Honor also

15   cited Ericsson versus Partis, a case two weeks after

16   Twombly.

17             Why is that important?  Because in this case, if

18   you are not nimble and adroit about being able to address

19   these pleading standards, you're going to be running afoul

20   of the defendants' immediate foreseeable specificity

21   arguments.

22             This Court has followed the Third Circuit

23   approach very carefully.  The Heckman case, the Illumina

24   case, all show this Court, the District of Delaware,

25   following the Third Circuit's test, which is more lenient

1    than other courts have sought to impose after reading

2    Twombly and Iqbal.

3              So you've got to be pretty well up on the

4    pleading standards and the Supreme Court cases and here to

5    claim you're able to represent this class.  You need to be

6    up on the most recent Supreme Court cases, like Skinner,

7    where the Court did not cite Iqbal and did not mention

8    heightened specificity of pleadings, but the Court went

9    back to what this Court has always used as the touchstone.

10   Fair notice of the claim and the grounds upon which it

11   rests.

12             The Delaware cases and the Third Circuit Federal

13   cases boil down to an endorsement that Twombly made clear,

14   its fair notice and the grounds upon which it's rests.  Why

15   do I say this?  Because we understand that.  We've been able

16   to satisfy those in other cases.  We understand the

17   intricacies of these pleadings.

18             The next thing, your Honor, you've got to be

19   competent about here are the substantive privacy rights

20   violations, the statutory claims.  Your Honor raised very

21   interestingly at the outset the point of standing.  And

22   what the defendants will say, your Honor, and obviously

23   they'll speak for themselves, they're very clever lawyers.

24   What they're going to say is, well, Judge.  You said

25   standing doesn't require injury in fact for a statutory

1   cause of action.

2              And the plaintiffs, your Honor, are going to

3   say that Austin in the Third Circuit Respa case says just

4   that in a statutory standing setting.  But not really,

5   Judge.  There still has to be injury in fact for statutory

6   standing.

7              What you've got to be able to show this Court in

8   order to be able to represent this class is that you

9   understand there is no two-tiered standing requirement.

10  There isn't money damages plus invasion of a statutory right

11  that is protected by the congressional fiat.

12             You need to be able to show this Court, as we

13  can from Ninth Circuit cases like Edwards, where the Supreme

14  Court justified certification after it was originally

15  granted, the Gallis versus Google case, and the Third

16  Circuit case I just mentioned, Austin, you need to be able

17  to show the Court that the Court is right.  That the

18  defendants aren't right when they seek to impose a more

19  stringent standing test that applies.

20             The defendants will -- and I know this because

21  I've done a lot of these cases -- they will say to the

22  Judge, well, Judge, they've really got to show more injury.

23  In these privacy cases, that is one of the great hobgoblins

24  of the plaintiffs' bar, is showing there has been sufficient

25  injury for some of the state law claims and some of the

1    common law claims.

2            And what they're going to say is there's just no

3    injury.  Apart from the invasion of the statutory protected

4    right, we're going to be able to show injury.  We have been

5    able to learn through the course of our work with experts,

6    through our preparation for this case and, for example, the

7    Facebook case and the Path case, how private identifiable

8    information of the kind we allege Google was getting and

9    improperly getting, is marketable, how it is monetized.

10   That is very important in terms of demonstrating competence

11   to be able best to represent this class, which we submit we

12   have.

13           If you're going to talk about, your Honor,

14   representing a class that involves a case under the Wiretap

15   Act, which, as you know from the complaint you looked at,

16   basically everyone alleges in this case, you've got to know

17   where does this requirement come in the Wiretap Act for a

18   contemporaneous interception?  It doesn't appear in the

19   statute.  Why has it been grafted, engrafted, onto the law

20   concerning the interpretation of the Wiretap Act?

21           I think you have to know, as we do, that it

22   comes from United States versus Turk, an old wiretap case

23   that has nothing to do with the kind of technology we're

24   talking about here.  We're able to demonstrate to your Honor

25   that the cases that will say you need a contemporaneous

1    interception are either badly reasoned, or to the extent

2    they apply, that they should be overcome by the Councilman

3    case in the First Circuit or the Miscavige case in the

4    Seventh Circuit.

5           The point I'm making, your Honor, is you have to

6    understand what is an intercept, what is the evidence of

7    intent for a violation under the stored communications act

8    and wiretap act?  What is a device for the Wiretap Act?

