1                IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3                          - - -

4
      IN RE GOOGLE INC. COOKIE      :   CIVIL ACTION
5     PLACEMENT CONSUMER PRIVACY    :
      LITIGATION                    :
6     -------------------------- :   NO. 12-MD-2358 (SLR)

7

8                          - - -

9                          Wilmington, Delaware
                           Thursday, July 25, 2013
10                         2:00 o'clock, p.m.

11                         - - -

12    BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.

13                         - - -

14    APPEARANCES:

15
               KEEFE BARTELS, LLC
16             BY:  STEPHEN G. GRYGIEL, ESQ.
                    (Red Bank, New Jersey)
17

18                  -and-

19
               STRANGE & CARPENTER
20             BY:  BRIAN RUSSELL STRANGE, ESQ.
                    (Los Angeles, California)
21

22                  -and-

23

24                         Valerie J. Gunning
                           Official Court Reporter
25

1    APPEARANCES (Continued):

2

3                BARTIMUS, FRICKLETON, ROBERTSON & GORNY, P.C.
                 BY:  JAMES P. FRICKLETON, ESQ. and
4                     EDWARD D. ROBERTSON, JR., ESQ.
                      (Leawood, Kansas)

5

6                         -and-

7

8                FINGER & SLANINA, LLC
                 BY:  DAVID L. FINGER, ESQ.

9

                          Counsel for Plaintiffs

10

11

12               FISH & RICHARDSON, P.C.
                 BY:  SUSAN M. COLETTI, ESQ.

13

                          -and-

14

15               SIDLEY & AUSTIN LLP
                 BY:  ALAN CHARLES RAUL, ESQ.
16                    (Washington, D.C.)

17

                          Counsel for Defendant
18                        PointRoll Inc.

19

20               WILSON SONSINI GOODRICH & ROSATI
                 BY:  MICHAEL H. RUBIN, ESQ. and
21                    ANTHONY J. WEIBELL, ESQ.
                      (Palo Alto, California)

22

23                        Counsel for Defendant
                          Google

24

25

```
 1    APPEARANCES (Continued):

 2
               MORRIS, NICHOLS, ARSHT & TUNNELL
 3             BY:  RODGER D. SMITH, II, ESQ.

 4
                        -and-
 5

 6             ROPES & GRAY LLP
               BY:  DOUGLAS H. MEAL, ESQ. and
 7                  LISA M. COYLE, ESQ.

 8
                    Counsel for Defendants
 9                  Media Innovation Group, LLC and WPP plc

10

11
               RICHARDS, LAYTON & FINGER, PA
12             BY:  RUDOLF KOCH, ESQ.

13
                        -and-
14

15             VENABLE LLP
               BY:  EDWARD P. BOYLE, ESQ. and
16                  DAVID CINOTTI, ESQ.
                    (New York, New York)
17

18                  Counsel for Defendant
                    Vibrant Media Inc.
19

20                     -  -  -

21

22

23

24

25
```

P R O C E E D I N G S

    (Proceedings commenced in the courtroom, beginning at 2:00 p.m.)

    THE COURT:  All right.  Let's start out with introductions, if we could.  Let's start with plaintiffs' counsel.

    MR. STRANGE:  Good afternoon, your Honor.  Brian Strange for the plaintiff class.

    THE COURT:  All right.  Thank you.

    MR. ROBERTSON:  Your Honor, Edward Robertson for the plaintiff class.

    MR. GRYGIEL:  Good afternoon, your Honor.  Steve Grygiel for the plaintiffs.

    MR. FRICKLETON:  And James Frickleton for the plaintiffs.

    THE COURT:  All right.  Thank you.

    MR. FINGER:  Good afternoon, your Honor.  David Finger for the plaintiffs.

    THE COURT:  All right.  Start with one of the defendants.

    MR. RUBIN:  Good afternoon, your Honor.  Michael Rubin of Wilson Sonsini for defendant Google.

    MR. WEIBEL:  Anthony Weibel for defendant

1    Google.

2                    MR. MEAL:  Douglas Meal for defendants WPP and

3    Media Innovation Group.

4                    MR. SMITH:  Good afternoon, your Honor.  Rodger

5    Smith from Morris Nichols, for the same two defendants, WPP

6    and Media innovation.

7                    MR. KOCH:  Rudy Koch from Richards, Layton &

8    Finger on behalf of Vibrant Media, Inc.

9                    MR. CINOTTI:  Davidson Cinotti for the defendant

10   Vibrant.

11                   MR. BOYLE:  Good afternoon, your Honor.  Edward

12   Boyle for defendant Vibrant.

13                   MS. COLETTI:  Your Honor, Susan Coletti from

14   Fish & Richardson for PointRoll.

15                   THE COURT:  All right.  Thank you.

16                   MR. RAUL:  Alan Raul, also for PointRoll.

17                   MR. NICHOLS:  Brent Nichols, Sidley & Austin,

18   for PointRoll.

19                   THE COURT:  All right.  Thank you very much.

20                   These, I believe, we're hearing argument on

21   defendants' motion.  Have you coordinated your argument so

22   I'm not hearing the same thing four times, three times?

23                   MR. RUBIN:  Indeed, we have.

24                   THE COURT:  All right.  You may proceed.

25                   MR. RUBIN:  Good afternoon again, your Honor.

1    Michael Rubin of Wilson Sonsini for defendant Google.

2              On the point of coordination, I'm going to

3    present argument for all three remaining defendants.  I

4    believe you saw yesterday that PointRoll had settled with

5    the plaintiffs.  There may be an issue here or there where

6    the parties differ.  If your Honor has questions, counsel

7    for one of the other defendants can rise and address those.

8              THE COURT:  All right.

9              MR. RUBIN:  But at this stage, we all believe

10   that common issues running through all of, in effect, all of

11   the defendants can be resolved right now and a favorable

12   ruling on a motion to dismiss.

13             THE COURT:  All right.

14             MR. RUBIN:  So this case has seen a fair bit of

15   complexity.  There are a lot of lawyers here today.  I

16   remember the last time I was here, it was a fairly chaotic

17   day.

18             The issues in Google's motions to dismiss are

19   quite straightforward.  Plaintiffs allege that they were

20   users of apples Safari web browser and Microsoft's Internet

21   web browsers.  Notably, that they used those browsers in

22   their default settings exactly how they came from Apple and

23   Microsoft, and that Google and the other defendants set

24   cookies on those browsers.  Also notably, they don't

25   actually allege that any of the defendants had cookies on

1    their browsers, just that cookies were set on browsers

2    generally.

3            Our motion is straightforward because two issues

4    decide, and those two issues run through each of the claims

5    and plaintiffs' claims to standing here, and those two

6    issues are pleaded clearly within the four corners of the

7    complaint.

8            Together, they can decide the case in Google's

9    favor, and they're these two issues.  Plaintiffs do not and

10   cannot allege causation, and they do not and cannot allege

11   harm.  And those two fundamental facts are enough to allow

12   this Court to dismiss the complaint as is routinely done in

13   cases like this.

14           We've cited a litany of cases in our papers and

15   I'm happy to walk through some of them today, if it would be

16   helpful, but this is not a unique posture for a case like

17   this, alleging these types of claims, certainly over

18   cookies.  This has been the history for a decade.  Cases

19   like this are broad and on motions to dismiss.  Particularly

20   where plaintiffs have been unable to articulate harm, the

21   courts dismiss them.

22           I'd like to walk through quickly the two

23   salient points that resolve through all the claims, and

24   I will walk through most of them, skipping where I can to

25   save some time.  But I think I also commend your Honor to

1    review the briefs where all of this is laid out in great

2    detail.

3                    THE COURT:  Yes.

4                    MR. RUBIN:  And I can see from your face that

5    you know that sometimes it's laid out by multiple parties.

6    So you'll forgive me if I'm in some places brief and refer

7    you to the briefs.

8                    The first issue is this.  Plaintiffs argue that

9    Google and the other defendants used cookies to collect

10   information about them, but the consolidated complaint makes

11   absolutely clear that the information they're upset was

12   collected is actually sent by plaintiffs' browsers directly

13   to the services.

14                   And I'm going to get back to it for a second

15   because I think it's quite important here to parse out the

16   communications at issue, what's being sent.

17                   If we look at -- a few relevant paragraphs of

18   the complaint.  I will point them out as I'm going.

19                   Plaintiffs really allege a few independent

20   communications, only one of them that actually goes to the

21   defendant.  They allege that they type URLs into browsers.

22   URLs are a uniform brief.  That's indicated in the browser

23   like CNN.com.

24                   Plaintiffs say that -- these are what are

25   called get requests.  The technical term for how that's sent

1    is a get request.  It's the HTML.  Hypertext market

2    language.

3              They allege, and this is true, it's a factual

4    allegation and it happens to be actually descriptive of how

5    the Internet works.  They allege that that get request

6    contained some information about the browsers, what we've

7    referred to as browser-generated information, so that we

8    didn't have to constantly refer to this litany of things in

9    the briefs.

10              But the things include IP address, the type of

11    browser they're using, the screen resolution and,

12    importantly, the URL contains that information.  Otherwise,

13    they wouldn't be able to get to where they're going.

14              They allege two other communications happened if

15    the defendants are involved.  If the website wishes to

16    display, for example, a Google ad, the website sends an

17    instruction back to the browser, telling the browser,

18    browser, send all that information you just sent me to

19    Google, or in this case technically it would be double

20    click, but send that over there so that they can send me the

21    right ad to populate into your browser and then all of that

22    same information, all of that browser-generated information,

23    is set in another get request, not to the website this time,

24    but directly from the browser to the service, in this case,

25    to Google.  That's a direct transmission, direct

1   communication.

2          And cookies played no part in this.  Cookies

3   don't enable that communication.  That communication occurs

4   on browsers that don't have any cookies.  It would have

5   occurred on their browsers long before they ever got a

6   cookie.  If they actually did get a cookie, it would occur

7   on them afterwards.  Cookies simply play no role in this.

8   And the same information is sent with a cookie as without a

9   cookie.

10          But plaintiffs' case is directed in large part

11   to how Google and the other defendant placed users, rather,

12   placed cookies on users browsers.  Plaintiffs say -- these

13   are a lot of words, but they say that defendants tricked

14   their browsers.  But, in fact, the functionality that was

15   used to place these cookies was functionality that was

16   designed into the browsers by Apple and Microsoft.  But at

17   the end of the day, particularly for this motion, that's

18   entirely besides the point, because the information that

19   plaintiffs argue Google and the other defendants shouldn't

20   have been receiving, they would have been receiving anyway

21   without these cookies, as I just explained.  These get

22   requests come anyway.

23          And plaintiffs had been sending it, that

24   information to Google and defendants and countless others,

25   not just these defendants -- that's the way browsers work --

1    long before this case arose and they'll be sending it long

2    before this case gets resolved, because that's just how the

3    Internet works.

4              And that explains why they can't allege a

5    credible theory of harm for the jury, which brings me to my

6    second point, the one that resolves this point.  They have

7    not alleged they've suffered any cognizable harm.  Really,

8    in paragraphs 242 to 244 of their complaint, way back,

9    interestingly, in a cause of action that's directed only

10   to Google, they assert that they lost the opportunity to

11   sell their information at full value.  This sort of

12   diminished value theory has been consistently rejected by

13   courts.

14             And putting aside that Google would have

15   received the information with or without the cookies,

16   plaintiffs allege no facts that would allow the Court to

17   infer that they ever tried to sell their information, that

18   they ever had an opportunity to sell their information,

19   let alone how or why the conduct that they allege here

20   undermine their ability to sell it and reduce the value

21   for which they were offered it.  And this lack of causation

22   and harm to the named plaintiffs, because the harm has to

23   be to one of these four named plaintiffs, requires dismissal

24   of the complaint.

25             First, I am going to address standing.  Then I'm

1    going to walk through some of the key causes of action.

