1                    IN THE UNITED STATES DISTRICT COURT.

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4

   IN RE GOOGLE INC. COOKIE      :    CIVIL ACTION
5  PLACEMENT CONSUMER PRIVACY    :
   LITIGATION                    :
6  ---------------------------   :    NO. 12-MD-2358 (SLR)

7

8                              - - -

9                                Wilmington, Delaware
                                 Wednesday, January 11, 2017
10                               1:00 o'clock, p.m.

11                             - - -

12   BEFORE:   HONORABLE SUE L. ROBINSON, U.S.D.C.J.

13                             - - -

14   APPEARANCES:

15

                 KEEFE BARTELS
16               BY:   STEPHEN G. GRYGIEL, ESQ.
                     (Red Bank, New Jersey)

17

18                     -and-

19

20               STRANGE & CARPENTER
                 BY:   BRIAN RUSSELL STRANGE, ESQ.
21                   (Los Angeles, California)

22

                         Counsel for the Class Plaintiffs
23

24                               Valerie J. Gunning
                                 Official Court Reporter
25

APPEARANCES (Continued):

        WILSON SONSINI GOODRICH & ROSATI
        BY:  MICHAEL H. RUBIN, ESQ.
           (Palo Alto, California)

           Counsel for Defendant
           Google Inc.

        COMPETITIVE ENTERPRISE INSTITUTE
        BY:  Adam Shulman, Esq.
           (Washington, D.C.)

           Counsel for the Theordore H. Frank,
           Objector

             -  -  -

1                    **P R O C E E D I N G S**

2

3              (Proceedings commenced in the courtroom,

4     beginning at 1:00 p.m.)

5

6              THE COURT:  Good afternoon, everyone.

7              (Counsel respond, "Good afternoon, your Honor.")

8              THE COURT:  I believe the way I would like to

9     proceed is for the plaintiff, the settling parties, to

10    present a succinct argument since I've read all the papers,

11    but for purposes of the record, why the proposed settlement

12    should be approved.

13              I then would like to hear a succinct summary of

14    the objections which have been filed again, which I have

15    reviewed in full, and then the settling parties' response,

16    the plaintiffs' response to those objections, and then move

17    on to the owners fees and do the same thing essentially.

18    That way I've got a record.  I've given everyone an

19    opportunity to bring anything to my attention that wasn't

20    included in the papers, but also to make a record for the

21    highlights of what's in the papers.

22              So that's how I would like to proceed.  If

23    anyone has any preliminary issues or concerns about going

24    that way, I'm happy to hear them.  I don't know.  Let's

25    have some introductions first though for purposes of the

1    record.

2              MR. STRANGE:  Good afternoon, your Honor.  Brian

3    Strange for the Class Plaintiffs.

4              THE COURT:  All right.

5              MR. GRYGIEL:  Good afternoon, your Honor.  Steve

6    Grygiel for the Class Plaintiffs.

7              THE COURT:  All right.  Thank you very much.

8              Good afternoon.

9              MR. RUBIN:  Good afternoon, your Honor.  Michael

10   Rubin for Google.

11             THE COURT:  All right.

12             MR. SCHULMAN:  Good afternoon, your Honor.  Adam

13   Schulman for Objector, Theodore H. Frank.

14             THE COURT:  All right.  Thank you.

15             All right.  Well, let's start with the

16   proponents' summary of why this settlement is fair,

17   reasonable, and should be approved.

18             Mr. Strange?

19             MR. STRANGE:  Thank you, your Honor.  And thank

20   you for the opportunity to be here again.

21             Just briefly, this case started back in --

22             THE COURT:  I was going to say, this lectern is

23   lamentable in that the people seated behind you can't

24   necessarily see me or me them, so, Mr. Schulman, you may sit

25   wherever you want to to get a view.

1          MR. SCHULMAN:  Thank you, your Honor.

2          THE COURT:  If my face happens to be of any

3     interest to you.  You may proceed.  I'm sorry.

4          MR. STRANGE:  Thank you, your Honor.  This case

5     started back in early 2012, when multiple cases were filed

6     around the country.  They were MDLs, ultimately to your

7     Honor's courtroom, and that was quite some time ago.  We had

8     hearings on leadership and my firm along with others were

9     honored to be entrusted with the leadership of this case.

10    We then filed a consolidated class complaint in December of

11    2012.  We did further research and filed an Amended

12    Complaint in January of 2013.  We engaged in discovery,

13    including initial disclosures with Google and others,

14    interrogatories and requests for production of documents.

15    Ultimately, Google filed a motion to dismiss in January of

16    2013, and after extensive briefing on extremely complicated

17    issues, your Honor heard oral argument in July of 2013 and

18    ultimately granted the motion to dismiss in October.

19          The plaintiffs then filed an appeal to the Third

20    Circuit.  There was again extensive briefing in the Third

21    Circuit and oral argument.  Ultimately, the Third Circuit

22    affirmed your Honor on the dismissal of the statutory claims

23    and held that only two claims remained.  Those were under

24    California State law, one claim for intrusion of privacy and

25    one for the right of privacy under the California

1    Constitution.

2         When we received that opinion, we were hopeful

3    it would have statutory claims in it, but unfortunately it

4    did not, but nevertheless, we filed a writ with the U.S.

5    Supreme Court, as your Honor is probably aware, and the U.S.

6    Supreme Court expressed some interest because of the, we

7    think the areas of privacy are at the forefront of issues

8    these days.

9         The Supreme Court ordered Google to respond in

10   May of 2016, but ultimately denied the petition in October

11   of 2016.

12        When we began a new the case after it was

13   remanded from the Third Circuit, we had discussions with

14   Google about settling the case.  Ultimately, we both agreed

15   that retired Judge Layne Phillips would preside over a

16   mediation.  Judge Phillips is a retired federal judge and I

17   think widely recognized by both the defendants and the

18   plaintiffs as far as an extremely talented mediator.

