UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
                              .
IN RE:  GOOGLE, INC.          .
                              . Case No. 1:12-md-02358-ER
COOKIE PLACEMENT CONSUMER     .
                              . 601 Market Street
PRIVACY LITIGATION            . Philadelphia, Pennsylvania 19106
                              .
                              .
. . . . . . . . . . . . . . . Thursday, June 15, 2023
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE EDUARDO C. ROBRENO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
For the Plaintiff Class:   Brian Russell Strange, Esq.
                           STRANGE & BUTLER
                           12100 Wilshire Boulevard
                           Suite 1900
                           Los Angeles, California 90025

                           Stephen G. Grygiel, Esq.
                           GRYGIEL LAW, LLC
                           301 Warren Avenue, Suite 405
                           Baltimore, Maryland 21230

                           James P. Frickleton, Esq.
                           BARTIMUS FRICKLETON ROBERTSON, P.C.
                           11150 Overbrook Road, Suite 200
                           Leawood, Kansas 66211
```

(Appearances Continued)

```
Audio Operator:            Electronically Recorded
                           by Cark Haugher, ESR

Transcription Company:     RedDoor Legal Services, LLC
                           44 Valley Forge Road
                           Bordentown, N.J. 08505
                           (973)985-3668
                           www.reddoorlegalservices.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:  (Continued)

For Defendant Google:       Anthony J. Weibell, Esq
                            WILSON, SONSINI, GOODRICH & ROSATI
                            650 Page Mill Road
                            Palo Alto, California 94304

For Objector Theodore
H. Frank:                   Adam H. Schulman, Esq.
                            HAMILTON LINCOLN LAW INSTITUTE
                            1629 K Street N.W., Suite 300
                            Washington, D.C. 20006

INDEX

                                                          Page

ARGUMENT BY MR. STRANGE                          7

ARGUMENT BY MR. WEIBELL                         36

ARGUMENT BY MR. SCHULMAN                        44

ARGUMENT BY MR. GRYGIEL                         62

ARGUMENT BY MR. SCHULMAN                        79

COURT DECISION                           (Reserved)

1                (Proceedings commence at 10:39 a.m.)

2                THE COURT:  Okay.  We are here today to consider

3        the parties' motions for approval of class certification,

4        request for attorneys' fees, and related matters.

5                There are objections to the motions pending and

6        we'll address those, as well.

7                But let's see first where we are in the case.

8        Through -- since the case was remanded from the Circuit, we

9        had an opportunity to consider whether the requirements for

10       class certification were met under Rule 23(a), and also

11       whether or not, under Rule 23(b)(2) and (b)(3) and the

12       certain ability requirement in this Circuit had been

13       satisfied.

14               We also had an opportunity to consider whether the

15       proposed settlement is fair and reasonable, including

16       considerations under Rule 23(e)(2), the Girsh factors, the

17       Prudential factors, and the *cy pres* proposed award.

18               So all of that is before the Court today based upon

19       the previous pleadings which have been submitted, so today is

20       the day to hear any argument that you have on any of those

21       issues.

22               It seems to me that the Rule 23(a) is not hotly

23       disputed, so, unless someone would like to add to what they

24       said in their submissions, I'd like to proceed with

25       consideration of Rule 23(b)(2) and (b)(3).  Is that all right

```
 1    to everybody?

 2         (No verbal response)

 3              THE COURT:  Okay.  Okay.  Hearing no objections to

 4    that --

 5              MR. SCHULMAN:  Your Honor?

 6              THE COURT:  Yes.

 7              MR. SCHULMAN:  We did raise an objection under

 8    23(a)(4).

 9              THE COURT:  Okay.  While you're standing up, let's

10    have the appearances of counsel, so that I can identify

11    counsel here.  Beginning with plaintiffs' counsel, would you

12    please enter your appearance?

13              MR. STRANGE:  Yes.  Good morning, Your Honor.

14    Brian Strange for the plaintiff class.

15              THE COURT:  Okay.

16              MR. GRYGIEL:  Good morning, Your Honor.  Steve

17    Grygiel for the plaintiff class.

18              THE COURT:  Okay.

19              MR. FRICKLETON:  James Frickleton for the plaintiff

20    class.

21              THE COURT:  All right.  Thank you.

22              Mr. Weibell?

23              MR. WEIBELL:  Yes.  Tony Weibell for the Defendant

24    Google.

25              THE COURT:  Okay.  And for the objectors?
```

1          MR. SCHULMAN:  Good morning, Your Honor.  Adam

2     Schulman for Objector Theodore Frank.  And I have with me at

3     counsel table Charles Granther (phonetic), summer law clerk.

4          THE COURT:  Okay.  Very well.

5          Is there anyone else in the courtroom on behalf of

6     the objectors or any of the parties in this lawsuit?

7       (No verbal response)

8          THE COURT:  Okay.  Hearing no response, we'll

9     proceed.

10          Okay.  Well, let me hear then, Mr. Strange, if you

11     -- let's take the (b) arguments first.

12          MR. STRANGE:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. STRANGE:  Thank you.

15          I was going to start with Rule 23(e), whether it's

16     fair and reasonable and adequate --

17          THE COURT:  No.  Why don't we do it the other way?

18          MR. STRANGE:  Okay.

19          THE COURT:  Yeah, if you don't mind.

20          MR. STRANGE:  No.

21          THE COURT:  If it doesn't -- I know you prepare,

22     and now the Judge turns you upside down, so ...

23       (Laughter)

24          THE COURT:  You're used to that.

25          MR. STRANGE:  Yes, Your Honor.

1          As Your Honor noted, the issue of numerosity,

2     commonality, typicality, and adequate requirements of (a) are

3     really not disputed.  With respect --

4          THE COURT:  I think you said there is a slight

5     objection anyway to -- which one was it, Mr. Schulman?

6          MR. SCHULMAN:  To (a)(4), adequacy.

7          THE COURT:  Oh, to adequacy of representation.  But

8     that's you mean because you think they made a bad deal.  It

9     wasn't -- it doesn't mean that they were inadequately

10    represented.  Is that -- that's your argument?

11         MR. SCHULMAN:  Essentially agreeing to all *cy pres*

12    settlement without --

13         THE COURT:  Yeah, yeah.

14         MR. SCHULMAN:  -- and actually --

15         THE COURT:  I don't think that -- you know, we

16    would have to fire every lawyer who lost a case for being

17    inadequate.  I mean, that -- you know, they made their best

18    argument.  I don't think that's going to fly.  So let's take

19    it the (a) having been satisfied.

20         MR. STRANGE:  Thank you, Your Honor.

21         THE COURT:  Yeah.

22         MR. STRANGE:  With respect to Rule 23(b)(2),

23    whether the defendant acted on grounds generally applicable

24    to the class, I believe that we've established that Google,

25    in this case, acted with respect -- the claims of this case

1    involved Google's placing of a cookie by means of

2    circumventing the internet browner's block on cookie are

3    facts that are applicable to the class as a whole; and,

4    therefore, whether they're viable or their acts all apply to

5    the class generally --

6              THE COURT:  Well, but --

7              MR. STRANGE:  -- and there's no --

8              THE COURT:  -- isn't the question under (b)(2)

9    whether you can get a release of all of these class members;

10   isn't that the issue?  I mean, in fact, I think, at one

11   point, it was suggested by you, or maybe by me and you

12   agreed, that this case will go away under (b)(2) if there was

13   no need for a release and Google did not -- you know,

14   obviously, for their own reasons, they didn't accept it.

15             So the (b)(2) issue is:  Can you have a (b)(2)

16   class certified?  And if these members cannot -- well, I

17   guess it mixes up all three elements.  But why don't you

18   address that?  Can we ultimately have a (b)(2) certified, get

19   a release from -- the Court would approve that settlement, it

20   would release all of the claims of the absentee class

21   members.

22             MR. STRANGE:  Your --

23             THE COURT:  Is that possible?

24             MR. STRANGE:  Yes, Your Honor.  And I think it is

25   under this case for the following reasons:

1          Normally, under a (b)(2) class, injunctive relief -

2    -

3          THE COURT:  Yes.

4          MR. STRANGE:  -- you don't give notice.

5          THE COURT:  Yes.

6          MR. STRANGE:  And you can have minimum notice.  But

7    a lot of times, under injunctive cases, the reason that

8    counsel settled them is to not have notice.

9          But here, unlike those cases, we have given

10   substantial notice.  I don't think anybody is disputing the

11   fact that the notice here -- which was just under $300,000

12   and went twice and, according to the declarations by the

13   people that gave the notice, was impression by 292 million

14   consumers, and on the website alone, there was 92,000

15   reviews.  So the notice here was exceptionally and applicable

16   under all reasonable notice requirements.

17          THE COURT:  Uh-huh.

18          MR. STRANGE:  So, when we get to that fact, the

19   next fact is:  Did the class members have an opportunity to

20   opt out and pursue their own claims?  Here, they did.  And in

21   fact, under the first notice, I think 50 class members

22   excluded themselves; and, under the second notice, about 39

23   did.

24          So, in this situation, Your Honor, the (b)(2)

25   class, we have exceptional notice and we have the right to

1    the class members to opt out and pursue their own claims.

2    So, under those circumstances, I think the courts would hold

3    that there can be a release of their damage claims under a

4    (b)(2) class.  And that's one of the questions raised by the

5    Court of Appeals, as Your Honor knows.

6              But here, we have also moved under 23(b)(3) --

7              THE COURT:  Right.

8              MR. STRANGE:  -- where we're requesting a release

9    of those damage claims.  Your Honor, with respect to that

10   issue, I wanted to make the following point, which is:

11             In this case, which was filed in 2012, the use of

12   the internet to collect data and use cookies was really just

13   starting to develop.  And to give Your Honor an example,

14   Facebook, a company called Facebook, didn't go public until

15   May of 2012, so it was a long time ago.

16             And one of the arguments by the major internet web

17   browsers or major internet companies like Google was to say

18   we can look at your data and there's no damage.  And they

19   made an Article III argument on that basis.

20             The District Court here did not get to that

21   argument, but just dismissed the case in its entirety,

22   holding that there's no loss or damage.  But the Court of

23   Appeals, in its first decision here, took up the Article III

24   argument and said:

25             "-- the assertion Google makes -- that federal

1          courts are powerless to provide a remedy when an

2          internet company surreptitiously collects ... data

3          -- is untenable."

4          And it held there was Article III standing.

5          And the reason I'm mentioning that, Your Honor, is

6     that that case that was decided in the Google case has been

7     cited 143 times since that decision in total.  I looked at

8     that before this hearing.  It's been cited 26 times by other

9     courts.  It's been cited 54 times by secondary sources like

10    ALR books.  It's been cited 45 times by appellate court

11    documents.  It has been cited 18 times by a trial court.

12          So I make that point because this was a difficult

13    case when we filed it.  We did make good law.  It has been

14    productive for the class.  So, when we look at the fact that

15    these claims are released, I think we also have to look at

16    what claims are being released.

17          And here, unfortunately, in the same decision where

18    the Court of Appeals held there's Article III standing, the

19    Court said -- it threw all of our wiretap act claims, all of

20    our consumer fraud claims, and basically said there's no loss

21    or damage.

22          THE COURT:  Uh-huh.

23          MR. STRANGE:  So, as class counsel, what we were

24    faced with was two claims for privacy right violations under

25    the California Constitution and under California common law

1    and no loss or damage.  So, at best, we have nominal damages,

2    if we can prove that.

3         So, when you look at these settlements, we have

4    released what the Courts have said are pretty minimal claims

5    that we had left.  And so, in answer to Your Honor's question

6    on (b)(2), we gave notice, we gave plans the opportunity to

7    opt out and to litigate their case if they felt it was

8    unfair, and no one has.  And I think the reason that no one

9    has is that there's minimal damages available.

10        THE COURT:  Uh-huh.

11        MR. STRANGE:  So, under (b)(2), we think it's a

12   proper release.

