IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE (WILMINGTON)
                               -  -  -

 IN RE:                               :  MDL NO.
                                      :  12-md-2358-JDW
 GOOGLE INC. COOKIE PLACEMENT         :
 CONSUMER PRIVACY LITIGATION          :  DISCOVERY HEARING
                                      :
                                      :  (HELD VIA ZOOM
                                      :  VIDEOCONFERENCE)
_____

                                      James A. Byrne U.S. Courthouse
                                      601 Market Street
                                      Philadelphia, PA 19106
                                      October 15, 2025
                                      Commencing at 2:02 p.m.
_____

                BEFORE THE HONORABLE JOSHUA D. WOLSON
_____


APPEARANCES:

FOR THE                  STRANGE LLP
PLAINTIFFS:              BY:  BRIAN RUSSELL STRANGE, ESQUIRE
                         12100 Wilshire Boulevard, Suite 420
                         Los Angeles, CA 90025
                         (310) 207-5055
                         brian@strangellp.com


                              -  -  -

             Cherilyn M. McCollum, CCR-NJ, RPR
                    Official Court Reporter
            Cherilyn_McCollum@paed.uscourts.gov


Proceedings taken stenographically and prepared utilizing
computer-aided transcription

APPEARANCES CONTINUED:


FOR THE               GRYGIEL LAW, LLC
PLAINTIFFS:           BY:  STEPHEN G. GRYGIEL, ESQUIRE
                      301 Warren Avenue, Suite 405
                      Baltimore, MD 21230
                      (407) 505-9463
                      stephengrygiel22@gmail.com



FOR THE DEFENDANT     MAYER BROWN LLP
GOOGLE LLC:           BY:  ANTHONY J. WEIBELL, ESQUIRE
                      3000 El Camino Real
                      Suite 2-300
                      Palo Alto, CA 94306
                      (650) 331-2000
                      aweibell@mayerbrown.com


ALSO PRESENT:

     JOHN T. CEGLIA, ESQUIRE
     DIANE BYUN, ESQUIRE

                              -  -  -

THE COURT:  Good afternoon, everybody.  We're going to go on the record, and I guess what we're going to do to start is I'm going to ask people to put their appearances on the record for the court reporter.  Once we have done that, I'm going to ask the people who are going to have speaking roles today to stay on screen, but if you are not going to have speaking roles, just to turn your camera off and note your appearance so I can preserve real estate on my screen.

So let me start with the plaintiffs.  And if you are here for the plaintiffs, let's have you state your appearance for the record.

MR. STRANGE:  Good afternoon, Your Honor.  Brian Strange for the plaintiffs, and I have Diane Byun and John Ceglia with me from my firm.

MR. GRYGIEL:  Good afternoon, Your Honor.  Steve Grygiel for the plaintiffs.

THE COURT:  Okay.  And then for the defense.

MR. WEIBELL:  Hello, Your Honor.  Tony Weibell from Mayer Brown for the defendant Google.

THE COURT:  Okay.  All right.  Nice to see everybody.  Nice to put some faces to names.

So just to set the stage for this, because I think a lot of what we've done has not necessarily been on the record and I want to make a record, this has been a long process of discovery, but what set us off on the current path we're on I

think was a motion to compel that the plaintiffs filed in June, D.I. 280.  And I had a call about it.  And then I denied it without prejudice and asked the parties to submit to me materials that had been produced in the case along with some discovery requests and things of that ilk just so I could have a complete picture of the run-up to the current dispute.

I received that information from the parties in August. It has a letter with the parties' positions, to some extent, and then a number of attachments.  I've read all the attachments.  I can't say all of them make a lot of sense to me, some of them are just computer code, but I have read them all, and that's what then led me to this hearing really to sort of revisit some combination of the motion to compel and then coupled with I think a letter that the plaintiffs sent after I denied a motion to compel really to follow-up on these issues. The letter is dated July 21, 2025.  I have it in front of me. It's from -- well, it's all of plaintiffs' counsel have signed it in addition to Mr. Weibell.  And it is really that letter I want to use as a jumping off point today because there seems to be, at this point in my mind, three somewhat interrelated issues that I want to tackle.

The first is the requests that the plaintiffs have made of Google for information about the data logs that Google either has or had.  It is sort of the two requests in the letter.  The first is names and description of data logs that

Google preserved for the litigation from Google's two cookie spaces, the GAIA space and the DoubleClick space.  And then names and descriptions of data logs that Google did not preserve for litigation with similar sort of limits.  And then as I think an alternative there was some questions that the plaintiffs posed.  And then I add that there has been a 30(b)(6) deposition notice as well that was served.  So I want to tackle those things sort of in order.

So let me just start with this, Mr. Strange or Mr. Grygiel, I don't know who is tackling this, but is that July 21 letter, is that sort of the current state in terms of what the plaintiffs are seeking from Google?

MR. STRANGE:  Yes, Your Honor, that's correct.

THE COURT:  All right.  So then let's start with this.  Through the letter, both the -- the request about the data logs and then the questions that you pose, there is a number of questions about data logs that Google did not preserve for litigation.  And I guess I wanted to start with those and understand the basis for asking for information about things that Google has made the determination, for one reason or another, are not relevant to the case.

MR. STRANGE:  Your Honor, on that issue, to the extent that Google had information which would have allowed us to identify the class but didn't preserve it, it seems to me we have a good argument to say, you know, we shouldn't be

penalized in terms of our ability to identify the class if Google destroyed the information.

THE COURT: Well, that's treading down sort of a spoliation path, isn't it, Mr. Strange?

MR. STRANGE: Yes, it is.

THE COURT: So don't you need a little more to ask, you know, for information? It does sort of tread into work product, what didn't you preserve, and why didn't you preserve it, and then mental states. Do you have a basis to think there are things Google didn't preserve that it should have preserved in the case?

MR. STRANGE: Well, there are some e-mails that talk about the Doritos cookie, and the Doritos cookie being the intermediary cookie which Google used to circumvent the blocker on all the Safari blocks. So to the extent -- and there is some indication in those e-mails that there is some correlation there. So to the extent they had information which logged the Doritos cookie and also identified who it went to, then that would be a pretty easy path to identify the class members. So it is sort of based on those e-mails we are saying, well, wait a minute, did they have this information and did they destroy it? So that's kind of the basis of our request, Your Honor.

THE COURT: So it's really -- I mean, it seems a bit narrow, right. You've asked, well, tell us all the logs you had in the space. If it's just a question what happened to the

Doritos cookie logs, if there were ever Doritos cookie logs, isn't that a narrower request?

MR. STRANGE: Well, I think our request is, in essence -- you know, there is two cookie spaces, as Your Honor just indicated. One is what they call a biscotti cookie, which is really in relation to the Google account, the Google Plus account, and then there is the PII information which relates more to the Doritos cookie. So we did limit it to those specific issues in both requests, both what they have now and what they had that maybe they don't have now.

THE COURT: And what does the case law say in terms of your ability to take discovery about sort of what amounts to preservation efforts and what did they and didn't have in their possession? And I assume what we are really talking about here is, because you said it's spoliation, so it's preservation after they've got some duty to preserve, which is -- you know, I don't know when that attached in this case. Obviously, the case is old. Maybe it's when the complaint was filed. Maybe it's before that. But, you know, it's got to be after that.

MR. STRANGE: Yes, absolutely, it has to be after that, Your Honor. And, I mean, I think after that and arguably after the FTC and the AG told them that they want information regarding the same violation that we're talking about, so there is definitely a timing requirement there.

THE COURT: So let's step back. I mean, it's not

uncommon to ask, for example, about document preservation policies, right, just to understand broad strokes what did you do, what didn't you do, you know, what would we be likely to find in your possession.  But then going a step beyond that, do the cases say that you can inquire as to, well, tell us what you chose to preserve and, more importantly, tell us what you chose not to preserve in the case without -- I mean, without sort of a somewhat strong showing of likely spoliation?

MR. STRANGE:  Your Honor, you make a good point.  I think perhaps we should start with the document preservation policy before we proceed down this path.  And it's really on the basis of, you know, what we are -- of the documents that we looked at.  So I'm happy to, with respect to that request, withdraw that request and just make sure that the timing is correct and that we are looking at the document preservation policies before we go down the spoliation issue.

THE COURT:  Let me just ask Mr. Weibell.  And I thought I saw something about this, Mr. Weibell, in the materials I read getting ready for this about things not being -- logs not being created or not being preserved sort of purposefully, and I don't mean that pejoratively or as bad faith, but that was a business practice at Google with respect specifically to this Doritos cookie.  Did I read that right? Can you point me to it?

MR. WEIBELL:  Let me help explain.  In effect,

Mr. Strange's explanation of what they are looking for and why, the Doritos cookie, you know, was associated or -- let me -- the purpose of the Doritos cookie was so that you could have a split-second-in-time association between someone's real identity on Google and the ad serving platforms, right, so to serve them ads.  But it was by design and it was vetted with external privacy consultants, right.  By design, they didn't want to create that connection and receive it and attain it and store it, right.  The whole point was we needed to come up with a way that we can do this that makes the ad-serving data logs anonymous, right, because we don't want to know who these people are.  So it was built into the product when it was released that this is what is going on.

So if that's the information they are looking for, I can answer that right now.  That doesn't exist because by design the system was set up so that this information would be collected anonymously.

THE COURT:  I thought I saw that in some of your correspondence.

MR. WEIBELL:  Yeah, it's in the joint letter.  But, I mean, also it's very -- it's explained in great deal in Exhibit 1 to the joint letter that we submitted to Your Honor.

THE COURT:  Mr. You's declaration?

MR. WEIBELL:  Exactly.  It says it in the first introductory paragraphs.  But also if you go to page 16 of the

declaration starting with paragraph 48, and paragraphs 48 through 60 explain why it's impossible for us to identify class members.

THE COURT:  Well, yes.  I want to focus specifically on sort of this is how the Doritos cookie was designed because, you know, the plaintiffs don't have to take Mr. You's word for it.  They may have another way to identify class members.  But if they are saying, well, we need information about the Doritos cookie, and the answer is it just doesn't exist, it never really existed, except the brief moment in time as it was being used that it existed but it wasn't kept in any kind of file, that seems like the end of it, Mr. Strange, doesn't it?

MR. STRANGE:  Yes, Your Honor.  I think -- but there is e-mails, like, for example, that we didn't quote in there, but it says, you know, we're really concerned about this blocking; it is really cutting down on our ad revenue.  And then they say, oh, yeah, the Doritos cookie, we figured out a way to get around this issue.  And then there is e-mails that say, well, don't talk to me about it; you better get a lot of really good lawyers and don't involve me.  So there is all this evidence of Google saying -- I know Google says it's unintentional.  We think the evidence is powerfully the other way.  I understand the policy which they've said in their papers saying, well, we intentionally didn't preserve this because it had personal information, you know, I mean if that's

true, that's true, so maybe we go to the document preservation policy, if they never --

THE COURT:  Well, hold on.  I don't know that it's going to be in a -- preservation policy is things like we keep this stuff for 30 days, we keep this stuff for 60 days.  Maybe Mr. Weibell will tell me otherwise and say, you know, Google is more specific.  But I've looked at a lot of these in my career, especially for an entity as big as Google, they are not quite that specific.

MR. STRANGE:  That's true, Your Honor.  Maybe that's not the right path.

THE COURT:  It seems to me if the answer that Mr. Weibell is giving you and I take it -- I mean, he's representing it to me, so I have no reason to think it's not true.  If that's what it is and there are -- it wouldn't be the first time that a big company has just said, for whatever reason, we're going to use this but not preserve it, you know, it is how a deposition is used in practice.  Use it and then toss them when it is done.  Stick them in a file because I don't know what I'd do with them afterwards.

So has this -- again, I haven't reread every paragraph of Mr. You's declaration, Mr. Weibell.  Is there something specific about we did not -- you know, for intentional purposes did not preserve data about the Doritos cookies to match up with user identities?  Is that in that declaration?

MR. WEIBELL: Yes, it is, Your Honor. That's exactly -- that's the whole point. The reason why this whole thing was created was because Google went to great lengths to create a cookie, and this is the Doritos cookie, that could preserve privacy so that it didn't have to even collect this information. They didn't even want to collect it. So that's why the Doritos cookie was created and because of the snafu caused by Apple's different exception policies, that is what inadvertently created the problem where a biscotti cookie was then served to some people.

THE COURT: And just to be clear, Mr. Strange, what I hear you saying in all these e-mails -- and again, I'm not looking at any of these, so I am sort of inferring them.

MR. STRANGE: Yes.

THE COURT: But it seems like you are telling me, oh, we think these e-mails are evidence that may overcome the assertion from Google that this was inadvertent.

MR. STRANGE: Absolutely. Yes.

THE COURT: And that's fine. That goes to liability. But as I understand it, the purpose of this sort of search of the data logs and the PII and things like that is really geared towards the ascertainability inquiry as to class certification.

MR. STRANGE: Yes, Your Honor.

THE COURT: And I want to be fair to you. It could be both. If it's not both, if it's just liability, then it seems

to me that I might just want to kick the can down the road, right, and say, let's see if you can get a class certified. And if you can, then I'll tackle the burdens that go with this and weigh it as to liability.  But if it goes to class cert, then that's something different.  But I don't hear the e-mails here saying being e-mails that shed light on whether the data exists in the logs, you know, in some sort of preserved data source to then identify the people whose computers received these cookies.

MR. STRANGE:  I think that's absolutely correct, Your Honor.  I agree with you.  And so we can kick that issue of preservation down the road until we have and if we have more evidence on the spoliation.  We were just really looking at was this data exist -- did it exist and did they not preserve it. But I understand what you're saying, and maybe we should kick that down the road.

THE COURT:  Okay.  One other thing I want to say because it occurred to me as I got ready and I want to go back to this, you did say, well, they didn't preserve data, you think -- you know, we talked about this in the spoliation context -- maybe it creates some impact in the case.  Is your argument that spoliation might have impact on class certification ruling?  In other words, I then might want to say something is ascertainable, deem it ascertainable based on data that is not preserved?

MR. STRANGE:  Yes, Your Honor, because if we have a situation where this data was available and Google decided not to preserve it, then why should the class be prejudiced by not being able to ascertain class when it could have ascertained it but for the fact that the data had been destroyed?

THE COURT:  So it's an interesting question, you know, and I don't know if I've seen a case that tackles this.  But the ascertainability requirement is sort of an administrability requirement, right, that comes from the circuit.

MR. STRANGE:  Yes.

THE COURT:  And I'm not sure how making the presumption, you know, flowing from spoliation lets me deal with that administrative issue.  In other words, I still then have the problem of who am I notifying -- who am I having to notify, I should say, of the claims in the case, who is being given a right to opt out, how are they being told about that right to opt out.  If I start with a -- in our ascertainability prong just presume that we can ascertain who they are, that seems like I'm stepping into a minefield.  Then again, I understand the argument that you don't want to give the defendants an incentive to challenge class certification, which is obviously often the beginning and end of the case.  But do you know of any cases that address this?

MR. STRANGE:  I think there is a case, Your Honor.  I don't have it on the tip of my tongue.  But the issue of

whether it's administratively feasible to determine and the issue of notice I think can be separate.  So there is different ways to notice a class after it is certified, so -- but I believe there is a case -- and I had friends involved in it and it's not on the tip of my tongue -- that dealt with the issue of spoliation with respect to identifying a class, and I'll try to find it and send it to Your Honor after the hearing.

THE COURT:  Okay.  All right.  So let me go then to the part of the letter that deals with the request for -- concerning the logs that were preserved and the -- you know, this would be -- it sort of says -- you say -- I think what you are asking for, as I understand it, is for an identification of the logs that are -- I think this is right, but you can tell me if I've got this wrong, it's the identification of the logs that have PII and then the fields where that PII would be located.  Is that right?