9    What is a facility for the stored communications act?  We

10   are intimately familiar with all of those things.  And I

11   think that's important because it demonstrates our

12   competence to represent this class.

13          Finally, your Honor, the third general area of

14   the law in which anybody purporting to represent a class in

15   a case of this magnitude and a case of this importance with

16   privacy rights that go back to Katz and Olmstead, those old

17   Supreme Court cases about the expectation of privacy.  If

18   you're going to represent a class and you want it to be a

19   class, you had really better understand Third Circuit

20   doctrine on pleading law.  I don't think, your Honor, it's

21   just that easy as picking up a couple of cases and reading

22   them.

23          We're very familiar with the Third Circuit law

24   on class certification.  It does not begin and end with

25   hydrogen peroxide.  As I'm sure your Honor is familiar with

1    the Comcast versus Berand case, which is now on appeal

2    to the Supreme Court, I believe the Supreme Court took

3    cert.

4               The issue there really is, do you have to

5    satisfy a Daubert like standard of expert testimony at the

6    class certification stage to show that damages are provable

7    on a class wide basis?  And if you do, is it Daubert in

8    full, or is it Daubert light?

9               Well, let's look at what the Third Circuit has

10   said about that.

11              THE COURT:  And I'm not sure I want to hear --

12              MR. GRYGIEL:  Okay.

13              THE COURT:  I mean, you're making arguments

14   that --

15              MR. GRYGIEL:  Right.  My point is simply to

16   demonstrate, your Honor, we know the law on this area.  I'm

17   not walking in here, thumping my chest, nor are any of my

18   colleagues, saying, Judge, we're really good lawyers.

19   Appoint us to run this class.  We really want to do it.  We

20   have a lot of lawyers.  We have a lot of resources.  We

21   understand the law, I submit, second to none.  We have

22   recent experience on exactly these topics.  And we have come

23   together, demonstrating our ability to run a case and to

24   organize a group, and we have done everything we can here to

25   develop the private ordering that this Court has said is

1    important.

2              And I don't believe, frankly, your Honor, that

3    it necessarily rewards the system when we impose systemic

4    costs by awarding a failure to agree to a private

5    conceptually ordered grouping of plaintiffs.  That's what we

6    sought to achieve.  It's regrettable that we did not.  But

7    in this case, your Honor, I think the choice has to be made,

8    and I'm ready to have the Court call balls and strikes on

9    it.

10             I'm done, your Honor.  Mr. Strange has a few

11   things I know he would like to say well.

12             THE COURT:  All right.  Thank you.

13             MR. GRYGIEL:  Thank you, your Honor.

14             MR. STRANGE:  May it please the Court, your

15   Honor, Brian Strange from Los Angeles.  I appreciate the

16   opportunity to be in your courtroom.

17             We argued that this case should be in Northern

18   California, where Google was based, but I appreciate the

19   fact that we're here in Delaware and look forward to working

20   with your Honor.

21             I've had the pleasure of working at MDLs across

22   the country, and I think there's a common thread that

23   benefits both the class and the Court with respect to

24   appointment of leadership.  I think that the leadership

25   slate needs to accomplish three main things.

1          The first is the ability to focus the case.  The

2     second is coordinating the plaintiffs' bar and organizing

3     discovery.  And the third is professionalism.

4          With respect to the ability to focus the case,

5     that's primarily based on the knowledge of the law, as

6     indicated by my colleague.  And without further ado, I'm

7     going to pass on that except for I will mention that last

8     Friday, Judge Rogers denied in part a motion to dismiss on a

9     very similar tracking case against Path, which is an

10    application downloaded on the iPhone.  And we also have

11    reached a settlement in the Kissmetrics case before

12    Magistrate Judge Beadler in San Francisco, which is another

13    tracking case.

14         With respect to coordinating the plaintiffs,

15    your Honor, we have a number of cases here, as I'm sure

16    you're aware.  We did reach out our side to the plaintiff,

17    got him on board to help ease the burden on the Court.

18    We've also coordinated with the State Court.

19         There's a pending State Court case in California

20    before Judge Kramer in San Francisco and their counsel is

21    here.  We've organized with them, trying to coordinate their

22    proceeding also.