2              Plaintiffs select standing for two basic

3    reasons.  First, they have not alleged harm, as I just

4    explained.  I'm going to walk through that a bit more.

5    And they have not alleged sufficiently the elements of

6    the statutes and they can't allege the elements of the

7    statutes that they say excuse their inability to allege

8    harm.

9              Fundamentally, it's simply not enough to allege

10   that your information has been tracked or accessed.  You

11   have to allege some resulting harm from that access or

12   track, and plaintiffs have not and cannot do that.

13             So as I mentioned, plaintiffs claimed to have

14   lost the opportunity to sell their personal information at

15   full value, but there are no facts whatsoever in the

16   complaint that support that allegation, and therefore it's

17   merely a conclusion that the Court can't credit.

18             What they do instead, because they're unable to

19   allege facts about themselves, is they cite studies and

20   services that had no connection to them or to this case.

21   None of them involved the consumer receiving payment for the

22   sort of information that's involved here, the information

23   that a browser sends a get request that they allege is in

24   their complaint.

25             They all involve either academics postulating

1   about the intrinsic value of personal information or some

2   services that allow people to pay to have certain

3   information protected.  There's nothing akin to what's at

4   issue here.

5           Ultimately, they simply have not shown that they

6   suffered injury in fact, let alone, let alone when it's

7   concrete and particularized and not conjecture and certainly

8   one that's not traceable to them.

9           A long line of cases have dismissed privacy

10  claims on the very same grounds.  These are in our briefs,

11  but I will mention them briefly.  The LaCourt versus

12  Specific Media case, DelVecchio v. Amazon, and very

13  recently, the younger versus Pandora Media case.

14          Also, in re Google Privacy Policy Litigation,

15  Lowe versus LinkedIn and Jet Blue.  This is a line that goes

16  back very long.

17          In the end, plaintiffs say, though, that they

18  actually don't need to allege that kind of harm.  They don't

19  need to allege it because they've asserted some statutes

20  here and that the statutes provide that standing.

21          Plaintiffs appear to misunderstand the rule.

22  Merely reciting the elements of a statute is not enough to

23  invoke the standing that the standing might confer.  The

24  elements of the statute must be plausibly met and they

25  certainly can't be contradicted by the allegations, as they

1   are here.  The fact that they're contradicted means that

2   plaintiffs can't rely on a statutory standing basis to -- as

3   a basis for proceeding with their litigation.

4            And notably, there's only, only one set of

5   claims that even contain a statutory standing possibility,

6   and that's those under the Wiretap Act.  The rest of the

7   claims, even those that are based on statutes, expressly

8   require some sort of injury.

9            For example, the Federal Computer Fraud and

10  Abuse Act has a statutory standing requirement far higher

11  than Article III standing, and I will get to that in a

12  moment, and some of the California statutory claims also

13  have standing requirements far above Article III, and if

14  they can't meet Article III, they certainly can't meet those

15  statutory requirements.

16           So looking at the Wiretap Act, where plaintiffs

17  say they don't need to allege harm, the Wiretap Act itself

18  says I get damages if the provisions are violated.

19           Plaintiffs need to show that the provisions are

20  violated and they can't.  So the federal claims that they

21  assert simply don't fit here.  The Wiretap Act and the

22  Source Communications Act simply don't fit, not to mention

23  the remarkable tension between asserting those two claims.

24           So the very first step you need to take when you

25  are looking at a Wiretap Act claim is to look at what the

1    communication is, because otherwise you can't analyze as a

2    fact-finder what's going on.  You can't look, you can't try

3    to make a decision.

4              Here, we don't have to question that.  The

5    complaint very clearly in its early stages, in paragraphs

6    between 30 and 45, very clearly explain, I think it's

7    paragraph 41 that does the most work on this, that it's the

8    get request that I explained earlier.

9              The get request from plaintiffs' browsers to

10   defendants in response to the website that they visit, that

11   is the communication that defendants receive.  They don't

12   receive anything else.  Defendants can't possibly be a party

13   to a communications that goes directly from plaintiffs'

14   browsers to another website.  It's simply not how the

15   Internet works.

16             And so in light of that, there are two reasons

17   why the Wiretap Act claim can't proceed, because the

18   elements aren't met.  The first and perhaps the simplest is

19   because Google is a party to the communication, and the

20   Wiretap Act is somewhat of a strange beast.  It sets out a

21   broad prohibition against interception and then carves out a

22   very significant number of exceptions to that.  So seeking

23   an exception to the Wiretap Act is nothing abnormal.  It

24   happens all the time.

25             When we receives e-mails, when your Honor

1    receives e-mails, those are interceptions of electronic

2    communications, but we're intended recipients of them.

3    We're parties to them, so they're not violations of the

4    Wiretap Act.  All sorts of things we do in our daily life

5    are excused from liability under the Wiretap Act because

6    we're parties to those communications.  The same here.

7    Material that is sent directly to a party can't be subject

8    to a Wiretap Act claim.  But even if we credited a claim and

9    even if you could imagine a world in which the communication

10   prior to the placement of the cookie was sent and then the

11   cookie was placed and then the next day it was the same type

12   of communication, but there was a cookie there and you

13   looked past the party exception, kind of hard to do that,

14   but if you look past the party exception, you can't get past

15   the other requirement of the Wiretap Act, which is that it

16   only covers the interception of contents, and that is

17   something related to the substance, report or meaning of the

18   underlying communication.

19           And as plaintiffs' complaints make clear, these

20   cookie values are just strings of text, a bunch of different

21   characters.  They don't change based on what is in the web

22   page that's being sent.  They're not related to the

23   substance or meaning of that page.  The cookie value does

24   not tell you what's on the website.  It's not content.  It's

25   transactional information, at most, and transactional

1    information has been routinely held to be outside the scope

2    of the Wiretap Act.  The senders of an e-mail, the who,

3    what, where, when and why, that's all outside the Wiretap

4    Act.  The Wiretap Act protects communication and that's

5    simply not anything that they've asserted here.  So the

6    Wiretap Act cannot provide plaintiffs with a basis for

7    having standing.

8            There's another claim that plaintiffs have

9    asserted similar to the Wiretap Act.  It's actually its

10   mirror opposite and its the claim under the Stored

11   Communications Act.  It's Count 2.

12           I first have to just point out that the exact

13   same alleged facts cannot support both a Wiretap Act claim

14   and a stored communications claim.  They're mutually

15   exclusive.  And while I'm going to go a little bit further

16   on this, I don't think we need to go much further than

17   looking at the allegations that plaintiffs make that these

18   communications were intercepted in transit.  They make this

19   in their attempt to make the square pegs of their facts fit

20   the round hole of the Wiretap Act.  They go to great length

21   to articulate how these communications were intercepted in

22   transit.

23           The Stored Communications Act only applies to

24   communications that are accessed well in a certain limited

25   type of electronic storage, where that storage is being done

1    by a certain limited type of defined people.  So it's a

2    strong protection, but it's very narrow and it simply has no

3    application to this case.

4           And I particularly commend your Honor to read,

5    for example, the in re iPhone decision by Judge Coe.  She

6    did a very splendid job of walking through the case law and

7    the ramifications of determining the sort of communications

8    that would apply here.  But plaintiffs still assert it and

9    they twist themselves in knots a little bit.

10           So the Communications Act only applies to

11   electronic storage, as I just articulated, and electronic

12   storage means any temporary intermediate or intermediate

13   storage.  Well, we know that does not apply here because

14   they're claiming that these cookies enabled something that

15   occurred over time and enabled either interception over

16   time, collection over time, correlation of information over

17   time.  It wasn't something that was done briefly.  The

18   cookies were placed on browsers and they stayed there.

19   That's what they allege.  So there's nothing intermediate.

20           And the other component of the definition is

21   that it's stored by a communication, an electronic

22   communication service for the purpose of backup protection.

23   Well, cookies aren't placed for backup protection.  It does

24   not make any sense.

25           But beyond missing that -- on that sort of basic

1  elemental problem with these cookies not being on electronic

2  storage, they can't allege that there are any SCA, Stored

3  Communications Act covered facilities here.  The SCA only

4  applies to communications that an electronic communication

5  server is storing in its own facilities, facilities that it

6  provided.  Nothing like that has been or could be alleged

7  here, and as I mentioned, a long line of cases have rejected

8  claims that things like mobile phones and personal devices,

9  and, in facts, cookies, are covered facilities under the,

10  under the Stored Communications Act, and every case that has

11  thoughtfully analyzed this question has come out in that

12  direction.  There are a few outliers.  I don't know how they

13  reach that conclusion, but any case, if you look at them,

14  these are not one-line decisions.  Particularly the iPhone

15  case I really do commend your Honor to read.  It's a very

16  lengthy review and analysis and I think it's very clear.

17       SCA covered facilities are things like the

18  information that electronic communications service providers

19  store on their own facilities, so what, what an Internet

20  service provider, where it stores its e-mail.  And it's

21  designed to protect against having someone breakthrough

22  security protocols, breakthrough and go into that server and

23  get e-mail, things like that, in temporary storage.

24       Plaintiffs seem to recognize the problem with

25  their allegations in their complaint because they make a

1    totally different argument in their opposition.  In their

2    opposition they don't argue that the facility are the

3    cookies.  They argue that -- I'm a little bit confused by

4    their argument, but let's see.  It's something like Google

5    is the provider of the electronic communication.

6    Plaintiffs' browser managed files are part of Google's

7    facilities and the cookies are temporarily stored.  That

8    does not work for all the reasons I just described, but I

9    want to highlight one of the real problems with this for

10   plaintiffs' claim.

11           There's an exception under the Wiretap Act --

12   sorry, under the Stored Communications Act.

13   18 U.S.C. 2701 (c)(1).  18 U.S.C. 2701(c)(1).  And it says

14   that the bar on access to the stored communication doesn't

15   apply to the electronic communication service provider

16   that's providing the service.

17           So under plaintiffs', this new theory in the

18   opposition where Google is the ECS provider, even if you

19   could imagine the SCA, the Stored Communications Act claim

20   applying, Google would have been authorized to get access

21   to those cookies because plaintiffs' computers were Google's

22   facilities under this, but it actually gets worse for

23   their position because the statute also says that Google in

24   that circumstance would be allowed to give third parties

25   access to their computers because that authorization is not

1    just for the provider, but it's anyone the provider

2    authorizes.

3              And there are other components of the statute

4    that wouldn't make much sense.  Plaintiffs would be subject

5    to compel disclosure of these files to the government under

6    18 U.S.C. 273(a).  Their argument just does not make sense

7    and for good reason.  The Stored Communications Act was

8    never designed for this sort of case and it's why Courts

9    consistently rejected it.

10             So those are the first two federal claims.  I'm

11   going to move on to the last federal claim, and that's the

12   Computer Fraud and Abuse Act.

13             There are a lot of very technical components

14   to this statute, but I think we can resolve it just by

15   looking at the standing provision in the statute, and so

16   I'm going to focus on that.  The rest of it is brief in

17   our papers.  If your Honor has questions, I am happy to

18   answer them.

19             Unlike Article III, where you have to allege a

20   concrete injury that's particularized and traceable, which

21   plaintiffs have not done, just doing that wouldn't get you a

22   CFAA claim.  Congress was clear that not everything that

23   violated the technical words of the statute would be enough

24   to get one into court.  There's a $5,000 jurisdictional

25   limit.  You have to have been damaged or suffered loss in

1      the amount of $5,000 in order to state a CFAA claim.

2                  And damage and loss are defined terms and

3      they're limited to economic damages.  It's an actual

4      detriment to you.  It's not a benefit to someone else.  It's

5      a detriment to you.

6                  Damage is defined as any impairment to the

7      integrity or availability of data, a program, a system or

8      information.  We don't have to spend any more time on damage

9      because plaintiffs didn't allege any in their complaint.