19        Prior to that mediation, we did extensive

20   briefing with Judge Phillips' office and had extensive phone

21   calls regarding the merits of our case, class certification,

22   discovery and, most importantly, damages for the remaining

23   claims.

24        In the all-day mediation in May, we had a

25   tentative deal which took us about 30 days to ultimately

1    execute in June of 2016.  We then presented it to your Honor

2    for preliminary approval, which was given on August 31st,

3    2016.

4             Pursuant to that order, we gave notice by a very

5    reputable company to millions and millions of people, both

6    on the Internet, through websites, through advertisements

7    and periodicals, and ultimately filed with the final

8    approval a declaration by the claims administrator and a

9    notice administrator as to the reach in his professional

10   opinion of that notice.  There has been no objection nor

11   do I think there can be about the sufficiency of the notice.

12            There was 50 timely requests for exclusions.

13   With respect to the settlement, the amount is 5.5 million

14   and including injunctive relief of Google's assurances that

15   it will give the counsel, assuming this Court gives final

16   approval, that it took actions and what actions it took to

17   expire or delete all of the cookies from the Safari browsers

18   that are at issue in this case.

19            One of the things that we noted in our papers is

20   that in considering to settle this case, not only did we

21   consider damages and liabilities, but we considered the fact

22   that Google has stated to government authorities that at

23   most, it made $4 million as a result of the conduct and it

24   has paid the FTC and other government entities over eight

25   times that amount as penalties.

1          In terms of approval of the settlement under

2   Rule 23(a) and Rule 23(b)(2), the first issue would be

3   numerosity.  I don't think there's any dispute that this

4   case involves millions of users of the Safari browser, the

5   Internet Explore, and so there's nothing more to discuss on

6   the numerosity.  It's clearly satisfied here under the Third

7   Circuit standards.

8          In terms of the common questions of law and

9   fact, the courts have been clear that one common question of

10  law and fact would be enough.  Here, Google's practice that

11  we've alleged of placing a mechanism to circumvent the

12  browser for Safari and Internet is the same for all the

13  class members.  So whether their conduct violates the

14  remaining claims of California State law is a common legal

15  question.  How Google carried out that act is a common

16  factual question, so that the common questions are clearly

17  present here for certification.

18         In terms of the next category of typicality, the

19  representative plaintiffs' claims are identical to the

20  class, which is that their rights of privacy were violated

21  as a result of the circumvention of their privacy control.

22         The fourth factor is whether the plaintiffs will

23  fairly and adequately protect the class.  The two factors

24  there would be whether you've appointed qualified counsel,

25  and we believe we've met those requirements, my firm and the

1    other two firms as lead counsel along with the firms acting

2    in the executive committee.

3              And the second factor for adequacy is whether

4    the representative plaintiff suffered the same injury as the

5    class, and here there's no intraclass conflict of the same

6    exact injury.

7              Finally, under Rule 23(b)(2), the injunctive

8    relief, Google's conduct is the same for all class members

9    and its agreement here to provide assurances it has

10   eliminated these cookies affects the class the same.

11             So having satisfied we believe the requirements

12   to certify the class, on the issue about whether the

13   settlement is fair, reasonable and adequate, there are a few

14   factors which I think are important.

15             Number one, did not lose sight of the fact, and

16   I'm sure your Honor having sat on this Court is aware of the

17   public policy which favors settlements in these types of

18   cases as described in the In re: GM Pickup case.

19             The second factor is that this settlement is

20   entitled to a presumption of fairness, and that would be

21   recently reiterated by the Third Circuit in the In re:  NFL

22   case.  The factors to determine whether it's entitled to a

23   presumption of fairness would be whether it was negotiated

24   at arm's length, which it was; whether there's sufficient

25   discovery, which there was; whether the proponents of the

1    settlement are experienced in similar litigation, which we

2    are, and clearly, Google's counsel is also from Wilson

3    Sonsini.

4              And the second factor, the fourth factor, excuse

5    me, is whether a small fraction of the class objected, and

6    here, we have one objector out of millions of class members.

7              So I think this settlement is entitled to a

8    presumption of fairness.

9              Then we get down to the Girsh factors which have

10   been established by the Third Circuit to review fairness.

11   The first factor is the complexity, expense and likely

12   duration of this litigation.

13             We're standing -- I'm standing here, your Honor,

14   which in February will be five years, so I think the length

15   is self-evident.  We've yet to fully litigate the two

16   remaining claims.  And the issue of damages on these types

17   of claims which involved nominal damages for violation of

18   rights of privacy are issues of first impression, and so the

19   complexity and the litigation that would ensue and the

20   expense of litigating these types of claims is significant

21   and therefore I think we've satisfied that requirement of

22   Girsh.

23             The Class' reaction to the settlement.  Again,

24   the issue there is whether the class supports the

25   settlement, and here with only one objection out of millions

1    of class members, I think it's safe to say the class

2    overwhelmingly does support the settlement.

3         The third is the stage of the proceedings.  We

4    have, unlike some cases, we have actually gone up to the

5    Court of Appeals and had extensive briefing on all the

6    claims in this case in addiction to the discovery, so I

7    think the stage of the proceedings is strongly in our

8    favor.

9         The fourth is the risk of establishing

10   liability.  And on this factor, your Honor, the Court's

11   don't delve into the intricacy of the merits.  A lot

12   of times they give credence to the class counsel about

13   what their chances are of succeeding, and here, one

14   of the seminal issues is under the California remaining

15   claims, we have to prove intentional conduct on behalf of

16   Google.

17        Now, we feel we have a good argument, but Google

18   has a strong argument with able counsel that, in fact, the

19   conduct was not intentional, that they didn't realize that

20   there was a particular method in which these Safari browsers

21   worked so that their code, we wouldn't mesh with it.  So

22   that's a fact that would be severely and ably litigated

23   here, and that's one of several issues on which we could

24   lose liability.  So I think that factor bodes in favor of

25   settlement.