13        And under (b)(3), the issue that we're faced with

14   is whether it's properly certifiable, the first is whether

15   common issues predominate.  And here, with the two remaining

16   counts, the single predominate issue is whether defendants

17   violated the privacy rights by using cookies to track these

18   internet communications.  That's common to all the case.  If

19   there's no cookies used or we can't prove that, none of the

20   class would prevail.  So I think the common issues are clear

21   here under 23(b)(3).

22        The next issue is whether the class action is a

23   superior method of adjudication.  And under that test, Your

24   Honor, I think that the cases are fairly clear that the core

25   of the class action is to be able to overcome the problem

1   that small recoveries don't provide an incentive for

2   individuals to pursue those claims.  So, here, unfortunately,

3   we do have small claims left.  And the courts have been

4   fairly uniform that, if you have a class action, then you

5   have the ability to pursue the claims and hold defendants

6   like Google responsible.

7           So, under common issues predominate and superiority

8   under 23(b)(3), I believe we've shown that a couple of other

9   elements under (b)(3) would be the interest of the class

10   members and individually controlling the prosecutions of

11   separate actions.  And again, I think the facts are, with

12   these small claims and small damages, there is very little

13   interest of the class members to control the prosecution of

14   separate actions.  And I think that that is supported by the

15   fact that no one has filed an individual case on this issue

16   and they've had many, many years to do so.

17           THE COURT:  Uh-huh.

18           MR. STRANGE:  The second factor would be the extent

19   and nature of litigation already commenced by members class,

20   which we discussed.

21           The additional factor is whether there's unusual

22   difficulties likely encountered in the management of the

23   case.  As Your Honor is aware, this is the settlement stage.

24   And under the M-CAM and other related cases, there will be no

25   trial, so there's really no management issues.

1          So I think, under 23(b)(2) and 23(b)(3), the facts

2     of this case fall squarely and support approval.

3          The other issue under a particular 23(b) class --

4     (3), is whether there's a sufficiency of notice.  And as Your

5     Honor is aware, we have this robust notice program.  We have

6     declarations, two declarations in the first notice period and

7     another declaration in this notice period, where there was

8     272 million impressions.  They had a website that was visited

9     by 92,000 people.  And they had print publications and

10    targeted social media on Facebook and others.  So, based on

11    the notice -- which I don't think anybody has really

12    contended was not adequate here -- all of the due process

13    requirements for a 23(b)(3) class have been satisfied.

14          THE COURT:  How about ascertainability under

15    (b)(3)?

16          MR. STRANGE:  Yes, Your Honor.  I think, on the

17    supplemental briefing that Your Honor requested and that we

18    filed, we believe that we have satisfied the ascertain --

19          THE COURT:  Well, you said that you don't have to,

20    I thought.

21          MR. STRANGE:  Well, I think we have to, in terms of

22    ascertainability being an objective criteria to --

23          THE COURT:  Under (a).

24          MR. STRANGE:  -- identify --

25          THE COURT:  Okay.

1          MR. STRANGE:  But under the issue of identifying

2   specifically all the class members, I don't think we have to

3   in the settlement context.  We believe that's supported by

4   the In Re Comcast case, which specifically dealt with that

5   issue, and the DB Investments case that talked about the

6   difference --

7          THE COURT:  No.  Comcast is a summary disposition,

8   that's an order --

9          MR. STRANGE:  Correct.

10          THE COURT:  -- of the Court.

11          MR. STRANGE:  Yes.

12          THE COURT:  No facts, no law, just a naked citation

13   to Sullivan.  So are we going to -- and it's a non-

14   precedential opinion --

15          MR. STRANGE:  Yes, Your Honor.

16          THE COURT:  -- which doesn't mean it's not entitled

17   to weight.  But since it has no justification or rationale,

18   we can't really tell why the Court did what it did.  Is that

19   really it truly, or is this really, in sense, a first

20   impression case?

21          MR. STRANGE:  Well, I think it could be determined

22   a first impression.  But I think the principle is outlined in

23   the DB Investments and the principle is outlined in the

24   Comcast case where, when you have a settlement, manageability

25   issues clearly go away --

1          THE COURT:  But there are other --

2          MR. STRANGE:  -- because --

3          THE COURT:  There are other reasons for it.  I

4    mean, at that -- I'm sure you're familiar with the recent

5    case, the Niaspan case.  There are other reasons why

6    ascertainability is required.  That may be one of them, but

7    there were some others, to protect class members, et cetera.

8    Do you think you satisfy those?

9          MR. STRANGE:  I do, Your Honor, because one of the

10   issues is -- in the ascertainability is the protection of the

11   defendant --

12         THE COURT:  Okay.

13         MR. STRANGE:  -- because, if the defendant is going

14   to trial, it wants to know it's going to have a judgment that

15   would protect them --

16         THE COURT:  Right.

17         MR. STRANGE:  -- and it knows who's suing it.  So,

18   here, in a settlement context, Google has stipulated to the

19   settlement, so the protection of a defendant is not at issue

20   here.

21         And with respect to the protection of the class, I

22   think that that is intertwined with the issue of notice.  Did

23   the class get proper notice of the settlement and have the

24   ability to opt out and litigate the case, which, here, it

25   did.

1           So the ascertainability issue, as it relates to

2   manageability of the case, goes away in a settlement context.

3   And we think that the cases we've cited and just the general

4   principle that, if you have a settlement and you have a

5   defendant that's willing to settle and pay money to resolve

6   the case, that the exact identity of the class is not as

7   important as in a litigant class.

8           THE COURT:  Now, in more general terms, there seems

9   to be the need to accommodate two conflicting or contrasting

10  principles:  On the one hand, the robust policy in favor of

11  settlement; on the other hand, the fiduciary duty of the

12  Court to protect the class members.  How was this -- how are

13  those principles accommodated in this case?

14          MR. STRANGE:  Yes, Your Honor.  And I did read your

15  decision in the Utah Retirement case, and I agree with you.

16  And -- but I also agree that, in this case, we don't even

17  need the presumption of fairness in the settlement.  And

18  that's taking up the issue of whether this settlement is

19  fair, reasonable, and adequate under 23(e) based on the facts

20  of the case.  And taking those factors up now, just to

21  summarize, Your Honor, with respect to the fairness issue, I

22  think a presumption of fairness is not necessary here and

23  I'll explain why.  But I do think severed from that, there is

24  a policy favoring settlements to try to resolve these kinds

25  of complicated cases, if it is a fair settlement.

1          THE COURT:  Uh-huh.

2          MR. STRANGE:  So I think that that policy should be

3     followed.

4          THE COURT:  Uh-huh.  And you think the absentee

5     class members are protected by virtue of the fact that they

6     had extensive notice and if they had opted out -- now I think

7     Mr. Schulman, in the Frank objection, argued that the best

8     resolution here would be to opt out, get the benefits of the

9     settlement, and then bring your own lawsuit.

10         MR. STRANGE:  Well, I mean, if Mr. Schulman wants

11    to litigate on behalf of his clients, he's entitled to do

12    that.

13         THE COURT:  Uh-huh.

14         MR. STRANGE:  And it's -- it is true he -- it is

15    true that he would get the benefits of the *cy pres* assuming

16    the *cy pres* is approved and we get people --

17         THE COURT:  Uh-huh.

18         MR. STRANGE:  -- proper cy pres recipients, who do

19    the research and investigation critical to issues in this

20    case, that that would be a benefit conferred on the class,

21    and he can opt out and litigate his claims.  So they're

22    certainly not prejudiced by this settlement, he's actually

23    benefitted by it.

24         THE COURT:  Uh-huh.

25         MR. STRANGE:  But whether it's fair, reasonable,

1    and adequate, I -- you know, the factors -- and I don't mean

2    to belabor this, but you know, one of the issues in the Court

3    of Appeals, as I read the decision, was there was only a few

4    sentences that talked about the factors.  And so I wanted to

5    make sure -- I mean, I think we did cover them in our

6    briefing --

7                    THE COURT:  Right, right.

8                    MR. STRANGE:  -- extensively.

9                    THE COURT:  Yeah.

10                   MR. STRANGE:  But in terms of the factors, the

11   first is the adequacy of representation.  Here, Your Honor,

12   there was a contested leadership application by the District

13   Court many years ago, and the counsel you see sitting at the

14   table, myself and Mr. Grygiel and Mr. Fricklestein [sic]

15   prevailed in that.  The Court looked at our requirements and

16   we, if anything, have hung in there and tried to do the best

17   we can in this case for 11 years.

18                   But we also, in our declarations, noted the fact

19   that we have thousands of attorneys' time in this case.  We -

20   - prior to reaching this settlement, we had extensive

21   briefing.  We actually discussed the issue with experts,

22   which was quite complicated.  We did the issue on appeal.

23   And many of those issues, as I noted, still remain subject to

24   being cited today.

25                   And then -- so we had -- that's what we did to

1    prepare for the mediation.

2                THE COURT:  Yeah.

3                MR. STRANGE:  And at the mediation, it was quite

4    extensive.  There was difficult questions asked.

5                And so the next factor under whether it's fair,

6    reasonable, and adequate is whether there's arm's length

7    negotiations.  One of the cases we cited said the preparation

8    of an independent mediator in settlement negotiations

9    virtually ensures that the negotiations were conducted at

10   arm's length, without collusion between the parties.

11               Here, Your Honor, as we indicated, Layn Phillips is

12   a retired federal judge.  He's been cited in numerous cases,

13   an extremely experienced judge, he's settled some of the

14   biggest cases.  You know, I was happy that he took this case

15   and he spent a lot of time.

16               One of the things I didn't mention is, after we got

17   this decision in the Court of Appeals here throwing out our

18   claims, we filed a writ to the U.S. Supreme Court.  Google,

19   as it's entitled to do, didn't respond to the writ.  The U.S.

20   Supreme Court, in a very unusual decision, ordered them to

21   respond to the writ, so we had high hopes there.  But

22   ultimately, the Court did not take the case.

23               So we didn't just sit idly by.  We really litigated

24   hard these issues and we hired a respected mediator.  And

25   this settlement is the result of his substantial involvement

```
 1    in the issues --
 2                  THE COURT:  Well --
 3                  MR. STRANGE:  -- in the case.
 4                  THE COURT:  -- are we really back to the -- what --
 5    Judge Ambro, I believe, wrote that opinion, said, when all is
 6    said and done, the members of the class get no monetary
 7    award, Google gets a release, and the lawyers -- which you
 8    have worked for and I don't want to minimize that -- but
 9    ultimately, the lawyers get paid, Google gets a release, and
10    the class gets nothing.  They do get some benefit, I mean,
11    the world gets a little bit of benefit, I suppose, from what
12    happened -- what happens here.  Is that fair?
13                  MR. STRANGE:  Yes, Your Honor, I think it is fair
14    for the following reasons:
15                  Number one, as the Court has noted, you have to
16    look at the case based o all the facts and circumstances.
17    Here, we have a court of appeal decision that says, even
18    though Google has our -- you know, took our data, there is no
19    loss or damage.
20                  THE COURT:  Yes.
21                  MR. STRANGE:  I was shocked by that.
22                  So we're left with only two privacy claims that
23    have an exceedingly high bar to prove, one of which we have
24    to show it's highly offensive, and then we have to show
25    nominal damages.
```

```
 1                THE COURT:  You could have dropped the case right
 2       there.
 3                MR. STRANGE:  We could have dropped the case, but
 4       we didn't.
 5                THE COURT:  Yeah.
 6                MR. STRANGE:  And one of the problems is, to show
 7       nominal damages, Google is going to argue you have to show
 8       actual damage.
 9                THE COURT:  Yeah.
10                MR. STRANGE:  And it's going to say, well, you
11       don't have any actual damage, look at this court of appeal
12       decision.
13                So this is an unusual case, in that we had an
14       appellate court rule on the merits of our claims.  It wasn't
15       that we, as counsel, decided, well, we don't like this case
16       or we're going to discount that case.  We had a published
17       decision.  So that's one issue you have to look at.
18                But I think the central issue Your Honor is
19       alluding to is:  Does the class get a benefit from the *cy*
20       *pres*?
21                THE COURT:  Well, yeah, there is a theoretical
22       benefit and I don't want to completely trivialize it.  But
23       you know, as a matter of ultimate fairness, public policy,
24       the bad names, that, you know, this is not quite a coupon
25       case, but you know, it's in the category where the reason why
```

1     -- or part of the reason or one of the many reasons why class

2     actions were promoted and ultimately enacted as Rule 23 is

3     that the small claims of consumers could not be vindicated,

4     except by putting them together.