MR. STRANGE:  Yeah.  And as well as the GAIA, the two separate indication, yes.

THE COURT:  The GAIA is just a different cookie space, right?

MR. STRANGE:  Yes.

THE COURT:  So it is a different universe of logs, but it's still logs.  Is that right?

MR. STRANGE:  That's right, Your Honor.  I think, and Google points this out in the their brief to the Court, their

letter brief, where they initially talked about 2,400-something logs, and they clarify that that's really just a directory and that there is a certain amount of files.  But in connection with their brief, the letter brief to the Court, they point out and say there is a relatively small number of unique log sources and log names.  And so we're just asking, okay, well, what are those log names for the entire universe of your documents?  And they must be pretty small.

Now, for the first time, Your Honor, they attached a list of logs preserved, and that's Exhibit 12, but we haven't seen that before.  They filed that with the Court in this briefing, which is helpful, but -- and that's a list of 24 logs.  So, you know, our first question is -- they make a note there that those don't include logs in which no relevant responsive information has been found.  What I'd like to know and what our expert wants to know is, you know, what other logs are there because --

THE COURT:  Why does that matter if there is nothing in them that's relevant or responsive?  In other words, parties preserve information all the time with a broad sweep and then don't produce it.

MR. STRANGE:  Well, experts in these types of cases, Your Honor, differ as to what is relevant.  Our expert, you know, may look at a log and think that that's relevant.  He's got a theory called fingerprinting where he wants to know

specific information that's in all of these logs.  So their starting point is, well, what -- you want me to administratively come up with an administrative method to identify the class members.  You know, what documents are available?  What information is available?

So it doesn't seem --

THE COURT:  I feel this is a little bit -- I'm wondering if this is a little bit backwards, Mr. Strange, and whether this should be -- your expert has a theory how he might go about doing this.  So isn't the approach then, rather than sort of a broad-based shotgun approach saying, tell me everything you have, shouldn't he be coming back and saying, these are the things we want, and if Google knows it has them, that's one thing, and if it doesn't have them, that's another thing.  Instead of trying to see what's out there and then have a theory fit what's out there, he has got a theory, shouldn't he articulate it through you and tell Google what he is looking for?

MR. STRANGE:  The problem is, you know, in order for him to tell us, yes, I can administratively come up with a method to identify this class, he wants to know, you know, what sort of information is available to him to identify it.  For example, you know, what agent -- you know, he uses a bunch of technical terms that I am probably not going to correctly describe about what's in those logs.

And let's just say, for example, we take Google's issue of relevance and they say there is 24 relevant logs.  That's what they have attached as Exhibit 12.  So then if we take those logs and we say, okay, what data is in those logs?  Now, Google has said in their briefing it's unknown but it's 650.  They use the number 650.  So if there is 650 data information in these logs, that's a pretty small number compared to literally millions of documents we deal with with these kinds of cases.  And so I don't know why there is any reason we can't understand what those -- you know, what are those 650 data.

THE COURT:  Just to be fair, I don't know how many other logs there are, but I'm just concerned a little bit that this is -- there is no end to it.  If your expert is just looking and looking and saying, I want to see what's available and I want to see what's available and I want to see what's available and then maybe I can craft a theory, when does that end?  When he does he say, all right, I've seen enough to know there is or isn't?  And how does Google know when it's enough?  And how do I know when it is enough for purposes of schedule setting to keep the case moving?

MR. STRANGE:  Your Honor, I think for purposes of this hearing, if I take Google's word for it, okay, we'll take what they say is relevant, those 24 logs.  Okay, let's take the 24 logs, which are identified in Exhibit 12, and please tell us -- and I'm not asking for the data itself, I'm saying, okay, what

data is available in those logs regarding the issues at hand?

THE COURT:  All right.  Mr. Weibell, let me ask you a couple of questions.  First, as to Exhibit 12, the list of the 24 logs, is it correct that the first time the plaintiffs had seen it was attached to this letter in August?

MR. WEIBELL:  Not entirely, Your Honor.  This is why.  So I think there is one or two logs that are listed in there that weren't listed on previous disclosures.  But in previous disclosure, like the May disclosure, where we listed all of the potentially relevant data fields and we listed the log sources in which we found those, that's where you will see I think 22 or 23 --

THE COURT:  This is the Exhibit 5 to the letter?

MR. WEIBELL:  Correct, Your Honor.  So if you compare those lists, you will see I think nearly all of them are there.  There may be one or two we discovered later that weren't on there, but for the most part they are there.

THE COURT:  And that information it tells you the fields that are there and the logs, and it gives you the definition.  And the definition column applies back to the field or it applies to the logs?  What am I looking at when I look at that?

MR. WEIBELL:  It applies to the field.

So it was an extremely laborious exercise.  We had a teams of engineers have to go through and try and extract the

data.  It is not that it is just like there is 24 Excel files that they are looking at some fields.  That is not this at all. There is 420 million files and they are a part of this, right. So when you see the 24 logs, those are 24 log sources.  That is the way -- we're trying to use terminology that --

THE COURT:  Essentially, I think you described them as like file folders on the computer, yes?

MR. WEIBELL:  So the file folders on the computer, that's the 2,000-something number.

THE COURT:  Okay.

MR. WEIBELL:  2,000 directories, which are file folders.  But the log sources are like when information comes into Google through a certain path or a certain server, like the café log or something like that, then it gets labeled as, you know, like a café log source, right.  But that happens all during the day and that happens on multiple days, right, so you are generating different logs.  And then over time, as Google engineers change the information that they want to collect, those logs and the data fields that are in those different logs change over time, right.  And so there is 24 log sources, but there is many, many more, like I said, 420 million files coming from those sources.  Searching those, the engineers were able to identify at least 650 unique data fields.  And then going through the exercise of looking at those data fields for anything that could be potentially relevant to this case, they

put together the list that was generated and served in May, right.  So that's the Exhibit 5 that you are looking at.  And they provided a description, to the best they are able to do.  Because again, they are looking at data that is now 13, 14 years old and trying to figure out what it represents.

And so to the best they are able to do, they provided a description.  The plaintiffs then deposed Google about those descriptions.  And to the extent that the witness was not able to answer any of the questions about a specific field, we said, we're happy to follow up with a follow-up question about that specific field if there is anything else we can provide.  But if you look at the questions that they have identified the witness was not able to answer, those questions actually don't get at what they are now seeking.

What happened, Your Honor, is they hired a new expert after that deposition who came up with new ideas about how to try and do stuff.  And so now they want to go back to the beginning, redepose Google, have Google serve responses to these requests.  It's too late for that for a case that has been pending for 13, 14 years.

THE COURT:  Mr. Strange, why isn't the information that's listed in that Exhibit 5 -- why doesn't that give you what you need to determine if there is a path to ascertaining the class here?

MR. STRANGE:  Because, Your Honor, Exhibit 5 is just

what Google has said -- Google is -- what they are saying is a potentially relevant field, and what Google says is potentially relevant is different from what we may say is relevant.  It's not their place to determine what is relevant.

THE COURT:  Well, parties determine what's relevant all the time.  I mean, doesn't Rule 26(b) say you have to articulate or the implication -- I don't know if it says this in so many words, but don't you have to articulate a basis -- not maybe -- but some basis to ask them to go back and get you additional fields?  I understand that it's hard if you don't know.  But if you have an expert who can say, well, in the normal course of things, a company like Google would have data like, you know, X, Y, and Z in some of its fields and I don't have that here, then that seems like you can come back to Google and say, well, where is that?  But just saying, I want to get a peek under the hood at everything so that I can understand what everything is and then I'll work backwards to get to my theory, it seems like it's inverted the burdens in discovery, doesn't it?

MR. STRANGE:  Well, Your Honor, I think one way to look at this is that, if you look at Exhibit 2, which is what they call the data log overview, and there they took two logs and they basically identified the data on those two logs.  And I'm saying, okay, on the 24 logs can you please identify the data on those logs, and then we'll have what we need.  But if

-- without knowing what data is on these 24 logs, you know, it's -- I don't know how we can know what we have to work with in terms of identifying the class members.

THE COURT:  As I look at Exhibit 2, there is sample records from two of the 24 logs.

Is that right, Mr. Weibell?  Do I have that right?

MR. WEIBELL:  That's correct.

THE COURT:  So you're saying if you had them for the other 22, Mr. Strange, that's all you need?

MR. STRANGE:  Yeah, I think that would be incredibly helpful for us to --

THE COURT:  Well, I want to be clear.  I want to find out what the burdens are of doing this.  But it can't be that's a step along the path.  Because again, something like this has to end, right.  I worry about cases where discovery becomes an end and not a means.

So is this what you are looking for is this type of record for each of those other 22 logs?

MR. STRANGE:  Well, let me back up for a minute.  Your Honor was talking about the burden and doesn't our expert have to say, you know, what we think is available.  We actually have been working on an affidavit from the expert doing just that, and we were going to submit it in connection with this motion but we didn't.  So that's why we offered to let him, you know, testify; they are going to have a hearing.  So maybe what I

should do is submit that declaration, tell Google exactly what we're looking for based on these samples, and take it from there.

THE COURT:  Well, I'm just -- I'm concerned about kicking the can down the road on this, too, because that seems like -- again, if you said to me, I'm going to give you an affidavit that says, here is what I need and why, and sort of definitively we do that.  But if it's just an open bid on something, then I'm a little more concerned about that.  We've been at this -- just this discovery process, I mean, these were produced to you in February.  Did you request these?

So just to sequence this for a second.  These were produced in February.  In May -- that was Exhibit 2 to this letter.

And by the way, I think what I'm going to want to do is put it on the docket -- I don't think it is on the docket -- with the exhibits just because we're talking about them.  And what I'll do is I'll give you -- I was going to say probably -- before I put it on the docket, I'll give you, say, two weeks, Mr. Weibell, to file a motion to seal if you think you need to put this stuff under seal.  I don't know if you do because, on the one hand, I understand it is internal.  On the other hand, it's pretty old, as you keep telling me, so I don't know if there is a harm from its disclosure publicly.  But I'll give you a chance to talk about that internally to file a motion.

MR. WEIBELL:  Thank you, Your Honor.  I definitely think we would want it sealed.

THE COURT:  Make sure you read my opinion on sealing. I take a pretty aggressive approach on it.

MR. WEIBELL:  It does make a huge difference whether it includes the exhibits.  So the exhibits, right, that have the actual data, that's supersensitive.  So it may be a situation where the letter is not a problem itself but the exhibits are the problem.

THE COURT:  If you are going to do it, make sure you give me an affidavit that lays out what the harm is, you know, the competitive harm is from its public disclosure.  Just the fact that it's internal and not public, that may satisfy step one, which is the kind of thing courts will protect, but it does not satisfy step two under the *In Re:  Avandia*, which is the Third Circuit case on this, which is "and there is a real concrete competitive harm from this disclosure."  So check that box and get me an affidavit for the things you want to keep under seal.  I am not opposed to doing it, but I think it's important that you actually make the record.

So going back to that now, though, Mr. Strange, February you get the Exhibit 2 --

MR. STRANGE:  Right.

THE COURT:  -- which has these records.  May 13 you get this bigger chart which at least covers at least 22 of

these 24 logs.  And did you at some point then go back to Mr. Weibell and say, can you give us similar records from the other 20 logs?

MR. STRANGE:  I think, like, what we did is we had various meet and confers.  And I, frankly, wasn't involved this those, but we had various meet and confers, and then we talked about a sampling of those, and that was sort of the basis of our motion, which Your Honor denied without prejudice.  And then after that we sent the Exhibit 10, which is the July 21st letter, where we said, look, okay, you don't have to produce the documents themselves, but we would like to know which of the logs and which of the files limited to the two cookie spaces, that is the GAIA and the PII, which -- what logs and what data reflects those two issues which are critical to ascertainability.

THE COURT:  I'm not understanding why that's not answered in this table from May.

MR. STRANGE:  That table is not limited -- which table, Your Honor?

THE COURT:  The May 13 one.  It's Exhibit 5 to the letter.

MR. STRANGE:  Exhibit 5 is not -- my understanding of Exhibit 5, and John or Steve, if you could join me on this, is that it's not -- those are just -- those are just -- those aren't limited to -- it doesn't include all the data fields

that we've asked for.  It's just a limited number of data fields.

MR. CEGLIA:  Exhibit 2, which is the excerpt from the two data logs, is a lot more data fields than are found in Exhibit 5.  Exhibit 5 is Google's identification of what they believe would be the most relevant of those data fields, but it doesn't include information from all the data fields within the logs that are identified in Exhibit 2.

THE COURT:  But do you have a basis -- does anyone have a basis to say to me that the other data fields that are not listed in Exhibit 5 are likely to contain information that bears on ascertainability for the class?

MR. STRANGE:  Your Honor, based on what I understand from our expert, there is various categories of data that he can use to help identify the class members.

THE COURT:  But what are those -- we're shooting in the dark, and again, I feel like you have inverted this process in a way that has put an onus on Google instead of on you.  It is your job to show you are asking for information that is relevant.  And to just say, we want to peek under the hood so our expert can see what's there, I don't think gets you there in terms of satisfying that burden.

Now, if your expert says, gee, I've looked at the two samples that are in Exhibit 2 and here is four fields in each of them that are useful and are not disclosed in Exhibit 5 and

that I would want to see in these other fields because they may inform me, that's a specific showing that I think would at least let us talk about the proportionality here.

But right now I have, you know, representations from Google talking about the burden that's involved with extracting this data and going through and, you know, A, I take it as true, but B, it intuitively makes sense to me that working with data that is more than a decade old and that is large in volume is going to be challenging. So both the representation and my gut kind of align with that. And then I have -- so I have a burden on one hand. I have no clarity on what you want and how it's going to lead to something of use in the case on the other side. I understand how you hope it might lead to something of use in the case, but nothing with any clarity.

So again, I'm struggling with this notion that, well, gee, there might be other fields out there. There might be, but why do we think they are relevant?

MR. STRANGE: Your Honor, I think where I'm not doing a good job of describing to the Court is in our letter what we said is those fields that are limited -- this is Exhibit 10 -- limited to the two cookie spaces, which is the GAIA information, which is Google account information, and what the Google account information does is identify people that are logged in to Google, and then the other space is the PII space, which is related to the intermediary cookie. So we limited the

request to those -- anything related to those two categories, not every data field around.  It's just limited to those -- all data fields that relate to those specific issues, which are -- I think we've satisfied, and if not, I haven't done a good job of explaining it, that those would relate to who is -- which class members were logged into Google, because they do have that ID, and which class members had the biscotti cookie and the Doritos cookie.

THE COURT:  I don't understand why that's not what you have in Exhibit 5.

MR. CEGLIA:  Your Honor, if I might.  The request is for the list of data fields within each data log and not the actual data.  And the reason why we asked for the list of all the data fields within each log is because certain logs, as those you've seen in Exhibit 2, include information about Google -- people who have Google accounts or people who may have received this cookie, but they don't include both within the same log.  And Google has been adamant that none of those separate logs can be combined or connected in any way so that we could identify both the Google user and someone who received a cookie.  And what our expert has told us is that if you have a list of all the data fields within each log, you can attempt to see whether certain logs can be lined up based on which logs have similar or identical data fields and that could --

THE COURT:  Wait.  You've lost me.  So you are telling

me the fields in Exhibit 2 do not allow you to do what you want.  Yes?

MR. CEGLIA:  The fields in Exhibit 2 do not allow us to connect a specific Google login user with the cookie data.