23         With respect to discovery, my firm sent out

24    preservation letters of the evidence in March of this year,

25    and that's important I think in these types of cases.

1          One of the issues I wanted to address with your

2    Honor with respect to the scheduling order is I think it

3    might be productive after the appointment of lead counsel

4    that we at least proceed to negotiate a DSI protocol and a

5    protective order, because without those documents we're

6    really not going to get anywhere for discovery.

7          And notwithstanding any motions that the

8    defendants bring, I think those are areas that we can begin

9    our communication with the defendants to try to get in place

10   with your Honor.  And the same I think with Rule 26

11   conference.  I don't know whether your Honor had felt that

12   we should go forward with that, but that's a potential issue

13   that might be addressed.

14         With respect to organizing the plaintiffs, your

15   Honor, as you can see, there are a lot of firms here, so one

16   of the jobs of lead counsel is to make sure that the case is

17   prosecuted in an efficient manner.  One of the things we do

18   is require, at least I do monthly, time records from all the

19   plaintiffs that are reviewed by lead counsel every month.

20   And also we engage in weekly, at least bi-weekly conference

21   calls with the plaintiffs' side to make sure that they're

22   organized.

23         And another rule that I think is effective is

24   that there has to be a meet and confer between the leads and

25   the defense counsel before any motion is brought to your

1    Honor's Court with respect to discovery so that we don't

2    have outliers getting in disputes with defense counsel and

3    all of a sudden a motion to compel --

4             THE COURT:  Well, trust me, there will be no

5    motions to compel in my court.  I will have regular

6    discovery conferences and we'll work out discovery issues

7    without piling more paper on my desk.

8             So I appreciate that.  And there certainly needs

9    to be communication between the parties before anything is

10   brought to my attention, but just for your benefit, no

11   motions without permission.

12            MR. STRANGE:  Thank you, your Honor.

13            And then, finally, with respect to

14   professionalism, I think all the lawyers here are of the

15   highest caliber and I don't think you're going to have an

16   issue in that regard.  But I do believe that our slate will

17   help move this case along in a professional manner and we

18   have a great knowledge of the law.

19            Thank you, your Honor.

20            THE COURT:  All right.  Thank you very much,

21   Mr. Strange.

22            MR. BARNOW:  Good morning, your Honor.  Thank

23   you for the opportunity to be here.

24            As I said previously, I think the papers are

25   comprehensive.  We've given a lot to the Court, perhaps too

1     much.  I do think all the issues that were touched upon to

2     date, as eloquently as they may have been reaped or

3     presented, are dealt with in the papers.

4              Unless the Court has any questions from me, I

5     would just close, begin and close by saying that the people

6     that we're traveling with here, the other attorneys in this

7     case that we have, are all competent.  They're competent,

8     too.

9              We look forward to an appointment, should the

10    Court deem it appropriate, and we'll work with attorneys

11    that are co-appointed.  Other than that, if the Court

12    doesn't have any questions, that concludes my presentation.

13             THE COURT:  All right.  Thank you very much.  I

14    do not at this moment.

15             MR. BARNOW:  Thank you, Judge.

16             THE COURT:  And if anyone on defendants' behalf

17    wants to speak on anything, this is the time to do it.

18             MR. RUBIN:  Good morning your Honor.  Again,

19    Michael Rubin for Google.

20             We obviously have no substantive position on the

21    23(g) issue other than to say that the more efficient

22    process, their selecting a more simple structure is easier

23    in our experience going forward, but we obviously take no

24    position between the two camps.

25             With an observation to the structure that you

1    outlined at the beginning of the process, first, thank you.

2    It's helpful.  The only thought that we might have is that

3    it's possible that the Amended Complaint could be

4    extraordinarily lengthy.

5           It has happened, I've seen, that when lead

6    counsel attempts to consolidate 21 complaints, sometimes

7    they grow to much longer than any of the individual

8    complaints, not only in length, but in number of claims.

9    And five weeks over two holidays may be a bit of a challenge

10   in responding to it.  If that were the case and the order of

11   the Court that comes out after this hearing is outlined the

12   way your Honor suggested, we could approach the Court and

13   discuss that.