10     They do come back again in their opposition, maybe they

11     recognize this problem and make a new argument.  Can't be

12     credited.  It's not in their complaint, but I will just tell

13     you, they claim that the planting of these cookies somehow

14     impaired the operation of their browsers.  That's not true.

15     The browsers operated just as they were designed to operate,

16     and their complaint makes that very clear.  Their complaint

17     includes the information either in the complaint or what

18     they attached.  The subject of our request for judicial

19     notice, that's unopposed.  Exactly how these browsers

20     operated.  Nothing was impaired.  They weren't unable to

21     visit websites.  They continued to operate just as they were

22     designed to.  But, in any event, that wouldn't be a basis

23     for denying the motion because it's not in a complaint at

24     this point.

25                 Loss.  The other way you can get to $5,000 if

1    you actually have suffered any injury is defined as a

2    reason, any reasonable cost to any victim, including the

3    cost of responding to an offense, conducting a damages

4    estimate and restoring data, program, system or information

5    to its condition prior to the offense and any revenue lost,

6    costs incurred or other consequential damages incurred

7    because of interruption of service.  So that last clause is

8    quite important.  Lost revenue, cost incurred or other

9    consequential damages have to be due to an interruption of

10   service.

11          Now, plaintiffs have not alleged any

12   quantifiable damage at all, so there would be no way for the

13   Court to even infer that anything could get them to $5,000,

14   but I'd say there's no way they can allege at all ever loss

15   under this statute.  Economic damages this way, there's no

16   way they had loss.  If everything happened exactly as they

17   allege, and this is a motion to dismiss, so we're going to

18   operate in that world, all they had to do was clear their

19   cookies.  That does not cost anything, first of all.  So

20   there's no way they get to $5,000.

21          And, second, courts have routinely held that the

22   unauthorized collection, use, and disclosure of genuinely

23   personal information, like people's names, things like that,

24   not the browser-generated information that's being sent

25   here -- Courts have routinely held that's not a cognizable

1    loss under the CFAA, and I point to your Honor to the

2    DelVecchio versus Amazon decision.  This is actually

3    DelVecchio 2.  There are two of those cases, both important

4    for different reasons.

5           IPhone, again, 2 and Double Click.  I think the

6    fact that there's iPhone 2 and DelVecchio 2 is a good

7    identifier that these cases tend to get dismissed the first

8    time around and they often get dismissed the second time

9    around, too.  You see multiple decisions coming out because

10   plaintiffs, they're grasping at a way to try to a certain

11   harm under statutes that don't typically fit.  I would

12   commend you to DelVecchio versus Amazon, the second of those

13   opinions, and the DelVecchio case.

14          There are other ways which they have problems.

15   We don't think we need to go into it right now.  It's very

16   extensively briefed, particularly in the Vibrant brief, that

17   they can't aggregate properly here.  But as I think I

18   learned when I was quite young, zero times anything is still

19   zero, so aggregation is somewhat irrelevant at this stage of

20   the argument.

21          There are a number of claims that are asserted

22   only against Google, so the claim that I just walked

23   through, the Wiretap Act claim, the interception claim,

24   which is vitiated by the fact that it's sent directly to the

25   services, Stored Communications Act claim, vitiated because

1    no electronic storage, no facilities, and Computer Fraud and

2    Abuse Act claim, vitiated because no damages at all let

3    alone $5,000 damage or loss.  Those apply to all the

4    defendants.

5            The remaining causes of action that I'm going to

6    go through, I'm going to try to be brief here, apply to

7    Google, and there are two that are analogs to certain of the

8    federal claims.

9            The first of the analogs, the Computer Fraud and

10   Abuse Act.  It's California computer crime law.  That claim

11   also requires damage or loss.  It does not have the $5,000

12   jurisdictional threshold, but it still requires actual

13   quantifiable damage or loss.

14           Here, there's no quantifiable damage or loss.

15   All we have here is an allegation of a lost opportunity to

16   sell personal value, to sell personal information at full

17   value without an explanation of what the market is, without

18   an explanation of who offered the information for sale, who

19   offered to buy it, and the fact that it was diminished in

20   value because of the events alleged here.  That would be

21   something like the buyer heard about this and said, oh, I

22   was going to offer you X, but now I'm going to offer you X

23   minus Y.  Those facts are implausible and they have not been

24   alleged, but the current allegations don't meet the

25   threshold that is required.  So the California computer

1    crime cause of action also doesn't seem to proceed.

2            And multiple courts have, when they dismissed a

3    federal Computer Fraud and Abuse Act claim, have dismissed

4    its tagalong state claim as well.  I can point you to the

5    Nextel case from 2012 in California.

6            And similarly there's a California invasion of

7    privacy claim.  That is essentially the California version

8    of the Wiretap Act.  The only difference is that it's an all

9    party consent statute, but the communication that was

10   intercepted here at the complaint on a, on a very straight

11   read of the four corners of the complaint, it's very clear

12   that this is the communication that was a sent to the

13   parties, to the defendants, rather.  There are only two

14   parties to that communication, and when you send something

15   directly to someone else, you're consenting to their receipt

16   of it.

17           So the California invasion of privacy claim goes

18   away.  Plaintiffs have also alleged two California common

19   law invasion of privacy claims, one denominated invasion of

20   privacy.  They both overlap.  They didn't dispute that in

21   their opposition.  I don't think they'll dispute it today.

22           They have to allege that Google invaded a

23   legally private matter in a highly, that would be highly

24   offensive to a reasonable person constituting a serious

25   invasion of privacy.  Well, it's not a legally private

1    matter if you are sending it to a website in the first

2    place, and I think the most on point case to which I would

3    direct your Honor's attention to, there are two of them, is

4    the Lowe versus LinkedIn case, which notes that California

5    sets a high bar for invasion of privacy claims, and has

6    noted that disclosure of browsing history is not highly

7    offensive.

8            But I think perhaps given that the plaintiffs'

9    claim has this disconnect in it, they -- they're upset about

10   the way cookies are placed on their browser, but their

11   complaint is mostly about the sending of information or the

12   correlation of it to send to, send more targeted ads, which

13   is done all the time.  It's totally ubiquitous and it's

14   well-known.

15           I want to read a case, read a small quote.  I'm

16   loathe to do this.  I think this is actually quite

17   instructive from the California Court of Appeals, Folcstrum

18   versus Lamps Plus, a 2011 case.  This is the California

19   Court of Appeals.

20           We have found no case which imposes liability

21   based on the defendant obtaining unwanted access to the

22   plaintiffs' private information which did not also allege

23   the use of plaintiffs' information was highly offensive.

24   However questionable, the means employed to obtain

25   plaintiffs', here, address.  There is no allegation that

1    Lamps Plus used the address once obtained for an offensive

2    or improper purpose.  And here, using information to send,

3    anonymous information to send, rather, to display targeted

4    ads isn't an improper or offensive purpose.  It does not

5    offend the senses under California law.  It happens every

6    day all the way.  It's totally routine and there's nothing

7    offensive about it.

8            Cases where drug prescription information was

9    correlated has been found not to be offensive and that's far

10   more personal than some browsing histories can be.

11           The other claims are a little bit perplexing.

12   The California Legal Remedies Act, I was -- I was surprised

13   to see in the complaint even a stretch as compared to many

14   of the other ones.  It applies only when there's a

15   transaction involving tangible chattels and damage in the

16   form of an increased cost or burden.  It does not fit here,

17   and it's for that reason that multiple courts have ruled

18   that it does not apply to software services.  It just does

19   not apply to software.

20           Plaintiffs came back.  They're listed in

21   software, this is a service, and we were buying something

22   with cookies.  I honestly didn't understand the response,

23   but, in any event, the California Legal Remedies Act

24   categorically, is categorically inapplicable to software.

25   Multiple California courts have said that.

1          So we don't need to get into the fact that there

2    was no transaction here, and if you even assume there was a

3    transaction, what was the cost to begin with, because there

4    was no cost and how could it have increased?  It's a little

5    bit mind-bending when you think about how inapplicable it

6    is.

7          Then we have the California Unfair Competition

8    Law, which is another law you'll see when we read our brief,

9    it's somewhat lengthily briefed.  But like some of these

10   other cases, you don't have to get past go the standing

11   question.  It, too, sets a standing bar that's higher than

12   Article III.  This was changed.  It used to be quite

13   different.  There was a proposition that changed that, 7200,

14   which is what this is.

15         You actually have to have had a loss of money or

16   property in order to bring a claim under the unfair

17   competition law, and Court upon Court have held, there's no

18   loss of money, no loss of money alleged in this case.

19   There's a vague statement that they lost the ability to

20   sell, lost an opportunity to sell their information at full

21   value.  I don't know where to begin to look at that, because

22   there's no -- it's not adorned with any facts.

23         They'll point to a bunch of studies and other

24   things, but that does not say anything about these

25   plaintiffs.  The studies aren't about these plaintiffs.

1   They're not about real markets that these plaintiffs

2   participated in and then started getting reduced offers

3   about this.

4            This type of information doesn't diminish in

5   value after one person collects it.  This isn't the way the

6   world works.  It does not happen that way.  So it's

7   implausible.  And so that's the money side.

8            And then data -- sorry, property.  Multiple

9   Courts have held, this was the prevailing law in California,

10  there are no cases going the other way, that data, the loss

11  of data isn't property under the unfair competition law,

12  unless it's something like losing your Social Security

13  number or something like that, but they don't allege that.

14  They can't allege that because that information never would

15  have been here.

16           So that brings us to the end, and we've walked

17  through all the statutes and I appreciate you bearing with

18  me on that.  If you don't have any questions at the moment,

19  I will sit down.

20           THE COURT:  I do not have questions at the

21  moment.

22           MR. RUBIN:  Thank you.

23           THE COURT:  Let's hear from plaintiffs.

24           MR. STRANGE:  Your Honor, Brian Strange for the

25  plaintiffs.

1          We have divided the argument among the

2    plaintiffs with respect to standing first and then the

3    Wiretap Act by Mr. Robertson, and Mr. Grygiel will address

4    the other two federal claims, and then I will address the

5    California claims.

6          As your Honor knows, we do have a settlement

7    on a classwide basis with defendant PointRoll and we intend

8    to file those motions for preliminary approval within

9    30 days.

10          THE COURT:  All right.  Thank you very much.

11          MR. STRANGE:  Thank you, your Honor.

12          MR. ROBERTSON:  Good afternoon, your Honor.  May

13    it please the Court, my name is Edward Robertson, and while

14    Mr. Strange was here, we caught an audible and thought

15    perhaps we ought to do the wiretap thing first.  If the

16    Court doesn't mind, we'll go that way.

17          THE COURT:  All right.

18          MR. ROBERTSON:  Your Honor, we've drawn this

19    chart up, which is based on the pleadings, not things we

20    found out since or otherwise.  We believe this is all in the

21    pleadings and there's a lot of this with which we agree with

22    Google and its counsel.

23          There is at the beginning, Safari is obviously

24    the Apple Internet browser.  It has a built-in do not track

25    device in it.  It sends off, if I want to go look at the

1    Wall Street Journal, it sends off a get request to the

2    Wall Street Journal.  It says, send me your entire web

3    page.

4              Now, the Wall Street Journal has a deal with

5    Google, we're assuming here, that says we're going to let

6    you have some of the space on our web page.  It's called an

7    iframe and it's blank, and you can put ads in there and

8    money goes back and forth on that.

9              So the Wall Street Journal sends its web page

10   back.  Now, my law firm doesn't have a deal with Google.  We

11   don't send an iframe.  So if you go to my little law firm,

12   all you get is my little law firm's website back.

13             So Wall Street Journal also sends back to

14   Safari, look, call up Google and tell them that you want to

15   fill these holes in the web page.  So Wall Street Journal is

16   no longer in the communication.  There is, as Mr. Rubin

17   said, a call from Safari to Google, and I'm going to use

18   call because I'm just a, not as technical as perhaps I

19   should be, and says, fill up these iframes.