1          The fifth factor is the risk of establishing

2     damages.  And, your Honor, I alluded to this earlier, but

3     under these claims for invasion of privacy, it would be

4     difficult to take each class member who had a browser and

5     had the privacy controls circumvented and therefore had a

6     cookie on it to establish how much of their damages.  We

7     think that our best argument would be nominal damages which

8     are allowed under the California right to privacy, but

9     nominal damages are a dollar or two at most per plaintiff.

10    So the risk of actually establishing those damages on a

11    classwide basis is unique.  So when we come to a situation

12    we can make a settlement, that benefits the whole class

13    instead of a dollar or two per class member, the advantages

14    to the class I think are self-evident.

15         Then there's the six factors, the risk of

16    maintaining a class action through trial.  I mean,

17    obviously, first obtaining the class cert is a novel issue

18    here in light of the complexities of the computer issues

19    we're discussing.  In terms of maintaining it through trial,

20    the courts don't give a lot of weight to that since a

21    settlement avoids trial, but those risks also bode in favor

22    of settlement.

23         The seventh factor is the ability of a defendant

24    to withstand a greater judgment.  Clearly, Google could

25    withstand a greater judgment, but again the Court has given,

1    has not given a lot of weight to that factor.

2            The eighth factor is the range of reasonableness

3    in settlement in light of the best possible recovery and all

4    attendant risk of litigation.  And I think I would go back

5    now to the issue of nominal damages, where there's a risk we

6    could get zero.  There's a risk that even if we win, that

7    the class members would be better off to have a settlement

8    of this nature.

9            So I think under the Girsh factors, we clearly

10   have a settlement which complies with most, if not all of

11   them, and the settlement should be approved as fair,

12   adequate and reasonable.  And I would just conclude with the

13   fact that it's not -- the issue is not whether this is the

14   best settlement possible under all circumstances.  It's

15   whether under these factors, given the consideration of

16   counsel and the stage of the proceedings, is it fair,

17   reasonable and adequate, and I believe under the Third

18   Circuit, it is, and I would request approval.

19            THE COURT:  All right.  Thank you very much.

20            MR. STRANGE:   Thank you.

21            THE COURT:  All right.  Let's hear from the sole

22   objector.

23            MR. SCHULMAN:  Thank you, your Honor.  Good

24   afternoon.  Adam Schulman for Objector Frank.  And there are

25   a couple of preliminary threshold issues I wanted to touch

1   on before I get to the merits of the objection.  I guess the

2   less pleasant of the task is addressing the ad hominem

3   attacks that were levied against my employer and my client

4   in the plaintiffs' response papers.

5           As an initial matter, they submitted several

6   exhibits attached to their response which weren't -- in the

7   documents there and weren't authenticated as required under

8   Rule 901 of the Federal Rules of Evidence, so they should be

9   disregarded for that reason.  And so we hope your Honor is

10  going to entirely disregard them, but if not, I would like

11  to ask the Court leave to file a supplemental declaration

12  rebutting the inaccuracies in those documents.

13          THE COURT:  Well, to tell you the truth, I don't

14  think my decision will hinge on your client's personal --

15          MR. SCHULMAN:  Viewpoints?

16          THE COURT:  Viewpoints, or --

17          MR. SCHULMAN:  His income.

18          THE COURT:  Litigation or anything else.  I

19  just --

20          MR. SCHULMAN:  Okay.  Well, that makes life a

21  lot easier then.  Thank you.

22          THE COURT:  And certainly, if I find out,

23  because I do feel compelled to issue something in writing --

24          MR. SCHULMAN:  Right.

25          THE COURT:  -- especially because it's a

1    multidistrict case, I plan on sharing some thoughts at the

2    end of this hearing, but I do need to write.  If in writing

3    I find that I'm relying on something that we've just talked

4    about, I will reach out to you.

5              MR. SCHULMAN:  Thank you.  Thank you, your

6    Honor.  We just want to be clear for the record if you were

7    going to do so.  Thank you.

8              I guess the second threshold matter was this

9    assertion thrown in at the end of plaintiffs' response that

10   my client does not have standing, and that's completely

11   fallacious for a number of reasons.

12             First, what they quote there in their response

13   is not actually the class definition that your Honor

14   approved in the preliminary approval order or in the

15   settlement agreement.  The class definition states as

16   follows:  All persons in the United States who use the Apple

17   Safari or Microsoft Internet Explorer web browsers and who

18   visited a website from which the whole Click.net cookies

19   were placed by means alleged in the complaint.

20             And in Frank's declaration, he actually provides

21   more information than the class member, the named

22   representatives do in the complaint.  He visited the website

23   that transmitted the cookies during a class period, so that

24   is -- we see that as just really a throw-in argument.  They

25   didn't reference it here and it shouldn't be credited in any

1  way.  And, in fact, if that was the actual definition, they

2  had -- the class members had to attest that they did not

3  have pre-existing cookies that remained on their browser to

4  block the new cookies.  Right.  They allegedly elicit

5  cookies, and nobody, no objector could come forward, because

6  nobody even knows the status today of the cookies on their

7  browser.  They know what websites they visited but they

8  don't know the status of their cookies let alone from a

9  period of time five years ago.

10          THE COURT:  And again standing isn't -- as I

11  foresee it, standing will not be a basis --

12          MR. SCHULMAN:  Okay.  Okay.  I will move on from

13  that, too.  I just wanted to make sure though.

14          So moving on to the merits of the objection,

15  plaintiffs rely a lot on this presumption of fairness.  You

16  hear it again today that the Third Circuit sometimes speaks

17  of in class action settlement proceedings, but this

18  presumption only pertains to objections that the total

19  amount obtained is not adequate.  That's not my client's

20  objection.  We don't dispute that $5.5 million is sufficient

21  in sum to settle the case.  For example, the first time

22  that -- that presumption has no bearing on objections that

23  the settlement miss allocated.  In fact, the first time that

24  the Third Circuit invoked that presumption, it was in the

25  GM Trucks case, where they reversed because of a

1    misallocated settlement.