5                But here, there is -- you know, the -- you know,

6     we're talking about, you know, who gets money.  And now what

7     comes to mind and is somewhat related, and you began by

8     reviewing the history of this case and what has happened in

9     technology, what has happened.  And the law is not a, you

10    know, pioneer, and we often get to the case after the problem

11    has gone away.  By the time the Supreme Court issues its

12    edict, really, many of the facts, technology has overcome

13    that.

14               MR. STRANGE:  Uh-huh.

15               THE COURT:  And I think that's particularly true in

16    patent cases or cases which involve technology.  And

17    certainly, the internet ten years ago, my god, in its

18    infancy, and now we're talking about artificial intelligence

19    and various other new concepts.  There is no problem to be

20    solved here, the problem has gone away.

21               MR. STRANGE:  Well, I don't --

22               THE COURT:  Now you should be -- I guess there is

23    some justice for you being rewarded for having helped resolve

24    the problem, but there is no problem and there are no

25    benefits and there are no damages.  Maybe the whole case

 1    should just go away, everybody goes in their own separate

 2    ways or maybe paid you some money for the work that you have

 3    done.  I don't know.  It just seems to me that it is a little

 4    bit like a law school exercise at this point.

 5              MR. STRANGE:  Your Honor, can I address that?

 6              THE COURT:  Yes.

 7              MR. STRANGE:  Because I think that's critical.

 8              THE COURT:  Yeah.

 9              MR. STRANGE:  And if you don't mind --

10              THE COURT:  Yeah, please.

11              MR. STRANGE:  -- can I grab my water for second?

12         (Pause in proceedings)

13              MR. STRANGE:  I think, Your Honor, that goes to the

14    heart of a *cy pres* settlement.  And a *cy pres*, obviously, is

15    an indirect benefit.  But as the Court of Appeals noted here,

16    it actually can be better than a lottery system, which was

17    suggested by the objector here, that, you know, let's take

18    this money and people can file their claim and -- because

19    that can result in overcompensation --

20              THE COURT:  Yeah.

21              MR. STRANGE:  -- to some people.

22              So the question is -- under *cy pres* is:  Is there a

23    benefit now to the class?  Let's look at it now.

24              THE COURT:  Uh-huh.

25              MR. STRANGE:  And so the -- what the courts have

1    said, starting with the Six American -- Mexican Workers case,

2    which is a Ninth Circuit case, and they talked about remedies

3    when there's only a small amount of money at issue, and is it

4    costly to give that to the class.

5            Now no one is complaining here about the 5.5

6    million based on the facts of this case, with virtually no

7    claims left; the objector isn't saying there should be more

8    money, either.  So we have a small amount of money, we have

9    millions of class members.  Do we want to give a few pennies

10   to these class members on this settlement or do we want to

11   give them something that may be beneficial, in terms of

12   further research, you know, education about cookies,

13   education about data, sponsoring --

14            THE COURT:  Yeah.

15            MR. STRANGE:  -- online forums about privacy?

16   Those are very real issues --

17            THE COURT:  Uh-huh.

18            MR. STRANGE:  -- that are here today.  Privacy is

19   huge, data is even bigger than it was when we filed this

20   case.  I mean, if I was to appear in a federal court now and

21   an adversary said, well, data doesn't have any value, I don't

22   think the Court would buy that, but ...

23            So we have privacy issues, we have data issues that

24   are very real today.  And the question is:  If we take, you

25   know, millions of dollars and give it to foundations that

```
 1    will do research or sponsor online forums or help consumers

 2    understand their rights to privacy or even monitor --

 3                   THE COURT:  Yeah.

 4                   MR. STRANGE:  -- what Google is doing, is that a

 5    benefit to the class?

 6                   THE COURT:  Right.

 7                   MR. STRANGE:  And I think it's absolutely a benefit

 8    to the class.

 9                   I mean, one of the cases we cited, which was Hughes

10    v. Kore Industries, said:

11                   "A foundation that receives $10,000 can use the

12                   money to do something to minimize violations of

13                   the" -- relevant law -- "as a practical matter,

14                   class members each given $3.57 cannot."

15                   And so I think that's relevant here.

16                   And I'll also note that the use of cy pres in a

17    (b)(3) class as a remedy was approved in the In Re Google

18    Street View case and --

19                   THE COURT:  That's a Ninth Circuit case, right?

20                   MR. STRANGE:  That's a Ninth Circuit case.

21                   THE COURT:  Yeah.

22                   MR. STRANGE:  But in the Baby Products case, which

23    Your Honor knows is a Third Circuit case, that cited the Lane

24    v. Facebook case, which was also a cy pres --

25                   THE COURT:  Yeah.
```

1          MR. STRANGE:  -- only case.

2          So the question, I think, for Your Honor and

3    presented here today is:  Is this *cy pres* going to be an

4    indirect benefit to the class?  And I think the answer is

5    yes.  And is *cy pres* better than giving a few pennies to the

6    consumers or somehow a lottery?  And I think the Court of

7    Appeals here answered that and said yes.

8          So *cy pres* is rare, Your Honor.  It's not a

9    situation where we do this very often.

10          THE COURT:  Uh-huh.

11          MR. STRANGE:  But I think the courts -- and we've

12    cited the cases -- have said, if you have a large number of

13    class members and it's difficult or burdensome to distribute

14    the money --

15          THE COURT:  Well --

16          MR. STRANGE:  -- it's the --

17          THE COURT:  -- I mean, I think it -- and I think

18    the Circuit rejected the proposition that *cy pres* was never

19    acceptable, and I think it is certainly a tool.  And the

20    question:  Is this the appropriate case for it?  Not so much

21    whether this is not -- this is not an appropriate tool.

22          And this may be a debate for higher minds, but as

23    you know, some members of the Supreme Court have raised the

24    question of the propriety of this mechanism just as a matter

25    of policy.  These are issues that were tilting, you know, the

1    scales on social policy, and whether this is the appropriate

2    forum for doing that.  That may be a great idea and maybe

3    Congress needs to be appropriate money to give, you know,

4    these folks an opportunity to study the issue.  But is this

5    the appropriate focus?  As I said, this may be a matter for

6    higher minds to determine and not certainly for me to do

7    that.

8          But it strikes me that the choices are not --

9    money, *cy pres*, and the third choice that neither choice is

10   appropriate.

11         MR. STRANGE:  Well, Your Honor, that -- it's true

12   that the third -- a choice could be let's don't give the

13   class anything --

14         THE COURT:  Right.

15         MR. STRANGE:  -- let's dismiss this case.

16         THE COURT:  Let's say that's -- we can't do that.

17   So now you say -- you're making it a -- you're making it

18   almost a default choice.  That is, if it becomes, you know,

19   the distribution is just not feasible or administratively --

20   or burdensome, et cetera, and let's go to *cy pres*.  And the

21   third choice is this -- for some reason, either the need for

22   it has disappeared or this is not an appropriate mechanism to

23   do it.

24         Now, look, I'm cognizant that, after ten years,

25   it's -- you know, maybe this could have been discussed out

1    front.  I mean, it's beating a dead horse here.  But is that

2    a choice, that this just doesn't fit in here, this is --

3            MR. STRANGE:   Well, Your Honor, let me address

4    that.  I will note that, in our supplemental briefing --

5            THE COURT:  Yeah.

6            MR. STRANGE:  -- we discussed cases in the Third

7    Circuit that held that monetary value is not required --

8            THE COURT:  Right.

9            MR. STRANGE:  -- to approved a (b)(3) class.

10   There's, you know, injunctive relief or -- in other words,

11   there's cases that said, okay, well, we've looked at the

12   defendant's wrongful conduct and they're going to, you know,

13   issue better advertising guidelines, they're going to tell

14   their people not to do various things.

15           So one of the ways to look at *cy pres*, Your Honor,

16   is we could have said, okay, Google, as a part of this

17   settlement, you're going to have -- you know, monitor your

18   actions to make sure that they comply with the law.

19           THE COURT:  Right.

20           MR. STRANGE:  You're going to take certain actions

21   with respect to cookies that we think will benefit consumers,

22   so ...

23           But what we did instead, which I think is much

24   better, is we're saying we're going to nominate companies,

25   independent companies, and give them money to monitor Google,

1    to do those same things.  So, instead of an injunctive relief

2    against Google -- which I don't think anybody could complain

3    of -- we gave them the money to independent people to

4    basically do the same thing.

5              THE COURT:  Uh-huh.

6              MR. STRANGE:  So, in answer to Your Honor's

7    question is this a case that's appropriate for a *cy pres* only

8    settlement, my answer is absolutely yet, based on the facts

9    of this case, the facts being:

10              The claims are minimal left.

11              There's millions of class members.

12              They're difficult to identify, it would be

13    extremely burdensome.

14              The benefit to the class members getting a few

15    pennies each is not nearly as beneficial as having millions

16    of dollars to independent organizations to do research on

17    data and privacy --

18              THE COURT:  Uh-huh.

19              MR. STRANGE:  -- which are big issues today.

20              And then, finally, Your Honor, we don't want to let

21    Google off the hook.  We don't want the alternative, see, so

22    Google, okay you spent all your money on lawyers and now you

23    don't have to pay the millions of dollars you agreed to pay.

24    That doesn't --

25              THE COURT:  So this --

```
 1              MR. STRANGE:  -- feel right.

 2              THE COURT:  -- would be a windfall for Google.

 3              MR. STRANGE:  Absolutely.  It would be --

 4              THE COURT:  Uh-huh.

 5              MR. STRANGE:  -- a windfall for Google.

 6              THE COURT:  Uh-huh.

 7              MR. STRANGE:  And even, in addition to the money,

 8      having the money spent to organizations that may be a thorn

 9      in their side later down the road.  It may prevent some of

10      the things that have happened here or may happen in the

11      future is a huge benefit to the class as a whole.  So I think

12      this is a quintessential case because of the burdensome

13      nature, because of the number of class members, that this

14      should be approved as a cy pres only.

15              I will note one point is that we also have

16      injunctive relief, we also have required them to delete these

17      cookies and eliminate these cookies and put dates --

18              THE COURT:  Now let me ask you a question about the

19      Ninth Circuit Street View case.  That was a (b)(2), was it

20      not?

21              MR. STRANGE:  No, Street View was a (b)(3) class.

22              THE COURT:  (b)(3) class.

23              MR. STRANGE:  Yes.

24              THE COURT:  Okay.  Were there releases given in

25      that case?
```

1          MR. STRANGE:  Absolutely.

2          THE COURT:  Okay.

3          MR. STRANGE:  Yeah, all the damage releases.

4          THE COURT:  Okay.

5          MR. STRANGE:  And the same as -- the same with Lane

6     v. Facebook.

7          THE COURT:  Okay.

8          MR. STRANGE:  And the same with -- there was

9     another Google case, a refer case, a refer case, and that was

10    also --

11         THE COURT:  There were releases in all the cases.

12         MR. STRANGE:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MR. STRANGE:  And the issue about the release here,

15    where the Court of Appeals talked about a broad release, this

16    release is no broader than any other case, in terms of just

17    only having the release relate to claims which were broad or

18    could have been broad.  It's not like we're -- it's a some

19    unusually broad release.

20         I think what the Court of Appeals was talking about

21    was releasing damage claims.  And the release of damage

22    claims is something that's very common and it was done in

23    other cases involving *cy pres*.

24         THE COURT:  Okay.  Okay.

25         MR. STRANGE:  So the -- I think, on the issue of

1    fairness, Your Honor, in light of all of those facts, this is

2    an extremely fair and reasonable settlement based on the

3    state of the record and based on the facts here.