THE COURT:  And Google has given you in Exhibit 5 a list of fields that it has for the logs that it preserved.  And I understand there may be a couple of logs that are missing and, you know, we talked about whether that requires supplementation, I don't know, but Google has given you a list of fields that it has for the logs that it preserved in Exhibit 5, right?

MR. CEGLIA:  They gave us a partial list of fields.

THE COURT:  Okay.  So are there fields specifically that you have seen in Exhibit 2 that are not listed in Exhibit 5 and that your expert says, gee, those are the fields that seem like they would bear on this outcome?  Or is it more just your expert saying, I don't know what's there until I see it and if I see it maybe I can come up with something?

MR. CEGLIA:  To answer your question, there is two parts.  One, there are fields within Exhibit 2 that are not shown in Exhibit 5.

THE COURT:  But are they ones that your expert is saying you can't do it with what's in Exhibit 2?  Is there a reason to think that if those fields were in these other logs that they would allow you to get to answer the question of

ascertainability?  Is there a reason to think that?

MR. CEGLIA:  Yes, Your Honor.  At least two reasons. The first reason is there are certain data fields shown on Exhibit 2 not shown on Exhibit 5, such as the user profile data field, which we believe contains information about what --

THE COURT:  Wait, wait, wait.  You are very hard to understand, Mr. Ceglia, so I didn't understand that.  So you believe they contained information about what?

MR. CEGLIA:  We believe that the user profile data field may contain information about a Google-user profile, perhaps a profile name, which could lead to identification of a particular person.  But more importantly, there is a second reason why.  We're interested not in the content of the data fields but the list of data fields itself.  Because even if there is a data field that doesn't appear on its face to implicate the Doritos cookie or something like that, our expert says that if the log contains information, like the information on Exhibit 5, and it contains, you know, any other type of data field that is also contained in another data log, we can use those similar or identical data fields, even if they are not directly relevant to an issue, to line up the relevant data fields that are in Exhibit 5 and connect the two data logs that Google says cannot be connected.  It is the fingerprinting method.

So if each data log contains, for example, a timestamp,

that timestamp on its face is not really relevant to anything that we're looking at.  But if both data logs contain the same timestamp category, our expert can use that category, that data field, to line up the two separate data logs and combine them and connect them to --

THE COURT:  And just to be clear, your expert is not saying he can, he's saying maybe.  Is that right?

MR. CEGLIA:  Yes.

THE COURT:  Okay.  So is it enough -- to go back to where we were a few minutes ago, would it be enough to get one of these records from each of the other logs?

MR. CEGLIA:  I believe so.  And that's why we're asking for the data fields involved and not the data itself. Because we don't want to impose the burden on Google of having to give us all the data if --

THE COURT:  So Mr. Weibell, there is sort of two alternatives on the table, and I want to understand the burden for each of them, because I know we've talked about this in the past.  What's involved with extracting records like the records that I see in Exhibit 2 from the other logs?

MR. WEIBELL:  So the problem is, if you are just talking about a sample, like we pulled one record from each of the 24 log sources, we may be able to do that with, I don't know, moderate burden.  The issue has been that, as I mentioned earlier, not every record, depending on the time period, is

going to have the same data fields in it, right.  It's still laborious -- now, remember, we did that -- we've been down this path before, right.  In June we produced sample records for the data fields that appeared on the May, you know, Exhibit 5, the May disclosure, and they said that wasn't helpful, it wasn't helpful to them.  And then after that they said, we don't want the data, never mind, we don't want any of the data, just tell us the data fields in the descriptions.  They have gone back to that.  That's what their letter says now, is they don't want the data, they just want the data fields and now we are going back to these other things.  It's too late for that.

THE COURT:  What's involved in providing the data and the data fields?  Is it different -- so if you expanded out what is now Exhibit 5, okay, and said, okay, I'm going to get you, say, not just the fields that -- I think -- let me step back and ask this question.

What's in Exhibit 5 are the fields from a particular log that Google has said these seem to be the relevant fields; is that right?

MR. WEIBELL:  That's correct.  Or even potentially relevant.  So yes, we took a very expansive view of that when we created it.

THE COURT:  And so what would be involved in recreating this and saying, here is all the fields?

MR. WEIBELL:  That is -- like the 650 number that's in

our papers, there is a reason why we can only estimate that there is at least 650, because it's an extremely laborious task to query the file, the 420 million files that are out there, to identify unique data fields and compare them is this really unique or is this the same thing.  And it's changing all the time.  The numbers are vast.  There is hundreds of engineering hours involved in doing that.  And the fact that they went through it before, they already went through that exercise before, they will have to go through it again just to produce this.

But it's -- the other problem you run into is you do need a description, because just giving you the field name is going to raise more questions.  They will say, well, we don't understand what this field name is?  What is this?  And as you mentioned, Your Honor, it never ends.  And to have the engineers go back and try to come up with a definition for each of these fields or an explanation, that's where it's just too much.  And it's all futile.

If you will bear with me one minute, I can explain why this is an entirely futile exercise and what they've explained their expert wants to do is futile, and here is why.

What the data represents -- we put the number in our papers.  It's so long I can't even say it, right.  It's an enormous, incomprehensible amount of data.  That represents browsing activity and Google ad-serving activity for users for

hundreds of millions of people back in 2011, 2012.  Of that data, some tiny fraction, we estimate somewhere 4 to 8 percent, somewhere around there, maybe 8 million, that was the estimates that were thrown out, of people who were affected by the issue that's been alleged in the complaint.  So what plaintiffs' expert is trying to do is he wants to look at all the data Google has on everything and all the fields and see if he can come up with a way to -- they mentioned the word "fingerprinting" -- to say, well, maybe even though Google designed its systems so this data is not associated with a particular person and it's anonymous, maybe there is way that we can piece stuff together and basically forge a key to de-anonymize all that data.

That's what he wants to do.  He wants to come up with a way to de-anonymize the data, the browsing data, your data, my data, from when we visited websites in 2011, de-anonymize that so that they can -- and that's just step one.  That would be an enormous privacy violation.  But that's just step one.  Even if that could be done, and it can't, and even if it should be done, and it shouldn't, it is futile because step two is, even if they know what data in there belongs to me and what data in there belongs to you, they won't be able to tell whether you and I received a biscotti cookie, the ad-tracking cookie, by the means alleged in the complaint versus some other means. The only way you can determine that is if you were examining

someone's device at the time they went to a website and received that cookie, right.  And that's exactly how the original expert that started this whole thing back in 2012, that's what he was doing.  He was analyzing this web traffic on browsers.  And he was a researcher at Stanford, right.  That's how he was able to do it.

The key to that mystery of who was affected by this can only be unlocked if you go back in time and you are sitting with a person looking at a device.  Obviously, you can't do that.  You can't do that for the class.  You can't even do it for these named plaintiffs.  Both named plaintiffs testified they no longer have those -- they don't have that information. They didn't preserve their devices.  They don't have it.  So it's a futile exercise.

So they are asking Google to forge a key, basically, to create new data that doesn't exist so you can unmask this browsing history of hundreds of millions of people just for purposes of meeting this ascertainability requirement in a case that is about anonymous data, not even about de-anonymous data.

THE COURT:  So I hear you.  I'm reluctant to -- I mean, that's kind of veering into the merits of class cert, and I'm reluctant to make a substantive determination about class cert in the context of a discovery motion.  But I am concerned about just the fact that, you know, we're just -- it does feel -- it feels very speculative.

Your expert, Mr. Strange, doesn't know what he can and can't accomplish.  And I just am not sure that -- I understand the value of it, but I'm not sure that it's worth the squeeze to undertake it.

So before I sort of decide that, let me go back to the questions, then, that you've posed to Google.  And I want to focus -- you have six questions here.  They kind of go in pairs.  For materials preserved and materials not preserved, I think materials not preserved is out.  So we are really focused on Questions 1, 3, and 5.  And we talked a lot about 1.

I guess I want to ask, and Mr. Weibell, let me ask you, for 3 and 5, is there a way to determine whether logs contain the kind of two criteria laid out in each of those?  It's the GAIA ID and some sort of, you know, browser or user-specific identifier from DoubleClick.  And then 5 would be the same GAIA ID and browsing history or browsing information, like a timestamp or a user name.  Is there a way for Google to determine if both of those things are in any of the logs?

MR. WEIBELL:  So we've already done that determination.  That's what you see in the Lawrence You declaration and that is what the witnesses testified to that were deposed.  The only form in which -- for example, the Doritos cookie itself was an encrypted form of the GAIA ID, right, and it shouldn't have been logged.  Even if it had been logged, it's encrypted.  So there is no unencrypted form of

that.

So does a log contain both personal identifiable information and browsing history?  Well, it depends on how you define those.  That's the other trick.  They defined it very expansively.  For example, we know that there is some IP address information in the logs.  Well, the IP address information doesn't identify a person.  Their expert may say, well, no, but that combined with a bunch of other stuff maybe we can fingerprint and find a way, like I said, to unlock this data.  So it depends how you are defining those terms that they have in those questions.

But we've already given them the answer.  The answer is they know what is encrypted, what's not encrypted.  That's in the Lawrence You declaration.  They know which IPs are in there and which are not.  That's already there, and they had the chance to depose our senior engineers about this already.

THE COURT:  So why isn't it in there, Mr. Strange?  Why do you need answers to these questions based on what Mr. You has already said in his declaration?

MR. STRANGE:  Well, because -- I mean, I heard what Mr. Weibell just said, but that didn't really answer the question.  If you have the data logs that have, you know, information from the GAIA and they also contain browsing history, that's what we want to know.  I don't think they have answered that question.

THE COURT:  Well, he's saying they have.

MR. STRANGE:  Well, where is it?

THE COURT:  He said it was in Mr. You's declaration.

MR. STRANGE:  Mr. You didn't specify any specific data logs or data fields.

MR. WEIBELL:  Let me clarify.  So again, what --

THE COURT:  Hold on.  Let him finish, Mr. Strange.

MR. STRANGE:  Sorry.  Go ahead, Mr. Weibell.

MR. WEIBELL:  Yeah.  To answer your question, sorry, Mr. Strange is correct, right.  If you are talking about logs that contain the GAIA ID, right, those are the logs that Google didn't want to intermix with the others.  In other words, there is data that's received on the Google side that knows who I am, right, because it knows I'm a Google user, it has my e-mail address in those logs and it knows who I am, and it doesn't want to mix the information with the stuff on the other side, the advertising stuff.  That's what's anonymous.  That's what is at issue in this case.

So their expert is going to try and say, maybe if I look at enough data points on this side and enough data points on this side, I can come to a pretty good guess, oh, this looks like it's the same user.

THE COURT:  But I think the question that's asked in the letter is are there any logs that are de-anonymous?  In other words, are there any logs -- tell me if I get this wrong,

Mr. Strange, but it seems like the question is are there any logs that have both the GAIA ID and an identifier from DoubleClick or a GAIA ID and a browsing history?

MR. STRANGE:  Correct.

THE COURT:  Right.  So at that point it's are there logs that Google has with the -- on the Google side, I guess, that have some sort of, you know, information about browsing history?  Or, alternatively, are there things on the sort of the ad side where the de-anonymization isn't maybe full-proof and there is the GAIA IDs?  That's what they are asking.

MR. STRANGE:  Correct.

MR. WEIBELL:  But again, they have the answer.  So they already know, their expert already knows that when you go to a Google website, Gmail or something like, that Google is receiving browser-generated information through those requested communique and, of course, there is the GAIA ID that is associated with those.  He knows that.  They already have that.

But if the question is but is there a log that has both that side and the other side together, the answer is no.  We've already answered that.

THE COURT:  Where have you answered that?

MR. WEIBELL:  That's explained in the Lawrence You declaration that the systems were designed to be separate so that you could not --

THE COURT:  I am going to go back to Mr. You's

declaration.  I just want to make sure just because Mr. Strange is saying, well, it is not in Mr. You's declaration.  So where in Mr. You's declaration are you pointing me to?

MR. WEIBELL:  If you go to -- in the section of paragraphs 48 through 60 in there.

THE COURT:  Okay.

MR. WEIBELL:  And it talks about how -- let me see. So I'm sorry, it's before that section.  It is in the section that's talking about why they came up with the Doritos cookie. So that would be paragraph 33.

THE COURT:  Okay.

MR. WEIBELL:  Right.  Google designed an intermediary cookie to act as a temporary encrypted intermediary between the two distinct account and advertising systems.  So that's the section where it explains why this intermediary cookie was created was because they didn't want there to be exactly what plaintiffs' expert is looking for.

THE COURT:  All right.  So Mr. Strange, there is a bunch of description here about the functionality.  Mr. Weibell is saying, no, those logs don't exist.  Isn't that enough to answer the question?

MR. STRANGE:  Well, I think that's -- we understand that Google is saying that there is no logs that contain both GAIA -- the GAIA information and the DoubleClick.  They said there is no logs, and that's what he says.  But we're asking

something different.  We're saying are there any --

THE COURT:  Wait, wait, wait.  When you say you are asking something different, you're saying are there anything that has the GAIA and information from the DoubleClick.  That's number 3.

MR. STRANGE:  No.  What we're asking for, like in number 5, was do you have any information that includes, you know, GAIA information and also contains browser history or other --

THE COURT:  So let's break these down.  Number 3 -- you're saying 3 is about DoubleClick.  Yes?

MR. STRANGE:  Pardon me?

THE COURT:  Number 3, Question 3, in this letter is about DoubleClick, right?

MR. STRANGE:  Yes.

THE COURT:  So they've told you point blank that they don't -- you know, GAIA and DoubleClick never meet, that that's sort of what the Doritos encryption cookie was for, but that they don't meet.  So doesn't that answer your question?

MR. STRANGE:  As long as they are willing to say and what they are saying there is no data logs that have that information, yes, that's acceptable.

THE COURT:  I think Mr. Weibell just said that.  Right, Mr. Weibell.

MR. WEIBELL:  Correct.  That's what the witness

testified and what the Lawrence You declaration says.

THE COURT:  Okay.  So Number 5, then, is does it have browser information.  And so do you know the answer to that one, Mr. Weibell?  Does that exist?

MR. WEIBELL:  That's what I said earlier.  If what they're talking about is when you go to Gmail to access your Gmail, you know, that's browser-generated information that Google receives there and your GAIA ID, but it has nothing to do with the advertising systems.  So if that's what they are asking about, they already know the answer.

THE COURT:  Does it contain browsing history?  In other words, if I go to Gmail and I come to Gmail from, you know, ESPN, does it know that I was at ESPN?

MR. WEIBELL:  Well, that's actually a trick question because sometimes a refer header will lead it.  But to get to your point, there is no association of browsing history like there is for the ad number, right, in order to determine where you've been so we can serve ads.  But there is browsing history in a sense that Google knows if you've been to Google, it knows if you've been to a Google website.  If you are on YouTube and you click a Gmail link and it gets to your Gmail, they know you have come from YouTube to Gmail, right.  That stuff is there.  But again, that is not helpful to anybody because that doesn't do anything.

But it's a problem for us because the way they worded

the question, we would then have to say yes and then provide all of those logs in all of those fields and then we're millions of engineering hours later.

THE COURT:  It seems to me, Mr. Strange, what you are getting at, I think, is a more general browsing history, not the referral site or something like that.

MR. STRANGE:  Well, yeah.  Like we gave an example of timestamp, user, agent, et cetera.  Right.

THE COURT:  So it sounds like, Mr. Weibell, you're saying that does not exist in a log that also has the GAIA ID. Is that right?

MR. WEIBELL:  If I'm understanding, if they are talking about the same browsing history that you would correlate for purposes of the ad network, we don't have that, right.  All we would have is potentially -- and I don't even know this for sure.  I just know how browsers work from working on this case for years.  Google is going to have browsing information related to the Google websites, so that's what's going to be on the GAIA side or that's going to be on the -- but not a third-party website, unless it was a referral header.