14           THE COURT:  All right.  One question I had for

15   you that was just brought up by Mr. Strange, and that is

16   whether it makes sense for the parties to discuss an ESI

17   protocol, protective order, and have some general discussion

18   about scheduling regardless of the motion practice that you

19   file, so that if having taken a look at the motion practice

20   I decide that the case is going to move forward because I'm

21   confident there's going to be at least something, even if

22   the motion practice whittles it down somewhat.

23           So I guess I need your input on that.

24           MR. RUBIN:  I certainly don't think it's a bad

25   idea for the parties, once lead counsel is appointed for the

1    parties to get together and talk, and that in advance of

2    whatever date ultimately we come in, whether it's the 30th

3    or if it is a bit further than that based on whatever may

4    occur, that we come in with positions.

5         If we're able to agree, which I certainly would

6    hope we are, that's much easier for the Court, much easier

7    for you, much easier for all of us, and so we would hope

8    that would be the case.  I don't see a reason not to do

9    that, and if we disagree, we could present you with

10   positions not unlike the way we did yesterday.  That was a

11   bit of a rushed process.  It came sort of late Friday.  But

12   we could do it in a much more organized process once we have

13   lead counsel.  I'm not opposed to doing that.  I don't see a

14   reason why not, if it became -- I can't imagine it would be

15   too burdensome to get it done.

16            THE COURT:  All right.

17            MR. RUBIN:  The other issue I wanted to raise is

18   something also that Mr. Strange raised, and counsel for the

19   California state class action is here, and I know that they

20   did send you a letter.

21            THE COURT:  Right.

22            MR. RUBIN:  This may be premature to raise, but

23   I don't think so.  At least we've been asked by the judge,

24   Judge Kramer in the California class action, to raise this,

25   so I'm doing it at his request as well.

1           There was an order issued by that Court.  We had

2    moved to stay the case.  He put an order in coordinating it

3    with this MDL.  I don't know if you've had an opportunity to

4    review the proposed coordination order that we drafted with

5    counsel for the plaintiffs in that matter.

6           THE COURT:  I have not.  I wasn't quite sure.

7    I've never quite done that before.  So I have not.

8           MR. RUBIN:  I will admit that I haven't either,

9    and it's essentially a pilot program that Judge Kramer is

10   issuing.  I will tell you, I don't think it would be much of

11   a burden on this Court at all whatsoever.  Essentially,

12   what's happening in this court would map on to what would

13   happen in the state class action literally with respect to

14   discovery disputes and at a much more general level with

15   respect to other matters.

16          And so we have a state -- we have, rather, a

17   conference in that court on November 27th to update things,

18   and there's no -- there has been no general action yet taken

19   in that case.  The complaint has been served, some

20   discovery, but nothing has moved forward until there's

21   action proceeding in this case.

22          THE COURT:  All right.  So basically it's an

23   effort to make sure that if depositions are taken, they're

24   not duplicative?

25          MR. RUBIN:  It's even more coordinated than

1    that.  All discovery would be the same.  If depositions were

2    taken, depositions would be admissible in both actions.

3    There would be one lead questioner appointed.  It would

4    require coordination between whomever is lead counsel in

5    this case with lead counsel in that case to make sure things

6    were done effectively.

7            It would ultimately reduce the burden on the

8    defendants, on Google, essentially, from having to be

9    burdened by participating in two parallel class actions

10   addressing essentially the same -- same transaction or

11   occurrence.

12           THE COURT:  Well, certainly, unless -- I take it

13   at this point everyone is ready to move forward with that,

14   and so I think it's my obligation to do what I can to make

15   sure that the two cases move forward and reserve everyone's

16   resources as much as we can.

17           I will take a look at it, and certainly if you

18   think it needs to be reviewed at our January -- at this

19   point, our January conference, then please put it on the

20   agenda so that we can make sure that we move forward

21   substantively in an appropriate way.

22           MR. RUBIN:  Thank you.  We appreciate that.

23   Nothing further from us at this time.

24           THE COURT:  All right.

25           Yes, sir?

1          MR. McNICHOLAS:  Good morning, your Honor.  Ed

2     McNicholas from Sidley Austin on behalf of PointRoll.

3          I would just speak very briefly.  We're involved

4     in only two of the more than 20 cases here.  And as we saw

5     in the papers coming in from the various factions of the

6     plaintiffs' attorneys, we saw the summary of the case, and

7     their summary of the case is almost entirely focused on

8     Google.  The one we saw was Document 28, summarized a case,

9     didn't even mention PointRoll, which normally is a good

10    thing from a defendant's perspective, of course.  But our

11    concern is that we're going to have a complaint that's going

12    to talk about Google and its competition with Apple and

13    Facebook-like buttons and Google Plus, and PointRoll has

14    nothing to do any of that.  PointRoll is an ad serving

15    company in King of Prussia.  It just serves internet ads.