20             Google respond and says, okay, I will fill up

21   the iframes.  So then there's this communication that takes

22   place between the two in which the iframes are filled.

23             Now, that's as far as Google's argument went

24   today.  That's benign.  We don't think there's any problem

25   there and that's not what the case is about.  If that's all

1    it were about, we wouldn't be here.  But it's about a little

2    bit more than that because, as I said earlier, Safari has a

3    built-in program in it that says, you can't put these drt

4    cookies on a Safari web browser.  Now, the drt cookies are

5    these tracking cookies, as we call them in the complaint.

6    So it has this built-in brick wall and that's how it's

7    designed to operate.

8            So while Google is filling in these holes on the

9    web page, it's also trying to send a drt cookie to Safari

10   and Safari is designed to block it.  But Google knows

11   something.  When you buy something and you have to fill out

12   a form, you've got to be able to get that form back and

13   forth.  And so in order to defeat the brick wall -- and this

14   is what we plead -- they send this invisible form that

15   tricks Safari, that's the word we use, into thinking that

16   it's not a drt cookie, that instead it's this form, and

17   Safari has to let that happen or you can't do some

18   transactions you want to do on the Internet.

19           So it gets by the brick wall through this device

20   of the invisible form and it goes into Safari and now the

21   tracking cookie is set and it can now track what happens on

22   that computer.

23           So once it's in, it can track.  Now, that's what

24   we claim, your Honor, is the problem in this case, is this

25   getting around the built-in thing in Safari and the Internet

1    Explorer, to keep that tracking cookie from going in, unless

2    you affirmatively say you can do that if you want as a

3    computer user.

4            So I'm going to talk to you, your Honor, about

5    the Wiretap Act.  And Pharmatrak sets out the elements.

6    It's just a statutory case for you, your Honor.  It's a

7    statutory interpretation case.  What are the elements?  And

8    Pharmatrak identifies five.  Some other cases say there

9    might only be four, but they are intentionally, an

10   intentional act.  We've pled that.  We think when you send a

11   trick, a piece of software in there, you know you're doing

12   that, so it's not that they didn't know.

13           Secondly, there has to be an interception.

14   We're going to talk a little bit more about that.

15           Third, there has to be an interception of

16   contents.

17           And, fourth, there has to be an electronic

18   communication and Pharmatrak says by a device.  That's the

19   fifth element.

20           So we've pled all of that.  I don't think

21   there's any question about that.  Those words actually show

22   up and the good news is Pharmatrak existed when we started

23   pleading this and we knew what to write down.

24           So they come in and say, well, we've got two

25   things.  We've got consent here or we're a party.  Now, the

1    consent they talk about in their first set of papers is, the

2    Wall Street Journal gave us consent, but the Wall Street

3    Journal is out of this conversation by the time that the

4    Google Safari is taking place.  All that's left is this

5    conversation, Mr. Rubin is right about that.  There's a call

6    made from Safari to Google.

7             Now, iPhone has some interesting language in it.

8    It says that there can be limited conversations.  If you

9    call the plumber and say, come to my house, I want you to

10   fix the plumbing in my kitchen, I have a leak, that doesn't

11   give the plumber the right to roam around your house, check

12   your mail, look in the garage, go upstairs into your

13   bedroom.  The plumber is given limited consent.  You may

14   enter my house to fix the plumbing in the kitchen.

15            What happens when Google sets this tracking

16   device, it's as though the plumber leaves a bug.  And we say

17   in paragraph 98 that there are other things that are

18   collected and they are personal information.  It's not just

19   URLs.  If it was, it would have no value.  They have to know

20   what you are doing in order to have these targeted ads.

21   They have to know whether you're going to go to the Walmart

22   ad, website, or Neiman Marcus, so the next time you get on,

23   you get something from an expensive purveyor of goods rather

24   than an inexpensive one.  The reason this stuff has value is

25   it tells them about me, it tells them about you, and that's

1    what this cookie does we say in the pleadings.

2            And that is why we think it violates the Wiretap

3    Act.  That is content.  It's intercepted.  It's intercepted

4    when the plumber is in the house during the first phone

5    call, when it's trying to break in because they find out

6    stuff then.  And then when a plumber leaves, the bug is

7    there.  And every time Google shows up, it finds out where

8    you've been.  There's a long list of the things that it

9    tracks we plead in paragraph 98.

10           So two interceptions take place:  The

11   interception when the plumber is there and the interception

12   when the plumber is not there and gone.

13           Now, I think that is basically it in a nutshell,

14   your Honor.  The conversation directly between Safari and

15   Google is a limited conversation.

16           Now, if your Honor reads the statute to say that

17   once you can talk about something, you can talk about

18   everything, then you ought to sustain this motion to

19   dismiss.  But if the statute, and the consent language in

20   Pharmatrak is very close to what we're talking about says,

21   there is limited consent.  You can't simply just get in for

22   a penny and be in for a pound.  If you are in for a penny,

23   you're in for a penny.  And here it was more than that.  Not

24   only was there a limitation on the conversation, but there

25   was an express denial of the right to talk about more, and

1    that's what we pled happened here.

2            So the party exception has to be limited in some

3    way or else it becomes meaningless.  The consent exception

4    has to be limited in some way or else it becomes

5    meaningless.  And the fact of the matter is, Google makes

6    lots of money because this stuff that they say is just a

7    string of numbers tells them all they need to know about me,

8    and that what we say violates the Wiretap Act.

9            Now, I've got some more slides here that are

10   more complicated, but I think given the time the Court has

11   heard already, we'll move on to the other causes of action.

12   But there's harm here because the statute has some

13   provisions for injunctive relief and some fines.

14            I thank the Court for its time.

15            THE COURT:  All right.  Thank you very much.

16            MR. GRYGIEL:  Good afternoon your Honor.

17            THE COURT:  Good afternoon.

18            MR. GRYGIEL:  Steve Grygiel.

19            I lost count at one point during my friend, Mike

20   Rubin's argument, about how many times I heard how the

21   Internet worked.  All I could think of was when I was

22   hearing that was, sounds like a factual question to me,

23   because as your Honor has written in three recent opinions

24   dealing with the pleading standards, factual allegations in

25   the complaint are taken as true, and your Honor in three

1    recent cases, including Wilmington Trust and including Senju

2    Pharmaceuticals and the RICO case has said that under

3    Ericsson versus Partis, the plaintiffs' factual allegations

4    are taken as true.

5            So we have to start this entire discussion from

6    that proposition.  And in this case, what we are talking

7    about is that the defendant here, Google and the other

8    defendants, are saying that a multi-step process done in

9    secret of technological ledger domain that defies easy

10   description is something they had every right to do.  It's

11   something that wasn't blocked by what we allege was the

12   blocking device in place.  That by itself, your Honor, shows

13   that this motion to dismiss, all of the motions to dismiss

14   should fail, because the complaint alleges that blocking was

15   in place, and it alleges factually that the defendants

16   intentionally got around it.

17           As the Pharmatrak case says, your Honor, when

18   there is a financial motive for someone to get unauthorized

19   access, you can pretty much take it to the bank that that

20   access was unauthorized.

21           Anyway, let's talk about standing a little bit.

22   Mr. Rubin was talking about standing and I think he made a

23   couple of mistakes and I think a couple of them are of

24   constitutional dimension.

25           The first one begins with, conflating merits in

1    standing.  In the cases that the plaintiffs cite and in the

2    cases that the defendants cite, we know one thing for a

3    truth.  Warth versus Seldin tells us this.  The merits and

4    standing are separate increase.  Standing is first.

5           We know what Judge Alito told us before he was

6    Justice Alito.  Standing is not Mount Everest.  We know in

7    the United States versus Scrap decision and in the Third

8    Circuit's Echo decision, In re Google Industries, we know

9    that an identifiable trifle of harm suffices for standing.

10          You do not under any constitutional regime that

11   this Supreme Court in the last two years has been thinking

12   about take the merits and say they can't get there, so

13   therefore they don't have standing.  No standing is first.

14          What do we allege?  We've alleged two things.

15   We have alleged two categories of things.  One, statutory

16   violations.  Number two, we have alleged the deprivation

17   of the full value of our personally identifiable

18   information.

19          Let me take the statutory standing first.  And I

20   think there is, as happened in many of the cases Mr. Rubin

21   has cited, there is the effort by defendants to conflate

22   statutory standing with Article III standing in a way that

23   makes it a two-tiered standing requirement.  Essentially

24   says, you have the invasion of the statutory right, which

25   Warth versus Seldin tells us, is enough to make out a claim

1   for standing.  But the defendant says, but PII is not worth

2   anything, Judge.  At least we don't think they've pled it,

3   so they don't have standing.

4          Not so.  Under the Wiretap Act and the Stored

5   Communications Act and under Warth versus Seldin, all that

6   is needed to state a statutory claim for purposes of

7   standing, to open this courthouse door, is the invasion of a

8   statutory right that is your right.  We have alleged that

9   these plaintiffs have the right to be protected by the

10  Wiretap Act and the Stored Communications Act and the

11  Computer Fraud and Abuse Act and that an intrusion upon that

12  right, even if nothing more, even if nothing more happened,

13  is enough.  And we have a great example of that, your Honor,

14  right here in the Third Circuit, and that's the Austin

15  Countrywide case.  Essentially, as your Honor might

16  remember, that is a case that deals with real estate

17  transactions and the RESPA statute.

18         And what the Third Circuit essentially said

19  there, and I'm quite sure a reading of that case will bear

20  me out, is that the statute gives a person who is a

21  participant in a real estate transaction the right to a

22  transaction that is free of conflict of interest.  Well, the

23  defendants in that case said, the bank, well, Judge, why do

24  the plaintiffs care?  It didn't cost them any more money.

25  And the Court properly reading Warth and all of the cases

1    that have followed Warth said, they're entitled to an

2    interest, conflict of interest-free transaction.  They

3    didn't get it.  Ergo, they have standing.

4           In these cases, your Honor, Congress in its

5    infinite wisdom has decided that the plaintiffs have

6    standing and that is enough.  There is nothing more that is

7    required, try as the defendants might to add something to

8    the requirement for standing.  It's just not so.

9           If I can move on, your Honor, to the question of

10   the personally identifiable information, with respect to the

11   standing for the Computer Fraud and Abuse Act, which I will

12   come to substantively in a moment.  Personally identifiable

13   information is something we do allege that these plaintiffs

14   had and were deprived of.  When your Honor looks at

15   paragraphs 1 and 2 of the complaint and couples that with, I

16   believe it's paragraphs 10 to 13, the only possible

17   inference according to the term of the language that we use

18   is that these plaintiffs were using the Internet in a way

19   that resulted in the deposit of these cookies that were

20   supposed to be blocked.

21          Then the question is, okay.  They've got these

22   cookies.  How are they damaged?  We'd say a couple of ways,

23   your Honor.  In all of the other cases, the litany of cases,

24   many of which took place long before the market in Internet

25   data has boomed the way it has now, and many of these cases,

1    for many example, iPhone I think is 2001, you didn't have

2    something you have in this case.  It's a fact that's

3    crucial, and that is the fact of the block.  The block helps

4    to define the value proposition.

5            If I leave my painting out on the front walk and

6    I don't do anything to protect it, it's a fair inference

7    that I don't assign a great value to that painting.  But if

8    I have it behind a block, behind a locked door, the value

9    proposition then is much more reasonable and certainly an

10   inference to which plaintiffs are entitled in a case like

11   this, that they had put their personally identifiable

12   information, described at paragraph 98, in great detail and

13   footnote 67 to 98, that that information has value.