2              Again, each of those four factors that

3    supposedly supports the presumption also applied in the Baby

4    Products case, which the Third Circuit again reversed due to

5    lack of sufficient direct benefit vis-a-vis the proposed

6    distribution.

7              Another factor they focus on in their response

8    and again focus on here today was the presence of a

9    professional mediator, but again that's irrelevant to

10   Frank's objection.  The mediator's job is to get the parties

11   in front of him or her to reach settlement amenable to them

12   themselves.  It's not to make sure that a settlement is fair

13   to absent class members and approvable under 23(e).  That's

14   this Court's duty, not the mediator's duty.  In fact, they

15   actually distort a quotation from the Bluetooth Headset

16   Products liability opinion out of the Ninth Circuit.  They

17   say that their distortion was that -- they contended that

18   Bluetooth said that the mere presence of a mediator is a

19   factor weighing in favor of non-collusiveness, but if you

20   read the entire opinion from that, that entire sentence from

21   that opinion, it says the mere presence of a neutral

22   mediator, though a factor weighing in non-collusiveness, is

23   not dispositive of whether the end product is a fair and

24   adequate and reasonable settlement.  And, again, the Ninth

25   Circuit of the United States reversed the approval of the

1    settlement.  They didn't provide any direct benefit to class

2    members.

3              In their papers they next assert that the lack

4    fairness, lack of objection demonstrates fairness, but the

5    Third Circuit itself has rejected that reasoning, again in

6    the GM Trucks decision, where the Court described, quote, "A

7    combination of observations about the practical realities of

8    class actions has led a number of courts to be considerably

9    more cautious about inferring support from a small number of

10   objectors to a sophisticated settlement.  Even where there

11   are no incentives or informational barriers to class

12   opposition, the inference of approval drawn from silence may

13   be unwarranted."  And if you want the cite for that, that's

14   55 F.3d at 812.

15             Getting to the core of my client's objection, it

16   relates to the use of cy pres and whether that use comports

17   with the seminal Baby Products decision of this circuit.

18   Plaintiffs actually amazingly consign their response to that

19   decision to a mere footnote, arguing that it's inapplicable

20   because direct distribution to class members here are not

21   feasible or efficient.  But nothing in that opinion turned

22   on the feasibility of direct distributions.  In fact, the

23   settlement presented to the Third Circuit in that case had

24   no direct distributions at all.  It only had a claims made

25   process, which is exactly what my client is arguing is

1    feasible here in which he has shown to be feasible, but in

2    dozens of cases cited in his declaration which have similar

3    numbers of class members, similar amounts available, and

4    could be distributed via a claims made procedure.

5           In their papers, plaintiffs also appear to

6    misunderstand why Frank was relying on the Fraley decision,

7    the Facebook v. Fraley decision out of the Northern District

8    of California.  We didn't cite it for the legal proposition

9    that as a Cy Pres settlement is improper per se.  We rely on

10   it just to demonstrate the fact that this amount of money

11   can be distributed to a class of tens or hundreds of

12   millions of persons during claims process.  Thus, the

13   subsequent Lane decision, which is, we think is not

14   applicable for the reasons stated in our papers, has no

15   bearing on the facts of Fraley.  We're citing it for the

16   fact of its existence, not the legal proposition in the --

17   that they attribute to us.

18          The case sort of boils down to a question of how

19   your Honor determines what is economically feasible.  The

20   plaintiffs set up a straw man that we want a distribution to

21   every single class -- each of the millions of class members,

22   but we don't think that's what economically feasible means

23   and we don't think that's what sufficient justification

24   means under the Third Circuit's Baby Products decision.  We

25   think if a claims made settlement is feasible, then you have

1    to pursue that instead of cy pres.  That it's not a last

2    resort as required by ALI 3.07 and the consensus of the case

3    law, really.  There's no contrary appellate authority saying

4    that cy pres can be anything more than a last resort, but

5    that's what the plaintiffs would prefer your Honor to do to

6    approve of the doctrine in this case.

7            The plaintiffs also pointed to the Subway

8    decision, but that decision didn't involve cy pres at all.

9    It was an injunctive relief settlement, and there the entire

10   amount of money available was $600,000.  It wasn't

11   $5.5 million.  600,000 is certainly closer to the line of

12   being infeasible to distribute given a couple hundred

13   thousand dollars of administrative costs.

14           Plaintiffs asserted that meaningful data and

15   statistically valid conclusions regarding claims made

16   distributions is extremely difficult to find, but that's not

17   correct.  There's a survey from a very well respected claims

18   administrator just two years ago that commissioned a survey

19   of claims rates and publication notice only settlement cases

20   and found that claims rate almost always fall below one

21   percent, which would make it feasible to distribute the

22   amount of money here to class members.

23           And then in response there they say that, well,

24   the center for class action fairness has objected to claims

25   made settlements in other cases, but we only do so when it's

1    being resorted to without any justification or rationale

2    whatsoever.  Here, there's a clear rationale.  There's

3    obvious reasons.  The parties don't have the -- any class

4    members' contact information, which is why you have notice

5    by publication rather than direct notice.  That itself is a

6    sufficient reason to use a claims made process.

7              And here, there's a set fund of 5.5 million.

8    The need to thin that fund to make distributions

9    economically feasible is a reason to use a claims made

10   process as well.  That way those who feel most injured by

11   Google's allegedly privacy violations can submit a claim and

12   be compensated.

13             So those are our arguments on the core issue of

14   the use of cy pres entirely.  Then we have the subsidiary

15   issue of the conflict of interest if a cy pres settlement is

16   justified at all.