4            And you know, one other factor that I was just

5    mentioning is Google did agree to eliminate these cookies and

6    to put a date on those cookies as a part of the settlement --

7            THE COURT:  Yeah.

8            MR. STRANGE:  -- which is --

9            THE COURT:  Let me --

10           MR. STRANGE:  -- separate --

11           THE COURT:  Let me --

12           MR. STRANGE:  -- from the --

13           THE COURT:  -- just ask you one final question or

14    near final question just to be sure that I understand.  And

15    go back to ascertainability.

16           MR. STRANGE:  Yes.

17           THE COURT:  If -- because I think this is a close

18    question or one which the Circuit has not addressed directly.

19           Your argument is that we don't need to do reliable

20    and administrative -- find a reliable and administratively

21    feasible mechanism because this is a settlement class.

22           MR. STRANGE:  That is correct, Your Honor.

23           THE COURT:  So your case is going to rise or fall

24    on that.  I mean, if -- you're not, in the alternative,

25    claiming that, if it is a requirement, you can satisfy that

1    requirement.  You agree you cannot satisfy or you do not have

2    to satisfy that requirement.  And that -- it seems to me,

3    this is what the Circuit is going to have to decide,

4    regardless of what I think of it.

5             MR. STRANGE:  Well, two points on that, Your Honor.

6    And I did -- I should have said at the outset --

7             THE COURT:  Yeah.

8             MR. STRANGE:  -- that my co-counsel Mr. Grygiel was

9    going to address the objection, but just two points on what

10   Your Honor just raised.

11            THE COURT:  Yeah.

12            MR. STRANGE:  On the ascertainability issue, part

13   of the ascertainability question is whether there's an

14   objectively identical class definition.

15            THE COURT:  Well, that I think is satisfied.

16            MR. STRANGE:  Yeah.  Okay.

17            THE COURT:  I'm going to the second one.

18            MR. STRANGE:  Yeah.  So, on the second one, yeah, I

19   believe, in a settlement context, that specifically

20   protecting the defendant by identifying specifically --

21            THE COURT:  So, if --

22            MR. STRANGE:  -- the class --

23            THE COURT:  -- you're wrong on that, that's the end

24   of your case.

25            MR. STRANGE:  No, Your Honor.

```
 1                    THE COURT:  No.  Okay.

 2                    MR. STRANGE:  And here --

 3                    THE COURT:  Tell me that.

 4                    MR. STRANGE:  Here's why:  Because, under (b)(2) --

 5                    THE COURT:  Okay.

 6                    MR. STRANGE:  -- I believe that we can have a

 7     release of damages because we have satisfied the due process

 8     --

 9                    THE COURT:  Okay.

10                    MR. STRANGE:  -- requirements of notice.

11                    THE COURT:  Okay.

12                    MR. STRANGE:  And since --

13                    THE COURT:  So you would --

14                    MR. STRANGE:  -- we've given --

15                    THE COURT:  You would really rely on -- the

16     alternative argument is a (b)(2) argument.  I don't know if

17     it's "alternative," but it's another argument that you have.

18     So this class, if we do not agree with you that the second

19     requirement is applicable to settlement class, you still

20     prevail and have the class certified as a (b)(2) class.

21                    MR. STRANGE:  Correct, Your Honor.

22                    THE COURT:  Okay.

23                    MR. STRANGE:  And the issue of the release of

24     damages is appropriate because we've given adequate -- more

25     than adequate notice --
```

```
 1              THE COURT:  Okay.

 2              MR. STRANGE:  -- in fact --

 3              THE COURT:  I get it.

 4              MR. STRANGE:  -- notice that complies with the --

 5              THE COURT:  Right.

 6              MR. STRANGE:  -- (b)(3) standards.

 7              THE COURT:  Right.  Okay.  Why don't we move on

 8    then and give, first, Google an opportunity to comment?  Then

 9    we'll go back and deal with the specific objections.

10              MR. STRANGE:  Thank you, Your Honor.

11              THE COURT:  Okay.  Thank you.

12              MR. STRANGE:  I appreciate your time.

13              THE COURT:  Okay.  Okay.

14              MR. WEIBELL:  Good morning, Your Honor.

15              THE COURT:  All right.

16              MR. WEIBELL:  Tony Weibell for Defendant Google.

17              What Mr. Strange said is -- you know, we agree with

18    most everything there.  And to address, I think, the two main

19    issues that Your Honor is floating:  The ascertainability

20    issue and then also the pure cy pres settlement issue, and I

21    can do both of those.

22              So, with ascertainability, we agree that the Third

23    Circuit's en banc holding in DB Sullivan Investments [sic],

24    even though it wasn't specifically addressing the

25    ascertainability requirements in a settlement context, that
```

1    decision, nonetheless, satisfy -- or explains what we need to

2    do here, right?  That any issues that would evaporate because

3    there's no trial are no longer an issue for certification.

4    So the two requirements, right?  The objective criteria and

5    the second one, the feasible way of people identifying

6    themselves, that second one just evaporates.  In this

7    context, no class member has to identify who they are.

8            And that makes sense, right?  If you -- the

9    alternative here is to force the parties to litigate a

10   putative class action that could never get certified, right?

11   There's a big dispute over whether or not individual class

12   members would be able to, down the road, prove -- or even

13   these name plaintiffs, trying to prove that they were members

14   of the class, right?  That they were affected by the means

15   alleged in the complaint.  That evaporates in this settlement

16   context.  Therefore, under the law of the Circuit in DB

17   Sullivan Investments, that shouldn't be an issue.

18           Your Honor is correct about the Comcast decision.

19   It wasn't a published decision, but it is still citable under

20   the rules of the Circuit.  And we do think --

21           THE COURT:  Well, it's not -- it's not binding.  It

22   -- we don't call them "published;" we call them

23   "precedential."  It's a non-precedential opinion.

24           MR. WEIBELL:  Right.

25           THE COURT:  But it is, it's entitled to due

38

```
 1    respect, but the Court is not bound by it.
 2              MR. WEIBELL:  Yep, that's exactly right, Your
 3    Honor.
 4              THE COURT:  Yeah.
 5              MR. WEIBELL:  I would agree.
 6              Now in the recent Third Circuit decision that Your
 7    Honor mentioned --
 8              THE COURT:  Niaspan, yeah.
 9              MR. WEIBELL:  -- earlier, when it was dealing with,
10    you know, why we have an ascertainability requirement in the
11    Third Circuit.  And it pointed to, well, the reasons why
12    match what other circuits are doing.  Even though other
13    circuits like the Ninth Circuit don't have an
14    ascertainability requirement, what they do have is found in
15    other areas of Rule 23, that they address those same
16    manageability issues in other contexts.
17              And it's the same issue.  It's if you were going to
18    trial, if you had class members had to make an individual
19    showing and prove on these issues, is that going -- are they
20    going to be able to do it, right?  Are they going to be able
21    to feasibly demonstrate that they're in the class or not.
22              And there is a huge difference -- this is what the
23    Third Circuit's holding in DB Sullivan Investments --
24              THE COURT:  Uh-huh.
25              MR. WEIBELL:  -- makes -- you know, this is the
```

1    main point.  There is a very big difference between a

2    litigation class and a settlement class.

3              THE COURT:  Uh-huh.

4              MR. WEIBELL:  In a litigation class, you're using

5    Rule 23 against the defendants, you're forcing a defendant to

6    have to defend a class of claims, and you're going to hit the

7    defendant with a judgment -- or you're trying to, anyway --

8    that's going to be applied, you know, for a class of people.

9              In a settlement context, it's completely different.

10   The parties have now agreed, as the Constitution gives them a

11   right to do, how they're going to resolve their dispute.  And

12   then the only issues you're looking at is:  Has due process

13   been satisfied to bind absent class members to that agreement

14   that they've then reached?

15             THE COURT:  Well, how do they know that they are

16   members of the class?

17             MR. WEIBELL:  So that's an excellent question.

18   Here, it's even -- it doesn't matter because, even if they

19   suspect that they might be a member of the class, they can

20   opt out of the settlement.  They have notice, they all had

21   notice, and they have the opt -- ability to opt out of the

22   settlement, even if they suspect and they can preserve their

23   rights.

24             THE COURT:  Uh-huh.

25             MR. WEIBELL:  So there's nothing that's -- you

1    know, there's no prejudice to the absent class members in

2    this point because let's say there's somebody that has the

3    ability -- even though we think it's impossible, has the

4    ability because they preserved their device for the last 12

5    years in the existing -- in the state it was in before, and

6    they had a forensic expert look at it back then and determine

7    what was going on.  If they could prove that they had been

8    affected by what's been alleged in the complaint, they could

9    opt out of the class here and still -- they would still have

10   their right to do that.  And if they can't, if they don't

11   have that proof, but they think they might have --

12            THE COURT:  Uh-huh.

13            MR. WEIBELL:  -- they can still opt out.  Nothing

14   prevents them from opting out.  So their due process rights

15   have been satisfied.

16            So I think, absolutely, the law of this Circuit,

17   the precedential law of the Circuit for the DB Sullivan

18   Investments case and the more recent case describing the

19   ascertainability requirement in the Third Circuit, support

20   that that second requirement for ascertainability is not an

21   issue here in the settlement context.

22            THE COURT:  Okay.  Thank you.

23            MR. WEIBELL:  Okay.  Let me address --

24            THE COURT:  Yeah.

25            MR. WEIBELL:  -- then the --

1          THE COURT:  Sure.

2          MR. WEIBELL:  pure *cy pres* issue.

3          THE COURT:  Yeah.

4          MR. WEIBELL:  So it is the law of this Circuit

5    under the Baby Products case that you can settle a class,

6    even though class members don't get any monetary relief.  If

7    there ever was a case that was appropriate for pure *cy pres*

8    relief, it would be this case, right?  Where the Third

9    Circuit and District Court had already held that there's no

10   actual damages here, there's no monetary relief that

11   individuals would be able to seek.  They're not giving

12   anything up.

13          In fact, this case has been going on so long that,

14   ten years ago, the District Court dismissed all the claims in

15   the case with prejudice.  And the Third Circuit didn't revive

16   any of those claims, it revived just a couple of those

17   claims, I think it was two years later.  So any statute of

18   limitations has long since passed on individual member's

19   claims, certainly as to their class claims under the American

20   Pipe decision, right?  They wouldn't get tolling for another

21   class action.

22          THE COURT:  Uh-huh.

23          MR. WEIBELL:  So they -- they're not giving

24   anything up, right?  There's no monetary damages here.  And

25   that's the law of the Circuit, right?  We cited cases in the

 1    brief that show, if there are really no actual damages to

 2    class members, then it makes sense that they wouldn't get

 3    monetary relief in a settlement.

 4            But the Baby Products case also says, if you take

 5    the value of the cases, right?  Which is reached through

 6    settlement.  In this case, there was a 5.5-million-dollar

 7    settlement.  If that value is too low to feasibly distribute

 8    it to all of the class members, then it makes sense to do *cy*

 9    *pres*.  That's this case.

10            So, even though class members aren't getting

11    anything, their alternative would be to get less than a

12    penny, which doesn't make sense, right?  The number of class

13    members and the value of the case is just so low.  That's why

14    this is a perfect case --

15            THE COURT:  Well, the third --

16            MR. WEIBELL:  -- for *cy pres*.

17            THE COURT:  The third option would be simply to

18    have the case dismissed.

19            MR. WEIBELL:  Well, but this is a settlement

20    context, so the plaintiffs wouldn't do that, right?  They

21    were --

22            THE COURT:  Yeah.

23            MR. WEIBELL:  They would keep going, unless they

24    were to give up the case.  I mean, if they had dropped the

25    case, just walked away at that point --

1          THE COURT:  Uh-huh.

2          MR. WEIBELL:  -- that was an option for them.

3          THE COURT:  Uh-huh.

4          MR. WEIBELL:  They said they were going to pursue

5    the case.  So then the parties were facing each other with,

6    all right, is Google going to spend millions of dollars

7    defending itself --

8          THE COURT:  Yeah.

9          MR. WEIBELL:  -- in litigation that will ultimately

10   get dismissed or is it just going to give that money to the

11   class in the form of a *cy pres* relief.  And so that's why it

12   makes sense here.