THE COURT:  Okay.  All right.  Let me just ask, then, at the last part of this is about the deposition.  And so you served a 30(b)(6) notice at some point, Mr. Strange, in the last couple months.  Is that right?

MR. STRANGE:  That's correct.

THE COURT:  And is it topics either the same as or similar topics that you've noticed before?

MR. STRANGE:  I don't have a copy in front of me, but it was served specifically on these questions that we've been talking about and also some of the unanswered questions in the deposition we took.  And the reason --

THE COURT:  Okay.  I mean, is there a reason -- what is your basis for saying that you can serve a second 30(b)(6) notice without leave of court?

MR. STRANGE:  Well, I think that the deponent, Your Honor, couldn't answer the question.  So with Google offering to, you know, answer -- have lawyers answer those questions that are unsworn testimony, we don't have any follow-up, that doesn't really work.

THE COURT:  I mean, I'm troubled, and I don't want to get too into the weeds on this, but the idea of a new 30(b)(6) notice as opposed to going back to Google and saying, here is some questions where we don't think we got answers and we want to follow up -- and that doesn't have to be lawyers answering it.  That could be, can you have someone do a declaration to answer that question?  If there are five or six questions, maybe you can be in a zoom deposition for a half an hour as a follow-up deposition.  But I think a new deposition notice is something different.

You know, I expect parties to meet and confer and try to

Case 1:12-md-02358-JDW    Document 292    Filed 10/20/25    Page 46 of 59 PageID #: 4789

work things out with respect to discovery issues, including potentially unanswered 30(b)(6) questions.  That's not the first time someone has complained about that in the history of litigation.  But I think -- I do think that Rule 30(a) applies. You know, otherwise I think it's a license for seriatim 30(b)(6) depositions that could be problematic.  And I think if you are going to come back and say, no, we need a new deposition as opposed to some follow-up, that requires leave of court.

And you know, if you can't work things out with Mr. Weibell where he says, no, I think you got, you know, some sort of -- I think you got enough, then again, your remedy is a motion to compel.

MR. STRANGE:  Fair enough.

THE COURT:  Not a new notice.

MR. STRANGE:  We will meet and confer and try to resolve that.

THE COURT:  Here is where I am.  So one of the questions that are in that letter I think, frankly -- again, it's not appropriate to get into the materials that were not preserved.  I'm not a hundred percent sure even, frankly, how Google could answer them.  The preservation decisions were over a decade ago.

The questions about the materials that were preserved, it sounds like they've been answered.  I do think they've been

answered.  Mr. Weibell has answered them here.  But he has pointed to Mr. You's declaration.  I've read Mr. You's declaration.  I think it provides information on these issues.  I haven't read all the deposition testimony, but again, I think this has been covered, so I don't think there is a basis on that.

As far as these logs go and the requests for the logs, you know, I think that asking for the fields is, you know, it's just -- it's a Pandora's box, and I don't think it's appropriate at this point for the plaintiffs to reopen the process of looking at all these fields.  I think that, as I consider the sort of various proportionality factors here, the burden on Google is pretty substantial.  It's not clear to me that the upside is high.  It's not -- I have an expert who is saying a lot of maybes, from what I can tell, about whether this information would be useful and would allow him to ascertain -- you know, to prepare some class-wide approach to ascertainability.  So I'm not going to compel any particular discovery.

What I am going to do is this, and I think I want to double-check where we are, but my recollection is that the schedule in this case we were basically coming to the end of discovery, and then I kind of said, okay, we need to get some briefing on this.  I'm going to give you a very short amount of additional time, Mr. Strange, if there are very specific,

targeted things that your expert can come back and say these are some things I would want to see and they are not too burdensome on Google to provide, then I might be open to having Google do that.  But it's got to be, as I said, specific; it's got to be targeted; it's got to be clear.  It can't be a fishing expedition.  It has to be, here is records that I've seen, here is the records that I have reason to think that are out there and that I have reason to think are going to let me answer this question.

And so what we're going to do is this.  I'm going to have one more call with all of you to try to resolve this once and for all and hear if the expert has anything to say.  Unless you've all agreed, I will decide if that's sufficiently specific.  And we're going to do that -- look at my calendar.  I'm going to aim I think to do that on the 31st, October 31st.  Let's say 3:30 Eastern.

Does that work for everybody?

Mr. Strange, your expert has got to -- until next Tuesday, the 21st, to put together the list and for you to get to it to Mr. Weibell, you know, any specific, targeted information that he thinks he wants.

Mr. Weibell, you can get back to him by the end of next week, the 24th, with just feasibility and if you agree or think it's problematic.

You are going to send me a letter -- you guys can talk

and send me a letter by the 29th.  And then we will get on the phone on the 31st, and I will resolve any outstanding disputes, and that's going to be it.  I'm not going to keep kicking this can down the road.  We're either going to have a schedule for a final batch of material to come out, if the experts can make the appropriate showing, and if not, then we're just going to move on and set some schedules for class cert briefing, okay.  But this process has got to end.

MR. STRANGE:  That's fair enough, Your Honor.  We'll proceed with that.

THE COURT:  Okay.  All right.  And I'll get a short order out.  So Mr. Weibell, as I said, I do want to get this letter on the docket, but I don't think there is any particular urgency to do so.  So let's just say that same 31st for a motion to seal.

MR. WEIBELL:  Can you put the letter on the docket without putting the exhibits on the docket?

THE COURT:  I mean, in the short term, but no ultimately.  Anyone who reads the transcript for today is going to have a very hard time making heads or tails of anything without the exhibits, and so I don't know if this is ever going up to the Court of Appeals, but I want to make the record in case it does.  And again, it's not an all-or-nothing proposition in terms of sealing, right.  If it's specific exhibits that are not okay, be judicious about it.  It would

curry some favor with me if you do.

MR. WEIBELL:  We'll do that, Your Honor.

THE COURT:  I think that's what we're going to accomplish for today.  As I said, I'll issue a short order with these deadlines, and we'll talk on the 31st and figure out where this case is going.  Okay?

Thanks, everybody.  Appreciate your time today.  Have a good day.

(Proceeding concluded at 3:19 p.m.)

- - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ *Cherilyn M. McCollum*

Cherilyn M. McCollum, CCR, RPR
Official Court Reporter

Date:  20th day of October, 2025

| / | 3 | A |
|---|---|---|

**/**

/s [1] - 50:15

**1**

1 [3] - 9:22, 37:10
10 [2] - 26:9, 28:20
12 [4] - 16:10, 18:3, 18:24, 19:3
12-md-2358-JDW [1] - 1:3
12100 [1] - 1:15
13 [4] - 21:4, 21:20, 25:24, 26:20
14 [2] - 21:4, 21:20
15 [1] - 1:9
16 [1] - 9:25
19106 [1] - 1:8

**2**

2 [15] - 22:21, 23:4, 24:13, 25:22, 27:3, 27:8, 27:24, 29:15, 30:1, 30:3, 30:14, 30:20, 30:23, 31:4, 32:20
2,000 [1] - 20:11
2,000-something [1] - 20:9
2,400-something [1] - 16:1
2-300 [1] - 2:8
20 [1] - 26:3
2011 [2] - 35:1, 35:16
2012 [2] - 35:1, 36:3
2025 [3] - 1:9, 4:16, 50:17
207-5055 [1] - 1:16
20th [1] - 50:17
21 [2] - 4:16, 5:11
21230 [1] - 2:4
21st [2] - 26:9, 48:19
22 [4] - 19:11, 23:9, 23:18, 25:25
23 [1] - 19:12
24 [14] - 16:12, 18:2, 18:23, 19:4, 20:1, 20:4, 20:20, 22:24, 23:1, 23:5, 26:1, 32:23
24th [1] - 48:23
26(b [1] - 22:6
280 [1] - 4:2
29th [1] - 49:1
2:02 [1] - 1:9

**3**

3 [7] - 37:10, 37:12, 42:5, 42:10, 42:11, 42:13
30 [1] - 11:5
30(a [1] - 46:4
30(b)(6 [6] - 5:7, 44:23, 45:8, 45:16, 46:2, 46:6
3000 [1] - 2:8
301 [1] - 2:3
310 [1] - 1:16
31st [5] - 48:15, 49:2, 49:14, 50:5
33 [1] - 41:10
331-2000 [1] - 2:9
3:19 [1] - 50:9
3:30 [1] - 48:16

**4**

4 [1] - 35:2
405 [1] - 2:3
407 [1] - 2:4
420 [4] - 1:15, 20:3, 20:21, 34:3
48 [3] - 10:1, 41:5

**5**

5 [27] - 19:13, 21:2, 21:22, 21:25, 26:20, 26:22, 26:23, 27:5, 27:11, 27:25, 29:10, 30:5, 30:11, 30:15, 30:21, 31:4, 31:18, 31:22, 33:4, 33:14, 33:17, 37:10, 37:12, 37:15, 42:7, 43:2
505-9463 [1] - 2:4

**6**

60 [3] - 10:2, 11:5, 41:5
601 [1] - 1:8
650 [8] - 2:9, 18:5, 18:6, 18:10, 20:23, 33:25, 34:2

**8**

8 [2] - 35:2, 35:3

**9**

90025 [1] - 1:15
94306 [1] - 2:9

**A**

ability [2] - 6:1, 7:12
able [9] - 14:4, 20:22, 21:3, 21:6, 21:8, 21:13, 32:23, 35:22, 36:6
above-entitled [1] - 50:13
absolutely [3] - 7:20, 12:18, 13:10
acceptable [1] - 42:22
access [1] - 43:6
accomplish [2] - 37:2, 50:4
account [5] - 7:6, 7:7, 28:22, 28:23, 41:14
accounts [1] - 29:16
act [1] - 41:13
activity [2] - 34:25
actual [2] - 25:7, 29:13
ad [8] - 9:5, 9:10, 10:16, 34:25, 35:23, 40:9, 43:17, 44:14
ad-serving [2] - 9:10, 34:25
ad-tracking [1] - 35:23
adamant [1] - 29:18
add [1] - 5:6
addition [1] - 4:18
additional [2] - 22:10, 47:25
address [4] - 14:23, 38:6, 39:15
administrability [1] - 14:8
administrative [2] - 14:13, 17:3
administratively [3] - 15:1, 17:3, 17:20
ads [2] - 9:6, 43:18
advertising [3] - 39:17, 41:14, 43:9
affected [2] - 35:4, 36:7
affidavit [4] - 23:22, 24:7, 25:11, 25:18
afternoon [3] - 3:1, 3:12, 3:15
afterwards [1] - 11:20
AG [1] - 7:22
agent [2] - 17:23, 44:8
aggressive [1] - 25:4
ago [2] - 32:10,

46:23
agree [2] - 13:11, 48:23
agreed [1] - 48:13
ahead [1] - 39:8
aided [1] - 1:22
aim [1] - 48:15
align [1] - 28:10
all-or-nothing [1] - 49:23
alleged [2] - 35:5, 35:24
allow [4] - 30:1, 30:3, 30:25, 47:16
allowed [1] - 5:23
ALSO [1] - 2:11
alternative [1] - 5:5
alternatively [1] - 40:8
alternatives [1] - 32:17
Alto [1] - 2:9
amount [3] - 16:3, 34:24, 47:24
amounts [1] - 7:12
analyzing [1] - 36:4
Angeles [1] - 1:15
anonymization [1] - 40:9
anonymize [3] - 35:13, 35:15, 35:16
anonymous [6] - 9:11, 35:11, 36:19, 39:17, 39:24
anonymously [1] - 9:17
answer [23] - 9:15, 10:9, 11:12, 21:9, 21:13, 30:19, 30:25, 38:12, 38:21, 39:9, 40:12, 40:19, 41:21, 42:19, 43:3, 43:10, 45:11, 45:12, 45:21, 46:22, 48:9
answered [7] - 26:17, 38:25, 40:20, 40:21, 46:25, 47:1
answering [1] - 45:19
answers [2] - 38:18, 45:18
ANTHONY [1] - 2:7
Appeals [1] - 49:22
appear [1] - 31:15
appearance [2] - 3:8, 3:10
APPEARANCES [2] - 1:13, 2:1
appearances [1] - 3:3

appeared [1] - 33:4
Apple's [1] - 12:8
applies [4] - 19:20, 19:21, 19:23, 46:4
appreciate [1] - 50:7
approach [4] - 17:10, 17:11, 25:4, 47:17
appropriate [3] - 46:20, 47:10, 49:6
arguably [1] - 7:21
argument [3] - 5:25, 13:22, 14:20
articulate [3] - 17:17, 22:7, 22:8
ascertain [3] - 14:4, 14:18, 47:17
ascertainability [8] - 12:22, 14:8, 14:17, 26:15, 27:12, 31:1, 36:18, 47:18
ascertainable [2] - 13:24
ascertained [1] - 14:4
ascertaining [1] - 21:23
assertion [1] - 12:17
associated [3] - 9:2, 35:10, 40:17
association [2] - 9:4, 43:16
assume [1] - 7:14
attached [4] - 7:17, 16:9, 18:3, 19:5
attachments [2] - 4:9, 4:10
attain [1] - 9:8
attempt [1] - 29:22
August [2] - 4:7, 19:5
available [9] - 14:2, 17:5, 17:22, 18:14, 18:15, 18:16, 19:1, 23:21
Avandia [1] - 25:15
Avenue [1] - 2:3
aweibell@ mayerbrown.com [1] - 2:10

**B**

backwards [2] - 17:8, 22:17
bad [1] - 8:21
Baltimore [1] - 2:4
based [7] - 6:20, 13:24, 17:11, 24:2, 27:13, 29:23, 38:18
basis [11] - 5:19, 6:9,

6:22, 8:12, 22:8, 22:9, 26:7, 27:9, 27:10, 45:8, 47:5

**batch** [1] - 49:5
**bear** [2] - 30:16, 34:19
**bears** [1] - 27:12
**becomes** [1] - 23:15
**BEFORE** [1] - 1:11
**beginning** [2] - 14:22, 21:18
**belongs** [2] - 35:21, 35:22
**best** [2] - 21:3, 21:6
**better** [1] - 10:19
**between** [2] - 9:4, 41:13
**beyond** [1] - 8:4
**bid** [1] - 24:8
**big** [2] - 11:8, 11:16
**bigger** [1] - 25:25
**biscotti** [4] - 7:5, 12:9, 29:7, 35:23
**bit** [4] - 6:23, 17:7, 17:8, 18:12
**blank** [1] - 42:16
**blocker** [1] - 6:14
**blocking** [1] - 10:16
**blocks** [1] - 6:15
**Boulevard** [1] - 1:15
**box** [2] - 25:18, 47:9
**break** [1] - 42:10
**Brian** [1] - 3:12
**BRIAN** [1] - 1:14
**brian@strangellp. com** [1] - 1:16
**brief** [5] - 10:10, 15:25, 16:1, 16:4
**briefing** [4] - 16:12, 18:5, 47:24, 49:7
**broad** [3] - 8:2, 16:20, 17:11
**broad-based** [1] - 17:11
**Brown** [1] - 3:19
**BROWN** [1] - 2:7
**browser** [5] - 37:14, 40:15, 42:8, 43:3, 43:7
**browser-generated** [2] - 40:15, 43:7
**browsers** [2] - 36:5, 44:16
**browsing** [15] - 34:25, 35:15, 36:17, 37:16, 38:3, 38:23, 40:3, 40:7, 43:11, 43:16, 43:18, 44:5, 44:13, 44:17
**built** [1] - 9:12