16    It's not Google.  It's a fraction of the size of Google.

17         And so that's why we were asking for appointment

18    of a counsel to do a consolidated complaint against

19    PointRoll, so that there would be a complaint against

20    Google, a complaint against PointRoll.  In doing this, we're

21    trying to streamline things.  We're not doing this to upset

22    the schedule.  The schedule could be the same for both.  We

23    don't have any great preference on the schedule of that.  We

24    could do everything in parallel so we're not going to upset

25    the schedule in any way.

1          But hopefully it would define the issues with

2     respect to PointRoll sooner.  If there's a long complaint

3     that talks all about Google and then mentions PointRoll at

4     the end, you would dismiss us from that, probably, but then

5     you'd give them leave to replete.  We'd act to it.  I want

6     to cut to the choice and actually find out what the

7     allegations against PointRoll are as opposed to the

8     allegations against Google.

9          The big concern here, of course, is discovery.

10    That long listing of discovery topics, ten of them only talk

11    about Google directly, and actually on a practical matter,

12    meaning more of them are only really focused on Google.  And

13    having a small company caught up in the type of discovery

14    that's being contemplated here would be exceptionally

15    burdensome for PointRoll.

16         Given that, I mean, the business of PointRoll is

17    literally to create the Internet advertisements and serve

18    them.  People don't have PointRoll account.  It's just --

19    it's a different thing entirely.

20         And there's not much -- there's a passing

21    suggestion that Google and PointRoll were somehow connected.

22    I don't actually know the basis of that, the factual basis

23    of this from my perspective.  There's no connection between

24    the two companies.  In fact, PointRoll competes with Double

25    Click, which is a Google subsidiary.

1          So it's about streamlining the issues, about

2    focusing discovery.  And the last bit is really about

3    fairness.

4          The plaintiffs have raised Google's FTC

5    settlement.  That stemmed from the Google buzz social media

6    platform, and then there has been a further action on that.

7    And it talks about specific representations that Google was

8    alleged to have made.

9          I will let that stick with my colleague for him

10   to respond.  I'm sure he will.  But if PointRoll is going to

11   be subject to an action, I would think it would be at least

12   based on PointRoll's representations or lack thereof, not

13   anything else.  A lot of the complaint talks about things

14   that Google said and then said PointRoll is liable, and

15   that's not fair to a company like PointRoll.

16         And so we're trying to ask for a separate

17   complaint, to focus the legal issues and to streamline the

18   case, and we're -- on timing, we are very happy to go along

19   in lockstep.  We had suggested maybe going in front to, as a

20   test case or whatever, but Google does not like that idea,

21   and so we're very happy and we put in the scheduling order

22   that we're very happy to stick with the schedule.  We're

23   just trying to figure out what the issues are with respect

24   to PointRoll and to segregate those off from Google.

25              THE COURT:  All right.

1              MR. GRYGIEL:  I'm sorry, your Honor, if I might?

2     I need one minute.  May I have one minute?

3              THE COURT:  Yes.  I was going to ask someone

4     from plaintiffs.

5              Are you done, sir?

6              MR. McNICHOLAS:  I am, unless you have

7     questions.

8              THE COURT:  Let's hear from plaintiffs' counsel.

9              MR. GRYGIEL:  Thank you, your Honor.  Take a

10    page from Mr. Barnow's book.  We'll rest on our papers on

11    the legal arguments about the separation of PointRoll.

12             I'd like to make three factual points.  First, I

13    just heard that PointRoll is a small company.  I don't think

14    that's quite so.  PointRoll is a rich media advertisement

15    company owned by Gannett, a very large --

16             THE COURT:  Well, I really don't want to hear

17    the legal argument.

18             MR. GRYGIEL:  It's not legal; it's factual.

19             THE COURT:  All right.  What I want to hear

20    is process, not legal or factual from this point.  And if,

21    in fact, the facts that are, the operative -- I'm looking

22    at this case as though there's a basic set of operative

23    facts.