14           Now, the defendants say, as they do, well,

15   Judge, they cite a bunch of studies, but all the case go the

16   other way and, your Honor, I'm not going to belabor them in

17   detail because your Honor I'm sure has read them.  But when

18   one looks carefully at a case like Claridge versus Rockview,

19   that case did not say the personally identifiable

20   information can never have any value in a monetary or

21   monetizable way.  What that case said in fairness was,

22   there's a paucity of information and at this stage of the

23   pleadings, I'm not going to toss the case on that basis.

24   Double Click refused to dismiss the case on the basis of PII

25   not having value.  The LaCourt case noted for example, I

1    believe it was the tepid allegations, the half-hearted --

2    I'm quoting -- efforts made by the plaintiffs to show value.

3    We have a complaint that is full, yes, of studies that show

4    what the value is in the marketplace for this data,

5    including value that Google has assigned to it.

6            We allege much more than those complaints.  That

7    takes us out of the realm of a generalized, completely

8    conclusory allegation that has value.  We're showing in the

9    marketplace for this information, people pay for it.  And

10   when you look at the inferences here to which the plaintiffs

11   are entitled, for example, that Google, Vibrant and MIG and

12   WPT businesses depend wholly on the collection, slicing,

13   dicing and selling of that data, it's pretty easy to see

14   that it has value.

15           Now, Mr. Rubin will say, and the argument gets

16   made, well, Judge, it may have value to me, but it's not

17   lost to them.  Well, the answer to that is twofold.

18   Certainly, under the statutes, it is.  The Computer Fraud

19   and Abuse Act just says information.  It doesn't say

20   proprietary information.  It doesn't say valuable

21   information; just says information.  There are certain

22   things you don't get to have whether that information you

23   think is valuable or not, certain information you just don't

24   get to take for nothing.

25           And the second issue is, how could we sell it?

1    It has already been sold.  I don't have to make an

2    allegation when someone steals my car that I had tried to

3    sell it before and therefore I can tell the police officer

4    that my car was worth $7,000.  That just doesn't add up.

5    That's not, to quote Mr. Rubin, the way it works.  We're

6    entitled to allege that.  We have alleged it as a fact.

7    Discovery will show that these items of information have

8    value.

9         And, again, here, your Honor, we're here on a

10   motion to dismiss, not summary judgment.  And on a motion to

11   dismiss, as the Phillips Third Circuit Court told us, all

12   the plaintiffs have to do is raise a right to relief above a

13   speculative level such that there's a reasonable inference

14   that discovery will produce evidence of the required

15   elements.  And in this case, rife with the detail of facts

16   in this complaint, I submit, your Honor, it's very difficult

17   to come to any conclusion but that we have pled a plausible

18   case and that we have certainly pled standing.

19        To me, it's, in fact, inconceivable that we have

20   not pled standing in a case where the irreducible

21   constitutional minimum of injury in fact is satisfied

22   simply by the statutory violation and the cases that

23   recognize, on less detailed complaints than ours, that

24   PII can have value.

25        Finally, on standing, your Honor, we heard a

1    lot -- not a lot.  We heard some about the requests for

2    judicial admissions that we're not opposing.  No, they were

3    not opposed.  I loved them.  I would take every word in

4    those statements and those requests for judicial admission:

5    Mr. Myers' web blog of February 17th, the Wall Street

6    Journal article of the 17th, Google's privacy policy, and

7    ask your Honor upon reading that whether or not what the

8    plaintiff alleged here makes perfect sense.  What those say

9    in a nutshell is, cookies track.  They don't say cookies are

10   these innocuous benign beings, the mere nuts and bolts of

11   cyberspace.  They all speak of trackable cookies, cookies

12   that permit, as paragraph 98 says, tracking of information.

13           A second thing they say is, Google and the other

14   defendants did this on purpose.  They did it intentionally.

15   That takes care of the intent element in every single claim

16   we have here.

17           The third thing they say is, they did it for

18   money.

19           And the fourth thing they say is that, and all

20   of the quotes in the complaint make it clear, none of the

21   defendants, when they got caught doing it, said, hey, you

22   knew about it.  We have a right to this.  You should not be

23   bothered, you knew about it.  What did Vibrant say?  The

24   hack was a work around.  A workaround?  It sounds like a

25   hack to me, designed to make Safari work like every other

1    browser, meaning no default setting.  Well, that's an

2    admission.

3              What we have from Rachel Whetstone, who was

4    Google's spokesperson, was very simple.  She said, we

5    created a temporary communications bridge essentially

6    between two Google domains.  Well, you'll see in the request

7    for judicial notice materials, Mr. Myers' blog, he explains

8    exactly how that leads to the surreptitious grabbing up of

9    information that the Safari browser was designed to block.

10             And I would say, your Honor, at the end of all

11   of that, those are all fact questions, if they are not fully

12   clear enough from the pleadings.  Those are all enough to

13   suggest a right to relief.  It's far above a speculative

14   level.

15             So on standing, your Honor, I think statutory

16   standing, they simply have it wrong on the law, and, in

17   fact, I like that they cite Lowe versus LinkedIn, because

18   Judge Coe there in her second opinion cites Massachusetts

19   versus EPA, which I won't read, but is, your Honor, I think

20   the best phrasing I've heard of exactly what statutory

21   standing means and basically it is somebody violated a

22   right.  You're protected by the right and you don't need

23   anything more to get inside of that courthouse door.

24             Now, your Honor, I'm going to turn, if I may, to

25   the question just at the top here of the Stored

1    Communications Act.  Chief argument, one of the chief

2    arguments Mr. Rubin made, and it's not without its appeal,

3    so I can understand the Court paying close attention to it,

4    is that, well, Judge, the Stored Communications Acts deals

5    solely with information in Stored and the Wiretap Act deals

6    with information in flight that is being seized

7    contemporaneously with its transmission.  How can you plead

8    one and not the other?

9              Well, your Honor, there is an answer to that,

10   and the answer to that is as follows.  Actually, it has got

11   a couple of parts.

12             The first answer is, the United States versus

13   Councilman, Councilman Roman Numeral III, the en banc

14   decision Justice Lopez wrote, says, while it may seem a

15   semantic paradox, it is not a technical paradox.

16   Information in a packet-switching regime, which is what this

17   is, can be both simultaneously in transient temporary

18   intermediate storage as well as in flight en route to its

19   final destination.

20             So the dichotomy between information for

21   purposes of the Stored Communications Act being in temporary

22   intermediate storage incidental to transmission, and on the

23   other side, information in flight for the Wiretap Act is a

24   false dichotomy.  And a couple of cases have recognized

25   that.  For example, one of the cases that the defendants

1    cite here, United States versus Smith, makes that point.

2    The case is not on all fours and I don't pretend to your

3    Honor that it is, but it makes a very interesting point.

4            It says that the Wiretap Act and the Stored

5    Communications Act, for purposes of protecting

6    communications, different, but not temporally, because it's

7    the temporal difference that Mr. Rubin and the defendants

8    point to is making them mutually exclusive.  No.  What that

9    case says is the wiretap's act intercept concept protects

10   information that is in flight and that someone is grabbing

11   up, if I can use that kind of clumsy gesture, which I

12   realize it is.  The Stored Communications Act deals with

13   getting in a position to grab up information and Smith can

14   be read, I think, quite fairly to say that they are not

15   mutually exclusive.

16           And I think, as we step back and say, well, what

17   exactly are these areas of the law protecting and what is

18   the purpose of these statutes, interpreting those statutes

19   consistent with their aim, one of our, of course, chief

20   operations leads to the conclusion that there is not

21   inconsistency between pleading the two.  If you plead one,

22   you are not out of court on the other.

23           And finally, your Honor, apart from those cases,

24   the Intuit case says the same thing, by the way.  Intuit

25   says for our motion to dismiss, I'm not going to dismiss on

```
 1    that basis.  Intuit says you can have some communications

 2    that are in flight that got intercepted and some that are in

 3    storage that are subject to the Stored Communications Act.

 4                On a motion to dismiss, they've pled enough.

 5    Our case is certainly as strong as that for purposes of

 6    pleading a claim there and for getting around this false

 7    dichotomy of mutual exclusion.

 8                And, finally, there's a statutory definition

 9    issue.  And this doesn't get discussed much and I apologize

10    if I didn't make much of it in our brief.  I'm sorry.  I

11    can't remember if I did.  But under the statute, the

12    definitions I believe are 2511.  But the statute's

13    definition apply both to Wiretap Act and Stored

14    Communications act.  And there is an exception to Wiretap

15    Act communication for information that is stored regarding

16    electronic funds transferred.  That exception would be

17    completely unnecessary if the Wiretap Act did not cover

18    certain stored communication.  It's not a point that gets

19    played a lot, but it intrigues me.  If nothing else, it

20    shows that the support that Smith gives us and the support

21    that Intuit gives us and the support that Councilman gives

22    us is proper support.

23                Anyway, I will turn now, your Honor, to the,

24    unless your Honor has any questions, to the Stored

25    Communications Act.
```

```
 1                THE COURT:  You may continue.
 2                MR. GRYGIEL:  The Stored Communications Act.  If
 3      you could get that slide up, Jim.  My fault.  The one with
 4      the elements in it.
 5                Here we are.  The Wiretap Act's elements are one
 6      thing.  The Stored Communications Act are another.
 7      Intentionally accesses is the first one, your Honor.  I
 8      don't think that can be seriously contested here.  Look at
 9      the request for materials in judicial admission, you make it
10      abundantly clear this was intentional.
11                A bank doesn't rob itself.  A cake doesn't bake
12      itself.  This was a multi-step process that Mr. Meyer and
13      Mr. Naryian (phonetic) and Mr. Shokai (phonetic) of the Wall
14      Street Journal confirmed was intentional.  And as to Google,
15      they're clearly intentional.  Vibrant and MIG, they say all
16      inferences support that.
17                Without authorization.  Nobody has pled consent
18      in this case and they can't because the users didn't give
19      consent and out complaint says otherwise.  Our complaint
20      says not only didn't we give consent, we did not know about
21      it.
22                Google says it was a known loophole in Safari.
23      Well, known to whom?  First is a fact question.  Second,
24      according to this request for judicial notice, in order to
25      be valid, Software Wizard.  Not like me clicking on the
```

1    Internet at night looking to buy my kid a hockey step.

2    Completely different.  There's no authorization there.

3               A facility.  And we get into the question about

4    what's a facility, and here we get to some technical stuff.

5    I will just make the following points.  First of all,

6    facility is an undefined term.  Facility is a little bit

7    amorphous.  I can think of a car or a bus, and then I can

8    think of a car service if I'm in New York or a bus service

9    if I'm in up state New York, like where I grew up.  But a

10   facility is an undefined term, and there are a number of

11   cases, including cases that Google likes, that say that what

12   we have here is a facility.  Our browser managed files.

13   That's what our complaint says.

14               The Chance case says that the Stored

15   Communications Act's definition of facilities includes

16   personal computers.  The Intuit privacy litigation says,

17   Section 2701 does not require that plaintiffs' computers be

18   communication service providers, only that they be a

19   facility through which an electronic communication service

20   is provided.  Export Janitorial cites Intuit and says,

21   plaintiffs' computers on which the data was stored may

22   constitute facilities under the CFAA.  Council on American

23   Public Relations.  Congress intended facility to include the

24   physical equipment used to facilitate electronic

25   communications.  Browser managed file equipment, helping to

1   move communications around the Internet.  That's facility.

2   And the cases say so.  They don't all say so.  The cases go

3   both ways.  But on a motion to dismiss with the facts as we

4   have alleged them, we have alleged the facility under the

5   Stored Communications Act.

6          When we get to the question of through which an

7   electronic communication service is provided, we get to yet

8   another definitional hurdle.  What's an electronic

9   communication service?  Well, here, the statute actually

10  gives us a little help.  The statute gives us definition.  I

11  won't quote it exactly unless I would have it on the slide,

12  which means I should click this.  I shouldn't.  I might have

13  removed it.