17             And we think that while it's commendable that

18   class counsel donates his own time and energy and service to

19   the underserved, it's not commendable that he donates class

20   members money to that same organization for which he serves

21   as chairman of the board, and that's a far more significant

22   conflict than the alma mater conflict that was approved in

23   EasySaver, a case that was then reversed on appeal, and

24   Google Refer, a case that's pending on appeal.

25             By analogy, if you look at the judicial recusal

1    statute under 28 U.S.C. 455, which obviously doesn't apply

2    here, it lists an example of a disqualifying conflict when

3    the judge or judge's spouse is an officer or director of a

4    litigant.  Here, we're talking about an officer of a party,

5    of a third party that's receiving class member funds in this

6    case.  It's almost self-evidently a conflict of interest in

7    our view.  And the fact that the plaintiffs continue to

8    defend it reinforces our contention that they're not

9    acceptable, not acting as acceptable representatives for the

10   class.

11          The reason that they're not acceptable

12   representatives is not simply because of the settlement

13   includes cy pres payments.  We represented objectors in

14   numerous cy pres cases without asserting an objection to

15   adequacy of representation.  In Baby Products, for example,

16   the initially approved settlement included an oversized

17   cy pres component but we didn't argue that the

18   representation was inadequate because at least class counsel

19   had made some overtures to getting class members money.

20   Here, class counsel proposed to waive class members claims

21   for no compensation at all while themselves seeking almost

22   half of the cash Google is willing to offer up.

23          The Subway decision again cited by the

24   plaintiffs premised its decision finding adequate

25   representation on the fact that settlement did not make

1      class members worse off.  There, the defendant provided

2      injunctive relief in exchange for a waiver of class members'

3      injunctive relief claims only at the same time it preserved

4      class members damages claims.  This settlement does not do

5      that.  It waives all matter of remedy related to the claims

6      alleged in the complaint.

7              And even though that's distinguishable, Frank by

8      no means concedes that Subway is correctly decided on that

9      issue.  And oral argument at the Seventh Circuit suggests

10     the Seventh Circuit may reverse in light of the Walgreen

11     opinion, the interceding Walgreen opinion.

12             And then there's the conflict of interest with

13     defendant, which Frank doesn't argue is a per se reason to

14     reject the settlement.  Rather, it's a reason that the

15     settlement shouldn't be valued at the sum total of

16     five-and-a-half million.

17             Unlike in the Miller v. Ghiradelli case, for

18     example, there's nothing in the record or settlement to

19     suggest that the donations in this case won't replace other

20     donations that were already earmarked by Google or in the

21     pipeline in some other way.

22             Then I have quite a bit on fees, but I will save

23     that.

24             THE COURT:  All right.  Thank you very much.

25             MR. STRANGE:  Thank you, your Honor.  Just

1    starting with the presumption of fairness, a fair reading of

2    the NFL case and the Baby Products case don't restrict the

3    presumption of fairness to certain aspects of the

4    settlement.  It just says if the requirements are present,

5    the arm's length negotiation and others, that it's entitled

6    to a presumption of fairness.  Obviously, that presumption

7    can be rebutted but it's fair, and that's very clear in the

8    NFL case and the Baby Products case.

9            With respect to the use of cy pres, the Baby

10   Products case is instructive because what it says is, quote,

11   "Although we agree with ALI that cy pres distributions are

12   most appropriate where further individual distributions are

13   economically feasible, we decline to hold that cy pres

14   distributions are only appropriate in the context."

15           The context which becomes clear when reviewing

16   all the cases is that the question is, do the cy pres -- is

17   it economically infeasible to distribute this to the class

18   members?  And if so, is cy pres in direct benefit?

19           With respect to the issue of cy pres, there have

20   been a number of settlements which allowed cy pres only

21   because of the difficulty of an economic in feasibility

22   distributing the money.  Here, there's no dispute that

23   there's millions of class members, and that if we took,

24   you know, a couple million, three million, four million,

25   however many million and distributed it to tens of millions

1    of class members, it's going to be a small amount per class

2    member.

3              If you go to a claims made, and this was the,

4    the point was made in the Subway case overruling Mr. Frank's

5    objections on the same issue, the Court said, look, when you

6    consider the administrative cost of the claims made, which

7    the Court there noted for a million claims was 2.7 million

8    in her experience, but here it would be clearly over a

9    million dollars just to administer the claim, and then you

10   have to provide the notice, and then when you consider the

11   time of the claim, filling out the claim form, they're going

12   to get pennies on the dollars.

13             And the question is as class counsel and as the

14   Court, is that a bigger benefit to the class, or is it

15   better to -- is it better to give a small amount of money to

16   a small amount of the class or to approve a cy pres which

17   benefits the entire class in an indirect way?  And here we

18   have, as in the Lane case, which was authority from the

19   Court of Appeals in the Ninth Circuit, which had a cy pres,

20   a hundred percent cy pres, the Court noted that there were

21   requirements in place as to how the cy pres recipients would

22   use the money.  Here as a part of the settlement we

23   stipulated with Google that anybody who receives this cy

24   pres amount has to use it for education, and the exact

25   wording is in the settlement agreement and to assist in the

1  understanding of Internet privacy and security.  Millions of

2  dollars sent to that kind of process is much more beneficial

3  to the class in our opinion than a few pennies to some

4  portion of the class members if they get it.  So the

5  economic infeasibility is present here as well as it being

6  burdensome and impractical.

7  The standard with respect to the cy pres as set

8  forth in the cases is whether there's a substantial nexus to

9  the interest of the class members by the use of the money

10  and whether you take into consideration the nature of

11  plaintiffs' lawsuit, the objection of the underlying

12  statutes, and the interests of the class.

13  So here, by having strict use of the money to

14  benefit the class through education of Internet privacy and

15  security is in the best interests of the class.  That's why

16  the Court of Appeals in the Lane case upheld that issue.

17  So with respect to direct distribution, the

18  standing issue goes to the claims in the complaint which

19  says in 2011, the conduct occurred in 2011 and early 2012.

20  Just for illustrative purposes, in 2011 there were 40

21  million iPhones and desktops sold by Apple.  There was 70

22  million desktops sold with Internet through Internet

23  Explorer.  So when you are talking about hundreds of

24  millions of people, what benefit is it to the class to only

25  give a portion of those class a small amount of money?