13         THE COURT:  Okay.

14         MR. WEIBELL:  Regarding the (b)(2) versus (b)(3),

15   absolutely you can do a (b)(2) settlement that releases

16   monetary claims as long as you satisfy due process with opt

17   out and notice, which we have done here.

18         That said, I think it would be a mistake to only

19   certify this settlement class under (b)(2) because there's no

20   reason to when you can also do it under 23(b)(3) just as

21   easily.

22         THE COURT:  Uh-huh.

23         MR. WEIBELL:  And so we think the requirements for

24   23(b)(3) are also satisfied here.

25         THE COURT:  Uh-huh.

1          MR. WEIBELL:  Again, we're in a settlement context,

2     there's no predominance problem here.  Everybody is getting

3     something in the way of *cy pres* relief and the claims are

4     essentially identical.  So all those requirements for a

5     23(b)(3) certification would be satisfied here, as well.

6          THE COURT:  All right.  Okay.  Thank you.

7          Let me hear from the objector now.

8          MR. SCHULMAN:  Good morning, Your Honor.

9          So I welcome the Court's questions and feel free to

10     lead me wherever you'd like to.  But I'm happy to discuss the

11     ascertainability argument --

12          THE COURT:  Why don't you start there?

13          MR. SCHULMAN:  With ascertainability?

14          THE COURT:  Yeah.

15          MR. SCHULMAN:  So, as Your Honor recognized, the

16     only precedent that the settling parties muster for the idea

17     that ascertainability doesn't apply to a settlement

18     certification is Comcast, which is non-precedential and

19     doesn't bind this Court.

20          This Court decided otherwise in Utah Retirement

21     System in the settlement context.  And there was good reason

22     that this Court decided otherwise because the reason behind -

23     - underlying ascertainability are applicable at the

24     settlement context:  To provide notice, the opportunity to

25     opt out.  And the opportunity to opt out isn't meaningful

1    without understanding who the class members are, so you can

2    provide them notice.  And of course, the non-dilution

3    rationale also applies at settlement.

4         The defendants and -- both Google's counsel, class

5    counsel say that the protection of ascertainability is just

6    for the defendant's interest and Carrera rejects that.  It

7    called that "misplaced," quote/unquote.  We cite that in the

8    objection.  So we think it is a first -- a question of first

9    impression for this Court, although this Court had decided

10   the issue in Utah Retirement System, and we think it decided

11   it right in that case.

12        I'm happy to -- and one point in the papers -- it

13   didn't come up today -- but class counsel asserted that it

14   was law of the case because this Court had decided --

15        THE COURT:  Right.

16        MR. SCHULMAN:  -- a preliminary approval.  That's

17   not how preliminary approval works.  I think Your Honor knows

18   that that's an interlocutory tentative decision pending

19   notice to the class and hearing from the objectors.

20        THE COURT:  Well, the word is "preliminary."

21        MR. SCHULMAN:  Right.  Yeah, for a reason.

22        THE COURT:  Okay.

23        MR. SCHULMAN:  Exactly, exactly.

24        And there's -- and it seemed like -- Mr. Strange

25   sort of disclaimed it today.  But in their papers, you see

 1    this idea of presumption of fairness for the settlement.  If

 2    you look at the -- look at the General Motors Fuel Tank

 3    liability litigation, it's very clear it's talking about

 4    preliminary approval, a presumption of preliminary approval.

 5    At final approval, the settlement proponents "bear the

 6    burden."  That's the language of GM Trucks.

 7              Happy to discuss the --

 8              THE COURT:  How about *cy pres*?  What do you think?

 9              MR. SCHULMAN:  Right.

10              THE COURT:  You don't think much of it, but --

11              MR. SCHULMAN:  Right.

12              THE COURT:  -- it's permitted in this Circuit,

13    isn't it?

14              MR. SCHULMAN:  We think -- it is permit -- there is

15    a -- there is a role as an instrument of distributing

16    residuals.

17              So defense counsel says that Baby Products -- it's

18    the law of the Circuit under Baby Products.  Baby Products

19    reversed a settlement approval.

20              THE COURT:  Uh-huh.

21              MR. SCHULMAN:  Okay?  There's dicta that you can

22    use *cy pres* in certain cases.  But the question of whether

23    you can have all *cy pres* in a (b)(3) class action, which is

24    different than this -- the Third Circuit's decision in this

25    case last time around, right?  It was a (b)(2) class action,

1    where the Third Circuit suggested, well, the funds might

2    belong to the class as a whole in the (b)(2) context, but not

3    the (b)(3) context.  That's where you have the prior decision

4    saying these funds are property of the class.

5              So we think -- and there's a variety of reasons why

6    it's inappropriate, and we can get into the conflicts

7    problem, which the parties propose to resolve the conflicts

8    problem by putting the recipients into a black box and not

9    giving notice who the neutral is, who the recipients are.

10   That's --

11             THE COURT:  Well, it would all be subject to the

12   Court's approval.  I mean, I don't think we're going to just

13   you know, let them do that.  They can suggest who that person

14   may be or persons, and then the Court would decide that.  I

15   don't think that's an insurmountable object.  That's more

16   administrative, I think.  Obviously, we would want to have

17   someone free of conflict and knowledgeable of the issues.

18   And I think, typically, then the Court approves that person.

19             MR. SCHULMAN:  True.

20             THE COURT:  Yeah.

21             MR. SCHULMAN:  That's fair enough.

22             THE COURT:  Yeah.

23             MR. SCHULMAN:  And Baby Products also suggests that

24   class members must get an opportunity to comment --

25             THE COURT:  Oh, probably.

1          MR. SCHULMAN:  -- and notice.

2          THE COURT:  Probably, if -- under ordinary

3     circumstances.  I don't know here the cost of doing all of

4     that.  But that's not unreasonable.

5          MR. SCHULMAN:  Well, and so one problem is that --

6     and I know they made that overture in their reply paper, that

7     this Court can do that.

8          THE COURT:  Yeah.

9          MR. SCHULMAN:  But there's no settlement document

10    saying they have to do that.  That's extremely irregular.

11    I'll tell you, as somebody who has litigated these cases and

12    has -- you know, they attack our track record, but our track

13    record speaks for itself.  There's plenty -- it -- we haven't

14    lost a case in the Third Circuit.

15         Just -- and while I'm talking about that, quickly -

16    - this is an unpleasant topic, obviously.  But the ad hominem

17    attacks against my employer and my client, if Your Honor is

18    inclined to rely on those at all, we'd ask --

19         THE COURT:  Irrelevant.

20         MR. SCHULMAN:  Okay.  Thank you.  I've lost my

21    train of thought now.

22         THE COURT:  Yeah, you haven't lost a case yet.

23         MR. SCHULMAN:  Yeah.  Yes, but -- and I forget what

24    I was speaking about right before then.

25         THE COURT:  So what's your bottom line?  What is it

1    that -- we've discussed most of it.  Is there anything other

2    than -- I think we got ascertainability, between the two

3    issues, and the fairness issue, particularly the *cy pres*

4    issue, conflict issues.

5         MR. SCHULMAN:  And then, beyond all of that -- and

6    of course, you, the Court -- this honor -- Your Honor can

7    avoid this as a matter of constitutional avoidance.  We have

8    the First Amendment argument, if Your Honor doesn't reject --

9         THE COURT:  Yeah.

10        MR. SCHULMAN:  -- as a matter of fairness.

11        THE COURT:  Yeah.  Tell me about the First

12   Amendment.  I saw that was one of the recent cases, I think,

13   that was not given much credence.  But what's the basis for

14   that?

15        MR. SCHULMAN:  So the Street View case did reject

16   that argument.

17        THE COURT:  Okay.

18        MR. SCHULMAN:  It rejected on the rationale that

19   there was the right of opt-out, which meant that the speech

20   was not compelled.

21        THE COURT:  Right.

22        MR. SCHULMAN:  We have the problem here that

23   there's no identification of the recipient, so the opt-out is

24   illusory in the sense that they don't know who's going to

25   come out of the -- you know, the black box procedure that

1    they've set up.

2              THE COURT:  Well, what do you mean by "black box."

3    You used that term a couple of times.

4              MR. SCHULMAN:  Yeah.  I simply mean that the

5    process doesn't designate -- so the Third Circuit found that

6    the recipients they designated may have had a conflict --

7              THE COURT:  Right.

8              MR. SCHULMAN:  -- with class counsel, right?  And -

9    -

10             THE COURT:  Oh, so you would like to know who the

11   recipient is ahead of time, so that you can object to the

12   recipient.

13             MR. SCHULMAN:  Right, or --

14             THE COURT:  Well, we can do that afterward.  In

15   other words, it's a separate -- we could accept it as subject

16   to the Court approving who the recipient is going to be.  And

17   we can have, you know, if it -- if there is a disagreement --

18   either the parties could agree to do it; or, if there's a

19   disagreement, ultimately it's the Court's responsibility to

20   approve that designation no matter what.  I don't think we

21   can delegate that designation.

22             MR. SCHULMAN:  I under -- I absolutely agree with

23   that characterization.

24             But also, even if Your Honor allowed for

25   objections, we'd still be --

1          THE COURT:  Well, what is --

2          MR. SCHULMAN:  -- beyond --

3          THE COURT:  -- the free -- the First Amendment

4    issue?

5          MR. SCHULMAN:  So it's from the foundational

6    premise that the funds belong to class members.

7          THE COURT:  Okay.

8          MR. SCHULMAN:  So the class counsel giving the

9    funds to third-party charities is a compelled subsidy from

10   the class members.

11         THE COURT:  Uh-huh.

12         MR. SCHULMAN:  And the Ninth Circuit said, oh, this

13   is okay because there's a right to opt out.  But here,

14   there's no right to opt out with knowledge --

15         THE COURT:  But --

16         MR. SCHULMAN:  -- of who the --

17         THE COURT:  Even --

18         MR. SCHULMAN:  -- recipients are going to be.

19         THE COURT:  I'm trying to understand.  Aside from

20   the opt-out --

21         MR. SCHULMAN:  Right.

22         THE COURT:  -- what is the -- conceptually, what's

23   the connection to speech?

24         MR. SCHULMAN:  Because it's the compelled subsidy

25   line of cases.

```
1              THE COURT:  Uh-huh.

2              MR. SCHULMAN:  So this is Janus, some cases --

3              THE COURT:  Okay.  From the --

4              MR. SCHULMAN:  From the --

5              THE COURT:  It's like making the people pay the

6    union dues, and then they would use it for some other

7    purpose, right?

8              MR. SCHULMAN:  Right, right.  Well, yes.  And then,

9    in this case, they could use it for advocacy that the class

10   members don't agree with.

11             For example, my client Mr. Frank is concerned that

12   it could be used by these to endorse sort of a European-style

13   right to be forgotten.  They could potentially run into First

14   Amendment territory.

15             THE COURT:  But they would only -- oh, you mean

16   they would advocate --

17             MR. SCHULMAN:  Yes.

18             THE COURT:  -- positions which the class members

19   may not agree with.

20             MR. SCHULMAN:  Right.

21             THE COURT:  Yeah.

22             MR. SCHULMAN:  And if you want to do a *cy pres*

23   style, you can have -- we would not have a problem if they

24   had some sort of an election that class members could make on

25   the settlement website saying tick a box, your portion of the
```

1    fund goes to whatever charity because then you don't have the

2    compulsion.

3              THE COURT:  Uh-huh.

4              MR. SCHULMAN:  Then it's an opt-in, which is what

5    Janus suggests.

6              THE COURT:  Well, I thought I had raised -- maybe I

7    did not think of it in First Amendment terms -- of whether --

8    and as I said, I don't think that -- this may be

9    intellectually stimulating, but not something that is --

10   whether or not the judicial branch and the class action

11   mechanism is a place to address a policy issue, such as

12   what's a good idea and not a bad idea.