**bunch** [3] - 17:23, 38:8, 41:19
**burden** [8] - 23:20, 27:22, 28:5, 28:11, 32:14, 32:17, 32:24, 47:13
**burdens** [3] - 13:3, 22:18, 23:13
**burdensome** [1] - 48:3
**business** [1] - 8:22
**BY** [3] - 1:14, 2:3, 2:7
**Byrne** [1] - 1:7
**BYUN** [1] - 2:13
**Byun** [1] - 3:13

## C

**CA** [2] - 1:15, 2:9
**café** [2] - 20:14, 20:15
**calendar** [1] - 48:14
**camera** [1] - 3:7
**Camino** [1] - 2:8
**cannot** [1] - 31:23
**career** [1] - 11:7
**case** [25] - 4:4, 5:21, 6:11, 7:11, 7:17, 7:18, 8:7, 13:21, 14:7, 14:15, 14:22, 14:24, 15:4, 18:20, 20:25, 21:19, 25:16, 28:12, 28:14, 36:18, 39:18, 44:17, 47:22, 49:23, 50:6
**cases** [5] - 8:5, 14:23, 16:22, 18:9, 23:15
**categories** [2] - 27:14, 29:1
**category** [2] - 32:3
**caused** [1] - 12:8
**CCR** [2] - 1:19, 50:16
**CCR-NJ** [1] - 1:19
**Ceglia** [2] - 3:14, 31:7
**CEGLIA** [10] - 2:12, 27:3, 29:11, 30:3, 30:12, 30:19, 31:2, 31:9, 32:8, 32:12
**cert** [4] - 13:4, 36:21, 36:23, 49:7
**certain** [6] - 16:3, 20:13, 29:14, 29:23, 31:3
**certification** [3] - 12:22, 13:23, 14:21
**certified** [2] - 13:2, 15:3
**certify** [1] - 50:12

**cetera** [1] - 44:8
**challenge** [1] - 14:21
**challenging** [1] - 28:9
**chance** [2] - 24:25, 38:16
**change** [2] - 20:18, 20:20
**changing** [1] - 34:5
**chart** [1] - 25:25
**check** [2] - 25:17, 47:21
**Cherilyn** [3] - 1:19, 50:15, 50:16
**Cherilyn_ McCollum@paed. uscourts.gov** [1] - 1:20
**chose** [2] - 8:6, 8:7
**circuit** [1] - 14:9
**Circuit** [1] - 25:16
**circumvent** [1] - 6:14
**claims** [1] - 14:15
**clarify** [2] - 16:2, 39:6
**clarity** [2] - 28:11, 28:14
**class** [27] - 5:24, 6:1, 6:19, 10:2, 10:7, 12:22, 13:2, 13:4, 13:22, 14:3, 14:4, 14:21, 15:3, 15:6, 17:4, 17:21, 21:24, 23:3, 27:12, 27:15, 29:6, 29:7, 36:10, 36:21, 36:22, 47:17, 49:7
**class-wide** [1] - 47:17
**clear** [5] - 12:11, 23:12, 32:6, 47:13, 48:5
**click** [1] - 43:21
**code** [1] - 4:11
**collect** [3] - 12:5, 12:6, 20:18
**collected** [1] - 9:17
**column** [1] - 19:20
**combination** [1] - 4:13
**combine** [1] - 32:4
**combined** [2] - 29:19, 38:8
**coming** [3] - 17:12, 20:21, 47:22
**Commencing** [1] - 1:9
**communique** [1] - 40:16
**company** [2] - 11:16,

22:12
**compare** [2] - 19:14, 34:4
**compared** [1] - 18:7
**compel** [5] - 4:1, 4:13, 4:15, 46:13, 47:18
**competitive** [2] - 25:12, 25:17
**complained** [1] - 46:3
**complaint** [3] - 7:18, 35:5, 35:24
**complete** [1] - 4:6
**computer** [4] - 1:22, 4:11, 20:7, 20:8
**computer-aided** [1] - 1:22
**computers** [1] - 13:8
**concerned** [5] - 10:15, 18:12, 24:4, 24:9, 36:23
**concerning** [1] - 15:10
**concluded** [1] - 50:9
**concrete** [1] - 25:17
**confer** [2] - 45:25, 46:16
**confers** [2] - 26:5, 26:6
**connect** [3] - 30:4, 31:22, 32:5
**connected** [2] - 29:19, 31:23
**connection** [3] - 9:8, 16:3, 23:23
**consider** [1] - 47:12
**consultants** [1] - 9:7
**CONSUMER** [1] - 1:4
**contain** [9] - 27:11, 31:10, 32:2, 37:12, 38:2, 38:23, 39:11, 41:23, 43:11
**contained** [2] - 31:8, 31:19
**contains** [5] - 31:5, 31:17, 31:18, 31:25, 42:8
**content** [1] - 31:13
**context** [2] - 13:21, 36:23
**CONTINUED** [1] - 2:1
**COOKIE** [1] - 1:4
**cookie** [38] - 5:1, 6:13, 6:14, 6:18, 7:1, 7:4, 7:5, 7:8, 8:23, 9:2, 9:3, 10:5, 10:9, 10:17, 12:4, 12:7, 12:9, 15:19, 26:12,

28:21, 28:25, 29:7, 29:8, 29:17, 29:21, 30:4, 31:16, 35:23, 36:2, 37:23, 41:9, 41:13, 41:15, 42:18
**cookies** [2] - 11:24, 13:9
**copy** [1] - 45:3
**correct** [13] - 5:13, 8:15, 13:10, 19:4, 19:14, 23:7, 33:20, 39:10, 40:4, 40:11, 42:25, 44:25, 50:12
**correctly** [1] - 17:24
**correlate** [1] - 44:14
**correlation** [1] - 6:16
**correspondence** [1] - 9:19
**counsel** [1] - 4:17
**couple** [3] - 19:3, 30:7, 44:24
**coupled** [1] - 4:14
**course** [2] - 22:12, 40:16
**Court** [7] - 1:19, 15:25, 16:4, 16:11, 28:19, 49:22, 50:16
**court** [3] - 3:4, 45:9, 46:9
**COURT** [88] - 1:1, 3:1, 3:17, 3:20, 5:14, 6:3, 6:6, 6:23, 7:11, 7:25, 8:17, 9:18, 9:23, 10:4, 11:3, 11:12, 12:11, 12:15, 12:19, 12:24, 13:17, 14:6, 14:11, 15:8, 15:19, 15:22, 16:18, 17:7, 18:11, 19:2, 19:13, 19:18, 20:6, 20:10, 21:21, 22:5, 23:4, 23:8, 23:12, 24:4, 25:3, 25:10, 25:24, 26:16, 26:20, 27:9, 27:16, 29:9, 29:25, 30:5, 30:13, 30:22, 31:6, 32:6, 32:9, 32:16, 33:12, 33:23, 36:20, 38:17, 39:1, 39:3, 39:7, 39:23, 40:5, 40:21, 40:25, 41:6, 41:11, 41:18, 42:2, 42:10, 42:13, 42:16, 42:23, 43:2, 43:11, 44:4, 44:9, 44:21, 45:1, 45:7, 45:15, 46:15, 46:18, 49:11, 49:18, 50:3
**Courthouse** [1] - 1:7
**courts** [1] - 25:14

**covered** [1] - 47:5
**covers** [1] - 25:25
**craft** [1] - 18:16
**create** [3] - 9:8, 12:4, 36:16
**created** [6] - 8:20, 12:3, 12:7, 12:9, 33:22, 41:16
**creates** [1] - 13:21
**criteria** [1] - 37:13
**critical** [1] - 26:14
**current** [3] - 3:25, 4:6, 5:11
**curry** [1] - 50:1
**cutting** [1] - 10:16

## D

**D.I** [1] - 4:2
**dark** [1] - 27:17
**data** [103] - 4:23, 4:25, 5:3, 5:15, 5:17, 9:10, 11:24, 12:21, 13:6, 13:7, 13:14, 13:19, 13:24, 14:2, 14:5, 18:4, 18:6, 18:10, 18:25, 19:1, 19:10, 20:1, 20:19, 20:23, 20:24, 21:4, 22:12, 22:22, 22:23, 22:25, 23:1, 25:7, 26:14, 26:25, 27:1, 27:4, 27:6, 27:7, 27:10, 27:14, 28:6, 28:8, 29:2, 29:3, 29:12, 29:13, 29:14, 29:22, 29:24, 30:4, 31:3, 31:4, 31:9, 31:13, 31:14, 31:15, 31:18, 31:19, 31:20, 31:21, 31:22, 31:25, 32:2, 32:3, 32:4, 32:13, 32:15, 33:1, 33:4, 33:7, 33:8, 33:10, 33:12, 33:13, 34:4, 34:22, 34:24, 35:2, 35:6, 35:10, 35:13, 35:15, 35:16, 35:21, 36:16, 36:19, 38:10, 38:22, 39:4, 39:5, 39:13, 39:20, 42:21
**Date** [1] - 50:17
**dated** [1] - 4:16
**days** [3] - 11:5, 20:16
**de** [6] - 35:13, 35:15, 35:16, 36:19, 39:24, 40:9
**de-anonymization** [1] - 40:9

**de-anonymize** [3] - 35:13, 35:15, 35:16
**de-anonymous** [2] - 36:19, 39:24
**deadlines** [1] - 50:5
**deal** [3] - 9:21, 14:12, 18:8
**deals** [1] - 15:9
**dealt** [1] - 15:5
**decade** [2] - 28:8, 46:23
**decide** [2] - 37:5, 48:13
**decided** [1] - 14:2
**decisions** [1] - 46:22
**declaration** [17] - 9:23, 10:1, 11:22, 11:25, 24:1, 37:21, 38:14, 38:19, 39:3, 40:23, 41:1, 41:2, 41:3, 43:1, 45:20, 47:2, 47:3
**deem** [1] - 13:24
**DEFENDANT** [1] - 2:7
**defendant** [1] - 3:19
**defendants** [1] - 14:21
**defense** [1] - 3:17
**define** [1] - 38:4
**defined** [1] - 38:4
**defining** [1] - 38:10
**definitely** [2] - 7:24, 25:1
**definition** [3] - 19:20, 34:16
**definitively** [1] - 24:8
**DELAWARE** [1] - 1:1
**denied** [3] - 4:2, 4:15, 26:8
**deponent** [1] - 45:10
**depose** [1] - 38:16
**deposed** [2] - 21:7, 37:22
**deposition** [10] - 5:7, 11:18, 21:16, 44:22, 45:6, 45:22, 45:23, 46:8, 47:4
**depositions** [1] - 46:6
**describe** [1] - 17:25
**described** [1] - 20:6
**describing** [1] - 28:19
**description** [5] - 4:25, 21:3, 21:7, 34:12, 41:19
**descriptions** [3] - 5:3, 21:8, 33:8
**design** [3] - 9:6, 9:7,

9:15
**designed** [4] - 10:5, 35:10, 40:23, 41:12
**destroy** [1] - 6:21
**destroyed** [2] - 6:2, 14:5
**determination** [3] - 5:20, 36:22, 37:20
**determine** [8] - 15:1, 21:23, 22:4, 22:5, 35:25, 37:12, 37:18, 43:17
**device** [2] - 36:1, 36:9
**devices** [1] - 36:13
**Diane** [1] - 3:13
**DIANE** [1] - 2:13
**differ** [1] - 16:23
**difference** [1] - 25:5
**different** [12] - 12:8, 13:5, 15:2, 15:19, 15:22, 20:17, 20:19, 22:3, 33:13, 42:1, 42:3, 45:24
**directly** [1] - 31:21
**directories** [1] - 20:11
**directory** [1] - 16:2
**disclosed** [1] - 27:25
**disclosure** [6] - 19:9, 24:24, 25:12, 25:17, 33:5
**disclosures** [1] - 19:8
**discovered** [1] - 19:16
**DISCOVERY** [1] - 1:4
**discovery** [10] - 3:25, 4:5, 7:12, 22:19, 23:15, 24:10, 36:23, 46:1, 47:19, 47:23
**dispute** [1] - 4:6
**disputes** [1] - 49:2
**distinct** [1] - 41:14
**DISTRICT** [2] - 1:1, 1:1
**docket** [6] - 24:16, 24:19, 49:13, 49:16, 49:17
**document** [4] - 8:1, 8:10, 8:15, 11:1
**documents** [5] - 8:12, 16:8, 17:4, 18:8, 26:11
**done** [7] - 3:4, 3:23, 11:19, 29:4, 35:19, 35:20, 37:19
**Doritos** [20] - 6:13, 6:18, 7:1, 7:8, 8:23, 9:2, 9:3, 10:5, 10:8,

10:17, 11:24, 12:4, 12:7, 29:8, 31:16, 37:23, 41:9, 42:18
**double** [1] - 47:21
**double-check** [1] - 47:21
**DoubleClick** [8] - 5:2, 37:15, 40:3, 41:24, 42:4, 42:11, 42:14, 42:17
**down** [11] - 6:3, 8:11, 8:16, 10:16, 13:1, 13:12, 13:16, 24:5, 33:2, 42:10, 49:4
**during** [1] - 20:16
**duty** [1] - 7:16

## E

**e-mail** [1] - 39:14
**e-mails** [9] - 6:12, 6:16, 6:20, 10:14, 10:18, 12:12, 12:16, 13:5, 13:6
**Eastern** [1] - 48:16
**easy** [1] - 6:19
**effect** [1] - 8:25
**efforts** [1] - 7:13
**either** [3] - 4:24, 45:1, 49:4
**EI** [1] - 2:8
**encrypted** [5] - 37:23, 37:25, 38:13, 41:13
**encryption** [1] - 42:18
**end** [9] - 10:12, 14:22, 18:13, 18:17, 23:15, 23:16, 47:22, 48:22, 49:8
**ends** [1] - 34:15
**engineering** [2] - 34:6, 44:3
**engineers** [5] - 19:25, 20:18, 20:22, 34:16, 38:16
**enormous** [2] - 34:24, 35:18
**entire** [1] - 16:7
**entirely** [2] - 19:6, 34:20
**entitled** [1] - 50:13
**entity** [1] - 11:8
**especially** [1] - 11:8
**ESPN** [2] - 43:13
**ESQUIRE** [5] - 1:14, 2:3, 2:7, 2:12, 2:13
**essence** [1] - 7:4
**essentially** [1] - 20:6
**estate** [1] - 3:8

**estimate** [2] - 34:1, 35:2
**estimates** [1] - 35:3
**et** [1] - 44:8
**evidence** [4] - 10:21, 10:22, 12:16, 13:13
**exactly** [5] - 9:24, 12:2, 24:1, 36:2, 41:16
**examining** [1] - 35:25
**example** [8] - 8:1, 10:14, 17:23, 18:1, 31:25, 37:22, 38:5, 44:7
**Excel** [1] - 20:1
**except** [1] - 10:10
**exception** [1] - 12:8
**excerpt** [1] - 27:3
**exercise** [5] - 19:24, 20:24, 34:8, 34:20, 36:14
**Exhibit** [44] - 9:22, 16:10, 18:3, 18:24, 19:3, 19:13, 21:2, 21:22, 21:25, 22:21, 23:4, 24:13, 25:22, 26:9, 26:20, 26:22, 26:23, 27:3, 27:5, 27:8, 27:11, 27:24, 27:25, 28:20, 29:10, 29:15, 30:1, 30:3, 30:5, 30:11, 30:14, 30:15, 30:20, 30:21, 30:23, 31:4, 31:18, 31:22, 32:20, 33:4, 33:14, 33:17
**exhibits** [7] - 24:17, 25:6, 25:9, 49:17, 49:21, 49:25
**exist** [8] - 9:15, 10:9, 13:14, 36:16, 41:20, 43:4, 44:10
**existed** [2] - 10:10, 10:11
**exists** [1] - 13:7
**expanded** [1] - 33:13
**expansive** [1] - 33:21
**expansively** [1] - 38:5
**expect** [1] - 45:25
**expedition** [1] - 48:6
**expert** [30] - 16:16, 16:23, 17:9, 18:13, 21:15, 22:11, 23:20, 23:22, 27:14, 27:21, 27:23, 29:21, 30:15, 30:17, 30:22, 31:16, 32:3, 32:6, 34:21,