24             MR. GRYGIEL:  Yes, your Honor.

25             THE COURT:  And at this point I'm not sure how

1    PointRoll and Google, whether those facts -- where the

2    interception of those facts are.

3            If it's a very small slice of this huge pie,

4    then it could be that in the future, I don't see why these

5    two defendants should go forward in lockstep.  So I'm not

6    sure I want to address it today, although I'm sure you are

7    prepared, because you seem very prepared to address anything

8    and everything.  But I want you to be thinking about that

9    because, again in my courtroom, the F word is fairness, and

10   it's not a bad thing that I am not necessarily going -- not

11   all parties are created equal.

12           And so you all as plaintiffs need to think

13   carefully about why this company is associated with Google

14   and this litigation.  The one complaint I picked up that I

15   was looking at that only had statutory claims only had

16   Google as a defendant.

17           So at this point I have not investigated the

18   case enough to know what PointRoll's role in all of this

19   was, but I just want you to think carefully about the

20   process and whether these two defendants are created equal

21   and should be put to the same burdens and schedule.

22           MR. GRYGIEL:  That's exactly what I was going to

23   say, your Honor, was that at this point, we believe there

24   are efficiency goals and gains to be prospered by treating

25   them both in the same case at the same time.

1              PointRoll, according to the guy who wrote the

2      story, this fellow John Meyer, was running these scripts

3      that were using the same code that the plaintiffs allege

4      Google was using.  And PointRoll's chief executive officer,

5      a fellow named Rob Gattos, admitted later that we don't

6      currently do that, but we did a limited test for a period

7      where we were doing it.

8              So from a factual standpoint, there is

9      sufficient indicia at this point, I think, your Honor, to

10     keep them in the case, and I don't think there's any

11     inefficiency from doing so.  At the appropriate time, they

12     can always move to sever or they'll answer a motion to

13     dismiss like everyone else in the world.  But there is a

14     factual basis that links the two together is the point I was

15     going to make.

16             THE COURT:  Or their use of this code for a

17     limited period of time.

18             MR. GRYGIEL:  Right.

19             THE COURT:  All right.  Speaking of which, just

20     let me say -- and you may sit down.

21             MR. GRYGIEL:  Thank you, your Honor.

22             THE COURT:  This is an observation to everyone,

23     and particularly to defendants who said that -- let me just

24     quote what you said, because I was fairly amazed.

25             "This matter will not be referred to a

1    Magistrate Judge for the purposes of exploring ADR."  I've

2    never been told that in a proposed scheduling order.  So let

3    me just say that if you all agree to an alternate form of

4    ADR, I'm happy with that, but ADR is a required step in the

5    litigation process, and absent agreement by the parties that

6    you are taking it outside of court, it will be referred to a

7    Magistrate Judge for purposes of ADR.

8           So I mean at this point I appreciate the fact

9    that I understand there may be an issue.  The plaintiffs

10   know that I understand there may be an issue.  I don't think

11   that we can move the ball forward by any further discussion

12   about PointRoll and its limited use of a code in the scheme

13   of things.  I think it's something we need to address after

14   we have a little more information.  All right.

15          MR. STRANGE:  Your Honor, Brian Strange.

16          On just a housekeeping note, part of our motion

17   was to consolidate two cases that were subsequently

18   transferred by the panel.  That's the -- that's the Dogga

19   (phonetic) case and the Nobles case.  So your Honor may

20   consider issuing a separate order just consolidating those

21   for pretrial purposes so we're all in the MDL today.

22          THE COURT:  All right.  Is there any objection

23   to that further consolidation?  I mean, are there papers

24   here someplace?

25          MR. RUBIN:  No.  No.  We are in favor of it.

1              THE COURT:  All right.  I will take care of

2     that.

3              MR. STRANGE:  Thank you.

4              THE COURT:  All right, counsel.  Thank you very

5     much for your time and your patience.  I appreciated being

6     further educated on the manner.  And I'm looking forward to

7     moving the case along as efficiently and fairly as we most

8     possibly can.

9              Thank you.

10             (Counsel respond, "Thank you, your Honor.")

11             (Court recessed at 10:15 a.m.)

12                        -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25