14         An electronic communication service is something

15  that enables a user to send or receive electronic

16  communications.  We allege in the complaint in facts that

17  control that the electronic communications server, service,

18  is the browsers.  Why do we say that?  Because the Safari

19  browser and the Internet Explorer enable, permit users to

20  send and receive electronic communications.

21         And on pages -- I'm picking on Google here, I

22  think it's about 22 through 26 of their brief, they're quite

23  clear to talk about how browsers permit the interface of a

24  user with the Internet, in particular, in the exchange of

25  electronic communications.  I would submit to your Honor

1    that that is a perfect admission of something that's

2    perfectly sensible.  These terms need to be interpreted in

3    light A of their statutory purposes, which is to protect

4    privacy.  I don't think anybody decides that.

5         And, second, there's no technical strain at all

6    to say that these browsers are the electronic communications

7    services.

8         We do argue in our brief, we say, not

9    exclusively, but Google is also an electronic communications

10   service.  That's also true.  Google helps people communicate

11   and get and receive electronic communications, but we don't

12   say that exclusively.  And the tension comes in, which is

13   not for the plaintiffs' prejudice, because Google became a

14   party to a part of the conversation that it wasn't supposed

15   to be a party to.  That is why you have both the browsers

16   being the services as well as our brief statement, in our

17   brief statement, saying that Google is.

18        An electronic communication.  There's a

19   definition for that in the statute and I don't think, your

20   Honor, anybody disputes that the transmission of the

21   information we've alleged in this complaint is electronic

22   communications.  Get requests, these secondary get requests.

23   A post.  The transmission of a secret form.  These are

24   electronic communications well within the act, and beyond

25   that, the information that paragraph 98 says, the cookies

1    allowed to be associated with particular users are also

2    electronic communications.

3              And on that point, your Honor, United States

4    versus Forrester, it's Footnote 6.  I regret that it's a

5    footnote, but Footnote 6, it's a very useful discussion of

6    why it is that an URL, which Mr. Rubin disdained, but why it

7    is that a URL is actually content, why that is meaningful

8    information.

9              And what it essentially says is, it tells people

10   something about you.  If you type in www.Help For Drunks or

11   Help for Incest Survivors survivors, somebody who knows that

12   about you, then they can populate an ad space with relevant

13   information, they know a lot about you.  That's different

14   from just the kind of cases the defendant cite that talk

15   about the time of a call and how long it lasted.  It's very

16   different.

17             And then we come down to storage.  What does it

18   mean to be in storage?  And here again we have a difference

19   of opinion with the defendants about what it means to be in

20   storage.  It's not as broadly defined as electronic

21   communication.

22             Electronic storage, for purposes of the statute,

23   means in temporary storage, intermediate storage, and they

24   are not disjunctive.  They're all together.  Temporary,

25   intermediate storage that is incidental to the transmission

1   of the message.

2           And I would simply say the following on that,

3   your Honor.  At paragraph 218 of our complaint, we allege

4   how the information that we say is subject to our claims was

5   being taken contemporaneously.  Among other things, this was

6   recently updated information.  It wasn't in permanent

7   storage.

8           Number two, the defendants themselves say, and

9   this is in their briefing, that this cookie that caused all

10  the trouble was an intermediate cookie.  Intermediate

11  cookie, intermediate storage.

12          Ms. Whetstone, when they got caught doing what

13  they got caught doing and stopped immediately, said this was

14  a temporary -- sounds like temporary to me -- communications

15  bridge.  Out of Google's own mouth, we have the

16  temporariness of the storage that we need here.

17          Apart from that, your Honor, we also have cases

18  that talk about what electronic storage is, and those

19  details in our complaint, which are factual and entitled to

20  the presumption of truth, are borne out not only by every

21  inference that attaches to those facts, but also to some

22  cases.

23          Expert Janitorial, and I will read it because I

24  think, to borrow from Mr. Rubin, it's an instructive quote.

25  For purposes of a motion to dismiss plaintiffs' allegations

1    under the SCA that the e-mail accounts, user names and

2    passwords were stored on plaintiffs' computers and that

3    defendants knowingly accessed this stored information

4    without authorization are sufficient allegations to assert a

5    claim under Section 2701, an appellate claim.

6              Intuit.  Plaintiffs have alleged that defendant

7    accessed data contained in cookies, just like here.  That it

8    placed in plaintiffs' computers electronic storage.  The

9    Court concludes that this allegation satisfies the liberal

10   requirements of Rule 8A2.

11             So we know that we have here electronic

12   communications in storage that were taken without

13   authorization and without consent.  That's the Stored

14   Communications Act.  And to the extent the numerous

15   contesting facts in the brief say anything, what they say is

16   here, that discovery is merited.  This isn't summary

17   judgment.  It's a question of, have we stated sufficient

18   facts to make them plausible.  And when Internet gurus like

19   Mr. Meyer and Mr. Miller, Doug Miller, whom we quote, as

20   well as the defendants' own spokes people say, well, we did

21   it and here's what we were doing, that's more than

22   plausible.  That's a question of, let's get the discovery

23   and see how much more there is here.

24             I'd like to turn, your Honor, now, to the

25   Computer Fraud and Abuse Act.

1          A couple things I'd like to say before I talk

2     about the elements.  The defendants make a lot about it in

3     their brief, I won't here, other than to state it.

4          Every one of the defendants is at pains to tell

5     the Court, your Honor, it's an anti-hacking statute.  It has

6     very little to do with what went on here.  The facts in the

7     complaint say otherwise.  The facts say it has everything to

8     do with what went on here.  This is no different than the

9     prototypical hack.  It's outside in with someone with great

10    expertise victimizing someone who doesn't know who has

11    erected technological barriers to prevent it from happening.

12    In fact, when you look at the Craig's List case and the

13    Facebook versus Power Venture case, they make that point.

14    The circumvention of technological barriers is quite

15    indicative of an offense, and that's exactly what happened

16    here.

17         So the defendants like to say that that case has

18    nothing to do with this case.  We think the facts are

19    completely the opposite.  That's just characterization.

20    That's spin.  That's argument.  That's not a fact entitled

21    to a presumption of truth, particularly since it's the

22    defendants who are saying it.

23         The second issue here, your Honor, the

24    defendants say, Judge, if there's a problem, if there's any

25    problem under the CFAA, and we think there isn't, we're

1    entitled to be excused under the rule of lenity, and the

2    defendants cite various cases for that.  Reocall is one.

3              Well, the rule of lenity applies when you have

4    an amorphous statute that may have criminal consequences

5    being applied either in a criminal or civil context.  And

6    the idea of rule of lenity, of course, as your Honor knows,

7    is simply to say, we're not going to stick somebody with

8    liability of conduct that they couldn't have reasonably

9    foreseen.

10             The facts in the complaint show how big Google

11   is, how sophisticated it is, its previous experiences with

12   the FTC, which fined them $22.5 million for violating an

13   order that was covered by the conduct here.  They knew what

14   they were doing.

15             Number three, again, this is the facts we

16   pleaded and we're entitled to their inferences.  They did it

17   in secret.  They did it a lot.  They did it for money and

18   they did it with technological wizardry, and together found

19   a technological blog that they knew about and apparently the

20   people in their world knew of it and nobody else knew did,

21   using a forced submission rule that then triggered a one in/

22   all in cookie blog.

23             It sounds pretty technical to me and I think

24   that gets us over the hurdle not only of intent, but it also

25   goes to show that the CFAA was violated.  And it shows that

1    the rule of lenity has no business in this case.  And

2    defendants say Google, at page 26, I believe, said

3    plaintiffs have not alleged any facts at all that show

4    that Google altered a setting.  That's pretty close to a

5    quote.

6              I'm sorry to be flippant.  I don't mean to be

7    flippant, your Honor, but are you kidding me?  That's

8    exactly what we allege.  You dismantled a default setting.

9    We had the default on.  You came in in the dark of night and

10   turned it off.  If you were entitled to it, you would have

11   disclosed it, you would have gotten consent.  You certainly

12   wouldn't have done what you did and stopped doing it

13   immediately and said, oh, this is temporary.

14             Anyway, back to the CFAA.  The elements.

15   Knowing transmission of a program, information, code or

16   command.  Mr. Rubin says they can't possibly allege it.

17   Well, we alleged that a secret code embedded in the ads that

18   Mr. Robertson described that were sent from the ad-serving

19   company to the browser of the user, that those codes trigger

20   a secret iframe.  That secret iframe then sends an

21   undisclosed form that essentially tricks the browser into

22   thinking that the person at the keyboard is actually

23   affirmatively communicating with this third party, which

24   then lets the cookies come in, what Google calls the

25   intermediary cookie then followed by the rest of them.

 1              But the transmission of that code, described in

 2    detail, including with all the slashes and that

 3    indecipherable language that the web people use, it shows

 4    exactly how they did it.  They transmitted a code to disable

 5    the blog.

 6              Intentionally caused damage.  Their intent is

 7    clear.  Damage.  Any impairment to the integrity of a system

 8    or a program.  We had a system.  We had a program that was

 9    the default system and they damaged it.  They impaired it.

10    And, by the way, the Black & Decker case, which is cited in

11    Expert Janitorial, says that damage for purposes of CFAA

12    doesn't require the loss, destruction or corruption of

13    information.  Damage for the CFAA, it's enough if you allege

14    that a computer was made less secure.  That's precisely the

15    gravamen of what resulted from the defendants' conduct here.

16    So we're there, certainly there for purposes of a motion to

17    dismiss.  Entitlement to discovery comes after.

18              Without authorization, we've talked about that

19    with respect to the other elements.  The secrecy itself

20    takes care of that.

21              To a protected computer.  Nobody disputes

22    protected computer because that is simply something that's

23    connected to the Internet and everybody knows what it is.

24              Exceeded authorized access and authorized and

25    unauthorized access.  Essentially, the same things.  I won't

1    repeat myself here.  They obtain information.  It has got to

2    be information, not special information; information.

3    That's all it says.  We have pled that.  We're entitled to

4    the truth of those factual allegations.

5           Now, if I can, your Honor, let me come just

6    quickly to the remaining elements here that the defendants

7    raised.  The first thing they say is, well, Grygiel can't

8    allege that a private party can aggregate the damages to

9    the $5,000 threshold.  That's reserved under the statute

10   only through federal government prosecutions or

11   investigations.

12          Well, first of all, I believe that misreads the

13   statutory definition.  The statutory definition describes

14   loss, which is the operative provision for purposes of a

15   civil action.  Describes loss as any loss to any person,

16   including, and then there is a chain of somewhat disparate

17   elements, including physical injury, wrongful disruption of

18   government files, and other items.

19          Well, my view is, statutory interpretation rules

20   do apply, and what they say is the word including, after the

21   following elements, after including, mean they're not

22   exclusive.  Those are simply suggestive.  That is

23   Massachusetts versus EPA.  And our friend Justice Scalia has

24   repeatedly made that point in any number of Supreme Court

25   cases.  So statutory interpretation shows us that we are

1    entitled to aggregate those losses.

2              Number two, Czech, the case Czech.  That case

3    says that the parenthetical that the defendants say in their

4    briefs restricts the ability to aggregate to a government

5    plaintiff is just wrong.  It says that's a mistake, and it

6    goes into the legislative history, which to quote Judge

7    Leventhal opinion, it's like going into a party, kicking out

8    your friends.

9              It says that legislative history snippet that

10   defendants rely on and I believe Vibrant relies on at great

11   length is of no moment, that simply permit this, not

12   excludes it.  The point is, your Honor, is statutory

13   interpretation, your Honor, the plain language, any person,

14   any loss, aggregate by itself suggests you can aggregate

15   over a one-year period certainly suggests aggregation is

16   reasonable.  We have cases that we cited in our brief, I

17   won't belabor, that make the same point.  We're entitled to

18   aggregate the damages to reach the $5,000.