1          The issue with respect to cy pres has to be

2    whether there is a direct benefit to the class and are

3    there sufficient controls in place for the use of that

4    money.

5          Here, there's six proposed recipients of the

6    cy pres.  With respect to the alleged conflict, I will just

7    point out that in the Lane versus Facebook case, the Court

8    held that there was not a conflict when it was set up there

9    for the cy pres, that an employee of Facebook was on the

10   Board of Directors of the company that actually decided who

11   should get the money.  And so since that is not a conflict,

12   I think it's a stretch to say that since I'm personally one

13   of 70 members of a board of directors on a public interest

14   law firm run by a former federal judge and I have zero

15   financial interest in the company, I don't think that's a

16   conflict.

17         If your Honor feels otherwise, obviously, we

18   cannot use that as a cy pres recipient.  There's other

19   cy pres recipients that are available.  But I will point out

20   that one of the cases made this point, that it's difficult,

21   you know, to find companies and entities that use this money

22   in a way that's helpful for the Internet privacy and

23   security.

24         And with respect to Google's conflict, I will

25   let them address that.  But just because they make donations

1    to those entities doesn't mean they are not making

2    additional donations through the cy pres money from a

3    separate case, and there hasn't been a case that held that

4    that is a conflict of interest.

5                One more point, your Honor, on the Fraley case.

6    There was a big objection by Mr. Frank about it shouldn't be

7    all cy pres and in the end, there was some minimal amount of

8    money given to the class.  And in the District Court

9    decision approving that settlement, there was a quote by the

10   Court that basically said it went through the process, and

11   the Court said, quote, "In a sense, adding a direct payment

12   component to the settlement did very little to buttress its

13   overall fairness."

14               So the issue is really what is in the best

15   interests of the class here.  And I submit that having an

16   indirect benefit through a cy pres which benefits the exact

17   issue in the case is more beneficial than even if it's

18   feasible to give a few dollars to not even the whole class,

19   only a small number of them.

20               Unless your Honor has any questions?

21               THE COURT:  I don't.  Thank you very much.

22               MR. STRANGE:   Thank you.

23               THE COURT:  I don't know whether counsel for

24   Google to like to add anything to the argument in terms of

25   particularly the fact that Google might already be making

1    payments to some of these same organizations and whether

2    that's a conflict that I should care about.

3            MR. RUBIN:  Let me quickly address that one

4    point.  I think everything else has been thoroughly

5    addressed.

6            No, I don't think that it's a conflict that

7    should concern the Court.  I can tell you that Google is a

8    large company.  The portion of that company, the people at

9    that company that decide its charitable contribution don't

10   have anything to do with the settling of cases and how those

11   funds are distributed and whether or not these entities

12   identified as cy pres recipients here and those that have

13   received donations in the past, whether they may receive a

14   donation in the future has absolutely nothing to do with

15   this settlement or the factors here.  It's completely

16   unrelated.  I don't know how to say it any more clearly than

17   that.  It's an enormous company.  So with that, I will rest,

18   unless your Honor has questions for me.

19           THE COURT:  I do not.  Thank you very much.

20           MR. RUBIN:  Thank you.

21           THE COURT:  All right.  I will give counsel for

22   the objector just a few minutes, if you want to respond to

23   anything that was said, and then we'll move on to attorney

24   fees.

25           MR. SCHULMAN:  Sure.  I of course welcome any

1    questions you have.

2              I guess since Fraley was brought up at the end

3    and we think that is a comparator case which shows that

4    distributions are, that most comparable cases, it shows that

5    distributions are feasible here, it wasn't just a pittance.

6    It was $15 to 600 and more than 600,000 class members.

7    That's a lot of money in aggregate that went to actual class

8    members rather than unrelated charities.  I just wanted to

9    clarify that.  I think everything else is in the papers and

10   we didn't really hear too much new from that.

11             THE COURT:  All right.  Thank you.

12             All right.  Let's move on to the motion for

13   attorney fees and expenses.

14             MR. STRANGE:  Thank you, your Honor.  With

15   respect to the motion for attorneys' fees, this is one of

16   those cases that took a long time and had a lot of

17   complexity in terms of the briefing of the federal statutes

18   on wiretapping, and just organizing the group of 12 law

19   firms we had working on the case took effort.  And the one

20   thing I will point out is, while I wish we would have

21   prevailed on our argument that these were wiretap violations

22   and we would have had statutory damages per violation, I

23   would have been elated.

24             One thing that we did accomplish, which I don't

25   think is insignificant, and, in fact, the courts have said

1 that a Court of Appeals decision is meaningful to every

2 class member and an important aspect of the law.  In the

3 decision here, which is in re Google Cookie Placement

4 Consumer Privacy Litigation, 806 F.3d 125, the Court settled

5 the issue of when is there an injury in fact, and I know

6 that your Honor grappled with that as do many courts across

7 the country about what type of injury do you need to show

8 that, and so I will just submit that that decision is

9 important in the area of privacy and I think will be helpful

10 for the Court to litigate for years to come.

11   So we did describe our hours, as were quite

12 significant, 4,843 hours.  $90,929 in expenses for the 12

13 law firms.  The total lodestar is $3,296,169.  The requested

14 fee is a negative lodestar.  On a percentage of the fund

15 basis, it's 43.7 percent.

16   On the factors that the courts have said to

17 consider whether a settlement is reasonable include the size

18 of the fund and the number of beneficiaries.  Here, the fund

19 is 5.5 million.  The number of beneficiaries through

20 indirect benefit is substantial.

21   The presence or absence of substantial

22 objections by class members.  Very rarely do you have only

23 one objector, particularly to attorneys' fees, so I think

24 that bodes in our favor, particularly here, since the

25 objector is in the business of objecting to class actions,

1   the scale and efficiency of the attorneys involved.  I'm not

2   going to claim to be the skilled one here, but I will say

3   the people working on the appeal did a good job and I think

4   a helpful opinion.