13             And here, I'm giving the money to some third party

14   who would then do that.  It gets us implicated on that.  I

15   mean, that would be kind of a Supreme Court decision because

16   it takes some steps to get there.  So --

17             MR. SCHULMAN:  Right.  That's not --

18             THE COURT:  -- I'm not going to go there, but I

19   appreciate --

20             MR. SCHULMAN:  Well, I'm --

21             THE COURT:  -- what you're saying.

22             MR. SCHULMAN:  I'm happy to agree with that.

23   That's not the purpose of Rule 23.

24             THE COURT:  Yeah.

25             MR. SCHULMAN:  It's a compensatory purpose --

54

```
 1                  THE COURT:  Yeah.

 2                  MR. SCHULMAN:  -- for the aggregation of

 3       individuals in the class.

 4                  THE COURT:  Yeah.

 5                  MR. SCHULMAN:  And that's the missing component

 6       here.

 7                  THE COURT:  Uh-huh.

 8                  MR. SCHULMAN:  And so, you know, Mr. Strange is

 9       talking about the deterrent, why the third option would let

10       Google off the hook, so to speak.  But the settlement that

11       they had arrived at was Google paying charities that it was

12       already donating money to.

13                  THE COURT:  Okay.  But we did away with that or we

14       will.

15                  MR. SCHULMAN:  Right.

16                  THE COURT:  Okay.  Yeah.

17                  MR. SCHULMAN:  I'm just saying that that's not --

18                  THE COURT:  Yeah.

19                  MR. SCHULMAN:  -- an action -- I don't think that's

20       a credible rationale.

21                  THE COURT:  Yeah.

22                  MR. SCHULMAN:  And so, in -- I would -- to the

23       extent that Your Honor thinks that there -- that the right

24       result might be a third option of dismissal, I would refer

25       Your Honor to the Subway Footlong case in the Seventh
```

1    Circuit, a case that class counsel cited a number of times

2    during the first -- before Your Honor was assigned to the

3    case, during the first preliminary approval hearing, we had

4    lost at the District Court level.  The Seventh Circuit

5    reversed that on appeal because -- under the premise -- the

6    foundational premise that you need to have a benefit to the

7    class at the time of certification, that it doesn't satisfy

8    (a)(4) adequacy to certify a class that isn't going to

9    provide a benefit, that's only going to provide a release to

10   the defendant and a pot of money to class counsel.

11            THE COURT:  Well, it's an indirect benefit, right?

12   You would agree with that.

13            MR. SCHULMAN:  It -- some -- I -- Baby Products is

14   a little more equivocal than that.  It says, at best, it's an

15   indirect benefit, I believe, if you look at the language of

16   Baby Products.

17            THE COURT:  Uh-huh.

18            MR. SCHULMAN:  It's not a form of relief, as

19   Justice Thomas --

20            THE COURT:  But here, when you went to the Circuit,

21   the Circuit didn't say this is a bad idea.  It said that the

22   mechanics, there were conflicts and, you know, they had some

23   issue with the specifics.  But they had an opportunity to say

24   --

25            MR. SCHULMAN:  Right.

```
 1              THE COURT:  -- we don't approve of these kinds of

 2     settlements, go away.

 3              MR. SCHULMAN:  They did.

 4              THE COURT:  In fact, they said go back and

 5     straighten it out.

 6              MR. SCHULMAN:  In the (b)(2) context --

 7              THE COURT:  Yeah.

 8              MR. SCHULMAN:  -- it said that because -- and you

 9     can look at the language of the opinion.  It said that the

10     funds might belong to the class as a whole in a (b)(2)

11     context --

12              THE COURT:  Uh-huh.

13              MR. SCHULMAN:  -- but not in a (b)(3) context.  I

14     think the implication was that, in a (b)(3) context, the

15     funds belong to the class members that are paying for the

16     recovery through giving the release to the defendant.

17              THE COURT:  Uh-huh.

18              MR. SCHULMAN:  You know, we wouldn't be here if

19     there was no release, we wouldn't have standing to be here if

20     there was no release given.

21              THE COURT:  Uh-huh.

22              MR. SCHULMAN:  So for them to say that it's not

23     value, we -- and we agree that it doesn't need to be a fifty-

24     five-million-dollar settlement, 5.5 is probably the right

25     amount, if you're reaching it through an arm's length
```

1    negotiation.  But that doesn't mean that the allocation is

2    fair.

3                THE COURT:  So which -- what should they have done?

4                MR. SCHULMAN:  We think that it should have been on

5    a -- we think that the claims made settlement was the proper

6    way to settle this.  That's what happened in Frank v. Gaos,

7    on remand, Google settled for a cash claims made settlement

8    for absentees.

9                We have absent class members have the objective

10   information necessary to determine that they're a member of

11   the class.  It's just a --

12               THE COURT:  Okay.  Now what we could end up with,

13   if there are no claims made, we could end up precisely where

14   we are here, today.

15               MR. SCHULMAN:  Do you mean if --

16               THE COURT:  If no -- you know, if 50 people --

17               MR. SCHULMAN:  Uh-huh.

18               THE COURT:  -- send in claims, unless they are all

19   going to get --

20               MR. SCHULMAN:  Okay.

21               THE COURT:  -- you know, $500,000 each, right?  And

22   you don't want that, right?

23               MR. SCHULMAN:  Right.  Yeah.

24               THE COURT:  Yeah.

25               MR. SCHULMAN:  That -- we don't think that would be

```
 1    the result.  There's plenty --

 2              THE COURT:  You think there will be a lot of

 3    people, plus a million claims?

 4              MR. SCHULMAN:  It would be about one percent --

 5              THE COURT:  One percent.

 6              MR. SCHULMAN:  -- is what the empirical data shows.

 7    And I'm -- we're happy to provide that, if Your Honor wants

 8    to --

 9              THE COURT:  Yeah.

10              MR. SCHULMAN:  -- to look at that.  We have some of

11    that in the record.

12              THE COURT:  And then what do we do with the

13    residue?

14              MR. SCHULMAN:  So, if it was a pro rata share, it -

15    - there wouldn't be a residue.

16              THE COURT:  Okay.

17              MR. SCHULMAN:  So one percent -- say the class is

18    10 million.

19              THE COURT:  Uh-huh.

20              MR. SCHULMAN:  They don't give a precise figure,

21    right?

22              THE COURT:  Yeah.

23              MR. SCHULMAN:  So one percent of claim --

24              THE COURT:  Well, we don't really know what the

25    class is, do we?
```

1          MR. SCHULMAN:  That's right.  They have an estimate

2     of millions --

3          THE COURT:  Yeah.

4          MR. SCHULMAN:  -- right?  But the fact that this is

5     feasible, you can see that through other large privacy

6     settlements.  Fraley v. Facebook is the one we cite in our

7     briefs.  But there's more recent settlements than that, too,

8     that show that it is a feasible --

9          THE COURT:  So is this consistent or inconsistent

10    with the recent settlements?

11         MR. SCHULMAN:  This is not consistent.  So the

12    Street View settlement that they bank on from the Ninth

13    Circuit was different in a fundamental way.  It required --

14    it found that a distribution wouldn't be feasible in that

15    case because the facts that you needed to know was, not only

16    that you had an unencrypted wifi network of -- you know, that

17    was accessed by a Google truck, you had to know that that

18    Google van with the camera for the street view van passed by

19    your house at the exact moment that you were sending a

20    package of data over your wifi.

21         THE COURT:  Uh-huh.

22         MR. SCHULMAN:  You don't -- for this case, you

23    don't need to know that.  You need to know what your browser

24    was at the time period and that you visited certain websites,

25    which, to me, that's amenable to self-identification.  I'm

1    putting -- and I'm putting to the side the Carrera

2    ascertainability when I'm discussing this --

3              THE COURT:  Yeah.

4              MR. SCHULMAN:  -- right now.

5              But it's an objective inquiry, whereas that -- the

6    facts of --

7              THE COURT:  Now if we were to distribute that --

8    well, one way would be, if the case went away, if it went all

9    for Google, if we tried to distribute to a limited number of

10   claimants, it's kind of a windfall for those claimants

11   because, as we know or as we think we know, there are no

12   damages.  And now they submitted a piece of paper and they

13   get thousands of dollars?

14             MR. SCHULMAN:  So we have --

15             THE COURT:  So what kind of outcome is that?  A

16   crazy outcome.

17             MR. SCHULMAN:  It -- we don't think it would be

18   thousands of dollars, Your Honor.  It would be more like 15

19   or $20.  And we have a footnote in our objection --

20             THE COURT:  Yeah.

21             MR. SCHULMAN:  -- about the presumption of damages

22   in the -- with these type of common law --

23             THE COURT:  Yeah.

24             MR. SCHULMAN:  -- claims of privacy.  And I think

25   we cited that picture case, there --

61

1              THE COURT:  Well, are there individual damages?

2              MR. SCHULMAN:  It's -- so California -- my

3    understanding from that picture case, which is a Third

4    Circuit case cited in California law, is there's a

5    presumption of damages for bringing these constitutional

6    privacy claims.

7              THE COURT:  Right.

8              MR. SCHULMAN:  So I don't think it could --

9              THE COURT:  Well, there may be nominal damages.

10   But are the --

11             MR. SCHULMAN:  Well, I think they used the term

12   "general damages" --

13             THE COURT:  Well, the --

14             MR. SCHULMAN:  -- and the presumption --

15             THE COURT:  -- presumption doesn't mean you're

16   entitled to it because a presumption is rebuttable by the

17   fact that there are no damages.

18             MR. SCHULMAN:  That -- if you look into the case

19   law, that may be correct.

20             And I guess I would say in response to that, even

21   if there are only nominal damages and the claims are --

22             THE COURT:  Sure.

23             MR. SCHULMAN:  -- $15 and the nominal damage would

24   be only $1, less of that is a windfall in giving it to third

25   parties because giving it to third parties is entirely a

```
 1   windfall.
 2             THE COURT:  Yeah.
 3             MR. SCHULMAN:  Whereas --
 4             THE COURT:  Okay.
 5             MR. SCHULMAN:  -- only a portion would be if giving
 6   it to the class members.
 7             THE COURT:  Okay.  Good.  Okay.  Thank you.
 8             Let me hear the response to that.
 9             MR. GRYGIEL:  Thank you, Your Honor.  Steve Grygiel
10   for the plaintiffs.
11             I have a lot of responses and we've heard a lot of
12   things today.  I'd like to start with this:
13             The entire through line of this objection is that
14   ex ante all cy pres is always impermissible.  And if one
15   looks at Pages 13 through 17 of their brief, that is
16   precisely what we see.  And that infects and is the through
17   line for every other argument they make.  The problem for Mr.
18   Schulman and Mr. Frank, with all due respect, is that is
19   simply dead wrong.
20             Baby Products left the door open to do all cy pres
21   in a case like this.  And it based that ruling on the ALI
22   principles of aggregate litigation, a fairly notoriously and
23   esteemed organization.  Okay.  So there's a couple of cases.
24   They're not all there for us all the way down in the facts of
25   this case.
```

1    Then we look at what the law has done in cases just

2    like this, where you have an amorphous class that can't be

3    identified -- which doesn't mean it can't be certified, and

4    the law is clear about that -- with minuscule, maybe small,

5    but nonetheless very difficult to prove damages.  All *cy pres*

6    is entirely appropriate.

7    Your Honor, I think I could basically stand up and

8    sit down after only telling Your Honor that, if one reads

9    with care and without an ideological bent In Re Google

10   Referrer, 869 F.3d 937, one reads In Re Google Inc. Street

11   View, which is at 21 F.4th 1102, and one reads Lane v.

12   Facebook, 696 F.3d 811, those cases alone, they answer the

13   question.  This is, as Mr. Weibell accurately said, the

14   paradigmatic case, the perfect exemplar for when all *cy pres*

15   is appropriate.