35:6, 36:3, 37:1, 38:7, 39:19, 40:13, 41:17, 47:14, 48:1, 48:12, 48:18

**experts** [2] - 16:22, 49:5
**explain** [3] - 8:25, 10:2, 34:19
**explained** [3] - 9:21, 34:20, 40:22
**explaining** [1] - 29:5
**explains** [1] - 41:15
**explanation** [2] - 9:1, 34:17
**extent** [5] - 4:8, 5:22, 6:15, 6:17, 21:8
**external** [1] - 9:7
**extract** [1] - 19:25
**extracting** [2] - 28:5, 32:19
**extremely** [2] - 19:24, 34:2

## F

**face** [2] - 31:15, 32:1
**faces** [1] - 3:21
**fact** [4] - 14:5, 25:13, 34:7, 36:24
**factors** [1] - 47:12
**fair** [4] - 12:24, 18:11, 46:14, 49:9
**faith** [1] - 8:22
**far** [1] - 47:7
**favor** [1] - 50:1
**feasibility** [1] - 48:23
**feasible** [1] - 15:1
**February** [3] - 24:11, 24:13, 25:21
**few** [1] - 32:10
**field** [13] - 19:21, 19:23, 21:9, 21:11, 22:2, 29:2, 31:5, 31:10, 31:15, 31:19, 32:4, 34:12, 34:14
**fields** [55] - 15:15, 19:10, 19:19, 20:2, 20:19, 20:23, 20:24, 22:10, 22:13, 26:25, 27:2, 27:4, 27:6, 27:7, 27:10, 27:24, 28:1, 28:16, 28:20, 29:3, 29:12, 29:14, 29:22, 29:24, 30:1, 30:3, 30:6, 30:10, 30:12, 30:13, 30:15, 30:20, 30:24, 31:3, 31:14, 31:20, 31:22, 32:13, 33:1, 33:4, 33:8, 33:10, 33:13, 33:15,

33:17, 33:18, 33:24, 34:4, 34:17, 35:7, 39:5, 44:2, 47:8, 47:11

**figure** [2] - 21:5, 50:5
**figured** [1] - 10:17
**file** [8] - 10:11, 11:19, 20:7, 20:8, 20:11, 24:20, 24:25, 34:3
**filed** [3] - 4:1, 7:18, 16:11
**files** [6] - 16:3, 20:1, 20:3, 20:21, 26:12, 34:3
**final** [1] - 49:5
**fine** [1] - 12:19
**fingerprint** [1] - 38:9
**fingerprinting** [3] - 16:25, 31:23, 35:9
**finish** [1] - 39:7
**firm** [1] - 3:14
**first** [10] - 4:22, 4:25, 9:24, 11:16, 16:9, 16:13, 19:3, 19:4, 31:3, 46:3
**fishing** [1] - 48:6
**fit** [1] - 17:16
**five** [1] - 45:21
**flowing** [1] - 14:12
**focus** [2] - 10:4, 37:7
**focused** [1] - 37:9
**folders** [3] - 20:7, 20:8, 20:12
**follow** [7] - 4:15, 21:10, 45:13, 45:19, 45:23, 46:8
**follow-up** [5] - 4:15, 21:10, 45:13, 45:23, 46:8
**FOR** [4] - 1:1, 1:14, 2:2, 2:7
**foregoing** [1] - 50:12
**forge** [2] - 35:12, 36:15
**form** [3] - 37:22, 37:23, 37:25
**four** [1] - 27:24
**fraction** [1] - 35:2
**frankly** [3] - 26:5, 46:19, 46:21
**friends** [1] - 15:4
**front** [2] - 4:16, 45:3
**FTC** [1] - 7:22
**full** [1] - 40:9
**full-proof** [1] - 40:9
**functionality** [1] - 41:19
**futile** [5] - 34:18, 34:20, 34:21, 35:20, 36:14

## G

**GAIA** [22] - 5:2, 15:17, 15:19, 26:13, 28:21, 37:14, 37:15, 37:23, 38:23, 39:11, 40:2, 40:3, 40:10, 40:16, 41:24, 42:4, 42:8, 42:17, 43:8, 44:10, 44:19
**geared** [1] - 12:21
**gee** [3] - 27:23, 28:16, 30:15
**general** [1] - 44:5
**generated** [3] - 21:1, 40:15, 43:7
**generating** [1] - 20:17
**given** [4] - 14:16, 30:5, 30:9, 38:12
**Gmail** [8] - 40:14, 43:6, 43:7, 43:12, 43:21, 43:22
**GOOGLE** [2] - 1:4, 2:7
**Google** [83] - 3:19, 4:23, 5:1, 5:3, 5:12, 5:17, 5:20, 5:23, 6:2, 6:10, 6:14, 7:6, 8:22, 9:5, 10:21, 11:6, 11:8, 12:3, 12:17, 14:2, 15:25, 17:13, 17:17, 18:5, 18:18, 20:13, 20:17, 21:7, 21:18, 22:1, 22:2, 22:12, 22:15, 24:1, 27:18, 28:5, 28:22, 28:23, 28:24, 29:6, 29:16, 29:18, 29:20, 30:4, 30:5, 30:9, 31:10, 31:23, 32:14, 33:18, 34:25, 35:7, 35:9, 36:15, 37:6, 37:17, 39:11, 39:13, 39:14, 40:6, 40:14, 41:12, 41:23, 43:8, 43:19, 43:20, 44:17, 44:18, 45:11, 45:17, 46:22, 47:13, 48:3, 48:4
**Google's** [4] - 5:1, 18:1, 18:22, 27:5
**Google-user** [1] - 31:10
**great** [2] - 9:21, 12:3
**GRYGIEL** [3] - 2:2, 2:3, 3:15
**Grygiel** [2] - 3:16, 5:10
**guess** [5] - 3:2, 5:18, 37:11, 39:21, 40:6

**gut** [1] - 28:10
**guys** [1] - 48:25

## H

**half** [1] - 45:22
**hand** [4] - 19:1, 24:22, 28:11
**happy** [2] - 8:13, 21:10
**hard** [3] - 22:10, 31:6, 49:20
**harm** [4] - 24:24, 25:11, 25:12, 25:17
**header** [2] - 43:15, 44:20
**heads** [1] - 49:20
**hear** [4] - 12:12, 13:5, 36:20, 48:12
**heard** [1] - 38:20
**hearing** [4] - 4:12, 15:7, 18:22, 23:25
**HEARING** [1] - 1:4
**HELD** [1] - 1:5
**hello** [1] - 3:18
**help** [2] - 8:25, 27:15
**helpful** [5] - 16:12, 23:11, 33:5, 33:6, 43:23
**high** [1] - 47:14
**hired** [1] - 21:15
**history** [13] - 36:17, 37:16, 38:3, 38:24, 40:3, 40:8, 42:8, 43:11, 43:16, 43:18, 44:5, 44:13, 46:3
**hold** [2] - 11:3, 39:7
**Honor** [39] - 3:12, 3:15, 3:18, 5:13, 5:22, 6:22, 7:4, 7:21, 8:9, 9:22, 10:13, 11:10, 12:1, 12:23, 13:11, 14:1, 14:24, 15:7, 15:24, 16:9, 16:23, 18:21, 19:6, 19:14, 21:15, 21:25, 22:20, 23:20, 25:1, 26:8, 26:19, 27:13, 28:18, 29:11, 31:2, 34:15, 45:11, 49:9, 50:2
**HONORABLE** [1] - 1:11
**hood** [2] - 22:16, 27:20
**hope** [1] - 28:13
**hour** [1] - 45:22
**hours** [2] - 34:7, 44:3
**huge** [1] - 25:5
**hundred** [1] - 46:21
**hundreds** [3] - 34:6,

35:1, 36:17

## I

**ID** [10] - 29:7, 37:14, 37:16, 37:23, 39:11, 40:2, 40:3, 40:16, 43:8, 44:10
**idea** [1] - 45:16
**ideas** [1] - 21:16
**identical** [2] - 29:24, 31:20
**identifiable** [1] - 38:2
**identification** [4] - 15:12, 15:14, 27:5, 31:11
**identified** [5] - 6:18, 18:24, 21:12, 22:23, 27:8
**identifier** [2] - 37:15, 40:2
**identify** [16] - 5:24, 6:1, 6:19, 10:2, 10:7, 13:8, 17:4, 17:21, 17:22, 20:23, 22:24, 27:15, 28:23, 29:20, 34:4, 38:7
**identifying** [2] - 15:6, 23:3
**identities** [1] - 11:25
**identity** [1] - 9:5
**IDs** [1] - 40:10
**ilk** [1] - 4:5
**impact** [2] - 13:21, 13:22
**implicate** [1] - 31:16
**implication** [1] - 22:7
**important** [1] - 25:20
**importantly** [2] - 8:6, 31:12
**impose** [1] - 32:14
**impossible** [1] - 10:2
**IN** [2] - 1:1, 1:3
**inadvertent** [1] - 12:17
**inadvertently** [1] - 12:9
**INC** [1] - 1:4
**incentive** [1] - 14:21
**include** [5] - 16:14, 26:25, 27:7, 29:15, 29:17
**includes** [2] - 25:6, 42:7
**including** [1] - 46:1
**incomprehensible** [1] - 34:24
**incredibly** [1] - 23:10
**indicated** [1] - 7:5
**indication** [2] - 6:16,

15:18
**inferring** [1] - 12:13
**inform** [1] - 28:2
**information** [57] - 4:7, 4:23, 5:19, 5:23, 6:2, 6:7, 6:17, 6:21, 7:7, 7:22, 9:14, 9:16, 10:8, 10:25, 12:6, 16:15, 16:20, 17:1, 17:5, 17:22, 18:6, 19:18, 20:12, 20:18, 21:21, 27:7, 27:11, 27:19, 28:22, 28:23, 29:15, 31:5, 31:8, 31:10, 31:17, 36:12, 37:16, 38:3, 38:6, 38:7, 38:23, 39:16, 40:7, 40:15, 41:24, 42:4, 42:7, 42:8, 42:22, 43:3, 43:7, 44:18, 47:3, 47:16, 48:21
**inquire** [1] - 8:5
**inquiry** [1] - 12:22
**instead** [2] - 17:15, 27:18
**intentional** [1] - 11:23
**intentionally** [1] - 10:24
**interested** [1] - 31:13
**interesting** [1] - 14:6
**intermediary** [5] - 6:14, 28:25, 41:12, 41:13, 41:15
**intermix** [1] - 39:12
**internal** [2] - 24:22, 25:13
**internally** [1] - 24:25
**interrelated** [1] - 4:20
**introductory** [1] - 9:25
**intuitively** [1] - 28:7
**inverted** [2] - 22:18, 27:17
**involve** [1] - 10:20
**involved** [8] - 15:4, 26:5, 28:5, 32:13, 32:19, 33:12, 33:23, 34:7
**IP** [2] - 38:5, 38:6
**IPs** [1] - 38:14
**issue** [14] - 5:22, 8:16, 10:18, 13:11, 14:13, 14:25, 15:2, 15:5, 18:1, 31:21, 32:24, 35:4, 39:18, 50:4
**issues** [8] - 4:15,

4:21, 7:9, 19:1, 26:14, 29:3, 46:1, 47:3
**itself** [5] - 18:25, 25:8, 31:14, 32:13, 37:23

## J

**James** [1] - 1:7
**job** [3] - 27:19, 28:19, 29:4
**John** [2] - 3:13, 26:23
**JOHN** [1] - 2:12
**join** [1] - 26:23
**joint** [2] - 9:20, 9:22
**JOSHUA** [1] - 1:11
**judicious** [1] - 49:25
**July** [3] - 4:16, 5:11, 26:9
**jumping** [1] - 4:19
**June** [2] - 4:1, 33:3

## K

**keep** [6] - 11:4, 11:5, 18:20, 24:23, 25:18, 49:3
**kept** [1] - 10:11
**key** [3] - 35:12, 36:7, 36:15
**kick** [3] - 13:1, 13:11, 13:15
**kicking** [2] - 24:5, 49:3
**kind** [8] - 6:22, 10:11, 25:14, 28:10, 36:21, 37:7, 37:13, 47:23
**kinds** [1] - 18:8
**knowing** [1] - 23:1
**knows** [8] - 17:13, 39:13, 39:14, 39:15, 40:13, 40:17, 43:19

## L

**labeled** [1] - 20:14
**laborious** [3] - 19:24, 33:2, 34:2
**laid** [1] - 37:13
**large** [1] - 28:8
**last** [2] - 44:22, 44:24
**late** [2] - 21:19, 33:11
**law** [1] - 7:11
**LAW** [1] - 2:2
**Lawrence** [4] - 37:20, 38:14, 40:22, 43:1
**lawyers** [3] - 10:20,

45:12, 45:19
**lays** [1] - 25:11
**lead** [4] - 28:12, 28:13, 31:11, 43:15
**least** [6] - 20:23, 25:25, 28:3, 31:2, 34:2
**leave** [2] - 45:9, 46:8
**led** [1] - 4:12
**lengths** [1] - 12:3
**letter** [27] - 4:8, 4:14, 4:16, 4:18, 4:25, 5:11, 5:15, 9:20, 9:22, 15:9, 16:1, 16:4, 19:5, 19:13, 24:14, 25:8, 26:10, 26:21, 28:19, 33:9, 39:24, 42:13, 46:19, 48:25, 49:1, 49:13, 49:16
**liability** [3] - 12:19, 12:25, 13:4
**license** [1] - 46:5
**light** [1] - 13:6
**likely** [3] - 8:3, 8:8, 27:11
**limit** [1] - 7:8
**limited** [8] - 26:12, 26:18, 26:25, 27:1, 28:20, 28:21, 28:25, 29:2
**limits** [1] - 5:4
**line** [2] - 31:21, 32:4
**lined** [1] - 29:23
**link** [1] - 43:21
**list** [12] - 16:10, 16:12, 19:3, 21:1, 29:12, 29:13, 29:22, 30:6, 30:9, 30:12, 31:14, 48:19
**listed** [7] - 19:7, 19:8, 19:9, 19:10, 21:22, 27:11, 30:14
**lists** [1] - 19:15
**literally** [1] - 18:8
**LITIGATION** [1] - 1:4
**litigation** [4] - 5:1, 5:4, 5:18, 46:4
**LLC** [2] - 2:2, 2:7
**LLP** [2] - 1:14, 2:7
**located** [1] - 15:16
**log** [23] - 16:5, 16:6, 16:7, 16:24, 19:10, 20:4, 20:12, 20:14, 20:15, 20:20, 22:22, 29:12, 29:14, 29:18, 29:22, 31:17, 31:19, 31:25, 32:23, 33:17, 38:2, 40:18, 44:10
**logged** [5] - 6:17, 28:24, 29:6, 37:24,