19             The next thing the defendants say is, well,

20   you've got to have a single act, and they say you can't

21   possibly have a single act here to get to the $5,000,

22   because look at all of these computers they talk about and

23   look at all of these people and it can't possibly have been

24   a single act.  Well, we say, first of all, the single act

25   appears nowhere as a restriction in the statute.  That's

1    number one.

2            Number two, the single act is inconsistent with

3    any loss to any person with the implication being multiple

4    acts and multiple people over a one-year period.  That

5    certainly suggests that the single act requirement doesn't

6    apply.

7            Third, creative computing.  Freedom Bank Shares

8    both say that is not an element of the statute.  It does not

9    apply.

10           The single act requirement, when you think about

11   what that would mean, and one of the cases we've cited says

12   this, it would essentially defeat the statutory purpose,

13   because what it says is, a single computer hack causing

14   $5,000 in losses would be actionable while systematic hacks

15   repeated 30 times, each causing $4,999 would not be.  And

16   that makes no sense given the statutory purpose let alone

17   the statutory language.

18           If Congress wanted to have a single act in the

19   statute, they knew how to do it, and Congress didn't.

20   Defendants, and Mr. Rubin pointed, out cites the language of

21   economic losses only.  That's all you get.  The question is,

22   what are economic losses?  There are cases that we cite and

23   cases that the defendants cite that take two different views

24   of how broadly you can read losses for purposes of this

25   CFAA.  Those cases largely stem, your Honor, from an

1    intellectual dispute between the Ninth Circuit and the

2    Seventh Circuit that has no relevance to why we're here

3    today.  That is the No Sale chain of cases which say, wait a

4    minute.  The CFAA is all about unauthorized access.  It's

5    not about misuse, and that is a narrower view.  Those cases

6    take a narrow view of damages.

7          The broader cases stemming from the Seventh

8    Circuit's Citrin case say otherwise.  They say that if I

9    have access to a computer, but I start to misuse it when I'm

10   in there, then the statute is triggered.  Those cases tend

11   to take a broader view.  I say we can avoid that swamp, your

12   Honor, which our cases tend to raise.  We cited the Baxter

13   case as a summary of them.  We can avoid that by simply

14   looking at the statutory language here, and what the

15   statutory language says is clear.  Any loss, any person,

16   statutory language makes it clear.

17         Defendants say, they don't allege an

18   interruption in service.  Statutory interpretation

19   principles in cases we cite say that the interruption in

20   service limitation doesn't apply.  That is a matter of

21   statutory interpretation.  That does not cover all the

22   antecedent elements of this statute, which is aimed at

23   protecting computer hacking, a statute that since its

24   enactment has been consistently broadened in its scope, its

25   definitions and its reach.

1              Finally, we cite cases.  Urban and Smith is a

2    good one.  It is in our brief.  E.F. Cultural Travel, Costar

3    Realty and in re Toys-R-Us, all of which your Honor say,

4    take a broad view of these losses.  And if you argue that it

5    has got to be a loss that affects the functionality of the

6    machine, that's precisely what we allege.  We say you

7    dismantled our default setting and that by itself is what

8    gets you there.

9              Finally, and I know Mr. Rubin will say this

10   because he said it very eloquently, he's a very good lawyer.

11   He's going to say, well, Judge, that may all be true,

12   he's got some law, he's got some argument, but where does

13   the money value?

14             And the answer to that is twofold, your Honor.

15   First of all, we know it has value because the defendants,

16   as we plead, it's a business proposition, collect it and

17   sell it.  We quote their businesspeople saying this is what

18   they do.  So we know it has value.  As the value to us, all

19   we need to say for purposes of a motion to dismiss is that

20   we were deprived of the opportunity, which we don't have to

21   actually go to exercise for purposes of the motion to

22   dismiss, to capitalize the net value ourselves or to decide

23   to keep it.  It has value to me simply by virtue of the fact

24   that it's private.

25             That, not to get too far afield, but one of the

1    things back to what Justice Brandeis said in Olmstead, the

2    right to privacy is the single most valuable right to

3    people, and there has been a lot of Supreme Court history

4    following that with Katz and Rowe that make that very

5    clear.

6            Discovery will show what its value is.  I am

7    sure when we do discovery in the case, we will see precisely

8    how the damage models, how the algorithms developing the

9    damage models for the defendants work.  There will be no

10   dispute, this information is extremely valuable and its

11   deprivation to the plaintiffs is a loss cognizable under the

12   Computer Fraud and Abuse Act.

13           I've been talking a long time, your Honor.  If

14   you have any questions, I'm happy to answer them.

15   Otherwise, I will sit.

16           THE COURT:  No.  Thank you very much.

17           MR. GRYGIEL:  You're welcome, your Honor.

18           MR. STRANGE:  Your Honor, I will be brief.  The

19   frequent of these cases leads to the end of the argument the

20   California claims, and they actually, when you read the

21   opinions, put them at the end, some of them are a little bit

22   confusing.

23           And when I started preparing with respect to the

24   California computer crime law, which the real name is the

25   Comprehensive Computer Data and Fraud Act, and the reason I

1    say that is, it's a very broad claim.  When I started

2    preparing, I realized that in the pleadings, a case not

3    cited was my own case, which was decided a few months ago by

4    Judge Rogers in the Northern District of California.  And if

5    you will forgive me, it's called Hernandez versus Path.  And

6    it's 2012, Westlaw, 519, 4120.

7         And Judge Rogers denied a motion to dismiss

8    under this section, and in that case, the issue was whether,

9    if you downloaded an app and the app took your address file

10   without your knowledge, does that state a claim under the

11   California Computer Crime Act?

12        This case is a classic case for that act, and

13   the reason is, if you go back to the brick wall, where the

14   consumers try to block the cookies, but as we explain in

15   paragraph 93, Google sent an invisible form and a code

16   accompanying it to trick the user's browsers into requesting

17   this cookie, thereby getting access to the computer.

18        So if you just look at the plain language of

19   that statute, for example, one provision of Section

20   502(c)(7) says, knowingly and without permission accesses

21   any computer.  If that's not knowingly and without

22   permission to accessing our computer, I'm not sure what is.

23   But just to quote from Judge Rogers' decision, she said,

24   based on the current limited briefing, the Court cannot

25   conclude as a matter of law whether past alleged conduct,

1      i.e., downloading the Path app, which plaintiff voluntarily

2      installed on its mobile device, contained undisclosed

3      software code that surreptitiously transferred data onto

4      plaintiffs' mobile device to Path servers fall outside the

5      scope of the California Computer Crime Law.  So I think that

6      under these facts, that we have alleged a claim under that

7      section.

8              And as one of the cases that defendants quote,

9      which is the LaCourt case, it notes that the California

10     Computer Crime Law does not have a minimum damage

11     requirement.

12             And there are two other minor points, your

13     Honor.  With respect to the California constitutional

14     privacy claim, we've quoted in our briefs the language that

15     the purpose of that constitutional amendment was the

16     stockpiling of information that's personal to people.  That

17     the only California case that the defendants really rely on,

18     their primary one, I should say, is the Focustrum case that

19     I believe was quoted to you in the argument by Google's

20     lawyer.  But that case only involved someone's address,

21     their physical address.  That was given to Lamps Plus, who

22     then sent them advertisements.

23             That case noted that some examples of violation

24     of privacy would be disclosure of HIV status, would be

25     confidential mental health records, would be the CHP, who

1    disseminated photographs on the Internet.

2            So if you think of the information on your

3    browser, if you look at someone's browser history, what

4    doctors they looked at.  We gave the example of Help For

5    Drunks.  We have people checking HIV issues for themselves.

6    That kind of private information, which the cookies allow

7    you to correlate to your user, that is private information

8    that I think clearly does fall within the ambit of that

9    statute.

10           And then, finally, with respect to -- I'm just

11   going to mention the UCL claim.  I'm not going to address

12   all of the arguments because I don't want you to think I

13   agree with them, but I don't think we really have time

14   here.

15           But just under the UCL claim, the unfair

16   competition, which we deal with, of course, all the time,

17   and Judge Rogers dealt with in her opinion, we have the

18   unlawful prong, which Section 502 would be a predicate act

19   of.  And then we have the unfair and fraudulent prong.

20           So I think that we've satisfied the California

21   claims for all the reasons we've set forth in our brief.

22           Thank you, your Honor.  Appreciate your time.

23           THE COURT:  Thank you very much.  Mr. Rubin?

24           MR. RUBIN:  I was going to start by saying I'm

25   going to try to be brief, but people keep saying that.

1          There were some loose words used in a lot of

2    that argument, and I want to make sure that we are all

3    clear.

4          We are not arguing, and wouldn't argue at this

5    stage of the case, that the Court should be considering

6    anything outside of the complaint or the materials of the

7    complaint referenced and relies upon.  I think what I said

8    was, their allegations about the get requests were right and

9    how the Internet worked and then we saw a picture of how

10   that worked.

11         I want to first address a few actual issues

12   because I think they were relevant to all the claims and

13   they're just not quite right.

14         First of all, we saw a picture of a brick wall.

15   You know, there's always a bit of an issue when you try to

16   import physical examples into the online world, but the

17   brick wall isn't the right example here.  The allegations

18   that are in the complaint, so back to the four corners that

19   the plaintiffs want us to focus on and that the rules say we

20   are to be looking at.

21         The plaintiffs here alleged that they used these

22   browsers in their default settings.  They also allege that

23   the default settings have exceptions.  And if you look at

24   the piece by Mr. Mayer, I believe it is Exhibit 3 to the

25   RJN, there's a screen shot, picture, it's actually quite

1    well done, of the setting themselves.  And it is very clear

2    that one of the settings is never.  That is, never accept

3    cookies.  That's not the setting that these individuals had.

4    They had a setting that said something else.

5              THE COURT:  But did they know that?  I mean, I

6    don't have any idea.  I have no idea.

7              MR. RUBIN:  I have no idea either, but it's part

8    of the complaint.  So the fact is, and right now we're

9    assessing whether software interactions in their default

10   state, when the default state has certain exceptions in it.

11             THE COURT:  But, to me, that seems like an issue

12   of fact.  It's though, certainly, you're asking me to make

13   legal conclusions, but the question is whether I can make

14   legal conclusions without having a true understanding.

15             If there are undefined words, you need to have

16   an understanding of how the Internet works in order to give

17   the best definition, to order to give a legal conclusion.

18   I'm not confident that this is the kind of case that it's

19   easy to say that accepting all of the plaintiffs' factual

20   allegations, I can still say there are no -- that your

21   position doesn't have factual issues associated with it.

22             MR. RUBIN:  Let me see if I can phrase it this

23   way.  There's no doubt that I would take issue with some of

24   the, some of their characterizations, particularly some of

25   the arguments and the way it was phrased up here, which is a

1    bit more hyperbolic than some of the statements made in the

2    papers.

3                    THE COURT:  Always.

4                    MR. RUBIN:  Of course.

5                    THE COURT:  That's why we have oral argument, I

6    guess.

7                    MR. RUBIN:  To make your argument less

8    interesting.  But what you can decide, and I think very

9    clearly decide from the four corners of the complaint, and

10   you don't have to get into any of this, because there's

11   agreement on how -- this is in paragraph 41 of their

12   complaint.  The chart that they had up didn't have any

13   paragraphs associated with it.  But the only communication

14   that's occurring between their browser and the services are

15   the get requests.

16                   There was a suggestion by them based on that

17   chart, that after a cookie is placed, some additional

18   communications occur.  That's nowhere in the complaint.

19   That's absolutely outside the complaint.  The allegations

20   alone will get you there.

21                   But there are two other key points, and I will

22   go back to the point I made at the outset of this hearing.

23   Two points that require dismissal here, and it's the fact

24   that they had not alleged any cognizable harm.