5           The complexity and duration of the litigation.

6   I think the record reflects that it has been over five years

7   and is very complex issues of privacy and the

8   interrelationship between the Internet and the wiretapping

9   act among others.

10          The risk of nonpayment.  It has been a long time

11  since this case has been started and we have not gotten

12  paid, except there was a small settlement of $100,000 in

13  2012, at the very beginning, from a different defendant,

14  which we have not distributed because we thought we might

15  have to pay experts, so we have not been paid fees.

16          The amount of time devoted to the case by Class

17  counsel is quite substantial, as evidenced by my

18  declaration, that of Mr. Grygiel and that of Mr. Frickelton.

19  The value of benefit attributed by other groups.  Here, the

20  FTC and the State Attorneys Generals brought actions, but

21  these, our case was completely separate and based on

22  different facts and legal theories than theirs.

23          And then we finally had the awards in similar

24  cases and the percentage of what you get in a private

25  contract.  We cited your Honor to the series of cases that

1    said the range is between 20 and 50 percent on a percentage

2    of the fund issue, and for a negative multiplier, we cited

3    the Haught case that said a negative multiplier is below the

4    range found acceptable by the Third Circuit.

5              And, finally, the argument that we shouldn't

6    consider -- we should consider the fact that it's cy pres

7    and not direct to the Class members I think is refuted by

8    the Boeing versus Van Gemert U.S. Supreme Court case we

9    cited, and the Baby Products case also.

10             So while not a perfect case, I think we've done

11   good work, and I request that the Court grant our motion for

12   fees and costs.

13             THE COURT:  All right.  Thank you.

14             I will hear any objections to such.

15             MR. SCHULMAN:  Thank you, your Honor.

16   Plaintiffs' counsel here is seeking nearly 45 percent of the

17   aggregate amount that Google is willing to put up.  That's

18   well above the standard mean and median, such an award that

19   has been documented in the literature, the empirical survey

20   of Fitzpatrick as well as the benchmark that has been

21   accepted in courts of this circuit, the 25 percent

22   benchmark.  It's almost double that.

23             And it is odd that the plaintiffs' response is,

24   well, you're supposed to consider the particulars of the

25   case because, if anything, the particulars of the case,

1    counsel going the other way here, when class members are

2    getting zero direct benefit and you're going to -- that

3    certainly does not count for an upward deviation from the

4    benchmark.  It counts as a downward deviation.  And we

5    suggest that no more than, if your Honor is going to approve

6    the certification and settlement, no more than ten percent

7    of the amount available, as the sum of the settlement would

8    be warranted as a fee.

9            Baby Products makes clear that when class

10   members are not getting direct benefit, the percentage

11   should be reduced, when class counsel hasn't had any success

12   in getting fees to actual class members.  And here they've

13   had no success, not less success.  Boeing v. Van Gemert had

14   no discussion of cy pres.  It was a case involving a fee

15   award when there was a common fund of money put forward by

16   Boeing made available to all class members.  Here, there's

17   no common fund that has been made available to any class

18   members.

19           THE COURT:  And just out of curiosity --

20           MR. SCHULMAN:  Sure.

21           THE COURT:  -- what is your best authority for

22   this 25-percent benchmark and where in the in re Baby

23   Products case --

24           MR. SCHULMAN:  The authority from the benchmark

25   is cited in our objection.  It's in a footnote near the --

1    in the fee section.

2              THE COURT:  Okay.

3              MR. SCHULMAN:  Including the, I believe you

4    cited it in the warfarin approval order 15 years ago, if I'm

5    not mistaken.

6              THE COURT:  Trust me, I don't remember.

7              MR. SCHULMAN:  Right.  It's in the FRD.  It

8    should be in a footnote in the fee section for sure.

9              THE COURT:  All right.

10             MR. SCHULMAN:  So plaintiffs would prefer you to

11   focus on their lodestar and all the time that they've

12   expended and how their multiplier is only .73, but in this

13   circuit for good reason, it is a percentage of recovery

14   method that has primacy.

15             In Baby Products, for example, Class counsel

16   argued that their fee award was reasonable because their

17   multiplier was only 0.37, roughly half of that here, yet the

18   Third Circuit disagreed, commenting that that case showed

19   why the lodestar multiplier wasn't outcome determinative.

20   In other cases the Third Circuit had instructed that the

21   lodestar should not be allowed to, quote, "trump," or,

22   quote, "displace" the primary reliance on the percentage of

23   the common fund method.  That was the Rite-Aid Corp., 396

24   F.3d, 205 -- 396 F.3d, 294, a 2005 case.  And AT&T

25   securities litigation, 2006 decision.

1    And so the lodestar can't be allowed to displace

2    the percentage methodology.  As the Ninth Circuit put it a

3    couple of years ago in the HP Inkjet litigation case,

4    attorneys don't get paid just for work, they get paid for

5    obtaining results, and in this case counsel obtained no

6    results for their actual clients, no direct benefit for

7    their actual clients, which is what matters under Baby

8    Products.

9    And then in the papers the plaintiffs touted its

10   case as risky.  We find that odd given the concurrent

11   enforcement actions from the FTC and State Attorney General.

12   That means it was less risky.  It also followed on the heels

13   of a blockbuster expose in the Wall Street Journal which

14   uncovered all the wrongdoing, thus again making it less

15   risky, just for those reasons.

16   Obviously, the legal claims obviously had some

17   risk, as many of them were dismissed and then affirmed on

18   appeal, so there was that risk involved, so we don't dispute

19   that.  Our main argument is that the percentage method has

20   to be dominant and is dominant in this circuit.

21   And I would love to welcome any other companies

22   your Honor might have.

23   THE COURT:  I think I shared with you my

24   questions.  Thank you very much.

25   MR. SCHULMAN:  Thank you.

1          MR. STRANGE:  Your Honor, can I have a brief

2     response?

3          THE COURT:  Sure.

4          MR. STRANGE:  First, your Honor, I neglected to

5     mention as a part of our order that we did request a

6     thousand dollars incentive award to each of the three

7     representative plaintiffs.  I don't think that has been

8     objected to, but it's clearly within the range of

9     reasonableness in this circuit.