16   There's another recent case, it's called Hyland v.

17   Navient, I'm sure it's familiar to Mr. Schulman, they

18   objected in that case.  Same thing, all *cy pres* --

19   THE COURT:  Well, we don't -- I don't think that's

20   going to be the outcome here.  I think the question is

21   whether it is appropriate in this case.

22   MR. SCHULMAN:  And Your Honor, let me answer why I

23   believe that is.  It's appropriate because, as Mr. Strange

24   articulated, the class got all the protection that

25   fiduciaries -- which we are, which we embrace, and which we

1    have shown -- can give to a class in a case like this, not

2    just one, but two notices.  And this was (b)(3) compliant

3    notice, the best practicable notice under the circumstances.

4           Number two, the right to opt out attended, and the

5    case law is clear.  And I commend Your Honor again to Street

6    View and to Referrer and to Lane v. Facebook.  They say, with

7    those kinds of protections, what possible prejudice is there

8    to the class in these circumstances, which is another

9    thematic point that gets lost here.

10          The Third Circuit in Google 2, the most recent

11   opinion with Judge Ambro, made this abundantly clear.  The

12   Court isn't presented with the opportunity to blue pencil and

13   to modify a settlement agreement based on theoretical musings

14   of Steve Grygiel or Adam Schulman or Brian Strange.  The

15   Court has to evaluate the settlement put before it, in terms

16   of three basic parameters:  Is it fair?  Is it adequate?  Is

17   it reasonable?  We apply those, whether it is an all monetary

18   settlement, whether it is a residual *cy pres* settlement with

19   money damages predominate, or whether it is entirely *cy pres*

20   settlement that is *ex ante cy pres* like this one.

21          And we know this is true because the 2018

22   amendments to the advisory committee notes to the amendment

23   to Rule 23 said, you know, the Courts -- I'm distilling this

24   -- the Courts have used all kinds of language about how to

25   analyze settlements and that's okay.  But what we really need

 1    to do is focus on the very criteria that Mr. Strange

 2    addressed:  Is it fair?  Is it adequate?  And is it

 3    reasonable?  And there isn't a single showing in this case

 4    why this settlement is anything other than fair, adequate,

 5    and reasonable.

 6             When one looks at the objectors' brief, one finds a

 7    conspicuous absence of arguments about Girsh and Prudential

 8    and Rule 23(e).  What you really see is we start with the

 9    presupposition that all *cy pres* is no good and then we make

10    our arguments from there.  But that is an improper analysis

11    that starts at the wrong place and, inevitably, it ends up at

12    the wrong place.

13             So to answer your question, Your Honor, is it

14    appropriate for this case, the answer is absolutely yes for

15    those three undeniable and I think undisputed factors:

16             You've got a huge class.  No, we don't know how

17    many people it is.  We know it's millions just from the

18    technology.  Can we identify them?  No.  As the Court said in

19    Street View, it took a special master three years to

20    establish that the 18 named class members there had standing.

21    So the Court said we can't do that and you can't have a

22    process by which people self-identify in this context.

23             It's not like we all know I bought Cheerios and the

24    box was under-filled.  It's not like I bought the car

25    yesterday and I know the -- with immediacy that this was

1    something that I bought.  It's not like that.  And Street

2    View said, Referrer said, Hyland v. Navient said, in cases

3    like this, this is when, with an amorphous class and an awful

4    lot of them, that *cy pres* is the right remedy.

5        Now we talked a little bit about deterrence.  I

6    think we should talk more because, in Google -- in Cookie 2,

7    the Third Circuit opinion that came before that brought us

8    here today, the Court talked about the deterrent effect of

9    class actions.  That is not a nothing, that is not something

10   that we don't count in terms of the class action analysis.

11   But it wasn't just Judge Ambro saying that.  One looks at it

12   was Baby Products, and Baby Products made much of the

13   deterrent effect of class actions.  And this is the kind of

14   case where that deterrent effect is extremely important.

15       Another thing I'd say about the objection --

16   there's an awful lot I could say, and I apologize, Your

17   Honor, for rambling on without breaking.  One thing I would

18   say was two rounds of (b)(3) compliant notice, millions of

19   class members getting all of the notice that Mr. Strange

20   explained.  And we have 88 or 89, depending on whether one of

21   those is timely, of people who opted out, and 2, 2 objectors.

22   One of them is not even here and his objection arguably is

23   late.  But we don't have to consider that for these purposes.

24   The point is 2 objectors.

25       And we all know from the established settlement

1    factors in the Third Circuit and in every other court in this

2    country, the class' reaction is a significant factor.  And

3    here, the class' reaction after notice is favorable; in fact,

4    one could argue extremely favorable because there's only one

5    person here saying we don't like this.  That strongly

6    supports the settlement here and strongly undermines the

7    objection.

8         Fundamentally, if we were going to take their

9    objection and give it credence, we would have to make new

10   law.  We'd have to say, first, that what Judge Ambro said

11   doesn't count; that, when a judge is evaluating a settlement,

12   the Judge has to evaluate the particular facts and

13   circumstances of the case.

14        Number two, under Rule 23, as Your Honor knows,

15   courts have broad discretion over settlement structures and

16   over settlement processed.  We'd have to cabin that

17   destruction -- that discretion by saying at the outset

18   there's no leeway for a judge to approve an *ex ante cy pres*

19   settlement.  Well, lots of cases say that's not so in the

20   right circumstances, which apply perfectly here, perfectly

21   aptly to this case.  The Court has discretion to approval an

22   all *cy pres* settlement.

23        And certainly, as we know from the Third Circuit's

24   ruling, the Third Circuit agreed that an *ex ante cy pres* can

25   be approvable.  It just said, as Your Honor correctly noted,

1    there were some flaws in the way the process worked.  But

2    principally, it did not say you couldn't have it.

3              In fact, I noticed that Mr. Schulman was talking

4    about their perfect record in the -- you know, in these kinds

5    of things.  Well, not really so because, if you look at the

6    Third Circuit's opinion, it pretty much said everything Mr.

7    Frank said, the fundamental objection to the settlement

8    doesn't count and we reject it.

9              Another thing we have to do in looking at their

10   objection and deciding whether or not it carried water would

11   be to decide whether the framework that the Third Circuit and

12   basically every other circuit of this country has applied in

13   analyzing settlements doesn't count.  Well, I don't think

14   objectors, just like counsel, wear the black robe.  That's up

15   for, I guess, as Your Honor has said, the higher minds,

16   including the ones sitting on the bench and the bench is

17   above us, it's up for them to decide that.  But you'd have to

18   change all of those things.

19             Now I would also point out -- because I do think

20   it's significant -- we did have an objection, Your Honor,

21   you'll probably recall, early on with the preliminary

22   settlement approved from the Arizona Attorney General.  And

23   we rebutted the Arizona Attorney General's objection, which

24   was very similar to Mr. Schulman's, in fact, thematically on

25   all fours with it.  And we rebutted that, I think, quite

1    squarely in the letter brief.  The Arizona Attorney General

2    is not here today.  I think that's pretty telling.

3            The other things I'd say, Your Honor, are this:  We

4    were talking about ascertainability.  Probably too much has

5    been said about it already.  But I would say two things, and

6    I'm quite confident, having read basically every Third

7    Circuit case ever written on ascertainability, I'd say the

8    following -- and the Supreme Court Am Tam case (phonetic),

9    from which this all comes.

10           Ascertainability is a manageability concern.  That

11   does not count, as Mr. Weibell very ably articulated, in the

12   settlement context.

13           Number two, yes, Comcast is not a binding

14   precedent.  It is persuasive.  Comcast cited DB Investments

15   v. Sullivan for that principle.  So, when Mr. Schulman, in

16   his brief, says that DB Investments doesn't have anything to

17   do with ascertainability, I humbly submit that the Third

18   Circuit Panel in Comcast thought otherwise.  It clearly does.

19           The next thing I'd say is this:  The Third Circuit

20   -- Mr. Schulman brought it up and it's a subject that really

21   interests me, and I could write an article about it that

22   would bore everyone to tears, maybe more than they already

23   are.  The Third Circuit's, quote "strict ascertainability

24   test" has two components:

25           The first is an objective identification of class

1    members.  As Your Honor pointed out, we have that here.

2        The second is that you have to have an

3    administratively feasible way of identifying the individual

4    class members.

5        No other circuit that has addressed this has

6    adopted that.  Okay.  Well, we're in the Third Circuit, so

7    we'll live with what the Third Circuit does.  I will simply

8    submit this to Your Honor:  The Third Circuit has been

9    walking back quite a bit its, quote "strict ascertainability

10   test" even in the litigation context.  One need only look at

11   City Select, Sleepy's v. Hargrove, Kelly v. RealPage and look

12   at the development of Third Circuit law on ascertainability.

13   And essentially, it's following what Judge Rendell said in an

14   early opinion that maybe that goes too far, maybe that will

15   prevent class actions from being brought if we impose this

16   two-tiered strict ascertainability test.

17       That's all a very long way, law review way of

18   saying, Your Honor, ascertainability is not a hurdle to

19   settlement here.  Your Honor was exactly right in the

20   preliminary settlement approval hearing and, on

21   ascertainability, that wasn't simply a light finding.  Your

22   Honor required rigorous briefing on that and heard argument

23   on it in the approval hearing that preceded us here today.

24   So it's not as if that's something that hasn't been examined

25   to death in this case.  And we satisfy that test as a matter

1    of law and as a matter of what we've done.

2         Let me come to the question of this notice because

3    Mr. Schulman's arguments about the lack of a settlement

4    agreement and the lack of the identification of the third-

5    party neutral and the lack of the identification of the donee

6    recipients.  Well, I read that and I said, well, you know,

7    let me think about that.  And then I thought about it some

8    more and I said, well, that's a notice argument.  It really

9    is saying that the class members didn't get appropriate

10   notice of who these people are.

11        Then one looks at the law.  You have to come back

12   to the law, at least I think we always do.  We come back to

13   the law and look at what does notice require.  Notice

14   requires, for purposes of settlement notice, general

15   description of the settlement, the general terms of the

16   settlement, enough information to put class members on notice

17   that they might want to stand up, stir themselves, and

18   protect their rights.  Well, they got that here twice.

19        And on the settlement website, one could make three

20   clicks and find everything they needed to know about the

21   donee organization, about the fact that it was going to go to

22   a donee organization, if not the specific one.  Frankly, as a

23   practical matter -- and settlement is a matter of

24   practicality as the Judge -- as Judge Ambro said in this case

25   -- I really find it difficult to believe that we're going to

1    hang our hats that some class member might find that one of

2    the donee organizations, who all have to comply with the

3    principles and the privacy principles and tasks aligned with

4    the litigation's goals in this case, that some class member

5    would say I like that privacy organization better than that

6    one.

7           Apart from that, as a matter of law, as Mr.

8    Frickleton pointed out to me when Mr. Schulman was speaking,

9    let's say we had a list right now of every donee organization

10   -- which, as Your Honor points out, is up to the Court anyway

11   -- but let's say we had a list.  And everybody says, well,

12   okay, we like that list.  What's to say the donee

13   organization, two years down the road or after they get the

14   money, gets a new board of directors or gets a new mission

15   and starts doing things that are somewhat different in tone,

16   not in substance, from what they were doing originally.  Some

17   class member might say, well, gee, I liked them better

18   before.  The point being it's all uncertain, you can't know.

19          And residual *cy pres*, which often comes way after

20   the fact, the class members never know who the donee

21   organization is going to be or whether there's going to be

22   any *cy pres* at all.