37:25
**login** [1] - 30:4
**logs** [85] - 4:23, 4:25, 5:3, 5:15, 5:17, 6:24, 7:1, 8:20, 9:10, 12:21, 13:7, 15:10, 15:13, 15:14, 15:22, 15:23, 16:2, 16:10, 16:13, 16:14, 16:16, 17:1, 17:25, 18:2, 18:4, 18:7, 18:12, 18:23, 18:24, 19:1, 19:4, 19:7, 19:19, 19:21, 20:4, 20:17, 20:19, 22:22, 22:23, 22:24, 22:25, 23:1, 23:5, 23:18, 26:1, 26:3, 26:12, 26:13, 27:4, 27:8, 29:14, 29:19, 29:23, 30:6, 30:7, 30:10, 30:24, 31:22, 32:2, 32:4, 32:11, 32:20, 37:12, 37:18, 38:6, 38:22, 39:5, 39:10, 39:11, 39:15, 39:24, 39:25, 40:2, 40:6, 41:20, 41:23, 41:25, 42:21, 44:2, 47:7
**look** [10] - 16:24, 19:22, 21:12, 22:21, 23:4, 26:10, 35:6, 39:19, 48:14
**looked** [3] - 8:13, 11:7, 27:23
**looking** [19] - 8:15, 9:1, 9:14, 12:13, 13:13, 17:17, 18:14, 19:21, 20:2, 20:24, 21:2, 21:4, 23:17, 24:2, 32:2, 36:9, 41:17, 47:11
**looks** [1] - 39:21
**Los** [1] - 1:15
**lost** [1] - 29:25

## M

**mail** [1] - 39:14
**mails** [9] - 6:12, 6:16, 6:20, 10:14, 10:18, 12:12, 12:16, 13:5, 13:6
**Market** [1] - 1:8
**match** [1] - 11:24
**material** [1] - 49:5
**materials** [7] - 4:4, 8:19, 37:8, 37:9, 46:20, 46:24
**matter** [2] - 16:18,

50:13
**maybes** [1] - 47:15
**MAYER** [1] - 2:7
**Mayer** [1] - 3:19
**McCollum** [3] - 1:19, 50:15, 50:16
**MD** [1] - 2:4
**MDL** [1] - 1:3
**mean** [15] - 6:23, 7:21, 7:25, 8:7, 8:21, 9:21, 10:25, 11:13, 22:6, 24:10, 36:21, 38:20, 45:7, 45:15, 49:18
**means** [3] - 23:16, 35:24
**meet** [6] - 26:5, 26:6, 42:17, 42:19, 45:25, 46:16
**meeting** [1] - 36:18
**members** [8] - 6:19, 10:3, 10:7, 17:4, 23:3, 27:15, 29:6, 29:7
**mental** [1] - 6:9
**mentioned** [3] - 32:24, 34:15, 35:8
**merits** [1] - 36:21
**method** [3] - 17:3, 17:21, 31:24
**might** [9] - 13:1, 13:22, 13:23, 17:9, 28:13, 28:16, 29:11, 48:3
**million** [4] - 20:3, 20:21, 34:3, 35:3
**millions** [4] - 18:8, 35:1, 36:17, 44:3
**mind** [2] - 4:20, 33:7
**minefield** [1] - 14:19
**minute** [3] - 6:21, 23:19, 34:19
**minutes** [1] - 32:10
**missing** [1] - 30:7
**mix** [1] - 39:16
**moderate** [1] - 32:24
**moment** [1] - 10:10
**months** [1] - 44:24
**most** [2] - 19:17, 27:6
**motion** [10] - 4:1, 4:13, 4:15, 23:23, 24:20, 24:25, 26:8, 36:23, 46:13, 49:15
**move** [1] - 49:7
**moving** [1] - 18:20
**MR** [91] - 3:12, 3:15, 3:18, 5:13, 5:22, 6:5, 6:12, 7:3, 7:20, 8:9, 8:25, 9:20, 9:24, 10:13, 11:10, 12:1,

12:14, 12:18, 12:23, 13:10, 14:1, 14:10, 14:24, 15:17, 15:21, 15:24, 16:22, 17:19, 18:21, 19:6, 19:14, 19:23, 20:8, 20:11, 21:25, 22:20, 23:7, 23:10, 23:19, 25:1, 25:5, 25:23, 26:4, 26:18, 26:22, 27:3, 27:13, 28:18, 29:11, 30:3, 30:12, 30:19, 31:2, 31:9, 32:8, 32:12, 32:21, 33:20, 33:25, 37:19, 38:20, 39:2, 39:4, 39:6, 39:8, 39:9, 40:4, 40:11, 40:12, 40:22, 41:4, 41:7, 41:12, 41:22, 42:6, 42:12, 42:15, 42:20, 42:25, 43:5, 43:14, 44:7, 44:12, 44:25, 45:3, 45:10, 46:14, 46:16, 49:9, 49:16, 50:2

**multiple** [1] - 20:16
**must** [1] - 16:8
**mystery** [1] - 36:7

## N

**name** [4] - 31:11, 34:12, 34:14, 37:17
**named** [2] - 36:11
**names** [5] - 3:21, 4:25, 5:3, 16:6, 16:7
**narrow** [1] - 6:24
**narrower** [1] - 7:2
**nearly** [1] - 19:15
**necessarily** [1] - 3:23
**need** [11] - 6:6, 10:8, 21:23, 22:25, 23:9, 24:7, 24:20, 34:12, 38:18, 46:7, 47:23
**needed** [1] - 9:9
**network** [1] - 44:14
**never** [5] - 10:9, 11:2, 33:7, 34:15, 42:17
**new** [7] - 21:15, 21:16, 36:16, 45:16, 45:23, 46:7, 46:15
**next** [2] - 48:18, 48:22
**nice** [2] - 3:20, 3:21
**NJ** [1] - 1:19
**NO** [1] - 1:3
**none** [1] - 29:18
**normal** [1] - 22:12

**note** [2] - 3:7, 16:13
**nothing** [4] - 16:18, 28:14, 43:8, 49:23
**notice** [8] - 5:7, 15:2, 15:3, 44:23, 45:9, 45:17, 45:23, 46:15
**noticed** [1] - 45:2
**notify** [1] - 14:15
**notifying** [1] - 14:14
**notion** [1] - 28:15
**number** [14] - 4:9, 5:16, 16:5, 18:6, 18:7, 20:9, 27:1, 33:25, 34:22, 42:5, 42:7, 42:10, 42:13, 43:17
**Number** [1] - 43:2
**numbers** [1] - 34:6

## O

**obviously** [3] - 7:17, 14:22, 36:9
**occurred** [1] - 13:18
**October** [3] - 1:9, 48:15, 50:17
**OF** [1] - 1:1
**offered** [1] - 23:24
**offering** [1] - 45:11
**Official** [2] - 1:19, 50:16
**often** [1] - 14:22
**old** [4] - 7:18, 21:5, 24:23, 28:8
**once** [2] - 3:4, 48:11
**one** [20] - 5:20, 7:5, 13:17, 17:14, 19:7, 19:16, 22:20, 24:22, 25:14, 26:20, 28:11, 30:20, 32:10, 32:22, 34:19, 35:17, 35:18, 43:4, 46:18, 48:11
**ones** [1] - 30:22
**onus** [1] - 27:18
**open** [2] - 24:8, 48:3
**opinion** [1] - 25:3
**opposed** [3] - 25:19, 45:17, 46:8
**opt** [2] - 14:16, 14:17
**order** [5] - 5:8, 17:19, 43:17, 49:12, 50:4
**original** [1] - 36:3
**otherwise** [2] - 11:6, 46:5
**outcome** [1] - 30:16
**outstanding** [1] - 49:2
**overcome** [1] - 12:16
**overview** [1] - 22:22

## P

**p.m** [2] - 1:9, 50:9
**PA** [1] - 1:8
**page** [1] - 9:25
**pairs** [1] - 37:8
**Palo** [1] - 2:9
**Pandora's** [1] - 47:9
**papers** [3] - 10:24, 34:1, 34:23
**paragraph** [3] - 10:1, 11:21, 41:10
**paragraphs** [3] - 9:25, 10:1, 41:5
**pardon** [1] - 42:12
**part** [4] - 15:9, 19:17, 20:3, 44:22
**partial** [1] - 30:12
**particular** [5] - 31:12, 33:17, 35:11, 47:18, 49:13
**parties** [5] - 4:3, 4:7, 16:19, 22:5, 45:25
**parties'** [1] - 4:8
**parts** [1] - 30:20
**party** [1] - 44:20
**past** [1] - 32:19
**path** [9] - 3:25, 6:4, 6:19, 8:11, 11:11, 20:13, 21:23, 23:14, 33:3
**peek** [2] - 22:16, 27:20
**pejoratively** [1] - 8:21
**penalized** [1] - 6:1
**pending** [1] - 21:20
**people** [11] - 3:3, 3:5, 9:12, 12:10, 13:8, 28:23, 29:16, 35:1, 35:4, 36:17
**percent** [2] - 35:2, 46:21
**perhaps** [2] - 8:10, 31:11
**period** [1] - 32:25
**person** [4] - 31:12, 35:11, 36:9, 38:7
**personal** [2] - 10:25, 38:2
**Philadelphia** [1] - 1:8
**phone** [1] - 49:2
**picture** [1] - 4:6
**piece** [1] - 35:12
**PII** [6] - 7:7, 12:21, 15:15, 26:13, 28:24
**place** [1] - 22:4
**PLACEMENT** [1] - 1:4
**plaintiffs** [15] - 3:9,

3:10, 3:13, 3:16, 4:1, 4:14, 4:22, 5:6, 5:12, 10:6, 19:4, 21:7, 36:11, 47:10
**PLAINTIFFS** [2] - 1:14, 2:3
**plaintiffs'** [3] - 4:17, 35:5, 41:17
**platforms** [1] - 9:5
**Plus** [1] - 7:6
**point** [14] - 4:19, 4:20, 8:9, 8:24, 9:9, 12:2, 16:4, 17:2, 26:1, 40:5, 42:16, 43:16, 44:23, 47:10
**pointed** [1] - 47:2
**pointing** [1] - 41:3
**points** [3] - 15:25, 39:20
**policies** [3] - 8:2, 8:16, 12:8
**policy** [4] - 8:11, 10:23, 11:2, 11:4
**pose** [1] - 5:16
**posed** [2] - 5:6, 37:6
**positions** [1] - 4:8
**possession** [2] - 7:14, 8:4
**potentially** [7] - 19:10, 20:25, 22:2, 33:20, 44:15, 46:2
**powerfully** [1] - 10:22
**practice** [2] - 8:22, 11:18
**prejudice** [2] - 4:3, 26:8
**prejudiced** [1] - 14:3
**prepare** [1] - 47:17
**prepared** [1] - 1:22
**PRESENT** [1] - 2:11
**preservation** [9] - 7:13, 7:15, 8:1, 8:10, 8:15, 11:1, 11:4, 13:12, 46:22
**preserve** [19] - 3:8, 5:4, 5:17, 5:24, 6:8, 6:10, 7:16, 8:6, 8:7, 10:24, 11:17, 11:24, 12:5, 13:14, 13:19, 14:3, 16:20, 36:13
**preserved** [14] - 5:1, 6:10, 8:20, 13:7, 13:25, 15:10, 16:10, 30:6, 30:10, 37:8, 37:9, 46:21, 46:24
**presume** [1] - 14:18
**presumption** [1] - 14:12
**pretty** [7] - 6:19,

16:8, 18:7, 24:23, 25:4, 39:21, 47:13
**previous** [2] - 19:8
**privacy** [3] - 9:7, 12:5, 35:18
**PRIVACY** [1] - 1:4
**problem** [8] - 12:9, 14:14, 17:19, 25:8, 25:9, 32:21, 34:11, 43:25
**problematic** [2] - 46:6, 48:24
**proceed** [2] - 8:11, 49:10
**Proceeding** [1] - 50:9
**proceedings** [1] - 50:13
**Proceedings** [1] - 1:22
**process** [5] - 3:24, 24:10, 27:17, 47:11, 49:8
**produce** [3] - 16:21, 26:10, 34:9
**produced** [4] - 4:4, 24:11, 24:13, 33:3
**product** [2] - 6:8, 9:12
**profile** [4] - 31:4, 31:9, 31:10, 31:11
**prong** [1] - 14:18
**proof** [1] - 40:9
**proportionality** [2] - 28:3, 47:12
**proposition** [1] - 49:24
**protect** [1] - 25:14
**provide** [3] - 21:11, 44:1, 48:3
**provided** [2] - 21:3, 21:6
**provides** [1] - 47:3
**providing** [1] - 33:12
**public** [2] - 25:12, 25:13
**publicly** [1] - 24:24
**pulled** [1] - 32:22
**purpose** [2] - 9:3, 12:20
**purposefully** [1] - 8:21
**purposes** [5] - 11:23, 18:19, 18:21, 36:18, 44:14
**put** [10] - 3:3, 3:21, 21:1, 24:16, 24:19, 24:21, 27:18, 34:22, 48:19, 49:16
**putting** [1] - 49:17

**Q**

**query** [1] - 34:3
**questions** [20] - 5:5, 5:16, 5:17, 19:3, 21:9, 21:12, 21:13, 34:13, 37:6, 37:7, 38:11, 38:18, 45:4, 45:5, 45:12, 45:18, 45:21, 46:2, 46:19, 46:24
**Questions** [1] - 37:10
**quite** [1] - 11:8
**quote** [1] - 10:14

**R**

**raise** [1] - 34:13
**rather** [1] - 17:10
**Re** [1] - 25:15
**RE** [1] - 1:3
**read** [7] - 4:9, 4:11, 8:19, 8:23, 25:3, 47:2, 47:4
**reads** [1] - 49:19
**ready** [2] - 8:19, 13:18
**real** [3] - 3:8, 9:4, 25:16
**Real** [1] - 2:8
**really** [19] - 4:12, 4:15, 4:18, 6:23, 7:6, 7:14, 8:11, 10:10, 10:15, 10:16, 10:20, 12:21, 13:13, 16:2, 32:1, 34:4, 37:9, 38:21, 45:14
**reason** [15] - 5:20, 11:14, 11:17, 12:2, 18:9, 29:13, 30:24, 31:1, 31:3, 31:13, 34:1, 45:6, 45:7, 48:7, 48:8
**reasons** [1] - 31:2
**receive** [1] - 9:8
**received** [7] - 4:7, 13:8, 29:17, 29:20, 35:23, 36:2, 39:13
**receives** [1] - 43:8
**receiving** [1] - 40:15
**recollection** [1] - 47:21
**record** [11] - 3:2, 3:4, 3:11, 3:23, 3:24, 23:18, 25:20, 32:22, 32:25, 49:22, 50:13
**records** [9] - 23:5, 25:24, 26:2, 32:11, 32:19, 33:3, 48:6, 48:7

**recreating** [1] - 33:24
**redepose** [1] - 21:18
**refer** [1] - 43:15
**referral** [2] - 44:6, 44:20
**reflects** [1] - 26:14
**regarding** [2] - 7:23, 19:1
**relate** [2] - 29:3, 29:5
**related** [3] - 28:25, 29:1, 44:18
**relates** [1] - 7:7
**relation** [1] - 7:6
**relatively** [1] - 16:5
**released** [1] - 9:13
**relevance** [1] - 18:2
**relevant** [22] - 5:21, 16:14, 16:19, 16:23, 16:24, 18:2, 18:23, 19:10, 20:25, 22:2, 22:3, 22:4, 22:5, 27:6, 27:20, 28:17, 31:21, 32:1, 33:18, 33:21
**reluctant** [2] - 36:20, 36:22
**remedy** [1] - 46:12
**remember** [1] - 33:2
**reopen** [1] - 47:10
**Reporter** [2] - 1:19, 50:16
**reporter** [1] - 3:4
**representation** [1] - 28:9
**representations** [1] - 28:4
**representing** [1] - 11:14
**represents** [3] - 21:5, 34:22, 34:24
**request** [10] - 5:15, 6:22, 7:2, 7:3, 8:13, 8:14, 15:9, 24:11, 29:1, 29:11
**requested** [1] - 40:15
**requests** [6] - 4:5, 4:22, 4:24, 7:9, 21:19, 47:7
**requirement** [4] - 7:24, 14:8, 14:9, 36:18
**requires** [2] - 30:8, 46:8
**reread** [1] - 11:21
**researcher** [1] - 36:5
**resolve** [3] - 46:17, 48:11, 49:2
**respect** [4] - 8:13, 8:22, 15:6, 46:1
**responses** [1] -