25                   And if you look at the studies that they have,

1    that Mr. Grygiel pointed to, none of them are connected to

2    these plaintiffs.  These plaintiffs say, in the back of the

3    complaint, paragraph 220-something, I believe, that they

4    lost the opportunity to sell their information for full

5    value.  That alone is too threadbare of an allegation to

6    provide this Court with jurisdiction over the matter.

7            And I want to make sure that our position with

8    respect to why they can't proceed based on the recitation of

9    the statutory claim is clear, because I think it has been

10   muddied a little bit.  I'm sure it wasn't deliberate, but I

11   want to make sure.

12           We aren't saying -- and this is an issue that is

13   bubbling around in courts -- that even if you check all the

14   boxes for a statute, you meet every single element, but you

15   lack Article III injury, you have no personal injury, the

16   fact that the statute itself provides for some damage

17   amount, our argument is in that case, no, you wouldn't have

18   standing.

19           That's not the argument we're making here.  We

20   don't need to make that argument here because they can't

21   check the boxes on those elements.  And that is not looking

22   into the merits of the case, and none of the cases they cite

23   say that that is looking into the merits of the case.

24           It would be a different thing if they were able

25   to show that all of those situations had been met or that

1    none, and none of the exceptions applied based on their

2    complaint.  Certainly, liability would not be established

3    based on that.  There still would be arguments to be made.

4    But you cannot establish any, unless you show that the Court

5    has jurisdiction to evaluate the application of that statute

6    as applied to the plaintiffs in the case on the facts

7    asserted, and that is the defect here with respect to both

8    of the claims that they say give them statutory standing,

9    the Wiretap Act and Stored Communications Act.

10            And I would just commend your Honor to read

11    their complaint and read our briefs, because we make this

12    abundantly clear.  The water has been muddied a little bit

13    here, but I think it really is very clear on those two

14    points.  And with those two issues, there's no standing for

15    the Court to begin the secondary inquiry of thinking about

16    those other fact questions.

17            I see why those fact questions have been raised

18    by the plaintiffs, because it starts to get the Court

19    thinking about those issues.  But the two issues that I

20    described, the failure to raise harm, causation issues and

21    the lack of statutory standing, those resolve this case.

22            There are quite a number of arguments I can

23    respond to with respect to the arguments that Mr. Strange

24    and Mr. Grygiel made.  They're all in our papers.  If you're

25    tiring, I can sit down, but if you are prepared to hear

1    them, I will continue.

2            THE COURT:  Well, I'm prepared to hear them for

3    a moment anyway.  I think I gave two hours.  If I gave more

4    than two hours, forget it.  But I can sit here for at least

5    the two-hour stretch.

6            MR. RUBIN:  Okay.  The point I want to make is

7    around, pointing to a couple of very important things in the

8    complaint that I think are important to see.  They're in the

9    complaint.  These aren't factual disputes.  This is just

10   facts in the complaint.

11           A lot of words were said by my, by opposing

12   counsel around information about users that was sent along,

13   personal information around users.

14           If you look at the complaint, and Mr. Grygiel, I

15   believe, cited paragraph 98 and footnote 67 of the

16   complaint.  That part of the complaint is talking about and

17   citing to Google's privacy policy.  But there's no

18   allegation in this case that the four named plaintiffs are

19   Google accountholders, so they would never have provided any

20   of that information to Google.  And I don't want to speak

21   for the other defendants, but I think it's fair to say that

22   those allegations don't apply to them at all.  And they can

23   get up and correct me if that's wrong.

24           So there's just no allegation that that sort of

25   information has been provided by anyone here.  Sure, if you

1    have a Google account, you sign up, give your name and do

2    all sorts of things.  These, these plaintiffs do not allege

3    to be Google accountholders, so the suggestion that they're

4    browsing, this is limited browser information that's sent by

5    their browsers and then to which the cookie goes along for

6    the ride after it's placed is somehow commingled, finds no

7    factual support whatsoever in the complaint and can't be

8    credited.

9            The other point I want to make with respect to

10   all of the complaint, all of the arguments they made is,

11   they talk about a lot of the underlying violations of the

12   statutes they believe occurred, but they came back with very

13   little response on the financial arguments, rather, the harm

14   arguments.  The CFAA response by Mr. Grygiel I think is

15   particularly instructive.

16           The loss issue or the damage issue there is

17   required.  There is no damage alleged in the complaint,

18   period, so they have to have alleged $5,000 in damages, and

19   they cannot have not done that.  A benefit to someone else

20   is not a loss within the meaning of the CFAA.

21           With respect to the Stored Communications Act,

22   the facts that they have alleged in this case do create a

23   situation of mutual exclusivity, so while some other case

24   may have said, the fact that the Internet is packet switched

25   means that there can be co-extensive application of these

1    statutes here, that does not apply on these facts and I

2    think that's clear when you look at the statutes and look at

3    what they've alleged.

4            And I will just say again what I said at the

5    beginning.  They are alleging under their new theory, this

6    is in opposition, it was the one that they articulated here,

7    that Google was an electronic communications service.  If

8    that is true in this context, 2701(c)(1) provides Google

9    with authorization to access these materials.  It had all of

10   those other unwanted effects, too, but it has that issue.

11           And with respect to the California claims

12   quickly, on the CCL, the computer crime claim, we have not

13   seen the Path case because it wasn't in the papers.  But

14   Mr. Strange said it involved downloading an app that stole

15   content from people's devices.  There's no -- contacts from

16   those devices.

17           There's no allegation in these cases that these

18   cookies do anything like that.  The allegations in this case

19   are that their browsers sent get requests, that a cookie was

20   placed and their browsers continued to send get requests,

21   just as they did before.  Those are the facts that they

22   actually allege, if you look at the complaint.

23           And there's no allegation that would be

24   actionable under California privacy, that mental health

25   information or HIV information attached to someone's name

1    has been collected here.

2            And with respect to the unfair competition law,

3    the substance of the prongs I've addressed in our papers,

4    but Mr. Strange didn't have a response, I know, to the fact

5    that there is a heightened statutory standing requirement

6    and they can't pass it.  There's no -- they have not lost

7    money or property in this case.

8            So unless the Court has any questions?

9            THE COURT:  Well, I'm not sure I can articulate

10   my question, but I guess I just want to make -- I would be

11   happy to know -- well, the plaintiff had some illustrations

12   up there about the communications and I guess you agreed

13   with them until it came to the brick wall?

14           MR. RUBIN:  I say two things about their

15   communications.

16           THE COURT:  Right.

17           MR. RUBIN:  It's all in their papers.

18           THE COURT:  I think there were two, and the

19   first one I thought -- well, that was the second one.

20   Right.

21           I don't know if it is included anyplace and I

22   want a copy of it, if this is an accurate representation of

23   what's happening here.  If it's not, I'd like you to tell me

24   it's not, because I think it's important for me to have a

25   basic understanding of the underlying receipt and transfer

1    of communications and information in order to be able to

2    resolve this.

3            MR. RUBIN:  Absolutely.  I note in my first

4    argument that there's no technique to the complaint and to

5    the paragraphs in the complaint.  And I personally, and I

6    think it would help the Court, it would help to see what

7    they're referring to in the complaint.  And let me tell you

8    what I see.

9            One, two, and three.  Three is back and forth.

10   That's all exactly right.  That's this transaction.  I mean,

11   it's iframes' point is the specific point here.  This is

12   ads, right.  This would be the user has Safari, asks -- I

13   wouldn't articulate it this way.  They said that's what they

14   were talking about and they said they agreed.  If there's a

15   dispute around this, let me know.

16           Someone types in an URL at their browser.  The

17   browser sends it off to the Internet.  There's actually an

18   intermediate step here.  Someone has to interpret what you

19   are typing and route it.  It gets to the Wall Street

20   Journal.  The Wall Street Journal says, I want to populate

21   my page with some ads, probably a lot of other stuff, too:

22   Facebook, share links and links from all over the place.

23   Sends that information back to the browser.  Some of it is

24   the news content you want to get and some of it is

25   placeholders for the services to insert their information.

1    So that's the first blue line.  There would be a bunch of

2    other blue lines going to services in reality.  Goes to

3    Google.  Google says, okay, I'm going to send you back these

4    ads.  That's one.

5            Where I have an issue is with five, because five

6    is not some independent thing that is now being enabled by a

7    cookie and there's no support in their complaint for the

8    suggestion that it is.  The next time someone goes to a

9    different website, if you type in NYTimes.CommunicationsAct,

10   for example, this whole thing happens again.

11           THE COURT:  One through four?

12           MR. RUBIN:  One through four.  One through four

13   happens every time, and they have not cited it, they have

14   not alleged it, and they can't allege it because it's just

15   simply not right, that once a cookie is put on a browser,

16   all of a sudden it enables new communication.  All it does

17   is enable the cookie to go along the next time that

18   transaction goes.

19           But this is not, this is not in the complaint,

20   that last part.

21           THE COURT:  And the next page?  Could I see the

22   next page with brick wall?  So that's another step.

23           MR. RUBIN:  So often, often when services

24   communicate back to, I guess the third step on the last

25   page, often services will set cookies.  That's often the way

1    cookies get set.  That is the way the cookies get set.  This

2    is in their complaint as well.  I don't know the page.  They

3    have a very lengthy background on how cookies get set, which

4    is for the most part correct.  In any event, we have to take

5    it.

6         And so here the claim is Google set this one

7    cookie, drt, and that there's a brick wall.  Google did set

8    a cookie.  The brick wall is supposed to be Safari's default

9    cookie block settings.  Their allegation is, is that

10   Safari's default cookie block settings actually allow

11   cookies to be sent in any number of circumstances.

12        If you look at the materials in the request for

13   judicial notice and this, sorry, and the complaint as a

14   whole, you'll see that there's one method called this form

15   post method that allowed a cookie to be set, but there are

16   others.  Clicking on a link allows it as well.  There's all

17   sorts of ways in this default setting.

18        So this is designed to create the impression

19   that in its default setting, Safari was impregnable or

20   blocked all cookies, but, in fact, that's not what happened.

21        It became relevant to the issues.  It's in the

22   complaint.  This cookie isn't the cookie by which Google

23   associates information, associates browsing information as

24   received.  This is something completely different.  That

25   other cookie got sent due to another quirk in the browser.

1          So I mean that's -- but this is all in the

2     complaint.  It's all detailed rather well, but in the RGN

3     exhibits.  But the point is, none of this the Court needs to

4     wade into this morning because they have not alleged any

5     harm, and on the two statutes that they assert that say

6     would give them statutory standing, those communications

7     go every time, and they go with a cookie or without a

8     cookie.  And this didn't enable anything.  It didn't change

9     how their browsers worked.  Their browsers were working this

10    way long before this whole incident came along and they're

11    working the same way now.

12         They're sending get requests every time.  We all

13    do.  It's just the way -- and this is in their complaint.

14    This is how paragraph 41 explains it.

15         THE COURT:  All right.  Thank you.

16         MR. RUBIN:  Thank you very much.

17         THE COURT:  Again, I appreciate all of your

18    time.  I have to say that I generally use oral argument as a

19    filter.  When you give me too much information, I assume

20    you're giving me the most information in oral argument and I

21    appreciate your doing so.

22         I have a 4:00 o'clock proceeding.  If plaintiff

23    has any final thoughts, I'm happy to hear it before I send

24    you on your way and I try to address the issues that you've

25    presented.

1         MR. ROBERTSON:  Your Honor, I don't want this to

2  turn into a Ping-Pong match.  I just want to tell you most

3  of this -- we think all it is in paragraphs 85 to 95 of the

4  complaint, and including the picture that we got from the

5  Wall Street Journal saying where the brick wall comes in.

6  So thank you for your time.

7         THE COURT:  All right.  Thank you.  All right,

8  counsel.  Thank you again.  I have to get out of my

9  computer, so go home.  Thank you very much.

10         (Counsel respond, "Thank you, your Honor.")

11         (Court recessed at 3:52 p.m.)

12                    -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25