10         With respect to the fee, my adversary is

11    mistaken about Baby Products.  What Baby Products

12    specifically said was, quote, "We think it is unwise to

13    impose, as Young suggests, a rule requiring district courts

14    to discount attorneys' fees when a portion of the award will

15    be distributed cy pres."

16         That expressly did not hold that.  And with

17    respect to the 25 percent rule, that's a Ninth Circuit rule.

18    It is not a rule in the Third Circuit.  And we cited on page

19    13 of our request for attorneys' fees the Erie City Retirees

20    Versus City of Erie, Pennsylvania, 192 F. Supp., 2d, 369.

21    See also In re: Combustion 968 F. Supp., Wise at 835 F.

22    Supp. at 980, noting that fee awards typically range from 20

23    to 50 percent of the common fund and awarded 45.3 percent of

24    the settlement fund.

25         So I think in this circuit, it's not a

1    25 percent rule, and that Baby Products doesn't help the

2    objector for attacking our fees.

3                Thank you, your Honor.

4                THE COURT:  All right.  Thank you.

5                All right.  As I said, I'm going to share my

6    thoughts at this moment.  I have to say that I might well go

7    back and just look at the attorneys' fees section again, but

8    let me give you my thoughts as of right now.

9                I think as noted, the thrust of the objection is

10   that the settlement should be modified or rejected because

11   rather than providing for direct compensation, it provides

12   for indirect compensation to certain cy pres charities.  I

13   have read the cases and conclude the following.

14               Number one, cy pres remedies are routinely

15   approved by courts under various and not exclusive

16   circumstances.  Therefore, aside from satisfying the Third

17   Circuit's Girsh versus Jepson factors and Prudential

18   considerations, the settling matters at bar, I believe, need

19   to demonstrate that the proposed cy pres remedy is

20   appropriate under two factors.

21               Number one, a direct monetary payment to absent

22   class members would be de minimis and/or direct distribution

23   would be logistically burdensome, impractical or

24   economically infeasible.

25               And, second, that the proposed cy pres

1    distribution bears a direct and substantial nexus to the

2    interests of absent class members.

3              My review of the papers leads me to believe that

4    the settlement satisfies both of those considerations.

5              With respect to the first factor, having

6    overseen this litigation from the time it was instituted, I

7    believe this has always been a case in which the facts

8    preclude direct individual compensation.  The problems

9    related, the related problems having to do with identifying

10   the millions of potential class members and of translating

11   the alleged loss of privacy into cash amounts.  I understand

12   that this claims made option and a lottery option have been

13   used.  To me though, that does not serve the purpose of this

14   class action, and I believe that the realities of this

15   litigation demonstrate the direct monetary payments to

16   absent class members would be de minimis and would more

17   likely be logistically burdensome, impractical, infeasible,

18   and that the facts of record are clearly distinguishable

19   from those addressed by the Third Circuit in the in re Baby

20   Products litigation.

21             With respect to the second factor, unlike the

22   facts reviewed by the Court in Dennis versus Kellogg, for

23   instance, the record demonstrates that the proposed

24   recipients bear direct and substantial nexus to the

25   interests of the absent Class members, and indeed the only

1    objection raised to the recipients relate to the appearance

2    of alleged conflicts of interest as noted created by the

3    pro bono service of one member of plaintiffs' Executive

4    Committee on the Board of Directors of one of the six

5    recipients and by Google's previous payments to several of

6    the proposed recipients.

7              Again, I find that the facts of record are

8    clearly distinguishable from those discussed in the

9    authorities cited in the objection, and I decline to reject

10   the settlement on certainly that basis.

11             In sum, given that the solitary objection, that

12   only one objection was filed to this proposed settlement,

13   and I find no merit to the objection.  I find the settlement

14   to be fair, reasonable and adequate when considered from the

15   perspective of a class as a whole.

16             With respect to attorneys' fees, I'm always

17   skeptical of such requests when the percentage of recovery

18   approaches 50 percent.  I understand that in this case,

19   where individual compensation makes no sense, where the

20   injunctive relief was of and is of great benefit as was the

21   resulting case law, and where the requested fee is within

22   the range approved by courts in the Third Circuit, I likely

23   will approve it, but I do want to go back and just check the

24   case law cited by the objector just to confirm my initial

25   read through all of this material.

1              As I said, I need to write something.  At this

2    point in time I would predict that I'm going to approve the

3    settlement and the motion for attorneys' fees.

4              I will try to get something in writing, and I

5    don't know whether there are proposed orders that the

6    plaintiffs' counsel would like to hand up so that I can fill

7    them out if, in fact, my writing is consistent with my oral

8    thoughts at this point.  And I will try to get whatever I'm

9    doing out just as soon as possible, because obviously, this

10   case is an old one and needs to come to a conclusion.

11             So do you have proposed orders?

12             MR. STRANGE:  Yes.  They were submitted with our

13   papers.

14             THE COURT:  Okay.  Do they still say "Proposed

15   Order" on them?

16             MR. STRANGE:  Yes, your Honor.

17             THE COURT:  Okay.  I'm sure I have them in the

18   stack of papers.

19             I do appreciate the work everyone has put in,

20   including that of the objector.  Make sure we stay honest

21   here.

22             Are there any other issues that we need to

23   address yet this afternoon?

24             Anything from you, Mr. Strange?

25             MR. STRANGE:  No, your Honor.  Thank you.

```
 1                    THE COURT:  All right.  Anything from
 2        Mr. Schulman?
 3                    MR. SCHULMAN:  No, your Honor.  Thank you.
 4                    THE COURT:  All right.  And anything from
 5        Mr. Rubin?
 6                    MR. RUBIN:  Nothing, your Honor.
 7                    THE COURT:  All right.  Thank you very much,
 8        counsel.
 9                    (Court recessed at 2:05 p.m.)
10                         -   -   -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```