23          Those two arguments about notice are red herrings.

24   There was all the notice in the world about what the *cy pres*

25   was, the *cy pres* structure of the case, and what the

```
 1    recipients would be, in terms of their qualitative

 2    qualifications.

 3              Number two, the notice we provided twice, at great

 4    expense --

 5              THE COURT:  No, let me ask you a question.  You

 6    raised a good point about the donees.  If approved and the

 7    money is distributed, that's the end of the Court's

 8    supervision.  As you said, they could do somethign else you

 9    know, next year or the next six months, whether it be a

10    change of the leadership of that organization.  Is that how

11    it works or would there be some --

12              MR. GRYGIEL:  No, Your Honor.  I think --

13              THE COURT:  Yeah.

14              MR. GRYGIEL:  -- it's a -- you raise a good point -

15    -

16              THE COURT:  Yeah.

17              MR. GRYGIEL:  -- more than a good point --

18              THE COURT:  Yeah.

19              MR. GRYGIEL:  -- and I'm glad you brought it up

20    because the Coourt, under our settlement agreement, has

21    continuing jurisdiction over administration of the

22    settlement.

23              THE COURT:  You mean --

24              MR. GRYGIEL:  The --

25              THE COURT:  -- they could come back and say --
```

1              MR. GRYGIEL:  Uh-huh.

2              THE COURT:  -- well, okay, we agreed, but now they

3     stand for a different proposition.  At this point, we would

4     have litigation --

5              MR. GRYGIEL:  Yeah.

6              THE COURT:  -- sort of at that point?

7              MR. GRYGIEL:  At that point, Your Honor, actually,

8     you would still have jurisdiction to say you are not

9     fulfilling the four different requirements --

10             THE COURT:  So it's an ongoing --

11             MR. GRYGIEL:  Yeah.  Uh-huh.

12             THE COURT:  -- duty.  Is there any law?  Has this

13    ever happened, where --

14             MR. GRYGIEL:  I'm not aware --

15             THE COURT:  -- where they've --

16             MR. GRYGIEL:  -- that it's ever --

17             THE COURT:  -- withdrawn the funds because they're

18    doing something different?

19             MR. GRYGIEL:  Your Honor, I'm not aware that it's

20    ever happened.  I think, analytically, intellectually,

21    theoretically, it's certainly conceivable.  I can't imagine

22    it's ever happened.  I've never had that happened to me in

23    many class settlements --

24             THE COURT:  Yeah.

25             MR. GRYGIEL:  -- or in many residual settlements,

1    all of which goes to show the concern is really how many

2    angles or how many lawyers are dancing on the head of a

3    proverbial pin.  It really is a make weight argument that

4    doesn't go anywhere.

5              There was this argument about an end run in this

6    case.  That stuck in my craw a little bit.

7              THE COURT:  Uh-huh.

8              MR. GRYGIEL:  An end run?  An "end run" is when you

9    settle a case, you sacrifice the class members' interests,

10   and you do it without giving them notice.

11             THE COURT:  Uh-huh.

12             MR. GRYGIEL:  Here, the entire idea of an end run

13   could only be accomplished if there was a (b)(2) settlement

14   with no notice.  But we had a (b)(2) and a (b)(3) settlement

15   and they're both permissible in one case, as Mr. Weibell

16   correctly points out, with abundant notice.  There was no end

17   run.  Everyone in the world got notice.  Mr. Frank's

18   objection shows he got all the notice he needed --

19             THE COURT:  Yeah.

20             MR. GRYGIEL:  -- and that it was due process

21   notice.

22             The next thing I'd say, Your Honor, is this:  When

23   we look at the adequacy of representation, when we look at

24   the propriety of the settlement and you look at the duration

25   of this case, 11 years of litigation, we look at the benefit

1    to the class.  And it is a serious mistake to dismiss *cy pres*

2    relief as, well, we may get some benefit, maybe it's a kind

3    of a benefit.  No, it's a benefit.

4            And what brings me to -- that to mind, Your Honor,

5    recently, in a case out in California -- it's called Lundy v.

6    Meta Platforms -- Facebook's new name -- Judge Donato was

7    confronted with the parties and he said to the parties -- I

8    could actually -- I have -- I've got the quotes, I won't bore

9    you with them.  The Judge said why aren't we talking about an

10   all *cy pres* settlement here, why give 53 cents to every class

11   member when we can give the money to privacy organizations

12   that will do a lot more good with it, that's a benefit --

13            THE COURT:  Yeah.

14            MR. GRYGIEL:  -- Judge, and he clearly thought so.

15            And then he told the parties, if you don't think we

16   should do it, you better tell me why because I think we

17   should do it.  I read that and I thought, you know, that's

18   exactly right, a very rare case.

19            It's a bit of a hobbyhorse.  Mr. Strange made the

20   point --

21            THE COURT:  Yeah.

22            MR. GRYGIEL:  -- and he's exactly right.  This is

23   the point made in the briefing in Google Street View.  By the

24   way, the Supreme Court denied cert in Google Street View, a

25   (b)(3) settlement with an amorphous class in an all *cy pres*

1    *ex ante* settlement --

2                THE COURT:  Uh-huh.

3                MR. GRYGIEL:  -- just like this one.

4                But when we look at Google Street View and we look

5    at this case, it's very hard to see any window between the

6    two of them.  And it's impossible, I think, to come to a

7    conclusion other than this case, the representation has been

8    more than adequate, it has been vigorous.  And you can't

9    argue that there's any adequacy problem here.

10               In this case, we have done the best we could do,

11   and that is ultimately a question of settlements philosophy,

12   settlement law from Hammurabi's Code in the United States,

13   basically, whatever passes for it.  Why?  Because courts do

14   not rewrite and lawyers do not rewrite and objectors do not

15   rewrite the class settlement that parties reach with hard

16   fought, arm's length negotiations supervised by a mediator

17   like Judge Phillips.

18               And Judge Phillips was hard to work with because

19   his questions were difficult.  And we had to submit a lot of

20   briefs -- a lot of answers in a brief to his many difficult

21   questions.  Why is your case good on the merits?  Why

22   couldn't you get it certified?  Why would you lose on the

23   merits?  And why wouldn't it be certified?  Pretty difficult

24   stuff to do.

25               And this is not a case -- as they -- the brief

1    contains the -- you know, the phrase that this might be an

2    end run, it might be a bit of a sham.  It's no such thing.

3    Your Honor, I've been practicing law for 37 years, I take

4    that pretty personally.  We worked really hard in this case.

5    You can look at my binder right there and see how thick it

6    is.  I've read every case in the Third Circuit on this stuff.

7              THE COURT:  Uh-huh.

8              MR. GRYGIEL:  This case deserves to be approved.

9              There's a lot more I could say, Your Honor.  But A,

10   is it fair?  It's absolutely fair.  Is it adequate?

11   Absolutely adequate.  Is it reasonable?  It's absolutely

12   reasonable.  The releases are reasonable, coterminous with

13   the claims in the case.  And releasing claims that -- to

14   quote, I think it was Lane v. Facebook, "in fairness,

15   probably aren't worth much of anything," which is a polite

16   way of saying you'd have a heck of a hard time proving them.

17             THE COURT:  Uh-huh.

18             MR. GRYGIEL:  It's a good result for a difficult

19   case.

20             With that, Your Honor, I'll sit down, unless you

21   have questions.

22             THE COURT:  Thank you.

23             Mr. Schulman, I'll give you an opportunity for a

24   brief rebuttal.

25             MR. SCHULMAN:  Thank you, Your Honor.

1          There's a lot, as -- that I'd like to cover, as

2     well.  I guess I'll start with the -- I'll start with the

3     idea that notice only requires the general terms of

4     settlement.  Well, it requires notice of the material terms

5     of the settlement.  And if the identity of the recipient

6     who's getting all the money is not a material term, I don't

7     know what is.  If it wasn't a material term, then the Third

8     Circuit wouldn't have reversed the case for a conflicted

9     representative if it wasn't a material term to the

10    settlement.

11         And there was a rationale that sometimes it could

12    all be uncertain.  Well, it's not uncertain here.  There's

13    $5.5 million.  They don't know -- it's not an unknown

14    residual.

15              THE COURT:  Uh-huh.

16              MR. SCHULMAN:  This is the amount of money.

17    There's no legitimate reason why the identity of the neutral

18    and the identity of the recipients hasn't been determined yet

19    and why there isn't a new written instrument.  Just -- you

20    know, that's just -- and I keep going back to that point

21    because it's so irregular from everything we've see in our --

22    in my practice.

23         The -- Mr. Grygiel mentioned the Arizona AG isn't

24    here.  Well, the Arizona AG wasn't here at preliminary -- at

25    the approval stage the first time.  It came in on appeal.  So

1    there's no -- certainly no settlement or you can't raise an

2    inference that they think that it's not problematic now.

3    There was a change of the identity of the AG in Arizona that

4    may have played into it.  But certainly, they haven't -- on

5    remand, when they were alerted to the settlement, Your Honor

6    remembers they filed an appearance and appeared at the

7    preliminary hearing to oppose the settlement.

8         The Lundy v. Meta case was mentioned.  That's a --

9    oh, and I guess I would say on notice, too.  So they want to

10   -- they want this Court to adopt the Ninth Circuit's rule in

11   all *cy pres* cases like Google Street View and Lane.  But the

12   Ninth Circuit also has a rule that the identity of the

13   recipients have to be known and noticed.

14        THE COURT:  Right.

15        MR. SCHULMAN:  They don't want to adopt that

16   component, that protection for class members.  They're

17   picking and choosing.

18        THE COURT:  But if they corrected that, it would be

19   all right with you.

20        MR. SCHULMAN:  No, absolutely not.

21        THE COURT:  Okay.

22        MR. SCHULMAN:  We still have the --

23        THE COURT:  I mean, it seems like that's somewhat -

24   -

25        MR. SCHULMAN:  Right.  We --

1          THE COURT:  -- correctable.

2          MR. SCHULMAN:  Sure.  We still --

3          THE COURT:  It --

4          MR. SCHULMAN:  We have fundamental issues with the

5    --

6          THE COURT:  Yeah.

7          MR. SCHULMAN:  -- the structure beyond that.

8          THE COURT:  I think that's the issue here.  Is the

9    structure one that the law permits?

10         MR. SCHULMAN:  Right.  And our answer to that is I

11   think a fair reading of Baby Products is it is not one that

12   would permit, in this case -- you hear from Mr. Grygiel that

13   Baby Products talks about the terms.  No.  It talks about it

14   being a compensatory mechanism.  It says class members are

15   not indifferent to themselves getting the money or a third

16   party getting the money, that they should be the foremost

17   beneficiaries of this settlement.  That's -- that was also

18   Judge Ambro's opinion --

19         THE COURT:  Uh-huh.

20         MR. SCHULMAN:  -- in 2013.

21         And the plaintiffs say they worked really hard.

22   That might be true.  But the problem for them is that events

23   mooted their case out the -- the practices of the defendant

24   aren't in play anymore.  And under this -- and because of

25   decisions like Buckhannon, they can't come and say there's a

1    fee-shifting statute, so we prevailed through these changed

2    circumstances.  That's not a viable argument.  So they need

3    to essentially put the class members in a worse position than

4    they otherwise would have been.

5              THE COURT:  Uh-huh.

6              MR. SCHULMAN:  And Your Honor seemed to recognize

7    that opt-outs are just in a marginally better position to

8    having to maintain their right and get the same,

9    quote/unquote, "benefit" that class members who remain in the

10   class are, and that's not an appropriate use of the class

11   device.

12             I guess one final point, and I heard it mentioned a

13   few times, the idea that there was a mediator here.  That

14   also goes to the total aggregate value of this settlement.

15   The mediator's job is not to make sure that the allocation is

16   fair, that's Your Honor's job, that's the District Court's

17   job.  A mediator's job is getting the parties to agree on

18   what the proper number is, given the strengths and weaknesses

19   of the case.

20             THE COURT:  Thank you.

21             I think everything has been said, maybe not by

22   everybody, but I think we have a full and complete picture at

23   this point.  And we intend to wrap this up in short order,

24   hopefully.  So I'll get back to you promptly.  Okay.  Thank

25   you.

1              COUNSEL:  Thank you, Your Honor.  Thank you, Your

2      Honor.

3              THE COURT OFFICER:  All rise.

4          (Proceedings concluded at 12:14 p.m.)

5                          * * * * *

1     <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of my

5     knowledge and ability.

6

7

8

9

10

11     _____     July 12, 2023

12     Coleen Rand, AAERT Cert. No. 341

13     Certified Court Transcriptionist

14     For RedDoor Legal Services, LLC