21:18
**responsive** [2] - 16:15, 16:19
**revenue** [1] - 10:16
**revisit** [1] - 4:13
**road** [5] - 13:1, 13:12, 13:16, 24:5, 49:4
**roles** [2] - 3:5, 3:7
**RPR** [2] - 1:19, 50:16
**Rule** [2] - 22:6, 46:4
**ruling** [1] - 13:23
**run** [2] - 4:6, 34:11
**run-up** [1] - 4:6
**RUSSELL** [1] - 1:14

**S**

**Safari** [1] - 6:15
**sample** [3] - 23:4, 32:22, 33:3
**samples** [2] - 24:2, 27:24
**sampling** [1] - 26:7
**satisfied** [1] - 29:4
**satisfy** [2] - 25:13, 25:15
**satisfying** [1] - 27:22
**saw** [2] - 8:18, 9:18
**schedule** [3] - 18:19, 47:22, 49:4
**schedules** [1] - 49:7
**screen** [2] - 3:6, 3:8
**seal** [4] - 24:20, 24:21, 25:19, 49:15
**sealed** [1] - 25:2
**sealing** [2] - 25:3, 49:24
**search** [1] - 12:20
**searching** [1] - 20:22
**second** [4] - 9:4, 24:12, 31:12, 45:8
**section** [4] - 41:4, 41:8, 41:15
**see** [19] - 3:20, 13:2, 17:15, 18:14, 18:15, 19:11, 19:15, 20:4, 27:21, 28:1, 29:23, 30:17, 30:18, 32:20, 35:7, 37:20, 41:7, 48:2
**seeking** [2] - 5:12, 21:14
**seem** [3] - 17:6, 30:16, 33:18
**send** [3] - 15:7, 48:25, 49:1
**senior** [1] - 38:16
**sense** [3] - 4:10, 28:7, 43:19

**sent** [2] - 4:14, 26:9
**separate** [5] - 15:2, 15:18, 29:19, 32:4, 40:23
**sequence** [1] - 24:12
**seriatim** [1] - 46:5
**serve** [4] - 9:6, 21:18, 43:18, 45:8
**served** [5] - 5:7, 12:10, 21:1, 44:23, 45:4
**server** [1] - 20:13
**serving** [3] - 9:5, 9:10, 34:25
**set** [4] - 3:22, 3:25, 9:16, 49:7
**setting** [1] - 18:20
**shed** [1] - 13:6
**shooting** [1] - 27:16
**short** [4] - 47:24, 49:11, 49:18, 50:4
**shotgun** [1] - 17:11
**show** [1] - 27:19
**showing** [3] - 8:8, 28:2, 49:6
**shown** [3] - 30:21, 31:3, 31:4
**side** [10] - 28:13, 39:13, 39:16, 39:20, 39:21, 40:6, 40:9, 40:19, 44:19
**signed** [1] - 4:17
**similar** [5] - 5:4, 26:2, 29:24, 31:20, 45:2
**site** [1] - 44:6
**sitting** [1] - 36:8
**situation** [2] - 14:2, 25:8
**six** [2] - 37:7, 45:21
**small** [3] - 16:5, 16:8, 18:7
**snafu** [1] - 12:7
**someone** [3] - 29:20, 45:20, 46:3
**sometimes** [1] - 43:15
**somewhat** [2] - 4:20, 8:8
**somewhere** [2] - 35:2, 35:3
**sorry** [3] - 39:8, 39:9, 41:8
**sort** [29] - 4:12, 4:24, 5:4, 5:8, 5:11, 6:3, 6:7, 6:20, 7:12, 8:8, 8:20, 10:5, 12:13, 12:20, 13:7, 14:8, 15:11, 17:11, 17:22, 24:7, 26:7, 32:16,

37:5, 37:14, 40:7, 40:8, 42:18, 46:12, 47:12
**sounds** [2] - 44:9, 46:25
**source** [2] - 13:8, 20:15
**sources** [7] - 16:6, 19:10, 20:4, 20:12, 20:20, 20:22, 32:23
**space** [6] - 5:2, 6:25, 15:19, 28:24
**spaces** [4] - 5:2, 7:4, 26:13, 28:21
**speaking** [2] - 3:5, 3:7
**specific** [17] - 7:9, 11:7, 11:9, 11:23, 17:1, 21:9, 21:11, 28:2, 29:3, 30:4, 37:14, 39:4, 47:25, 48:4, 48:14, 48:20, 49:24
**specifically** [4] - 8:23, 10:4, 30:13, 45:4
**specify** [1] - 39:4
**speculative** [1] - 36:25
**split** [1] - 9:4
**split-second-in-time** [1] - 9:4
**spoliation** [9] - 6:4, 7:15, 8:8, 8:16, 13:13, 13:20, 13:22, 14:12, 15:6
**squeeze** [1] - 37:3
**stage** [1] - 3:22
**Stanford** [1] - 36:5
**start** [7] - 3:2, 3:9, 5:9, 5:14, 5:18, 8:10, 14:17
**started** [1] - 36:3
**starting** [2] - 10:1, 17:2
**state** [2] - 3:10, 5:11
**STATES** [1] - 1:1
**states** [1] - 6:9
**stay** [1] - 3:6
**stenographically** [1] - 1:22
**step** [9] - 7:25, 8:4, 23:14, 25:13, 25:15, 33:15, 35:17, 35:18, 35:20
**STEPHEN** [1] - 2:3
**stephengrygiel22@gmail.com** [1] - 2:5
**stepping** [1] - 14:19
**Steve** [2] - 3:15,

26:23
**stick** [1] - 11:19
**still** [3] - 14:13, 15:23, 33:1
**store** [1] - 9:9
**STRANGE** [53] - 1:14, 1:14, 3:12, 5:13, 5:22, 6:5, 6:12, 7:3, 7:20, 8:9, 10:13, 11:10, 12:14, 12:18, 12:23, 13:10, 14:1, 14:10, 14:24, 15:17, 15:21, 15:24, 16:22, 17:19, 18:21, 21:25, 22:20, 23:10, 23:19, 25:23, 26:4, 26:18, 26:22, 27:13, 28:18, 38:20, 39:2, 39:4, 39:8, 40:4, 40:11, 41:22, 42:6, 42:12, 42:15, 42:20, 44:7, 44:25, 45:3, 45:10, 46:14, 46:16, 49:9
**Strange** [3] - 3:13, 37:1, 40:1
**strange** [17] - 5:9, 6:4, 10:12, 12:11, 17:8, 21:21, 23:9, 25:21, 38:17, 39:7, 39:10, 41:1, 41:18, 44:4, 44:23, 47:25, 48:18
**Strange's** [1] - 9:1
**Street** [1] - 1:8
**strokes** [1] - 8:2
**strong** [1] - 8:8
**struggling** [1] - 28:15
**stuff** [9] - 11:5, 21:17, 24:21, 35:12, 38:8, 39:16, 39:17, 43:22
**submit** [3] - 4:3, 23:23, 24:1
**submitted** [1] - 9:22
**substantial** [1] - 47:13
**substantive** [1] - 36:22
**sufficiently** [1] - 48:13
**Suite** [3] - 1:15, 2:3, 2:8
**supersensitive** [1] - 25:7
**supplementation** [1] - 30:9
**sweep** [1] - 16:20
**system** [1] - 9:16
**systems** [4] - 35:10,

40:23, 41:14, 43:9

**T**

**table** [4] - 26:17, 26:18, 26:19, 32:17
**tackle** [3] - 4:21, 5:8, 13:3
**tackles** [1] - 14:7
**tackling** [1] - 5:10
**tails** [1] - 49:20
**talks** [1] - 41:7
**targeted** [3] - 48:1, 48:5, 48:20
**task** [1] - 34:2
**teams** [1] - 19:25
**technical** [1] - 17:24
**temporary** [1] - 41:13
**term** [1] - 49:18
**terminology** [1] - 20:5
**terms** [8] - 5:11, 6:1, 7:11, 17:24, 23:3, 27:22, 38:10, 49:24
**testified** [3] - 36:11, 37:21, 43:1
**testify** [1] - 23:25
**testimony** [2] - 45:13, 47:4
**THE** [93] - 1:1, 1:1, 1:11, 1:14, 2:2, 2:7, 3:1, 3:17, 3:20, 5:14, 6:3, 6:6, 6:23, 7:11, 7:25, 8:17, 9:18, 9:23, 10:4, 11:3, 11:12, 12:11, 12:15, 12:19, 12:24, 13:17, 14:6, 14:11, 15:8, 15:19, 15:22, 16:18, 17:7, 18:11, 19:2, 19:13, 19:18, 20:6, 20:10, 21:21, 22:5, 23:4, 23:8, 23:12, 24:4, 25:3, 25:10, 25:24, 26:16, 26:20, 27:9, 27:16, 29:9, 29:25, 30:5, 30:13, 30:22, 31:6, 32:6, 32:9, 32:16, 33:12, 33:23, 36:20, 38:17, 39:1, 39:3, 39:7, 39:23, 40:5, 40:21, 40:25, 41:6, 41:11, 41:18, 42:2, 42:10, 42:13, 42:16, 42:23, 43:2, 43:11, 44:4, 44:9, 44:21, 45:1, 45:7, 45:15, 46:15, 46:18, 49:11, 49:18, 50:3

**themselves** [1] - 26:11
**theory** [6] - 16:25, 17:9, 17:16, 18:16, 22:18
**they've** [6] - 7:16, 10:23, 34:20, 42:16, 46:25
**thinks** [1] - 48:21
**Third** [1] - 25:16
**third** [1] - 44:20
**third-party** [1] - 44:20
**three** [1] - 4:20
**thrown** [1] - 35:4
**timestamp** [5] - 31:25, 32:1, 32:3, 37:17, 44:8
**timing** [2] - 7:24, 8:14
**tiny** [1] - 35:2
**tip** [2] - 14:25, 15:5
**today** [5] - 3:6, 4:19, 49:19, 50:4, 50:7
**together** [4] - 21:1, 35:12, 40:19, 48:19
**tongue** [2] - 14:25, 15:5
**Tony** [1] - 3:18
**took** [3] - 22:22, 33:21, 45:6
**topics** [2] - 45:1, 45:2
**toss** [1] - 11:19
**towards** [1] - 12:22
**tracking** [1] - 35:23
**traffic** [1] - 36:4
**transcript** [2] - 49:19, 50:12
**transcription** [1] - 1:22
**tread** [1] - 6:7
**treading** [1] - 6:3
**trick** [2] - 38:4, 43:14
**troubled** [1] - 45:15
**true** [5] - 11:1, 11:10, 11:15, 28:7
**try** [8] - 15:6, 19:25, 21:17, 34:16, 39:19, 45:25, 46:16, 48:11
**trying** [4] - 17:15, 20:5, 21:5, 35:6
**Tuesday** [1] - 48:19
**turn** [1] - 3:7
**two** [25] - 4:24, 5:1, 7:4, 15:17, 19:7, 19:16, 22:22, 22:23, 23:5, 24:19, 25:15, 26:12, 26:14, 27:4, 27:23, 28:21, 29:1,

30:19, 31:2, 31:22, 32:4, 32:16, 35:20, 37:13, 41:14
**type** [2] - 23:17, 31:18
**types** [1] - 16:22

**U**

**U.S** [1] - 1:7
**ultimately** [1] - 49:19
**unanswered** [2] - 45:5, 46:2
**uncommon** [1] - 8:1
**under** [5] - 22:16, 24:21, 25:15, 25:19, 27:20
**undertake** [1] - 37:4
**unencrypted** [1] - 37:25
**unintentional** [1] - 10:22
**unique** [4] - 16:5, 20:23, 34:4, 34:5
**UNITED** [1] - 1:1
**universe** [2] - 15:22, 16:7
**unknown** [1] - 18:5
**unless** [2] - 44:20, 48:12
**unlock** [1] - 38:9
**unlocked** [1] - 36:8
**unmask** [1] - 36:16
**unsworn** [1] - 45:13
**up** [24] - 4:6, 4:15, 9:9, 9:16, 11:24, 17:3, 17:20, 21:10, 21:16, 23:19, 29:23, 30:18, 31:21, 32:4, 34:16, 35:8, 35:14, 41:9, 45:13, 45:19, 45:23, 46:8, 49:22
**upside** [1] - 47:14
**urgency** [1] - 49:14
**useful** [2] - 27:25, 47:16
**user** [11] - 11:25, 29:20, 30:4, 31:4, 31:9, 31:10, 37:14, 37:17, 39:14, 39:22, 44:8
**user-specific** [1] - 37:14
**users** [1] - 34:25
**uses** [1] - 17:23
**utilizing** [1] - 1:22

**V**

**value** [1] - 37:3

**various** [4] - 26:5, 26:6, 27:14, 47:12
**vast** [1] - 34:6
**veering** [1] - 36:21
**versus** [1] - 35:24
**vetted** [1] - 9:6
**VIA** [1] - 1:5
**VIDEOCONFEREN CE** [1] - 1:6
**view** [1] - 33:21
**violation** [2] - 7:23, 35:18
**visited** [1] - 35:16
**volume** [1] - 28:8

**W**

**wait** [8] - 6:20, 29:25, 31:6, 42:2
**wants** [8] - 16:16, 16:25, 17:21, 34:21, 35:6, 35:14, 48:21
**Warren** [1] - 2:3
**ways** [1] - 15:3
**web** [1] - 36:4
**website** [4] - 36:1, 40:14, 43:20, 44:20
**websites** [2] - 35:16, 44:18
**weeds** [1] - 45:16
**week** [1] - 48:23
**weeks** [1] - 24:19
**WEIBELL** [31] - 2:7, 3:18, 8:25, 9:20, 9:24, 12:1, 19:6, 19:14, 19:23, 20:8, 20:11, 23:7, 25:1, 25:5, 32:21, 33:20, 33:25, 37:19, 39:6, 39:9, 40:12, 40:22, 41:4, 41:7, 41:12, 42:25, 43:5, 43:14, 44:12, 49:16, 50:2
**Weibell** [25] - 3:18, 4:18, 8:17, 8:18, 11:6, 11:13, 11:22, 19:2, 23:6, 24:20, 26:2, 32:16, 37:11, 38:21, 39:8, 41:19, 42:23, 42:24, 43:4, 44:9, 46:11, 47:1, 48:20, 48:22, 49:12
**weigh** [1] - 13:4
**whole** [4] - 9:9, 12:2, 36:3
**wide** [1] - 47:17
**willing** [1] - 42:20
**WILMINGTON** [1] - 1:1
**Wilshire** [1] - 1:15

**withdraw** [1] - 8:14
**witness** [3] - 21:8, 21:13, 42:25
**witnesses** [1] - 37:21
**WOLSON** [1] - 1:11
**wondering** [1] - 17:8
**word** [3] - 10:6, 18:22, 35:8
**worded** [1] - 43:25
**words** [7] - 13:23, 14:13, 16:19, 22:8, 39:12, 39:25, 43:12
**worry** [1] - 23:15
**worth** [1] - 37:3

## Y

**years** [3] - 21:5, 21:20, 44:17
**You's** [9] - 9:23, 10:6, 11:22, 39:3, 40:25, 41:2, 41:3, 47:2
**YouTube** [2] - 43:20, 43:22

## Z

**ZOOM** [1] - 1:5
**zoom** [1] - 45:22